Page 3

```
 1           UNITED STATES DIS
 2           DISTRICT OF MA
 3  * * * * * * * * * * * *
 4  LIBERTY MUTUAL
 5                 Plaintiff
 6           VERSUS
 7  BLACK & DECKER
                 Defendant
 8  * * * * * * * * * * * *
 9     BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
10        UNITED STATES DISTRICT COURT JUDGE
11           HEARING - BROS SITE
12           AUGUST 27, 2003
13  APPEARANCES:
14     RALPH T. LEPORE, III, ESQ. AND JANICE KELLEY
       ROWAN, ESQ., Holland & Knight, LLP, 10 St. James
15     Avenue, Boston, Massachusetts 02116, on behalf
       of the Plaintiff
16
17     JACK R. PIROZZOLO, ESQ. AND RICHARD L. BINDER, ESQ.,
       Willcox, Pirozzolo & McCarthy, 50 Federal Street,
18     Boston, Massachusetts 02110, on behalf of the
       Defendants
19
20  ALSO PRESENT: Linda Biagioni
21                 Courtroom No. 1 - 3rd Floor
                   1 Courthouse Way
22                 Boston, Massachusetts 02210
                   10:00 A.M. - 11:30 A.M.
23     Pamela R. Owens - Official Court Reporter
24     John Joseph Moakley District Courthouse
       1 Courthouse Way - Suite 3200
25     Boston, Massachusetts 02210
```

```
 1  next time.
 2       THE COURT: Yes. Cross is the 17th and then –
 3       MR. PIROZZOLO: I thought we had a different
 4  one for October.
 5       MR. LEPORE: Yes, Bostick/Middleton.
 6       MR. PIROZZOLO: You mean next after Bostick?
 7       THE COURT: Yes. Okay. So, I will try and
 8  set a date in October for that.
 9       Now, there were lingering questions about
10  discovery in Beverly. Have they been worked out?
11       MR. LEPORE: By and large, we have worked --
12  in fact, Mr. Pirozzolo and I spoke yesterday. Over the
13  last six weeks, they have produced a numerous amount of
14  materials and documents, in large respect that are
15  responsive, but have raised other questions. My
16  preference -- and I talked to Mr. Pirozzolo last night
17  about this -- is to defer that motion until we've had a
18  chance to work it out over the next two weeks so that if
19  on September 17 when we're back, we'll be able to tell
20  you one way or the other whether there's anything
21  remaining if that's fair, Your Honor.
22       THE COURT: That's fine with me.
23       MR. PIROZZOLO: I see no reason to involve the
24  Court in this at this stage.
25       THE COURT: Okay. And it's not going to
```

Page 2

```
 1           CA-96-10804-DPW
 2           AUGUST 27, 2003
 3       THE COURT: Well, just a kind of scheduling
 4  thing. We're on for Jaffrey/Cross on September 17th and
 5  then Bostick/Middleton October 3rd, is it --
 6       MR. LEPORE: 8th.
 7       THE COURT: 8th. Okay. What is the timing
 8  that you anticipate for Beverly to be put in a context
 9  of summary judgment?
10       MR. LEPORE: Summary judgment motions are due
11  September 5th, next Friday; and the oppositions are due
12  October 3, I think, four weeks after that. So, I would
13  expect, barring any necessary replies, if there were
14  replies, I can imagine we could do it in ten days. But
15  probably the end of October, Judge.
16       THE COURT: Okay. So, --
17       MR. LEPORE: Is that fair, Jack, for argument
18  on Beverly?
19       MR. PIROZZOLO: That's fine with me.
20       THE COURT: So, then, that would be the next
21  argument, I think.
22       MR. PIROZZOLO: I thought we had --
23       THE COURT: There's a long-term exposure
24  that's out there as well.
25       MR. PIROZZOLO: But we'll leave Cross as the
```

Page 4

```
 1  interfere with the briefing?
 2       MR. PIROZZOLO: No.
 3       MR. LEPORE: I don't believe so. I think, as
 4  I said, the documents that have been produced over the
 5  last four to six weeks have been helpful.
 6       THE COURT: Will be adequate. Okay.
 7       Now, let me turn to the BROS and Brooks and
 8  Huth materials. Again, the issue -- and it's becoming
 9  more clear to me that the factual resolution is likely
10  to focus on a fairly large degree on the policies that
11  are involved and whether or not they can properly be
12  said to be involved. But I want to skip over that for a
13  moment. That is, I find it difficult to believe that I
14  can grant summary judgment with respect to the policies
15  really up to 1970, that really I'm dealing with policies
16  from '70 to '79 that can be dealt with on a summary
17  judgment basis.
18       MR. PIROZZOLO: Your Honor, I believe the
19  record shows that the policies through 1971 have no
20  pollution exclusion.
21       THE COURT: Well, I understand that. The
22  problem is --
23       MR. PIROZZOLO: The policies -- I don't think
24  it has ever been brought specifically to the Court's
25  attention. There is an excess policy that runs from
```

**Page 5**

1970 through 1973 --

THE COURT: Right.

MR. PIROZZOLO: -- that has been no pollution exclusion and that also does not have provisions that the underlying policy terms are incorporated. So, there would be a right to a defense.

THE COURT: Let me understand about the -- I was thinking of the '69 to '70 excess policy, but '70 to '73?

MR. PIROZZOLO: Nothing before 1971 has --

THE COURT: But there is an excess policy from '70 to '73?

MR. PIROZZOLO: Excess policy from '70 to '73, three-year policy.

THE COURT: You say that hasn't been brought to my attention before?

MR. PIROZZOLO: Well, it's in the record, Your Honor. I mean, we haven't emphasized it. It's in the record. And it has no pollution exclusion. And I'm losing the phrase. It does not incorporate in it -- follow form. It doesn't follow form. So it stands on its own. So, if there's no underlying coverage, it drops down. And we have the right under that policy to a defense regardless of any arguments about the pollution exclusion.

**Page 6**

THE COURT: Well, let me -- I simply am unfamiliar with it, so I haven't focused on it.

MR. PIROZZOLO: I didn't think so. I don't think we have briefed it that way and I don't think we have previously argued it orally.

THE COURT: All right.

MR. LEPORE: If I may, Your Honor, --

THE COURT: Right.

MR. LEPORE: -- with respect to that excess policy, there is no duty to defend in any excess policy. So, regardless, the drop-down has to do with the indemnification issue. That's the purpose of excess policies is to deal with that.

MR. PIROZZOLO: I don't think that's correct. When the Court reads the excess policy, it will see that there's a duty to defend.

THE COURT: Well, the Court hasn't, so the Court better.

MR. PIROZZOLO: And, frankly, what tipped us off on this in preparation for this hearing is to go back and study the motion for summary judgment. And Liberty Mutual's motion for summary judgment seeks a judgment through March of 1973 which is before the expiration of this excess policy. And in looking at it, why did they move just through March of 1973? We then

**Page 7**

1  realized that the excess policy imposes a defense
2  obligation regardless of the underlying --
3      THE COURT: Well, you know, I've tried to be
4  fairly diligent in going through these materials. And
5  it just didn't come out to me in this fashion. And
6  while I am loathe to impose additional obligations of
7  briefing and so on, I think it would be helpful to me to
8  have some briefing on the 1970 to '73 excess policy and
9  its implications here. But I can't talk about it
10  because I don't know it. And you're not going to teach
11  me enough about it --
12      MR. PIROZZOLO: Today.
13      THE COURT: -- today for me to deal with that.
14      MR. PIROZZOLO: We're happy to -- whatever the
15  Court says, we'll abide or submit on whatever schedule
16  the Court wants.
17      THE COURT: A couple of weeks.
18      MR. PIROZZOLO: Fine, no problem.
19      THE COURT: Two weeks to address the
20  implications of -- the dimensions of and the
21  implications of 1970 to '73 excess policy on this
22  matter. And it will probably be sharpened a bit by our
23  discussion here today.
24      MR. PIROZZOLO: Thank you, Your Honor.
25      THE COURT: But that -- putting that to one

**Page 8**

1  side, dealing with it, I think the only thing that is
2  available for summary judgment, although I haven't
3  finally decided, is the policies that can provide a
4  basis for summary judgment and the policies from '70 to
5  '79 here. The previous policies seem to me to raise
6  factual questions about their existence, their
7  provisions, that sort of thing that I hope to be able to
8  clarify for you at some point.
9      But for purposes of discussion here today, I
10  want to focus on really '70 to '79.
11      Now, turning to the BROS circumstances -- and
12  maybe I want to go back a bit on this to deal with
13  pollution exclusion a bit more specifically with the
14  deletion of the pollution exclusion in this context --
15  my view of the deletion provision has come to the belief
16  that we have to be dealing with operations in Maryland.
17  And I have come, I think, to view the Minut-Lube, if
18  I pronounce that correctly, case as to some degree
19  dealing with the essential operations of the entity, a
20  lubrication business and, consequently, distinguishable
21  from the activities of Black & Decker that led to the
22  potential here for exposure. And, so, I would be
23  inclined to believe that the deletion provision is going
24  to displace any claim after 1971 of Black & Decker for
25  indemnification and perhaps if it hinges on that,

LIBERTY MUTUAL                    CondenseIt!™                    AUGUST 27, 2003  BROS

**Page 9**

1 although I don't think it does, the duty to defend.
2 Now, I'll hear some argument about that, but I'm pretty
3 much on that ground.  Mr. Pirozzolo, you may want to
4 address the question of the deletion provision here.  If
5 it's there, you're pretty much dead in the water as to
6 indemnification, aren't you?
7      MR. PIROZZOLO:  If I understand Your Honor's
8 comment, first, within the four corners of the
9 provision, as is included in the policy --
10      THE COURT:  Right.
11      MR. PIROZZOLO:  -- it says the exclusion is
12 not applicable to operations, its disjunctive operations --
13      THE COURT:  Right.
14      MR. PIROZZOLO:  -- or occurrences in Maryland.
15 And the facts of this case are such that Black & Decker's
16 alleged fault or alleged action that gives rise to the
17 claim against it arises out of its plant in Maryland and
18 its delivering its waste to A&A Disposal in Maryland.
19 And, therefore, I think it falls squarely within the
20 provision that it is arising under an operation in
21 Maryland.
22      THE COURT:  That turns on the belief that this
23 is an occurrence in Maryland, doesn't it?
24      MR. PIROZZOLO:  There's operation or
25 occurrence.

**Page 10**

1      THE COURT:  It's not an operation in Maryland
2 unless everything you do that goes out of the state
3 becomes an operation in Maryland.  It seems to me fairly
4 clear -- and in this, I'm influenced, I suppose, by the
5 SJC in Nashua having in mind, of course, that we're
6 dealing with New Hampshire law, but the reading that
7 they give to this provision.  I have looked carefully at
8 Minut-Lube because I think it arguably supports
9 your case.  But I view that as a special kind of
10 operation, special intensively oil discharge petroleum
11 discharge operation, and would distinguish it on those
12 grounds.  But if I were to take and say whenever it
13 comes to it, the Maryland courts are going to say that
14 "we block with Nashua," doesn't that end the matter
15 for you?  They're treating the same -- essentially the
16 same provision.
17      MR. PIROZZOLO:  But I don't think they would.
18 Because you begin with the proposition that there should
19 not be a pollution exclusion at all in Maryland, that
20 Maryland bars the pollution exclusion.  Liberty Mutual
21 has placed into the policy a cleverly-drafted pollution
22 exclusion which now they argue will take it outside
23 -- take their policy outside the policy of Maryland.  We
24 have a case that we cite, the Alcolac case --
25      THE COURT:  Right.

**Page 11**

1      MR. PIROZZOLO:  -- where the operation -- the
2 generator was in Missouri and the pollution was in
3 Missouri.  And it was held that the pollution exclusion,
4 very similar to the one involved here, did not apply.
5 And that was so determined by the District Court in
6 Maryland which would presumably be closer to Maryland
7 law than Nashua was.  That's 16 F.Supp 1541.
8      THE COURT:  Well, you see, the problem I have
9 with Alcolac is the suggestion of ambiguity that it
10 seems to rest on.  I guess it puts it at direct
11 opposition to Nashua.  I'm not sure that I think it
12 is as well developed as Nashua.  I'm not sure that I
13 would be inclined to follow it here.  Of course, it's
14 not the definitive statement of Maryland law because
15 it's a --.
16      MR. PIROZZOLO:  With respect, I don't think
17 either the 4th Circuit or the Court of Appeals in
18 Maryland would follow Nashua.
19      THE COURT:  Well, that's your -- as you said,
20 the question for me is let's assume -- as I do -- that
21 they find that more persuasive than Alcolac, what
22 does that do to your case?
23      MR. PIROZZOLO:  Well, we still have pre-
24 pollution exclusion.
25      THE COURT:  For summary judgment purposes,

**Page 12**

1 which is how I raise this by talking about the period
2 '70 to -- we're really talking about the period '70 to
3 '71, aren't we?
4      MR. PIROZZOLO:  We would have pre-pollution
5 exclusion activities on the site.  Well, it's a little
6 difficult because Black & Decker denies that it ever
7 shipped material to this site.
8      THE COURT:  I'll go back to that.  But let me
9 say --
10      MR. PIROZZOLO:  But the allegations -- the
11 claims would --
12      THE COURT:  Let me say that I think that there
13 is the potentiality for liability for activities on the
14 site by Black & Decker.  Whether denied or not, there
15 is.  That's a duty to defend kind of issue; but it
16 frames it.  Aren't we then talking about '70 to '71?
17      MR. PIROZZOLO:  And also pre-'70.
18      THE COURT:  Well, pre-'70.  I've indicated my
19 view that that's not summary judgment material because
20 of the uncertainties in respect of whether and, if so,
21 what dimensions there are to the policies that Liberty
22 had -- or Black & Decker had with Liberty.
23      MR. PIROZZOLO:  One other -- before I answer
24 that question directly, I'd point out the Liller
25 case which defines operations.  That's a Maryland

BLACK & DECKER                                        Page 9 - Page 12

**Page 13**

1 case. And it says -- it embraces the Webster's New
2 International Dictionary definition of "operations"
3 as "the whole process of planning for and operating
4 a business or other organized unit." And in a
5 non-environmental case, it says it is "a course or a
6 procedure of productive or industrial activity." So
7 that at the very least, there is a fact dispute as to
8 whether Black & Decker engaged in operations and whether
9 the operations of which we are concerned were conducted
10 entirely in Maryland. So, I don't think it's -- I don't
11 think the Court could grant summary judgment for Liberty
12 Mutual as a matter of law. What ought to happen is the
13 definition should be given to the jury and the jury
14 should then determine whether or not under these
15 circumstances these are operations in Maryland.
16     So, for summary judgment purposes, it would
17 probably defeat our motion for summary judgment.
18     THE COURT: Yes.
19     MR. PIROZZOLO: But I don't believe that it
20 leads to granting Liberty Mutual's motion for summary
judgment.
     THE COURT: If I accept the characterization
of operations for purposes of this provision as, at a
minimum, ambiguous, that's really what it comes down
to, doesn't it, for that to stay alive?

**Page 14**

     MR. PIROZZOLO: But at some point, the Court
will define that. But then it would be the question for
the jury to fit in the facts to see if the facts --
     THE COURT: Well, but let's say that I provide a
definition that effectively mimics Nashua. The only
way that you get to the jury is if you say, "No, no,
this is ambiguous." And the jury has to decide what they
meant by "operations" under these circumstances.
     MR. PIROZZOLO: I could see it going that way.
     THE COURT: All right.
     MR. PIROZZOLO: The more direct answer to the
Court's question is that it's all a question of which
policies are implicated and whether we would be
implicating the policies right through the '70s or just
the policies up to 1971 or, based on what I've just
alerted the Court to about the excess policies, the
policies through 1973.
     THE COURT: Okay. Let's just assume that
we're -- because I want to clarify for my own purposes
where the disputes are in the policies themselves
that I think are subject to summary judgment or, more
specifically, one policy that's subject to summary
judgment.
     We're dealing from '70 to '71. And I think
that I want to understand the view of Liberty on even

**Page 15**

1 that thin eye of a needle, because I read Bausch & Lomb
2 fairly broadly here and I want to understand how you
3 think you're going to get out of it for '70 and '71.
4     MR. LEPORE: The second Bausch & Lomb, Your
5 Honor?
6     THE COURT: Yes.
7     MR. LEPORE: The '99 decision?
8     THE COURT: Yes.
9     MR. LEPORE: I think the second Bausch & Lomb
10 decision actually can be helpful to Liberty Mutual in
11 the following respects, Your Honor. It addresses the
12 situation where the Court concluded that coverage could
13 be determined if the damage to the environment occurred
14 after the dumping. We acknowledge that that is the
15 issue. Ours is the reverse situation. And that is as
16 follows, Your Honor: There is no evidence whatsoever --
17 to the extent that there's any evidence that BROS
18 accepted any B&D waste -- that it occurred before 1973.
19 There is no evidence at all.
20     THE COURT: But now we're talking -- let me
21 focus it on duty to defend.
22     MR. LEPORE: Yes.
23     THE COURT: And there, you don't get to rely
24 upon extrinsic evidence.
25     MR. LEPORE: Let me address that in three

**Page 16**

1 separate points, Your Honor, because -- and I'm glad
2 that you've focused on that.
3     The duty to defend in Maryland is that you
4 have to deal with the four corners of the complaint and
5 the four corners of the policy.
6     THE COURT: And the insurer can adduce
7 extrinsic evidence to support that.
8     MR. LEPORE: The insured, you mean?
9     THE COURT: The insured. Excuse me.
10     MR. LEPORE: That's right. However, there is
11 a case that -- there are two cases, Your Honor, that
12 have come down recently. I'm going to give you one
13 cite. The Northern Insurance Company of New York versus
14 Baltimore Business Communications, 2003 U.S.App. Lexis
15 12318.
16     THE COURT: Hold on a second, 12318.
17     MR. LEPORE: Fourth Circuit, June 19th, 2003.
18 And I'm going to just recite that and then I'll get to
19 the second case. The Fourth Circuit pointed out that,
20 "Significantly, Maryland recognizes two limited
21 exceptions to the general rule against an insurer's use
22 of extrinsic evidence. First, when the underlying tort
23 plaintiff has amended his allegations against the
24 insured, the insurer may utilize the amendments as
25 extrinsic evidence. If the amended allegations no

LIBERTY MUTUAL                 CondenseIt!™                 AUGUST 27, 2003  BROS

**Page 17**

1 longer raise a potentiality for coverage, the insurer
2 no longer has a duty to defend."
3     Okay. Now, that doesn't apply here, that
4 first exception. I will acknowledge that.
5     THE COURT: And it sounds wrong. All
6 that's happened is that you've got a new operative
7 document.
8     MR. LEPORE: That is correct.
9     THE COURT: I mean, it's not extrinsic
10 evidence. It's simply the new -- the four corners are
11 redefined.
12     MR. LEPORE: Exactly. But this is where we
13 end up going to the second exception, Your Honor. And
14 that is in Universal Underwriters v. Lowe, 135 Md.App.
15 122 --
16     THE COURT: Hold on. I'm slow.
17     MR. LEPORE: -- the dual cite -- I'm sorry,
18 135 Md.App. 122. And the dual cite is 761, Atl.2d 997,
19 2000.
20     THE COURT: This is the Maryland intermediate
21 appellate court?
22     MR. LEPORE: Yes. That's correct. And it
23 says, "In other words, an insurer may utilize
24 uncontroverted extrinsic evidence from the underlying
25 lawsuit if such evidence clearly establishes that the

**Page 18**

1 suit's allegations are beyond the scope of coverage."
2     Now, I point these out to you because we
3 start from the premise that we're dealing with the four
4 corners of the so-called complaint and the four corners
5 of the policy. Over the last couple of years, we have
6 seen two exceptions to that. And it has to do with
7 throughout all of our arguments over the past several
8 months, Your Honor, having to do with understanding that
9 the duty to defend is at a specific point in time to be
10 determined with coverage for the overriding, underlying
11 lawsuit to be determined at a later date, which is what
12 the insurer is entitled to do.
13     THE COURT: Let me be sure I understand what
14 you mean by that. I look at -- or we look at the time
15 of the -- I won't say tender because that --
16     MR. LEPORE: Right.
17     THE COURT: -- incorporates a different
18 concept, but more or less at the time that the insured
19 is put on notice of the potentiality.
20     MR. LEPORE: Right.
21     THE COURT: Then your duty to defend, if it
22 is within the potentiality, continues until there is
23 some basis for saying there's no longer a potentiality.
24 I'm using the language of Maryland. Is that it?
25     MR. LEPORE: Fair enough. Now let's start

**Page 19**

1 going backwards in time. Liberty Mutual became aware
2 of this underlying claim in March of '94. That's
3 uncontroverted.
4     THE COURT: Now we're just dealing with BROS.
5     MR. LEPORE: Yes. What did they become aware
6 of in March of '94? They were presented with a cover
7 letter and two complaints that date back to October of
8 '92, I believe. October, yes, of '92. Okay. Liberty
9 didn't find out until about -- whatever, how many months
10 that is -- 17 or 18 months after Black & Decker became
11 aware of this. What is important to understand about
12 what Liberty became aware of in March of '94 is that in
13 the cover letter and in the two underlying complaints
14 that were submitted with the cover letter was that
15 Black & Decker was not a defendant in either of those
16 lawsuits. That is uncontroverted.
17     THE COURT: All right.
18     MR. LEPORE: Okay. So the question is when
19 Liberty Mutual became aware of this claim in '94, was
20 that a suit?
21     THE COURT: All right.
22     MR. LEPORE: We all acknowledge that Maryland
23 hasn't addressed that situation yet.
24     THE COURT: Yes.
25     MR. LEPORE: And the question is whether they

**Page 20**

1 are going to follow certain case law and decide that it
2 was a suit or whether they're going to follow other
3 cases in the country where it wasn't a suit. All right.
4 Our position, of course, is that it wasn't a suit. It
5 didn't trigger anything. Now, assume for a moment that
6 Your Honor concludes otherwise, that that letter --
7     THE COURT: What is the duty --
8     MR. LEPORE: Yes.
9     THE COURT: Do you have a duty at that point
10 when there is uncertainty about that then to seek a
11 declaratory judgment? That is to say, you're faced with
12 case law around the country. You know, I suppose it's
13 -- I keep forgetting the Maine case. But Maine goes one
14 way and Massachusetts goes the other --
15     MR. LEPORE: That's correct.
16     THE COURT: -- on this. Do you simply take
17 your chances?
18     MR. LEPORE: Maryland law is not decided on
19 that. And that's a fair question to ask.
20     THE COURT: Right.
21     MR. LEPORE: And I understand where Your Honor
22 is headed. So, let me just follow the thought process
23 for just a moment.
24     THE COURT: Okay.
25     MR. LEPORE: Assume for a moment that Your

BLACK & DECKER                                           Page 17 - Page 20

**Page 21**

Honor decides that this letter is sufficient to transform the letter into a suit so that it's within the coverage arguably. There is no case law in Maryland that decides what a suit is. We start from that premise.

THE COURT: All right.

MR. LEPORE: There are only a few cases in the country that have decided whether a PRP letter or a DEP letter is a suit. There's only one case that I'm aware of -- and that is the Zecco/Hazen line of cases here in Massachusetts that sets out the criteria for determining whether a private party letter is a suit. This under any set of circumstances must be considered a private party letter. It is a letter from the BROS settlement committee inviting Black & Decker to participate in a settlement process.

THE COURT: Well, giving them an alternative, one track or the other. Do you want to be in litigation? Do you want to be in settlement?

MR. LEPORE: And as we know, they were never sued. In fact, your question earlier to Mr. Pirozzolo about indemnity is not particularly helpful here because there is no indemnity. All we're dealing with are defense costs.

THE COURT: All right.

**Page 22**

MR. LEPORE: And we're only dealing with duty to defend. So, the question then becomes at the time that Liberty Mutual became aware of this in '94, what did they have in front of them? They have a letter inviting Black & Decker to participate in a settlement process. It says in it -- it does say "or the alternative is to face a lawsuit." The face -- the uncontroverted fact is that they weren't sued. Black & Decker went through the settlement process, refused to settle, and never got sued. Okay. Now, if you look at the Zecco and Hazen line of cases, they set forth the criterion for determining whether or not a PRP letter is a suit or not a suit. They talk about three different criteria: First, a failure to comply with the letter should itself somehow alter the substantiality of the insured's liability. Okay. You look at this particular letter. It doesn't do anything like that because all it does is say if you don't agree, we're going to sue you. It doesn't establish liability.

THE COURT: Isn't that enough?

MR. LEPORE: No.

THE COURT: That is, it says -- whether or not it's realized, it says it's going to result in the lawsuit.

MR. LEPORE: Which never happened.

**Page 23**

1  THE COURT: That's what you -- well, but never
2  happened is something occurs after the time at which
3  there is what loosely I'll call the tender.
4      MR. LEPORE: Which I will get to in a second.
5  Because the 16-month delay is important, Your Honor.
6  It's vitally important and I'll get to that in a second.
7  But I need to go through the Hazen/Zecco line first.
8  Because I firmly believe that this was not a suit that
9  would have triggered any duty to defend.
10     The second part of that is that the SJC here
11 has said that government letters, as opposed to private
12 party letters, carry much more substantial weight. The
13 government generally follows through on their threats.
14     Number three, the tone of the letter is
15 relevant to determine whether or not it's a suit that
16 triggers the duty to defend. This letter, however
17 described, was an invitation. In fact, the word is in
18 there. "We invite you to participate in a settlement
19 process."
20     So, we look at those three factors. Does the
21 failure to comply with the settlement process alter the
22 insured's liability? No. It doesn't do anything. If
23 they had complied, which they took the invitation, it
24 didn't do anything because nothing happened. If they
25 didn't comply, nothing happened because they never got

**Page 24**

1  sued.
2      Number two, this is plainly a private party
3  letter.
4      Number three, it was an invitation.
5      So I don't think there was a suit. But here's
6  the vitally important point. When Liberty Mutual became
7  aware of this in March of '94, Black & Decker had
8  already been involved in this settlement process for 18
9  months. It is uncontroverted that during that 18-month
10 period of time, they obtained information which
11 established that they had no connection to the BROS
12 site. Now, they knew that in March of '94. They didn't
13 tell Liberty Mutual that. Now, why is that? I don't
14 know. But why is it that they ignored their own
15 counsel's advice to tell Liberty Mutual about the years
16 of involvement? I don't know. I can only speculate as
17 to that.
18     But the bottom line is at that point when
19 Black & Decker notified Liberty Mutual of this so-called
20 claim and lawsuit, they had definitive uncontroverted
21 information that they had involvement at BROS before
22 1973. In fact, there is a letter that's in the record
23 from Swidler & Berlin, the counsel, that as early
24 as April 19 of 1993, they knew that there was no
25 involvement before '73. There were letters and they

**Page 25**

1  are all in the record.
2  THE COURT: Well, let me ask this: So that's
3  their position.
4  MR. LEPORE: I'm sorry?
5  THE COURT: That's their position, that they
6  have no involvement.
7  MR. LEPORE: Right.
8  THE COURT: From whose perspective do we view
9  this? Isn't it whether or not it is possible for an
10  alternative position to be taken?
11  MR. LEPORE: That's a very good question,
12  except that the only opposing party arguably was the
13  BROS settlement committee. Okay.
14  THE COURT: Not necessarily. It's tiering.
15  And ultimately, I suppose EPA can get into it. They,
16  for a variety of reasons, don't go down the tiers. They
17  look to second- and third-party actions to do that. But
18  ultimately, the obligation is to EPA -- or for the
19  remediation is to EPA.
20  MR. LEPORE: I agree with that.
21  THE COURT: So it's attenuated, but it's still
22  there.
23  MR. LEPORE: And, yet, there's still no
24  evidence. No one is even alleging that B&D was at the
25  BROS site before '73. No one. Now, let me --

**Page 26**

1  THE COURT: Well, but what do I -- is it Mr.
2  Goldstein? Is that the fellow's name? I'm trying to
3  remember who the fellow -- the son of the founder of
4  A&A.
5  MR. LEPORE: That's right.
6  MR. PIROZZOLO: Before Mr. Lepore was on his
7  feet. But the record shows that A&A picked up waste
8  from Black & Decker all through the '60s and that the
9  son of Mr. -- I believe it's Mr. Goldstein -- that he
10  picked up waste at Black & Decker when he was still a
11  teenager and puts that in the -- at least in the late
12  '60s. And there is a document in the record. This is
13  at Appendix R, Appendix O1O, that shows on a site
14  questionnaire that shows that Black & Decker waste --
15  I'm sorry -- that A&A waste went to the BROS site from
16  1964 through 1979. Their record -- the extrinsic
17  evidence is abundant except there is the possibility of
18  a claim that Black & Decker waste went to the BROS site.
19  Of course, Black & Decker has maintained right along
20  that none of it went to the BROS site.
21  THE COURT: But let me just pause for a moment
22  to focus on this. So we're back to there's somebody out
23  there who says that it did. Black & Decker says that
24  it didn't. Well, you know, I look --
25  MR. LEPORE: But that's not true, Your Honor.

**Page 27**

1  That's a misstatement of the record. The record
2  reflects that it is possible that A&A picked up waste
3  from B&D. Okay. Goldstein said that, but he doesn't
4  remember specifically. But there's no connection
5  between A&A picking up the waste and bringing it to
6  BROS. There is evidence that at that period of time,
7  A&A brought that particular waste to Burke's. There is
8  no connection between A&A picking up B&D waste and
9  bringing it to BROS until March of 1973. That is
10  uncontroverted. There is nothing in the record,
11  notwithstanding everything that they have done to create
12  an issue of fact here, there is nothing to make that
13  connection before March of 1973. And I say that
14  emphatically because, Your Honor, there is information
15  in the record. There is a letter that I just referred
16  to, April 29th of 1993. There's a September 20th, 1993,
17  letter from Swidler & Berlin to Ms. Biagioni.
18  THE COURT: Well, but, see, let me just stop
19  on that. That there are internal discussions in which
20  they say that they did not -- that their waste never
21  made its way to BROS, it seems to me, is interesting,
22  but not immediately relevant on the question of duty to
23  defend.
24  The more fundamental question is whether or
25  not a finder -- there is a potentiality that a finder of

**Page 28**

1  fact could find that they did. Now, as I go through the
2  evidence in this case, you know, to some degree, it's
3  dot to dot. But A&A delivered to BROS starting sometime
4  in the 1950s, according to Mr. Goldstein. BROS and its
5  predecessors, which I guess are particular predecessors,
6  Regal Petroleum, were the recyclers. Do I have to have
7  a particular document showing a particular time? There
8  is no question that Goldstein says that Black & Decker's
9  Hempstead facility was a customer of A&A and that he
10  could go back -- while he himself began working directly
11  there in the 1970s, he worked with his dad as a teenager
12  during the late 1960s.
13  MR. LEPORE: I understand your point, Your
14  Honor. And here's the response. What you're doing, I
15  think, is taking into account in looking at the duty to
16  defend certain extrinsic evidence arguably. Correct?
17  THE COURT: Yes.
18  MR. LEPORE: Okay. Now, having said that, in
19  1994, that's the time frame that we're dealing with when
20  Liberty Mutual became aware of that -- the claim. All
21  right. That's when arguably a duty to defend arose.
22  Because until then, we didn't know about it, right?
23  THE COURT: All right.
24  MR. LEPORE: Okay. You're taking into account
25  today, looking back nine years, certain extrinsic

## Page 29

1 evidence. Are you permitted to do that? I don't think
2 so.
3       THE COURT: Why not?
4       MR. LEPORE: And I'll tell you why. I think
5 what you're entitled to do -- and follow me out, hear me
6 out. If you're going to look back in 1994 as to what
7 Black & Decker knew and include extrinsic evidence at
8 the time that they had a letter inviting them to
9 participate and two complaints of which they were
10 neither a defendant in. What extrinsic evidence are you
11 permitted to look at? Are you only permitted to look at
12 the stuff that's helpful to them as opposed to all of
13 the stuff that they knew at the time, including a letter
14 from the BROS settlement committee setting forth the
15 parameters of the years of involvemenet?
16      THE COURT: Well, I think I have to look at
17 all that stuff.
18      MR. LEPORE: That's my point. And if you do
19 that --
20      THE COURT: But let me just step back for a
21 minute.
22      MR. LEPORE: Okay.
23      THE COURT: But if there is enough in that
24 to create a question of fact, then the existence of
25 contrary positions is interesting, but not compelling on

## Page 30

the question of duty to defend. I mean, if there is
someone at Black & Decker who says "absolutely, never
did it, I always have everything to go to Burke's, even
told them we wanted it to go to Burke's" and then there's
somebody who says "uh-uh, we took it to BROS or Regal,"
well, I don't resolve that and you don't resolve that.
What you do is offer a defense until it is determined.
     MR. LEPORE: Okay, I understand that. All
right. Let me go on, because I can understand your
point, Your Honor. I respectfully disagree. But here's --
     THE COURT: Well, is there something out
that says that that isn't what happens under these
circumstances, some case that says that that isn't what
happens?
     MR. LEPORE: Your Honor, I come back to --
Yes. And here's where we are with this: Your focus
right now is on the duty to defend.
     THE COURT: Well, it is.
     MR. LEPORE: And my focus --
     THE COURT: Let me just go back to Universal
Underwriters --
     MR. LEPORE: Yes.
     THE COURT: -- the most recent case that you've
called to my attention --
     MR. LEPORE: Yes.

## Page 31

1       THE COURT: -- talking about an exception.
2 And it is uncontroverted evidence.
3       MR. LEPORE: Yes.
4       THE COURT: So if there's some dispute, then
5 that exception isn't in play.
6       MR. LEPORE: I understand that. Now, let me
7 point to the uncontroverted absolute answer. It is in
8 Volume 30-001. It is a letter from Black & Decker's
9 insurance broker, Alexander, dated October 7th, 1994, in
10 which it responds to Liberty Mutual's questions after
11 Liberty -- just to backtrack for a second, Your Honor.
12 After Liberty Mutual became aware of this claim in March
13 of '94, they sent out the acknowledgment letter and
14 asked for certain information. The classic request for
15 information is the years that they were at the site. In
16 response to that, on October 7th, 1994, Black & Decker's
17 broker said, "It does not predate 1973." Now, that's
18 uncontroverted. There is nothing -- this is an
19 admission from them that nothing was sent to the BROS
20 site before 1973.
21      THE COURT: You mean if someone writes back to
22 their insurer that "I didn't hit the little kid, I'm
23 telling you that as emphatically as I can," even though
24 somebody else out there says that I did, that I have
25 an alibi and that, as a consequence, you don't have to

## Page 32

1 provide a defense?
2       MR. LEPORE: Well, that's a fair point.
3 But then they supply the information, the backup
4 information.
5       THE COURT: Right. And, so, I provide the
6 letter from my girlfriend who says --
7       MR. LEPORE: But they won't have that.
8       THE COURT: -- I was somewhere else on that
9 occasion.
10      MR. LEPORE: I understand your point. But --
11 and I understand it completely, Your Honor. But they
12 have to come up with something. They can't just say,
13 "yes, well, that's true, but maybe there was something
14 else." They haven't done that. They come up with a
15 guy whose name is Goldstein saying that "yes, maybe," but
16 there's no connection between A&A and BROS.
17      THE COURT: He didn't parachute in there. The
18 guy whose name was Goldstein wasn't somebody walking by
19 the BROS site. He's the son of the owner.
20      MR. LEPORE: Right. I understand that. But
21 let's look at -- again, if we're going to deal with the
22 charging documents, all right --
23      THE COURT: Right.
24      MR. LEPORE: -- what's in the charging
25 documents about Black & Decker? Nothing. They don't

**Page 33**

1 even reference Black & Decker, right?
2     THE COURT: When you say "charging documents,"
3 you mean the two complaints?
4     MR. LEPORE: Right.
5     THE COURT: Okay. So --
6     MR. LEPORE: The complaints are irrelevant.
7     THE COURT: Well, no, they are not irrelevant.
8 They shape the area of dispute and they allege that
9 there is a right on the part of EPA. And then the PRPs
10 bring their own lawsuit or the first tier bring their
11 own lawsuit alleging a right to recover for whatever
12 costs of remediation they have. So, that sets the
13 broader playing field. And that broader playing field
14 extends beyond 1973.
15     MR. LEPORE: I will acknowledge that the two
16 complaints beyond -- but the connection is -- the
17 question is what is Black & Decker's connection to that?
18     THE COURT: Okay. And then they get the
19 letter from -- is it Mr. Hyatt --
20     MR. LEPORE: Yes. That's correct.
21     THE COURT: -- that fellow who represents as
22 current counsel for the PRPs. You know, kind of border
23 state gentility which you call an invitation. I'm not
24 sure that it falls quite in that category. But in any
25 event, just looking for a way in which he characterized

**Page 34**

1 it --
2     MR. LEPORE: I think he says "we invite you to
3 participate."
4     THE COURT: He does. But he also --
5     MR. LEPORE: It's on the second page of the
6 information you're looking for at the bottom, "In lieu
7 of" --
8     THE COURT: Right. But he's got a broader
9 statement of what it is that he thinks Black & Decker is
10 in for. It's not quite in English or at least there are
11 a series of typographical errors, I suppose. I'm just
12 searching for the particular language because I made
13 notes of it just this morning. Well, I can't put my
14 hands on it right now, I'm afraid. But he does not
15 foreclose anything after -- anything before 1973 for the
16 potential obligation of BROS --
17     MR. LEPORE: Black & Decker.
18     THE COURT: -- of Black & Decker, does he?
19     MR. LEPORE: I will acknowledge that, Your
20 Honor. That is not foreclosed.
21     THE COURT: So here is what you have. You
22 have something that says you may be in the ball park.
23     MR. LEPORE: Yes.
24     THE COURT: And Black & Decker vigorously
25 saying, "uh-uh, we weren't there" or "at least if we

**Page 35**

1 were there, we were there after 1973." But that's
2 the state of the record at that point.
3     MR. LEPORE: Agreed.
4     THE COURT: A potentiality and a denial. That
5 seems classic duty to defend.
6     MR. LEPORE: Okay. Let me address those
7 points and I understand your point. It's well taken,
8 Your Honor. Let's step back for a minute.
9     Understanding that it is Black & Decker's
10 obligation and burden to establish a claim within
11 coverage. All right. We understand that. Assume for a
12 moment -- and I don't acknowledge this, but assume that
13 that letter and those underlying complaints are a suit
14 that would trigger a duty to defend analysis.
15     THE COURT: Yes.
16     MR. LEPORE: Is a duty to defend triggered in
17 March of '94? And the answer to that question is no.
18 And the reason for that, Your Honor, is because if you
19 look at that letter and you look at the underlying
20 complaints, at anyone's reasonable understanding or
21 reading of that, it alleges long-term contamination.
22 There's no doubt about it. They're alleging that it's a
23 dump site that's contaminated over decades.
24     THE COURT: All right.
25     MR. LEPORE: All right. So, assume for a

**Page 36**

1 moment that we jump to the pollution exclusion. And
2 before we get to the pollution exclusion, of course we
3 have to deal with whether or not it's an exclusion --
4     THE COURT: We're talking about '70 to '71?
5     MR. LEPORE: Exactly. So the question then --
6 we'll ignore the pollution exclusion just for a minute.
7 Assume that we're dealing with an accident or an
8 occurrence, right, which is the language. At '70 to '71
9 was the occurrence language.
10     THE COURT: Yes.
11     MR. LEPORE: It requires an accident. Okay.
12 Is there anything in there that could be fairly read to
13 be an accident? It describes in great detail
14 contamination of a long-standing event. The case law in
15 Maryland is clear there is no coverage for gradual
16 pollution under Maryland law. We have cited numerous
17 cases in that regard.
18     THE COURT: Well, but let me step back on
19 that. If I don't accept the sudden and accidental
20 exception --
21     MR. LEPORE: Yes.
22     THE COURT: -- being read in quite the way
23 you do --
24     MR. LEPORE: Yes.
25     THE COURT: -- then we're really back to you

## Page 37

had a duty to defend, aren't we?

MR. LEPORE:  No.  Here's the -- I think --

THE COURT:  If I say, well, sudden and accidental, that's giving a capacious reading.  I may not because I may find that that has a resonance here.  But that really is focused on a period after 1971, right?

MR. LEPORE:  Yes.  I agree with that.

THE COURT:  So, let's talk about '70 to '71.

MR. LEPORE:  That's what I was talking about.  It's still an occurrence-based policy, Your Honor.  In order to -- before you get to the exclusions, you have to figure out what's covered.  And in order for it to be covered, they've got to establish that there's an occurrence alleged.  In order to establish that an occurrence has been alleged, they have to at least argue that there was an accident.  There is no accident that could be fairly read into the underlying documents.  This was ongoing pollution on a regular basis.  Maryland does not recognize that for coverage.

THE COURT:  What do I do with the June 1971 broken nozzle at the storage tank?

MR. LEPORE:  Okay.  That's another good question.  Assume for a moment that the pollution exclusion is in effect from '71 on.  Just assume that.

## Page 38

The question then becomes was the June '71 event a sudden and accidental event within the terms of the policy.  First of all -- and, again, you won't know this, obviously, from looking at the documents that were given to us in March of '94 because there's no evidence of any June '71 accidental event.  You need to look at extrinsic evidence.  Okay.

What is extrinsic evidence regarding the BROS site that's important?  This BROS site was probably one of the worst sites in the country.  And what was the central focus of the pollution?  It was a lagoon in the middle of the site that was about 12-1/2 acres in size.  It contained over 70 million gallons of liquid waste, another 2-1/2 million gallons of petroleum waste, over 72-1/2 million gallons of waste in this 12-1/2-acre size lagoon.  What happened in June of '71?  As best can be determined -- and for purposes of summary judgment, this is what I understand it to be -- one of the tanks leaked approximately 59,000 gallons.  Where did it go?  It went right into the lagoon.  That's where it was designed to go.  What was the pollution event?  And assume for a moment that it was a sudden and accidental event.  There couldn't be anything that was more de minimis than a 59,000 gallon leak into a 72-1/2 million gallon lagoon.  The math ends up to be less than .07 percent.

## Page 39

1  Now, if there's anything that's de minimis, it's
2  something that's less than .1 percent.  And, again,
3  we're talking about unrebutted, uncontroverted evidence.
4  That's what our experts say.  That's what you have
5  before you, Your Honor.  This is a drop in the bucket.
6      THE COURT:  Yes.  That aspect of it is a
7  little different.  That is, that your expert is saying
8  that.  You know, one way of looking at it is 59,000
9  gallons is a fair amount.  Now, if you say, "well, you
10  know, among PRPs, then, particularly a modest PRP like
11  this, it's not much."  But I guess I want to go back
12  to this.  Maybe I'm misunderstanding and I want to
13  understand more fully --
14      MR. LEPORE:  Yes.
15      THE COURT:  -- because I don't think I've
16  looked at this as carefully on this issue as I should
17  have.  Prior to '71 --
18      MR. LEPORE:  Yes.
19      THE COURT:  -- there has to have been an
20  occurrence.
21      MR. LEPORE:  Yes.
22      THE COURT:  You're saying that Maryland law
23  will not recognize, as some law does, this kind of
24  accretion of exposure to waste as an occurrence -- that
25  is, someone comes and they dump on a periodic basis,

## Page 40

1  they dump at the location.
2      MR. LEPORE:  Well, that's what Alcolac
3  stands for.
4      THE COURT:  Well, yes and no.
5      MR. LEPORE:  It says "no occurrence where
6  pollutants escaped over a period of years."  That's
7  the Maryland case.  Now, the reason that Black & Decker
8  wants the Alcolac case is because of the dicta
9  regarding the deletion endorsement, but it's different
10  language.  But they ignore the primary holding, which is
11  that there's no occurrence where the pollutants escape
12  over a period of years.
13      THE COURT:  Let me -- point me to the
14  particular language that I can look at here.
15      MR. LEPORE:  I don't have the jump cite, Your
16  Honor.  I'm sorry.
17      THE COURT:  Okay.  Let me just look at it real
18  quick.  Okay.  "The better reasoned authority is to the
19  effect that when pollutants regularly have escaped over
20  a period of years, especially when management was either
21  deliberately indifferent to the situation or consciously
22  disregarded it, coverage is excluded under the policy
23  definition of occurrence because damage is to be
24  expected with a substantial degree of probability.
25  The better reasoned authority construing the sudden

## Page 41

1 and accidental language of the pollution exclusion
2 reaches a similar result."
3     MR. LEPORE: That's correct.
4     THE COURT: I see.
5     MR. LEPORE: And you won't find any Maryland
6 law to contradict that. In fact, the cases go on. With
7 respect to the ARTRA case, the Bentz case,
8 there's nothing unclear about sudden or accidental.
9 That's what they focus on.
10     THE COURT: Well, sudden and accidental are a
11 little bit --
12     MR. LEPORE: And I understand. But all I'm
13 saying is that they've assumed that the underlying issue
14 with respect to occurrence is not in dispute.
15     THE COURT: Right. So, let me take this part
16 of it: That you are entitled to take the position
17 that unless they say that this was the result of an
18 occurrence as defined by Maryland law, you don't have to
19 provide a defense. They have to show you in some
20 fashion that it was an occurrence.
21     MR. LEPORE: Yes. There has to be something
22 in the underlying documents.
23     THE COURT: What else? I just want to move
24 on. I understand that argument. I want to move on to
25 anything else on that.

## Page 42

1     MR. LEPORE: No.
2     THE COURT: Okay. So, Mr. Pirozzolo?
3     MR. LEPORE: Thank you, Your Honor.
4     MR. PIROZZOLO: Your Honor, a few points.
5 First of all, I'd like to emphasize the charging
6 document, which is the thing that came with the
7 invitations. And that appears at Appendix 28-XXVII-79.
8 And it has Black & Decker's -- the claim against Black &
9 Decker. And it says, "Black & Decker's a PRP at the
10 BROS by virtue of its having disposed of or arranged for
11 disposal of hazardous substances at the BROS superfund
12 site. Based on documents obtained from the Maryland
13 Department of Natural Resources as well as interviews
14 with former A&A waste oil drivers, it is understood that
15 Black & Decker disposed of some or all of its hazardous
16 waste through A&A, a bulk from Maryland. A&A waste oil
17 bulk, Maryland. Maryland disposed of some, if not all,
18 of its hazardous waste that it collected at the BROS
19 superfund site." That is without time. And, therefore,
20 the potentiality of liability is there on the face of
21 the charging document.
22     THE COURT: Okay. You're treating the Hyatt
23 letter as the charging document?
24     MR. PIROZZOLO: Well, that's certainly a
25 reasonable place to go.

## Page 43

1     THE COURT: Okay. But now let's talk about
2 the occurrence aspect of this. What is described in the
3 underlying complaints which Mr. Hyatt's letter forwards
4 is, at least as I recall -- I haven't gone back and
5 looked at it this carefully. I went through that aspect
6 of it carefully. I went through them very quickly. But
7 it raises some questions about whether or not what was
8 involved here is an occurrence, doesn't it, within the --
9     MR. PIROZZOLO: We're in an anomalous
10 position. In a sense, there's no occurrence because our
11 stuff never went there.
12     THE COURT: Oh, no. This is -- that may be
13 so. But you have to show that somebody is saying -- it
14 seems to me you have to show that somebody is saying --
15 making the argument, exposing you to risk that you
16 engaged in an occurrence.
17     MR. PIROZZOLO: I think that's what they're
18 saying. They're saying that A&A picked up our waste
19 and brought it to the BROS site.
20     THE COURT: Well, what do I do with that
21 language that I just recited from Alcolac?
22     MR. PIROZZOLO: The policy provides coverage
23 for continued -- repeated or continuous exposure to
24 conditions. And what we're dealing with is -- what Mr.
25 Lepore is talking about is well like a gradual leak or

## Page 44

1 something. But this is oil. The facts show, if they
2 were proven, that A&A came to Black & Decker and picked
3 up large loads of oil and then mixed it with other oil
4 at its facility in Maryland and then brought that to
5 BROS. That's not gradual. Those are specific --
6     THE COURT: But that's not the occurrence
7 either. The occurrence is the escape from the lagoon.
8 It sounds like a horror film. But that's what it's
9 about. That's what the occurrence is.
10     MR. PIROZZOLO: And if our oil is in the
11 lagoon and it escapes --
12     THE COURT: Right. But what do I do with
13 Judge Smalkin's language that "when pollutants regularly
14 have escaped over a period of years, especially when
15 management was either deliberately indifferent to the
16 situation or consciously disregarded it, coverage is
17 excluded under the policy definition of occurrence
18 because damage is to be expected with a substantial
19 degree of probability." What do I do with that? You
20 know, they're dumping into the lagoon. The lagoon is
21 leaking. He says that's not an occurrence.
22     MR. PIROZZOLO: I think you go to the policy
23 language. And the policy says it covers repeated
24 exposure to conditions and that is what the contractual
25 obligation is.

**Page 45**

1  THE COURT: Is there anything -- any case law
2 or anything dealing with repeated exposure conditions as
3 distinguished from occurrence?
4  MR. PIROZZOLO: I think the insurer is
5 occurrence including -- I don't know if I'm quoting it.
6 It's approximately this. An occurrence including
7 continuous exposure to conditions.
8  THE COURT: Well, was Judge Smalkin dealing
9 with the same policy?
10  MR. PIROZZOLO: Maybe he wasn't dealing with
11 the same policy or maybe he was wrong. But the policy
12 very plainly covers and defines occurrence as including
13 continuous exposure to conditions. So, if we say the
14 leaking from the landfill into the swamp is the
15 occurrence, that is a continuous exposure to
16 conditions. And I would remind the Court there's some
17 secondary evidence that Liberty Mutual so interpreted
18 that because they have that brochure saying that if the
19 pollutant escapes and it goes into the river and it goes
20 downstream and it injures the cows and so on, that that
21 is continuous exposure to conditions.
22  THE COURT: All right.
23  MR. PIROZZOLO: The other point is that on the
24 duty to defend, the complaint is neutral as to how it
25 occurred, anyway. The complaint doesn't say that it

**Page 46**

1 occurred continuously. It says that the complaint could
2 be read to say that A&A went to the site and dumped it
3 right into the swamp. The complaint does not specify
4 how the pollution occurred, anyway. So the duty to
5 defend -- in fact, what I was going to say to Mr.
6 Lepore's argument is that he really confuses the duty to
7 defend with the defense. It was Liberty Mutual's duty
8 to make the arguments that Black & Decker's waste did
9 not go to the site to make the arguments, if there are
10 arguments, that there's insufficient evidence that A&A
11 brought the Black & Decker waste to the site. That in
12 the course of providing a defense ourselves, we
13 discovered that. It doesn't militate against Liberty
14 Mutual having a duty to defend.
15  THE COURT: I don't disagree with that.
16 I guess I'm onboard on that. I'm more bothered, I
17 think, by the occurrence dimension to this, which is
18 what do you have to present them with? And you say the
19 plain vanilla complaints plus Mr. Hyatt's letter saying
20 you're within the heartland of these complaints. That's
21 enough.
22  MR. PIROZZOLO: There is the potential of
23 liability based on the complaints in the litigation along
24 with the invitation document that came to Black &
25 Decker.

**Page 47**

1  THE COURT: Okay. Now, do you want to --
2  MR. PIROZZOLO: And that's enough for them to
3 -- we go to extrinsic evidence only to the extent that
4 it helps the insurer, not to the extent that it helps
5 the insured.
6  THE COURT: Well, some of the language says
7 that. I guess I treat it a little bit differently which
8 is -- and it comes out, I suppose, the same way. But it
9 is is there evidence from which a finder of fact could
10 find that there has taken place something for which
11 coverage would be provided?
12  MR. PIROZZOLO: I think there is.
13  THE COURT: I'd be very surprised if he said
14 it --
15  MR. PIROZZOLO: It apparently resolves the
16 issue.
17  THE COURT: No, it doesn't, but it -- well, it
18 would if you said no. Okay.
19  Now, let me step back a bit on this to
20 deal with the question of the role of the kind of
21 Hazen/Zecco, what is called Hazen/Zecco. I'm
22 sure that Judge O'Toole would like to be made equivalent
23 with the SJC on these issues. But --
24  MR. PIROZZOLO: Well, there again, I have some
25 disagreement with what Mr. Lepore says is uncontested.

**Page 48**

1 First of all, this is characterized as an invitation.
2 Maybe we're dealing with southern hospitality. This is
3 a letter that says you join this -- and it's a letter
4 from the Court. Although it's transmitted by a
5 lawyer -- it's transmitted by a lawyer. It's a lawyer
6 transmitting the court order. And as the Court knows,
7 very often, a court order is transmitted through
8 counsel. So, it must fairly be read as a court order
9 that says "join the settlement process or be named as a
10 party." And that is a fairly coercive document saying
11 if you don't join, some unpleasant things are going to
12 occur.
13  Now, I believe -- I think it's quite clear --
14 that the Bausch & Lomb case decided by the Court of
15 Appeals in Maryland deals quite explicitly with this
16 kind of a situation. In that case, the party accused of
17 pollution was not under any state order. There was no
18 suit. There was no administrative proceeding. They
19 voluntarily complied with the need to clean up. The
20 operative language appears in the second column on page
21 five of the opinion where it says "B & L's Director of
22 Services wish to cooperate with the state in cleaning up
23 the Diecraft pollution and, in so doing, avoid being
24 subjected to an administrative order to perform the
25 work." And it then goes on to elaborate by saying that

LIBERTY MUTUAL                    CondenseIt!™                    AUGUST 27, 2003  BROS

**Page 49**

1  "Bausch & Lomb's posture in its response to the Diecraft
2  pollution was one of uncontested compliance." At no
3  time does it state that any neighboring land owners sue
4  Bausch & Lomb for money damages or injunctive relief,
5  nor did the state file administrative procedures against
6  Bausch & Lomb or any anvil to clean up the Diecraft
7  facility. At no time did the federal Environmental
8  Protection Agency ever send a PRP letter to Bausch &
9  Lomb designating it as a potentially responsible party
10  in regard to the pollution.
11       The trial court, in delivering its opinion in
12  that case said, "There is no question in my mind that
13  that the total circumstances constitute the sufficient
14  coerciveness and adversariousness of an administrative
15  body and a degree of definiteness which indicate that
16  this was, in fact, a suit, a demand for damages and
17  money to a certain extent that the State had the right
18  to require it be paid. There was no question but that
19  they were going to require compliance and that Bausch &
20  Lomb did make that compliance. Now, that finding of the
21  trial court was not contested on appeal. It was the
22  trial court's opinion as reported in the appellate
23  decision, but it is not an issue raised on appeal. The
24  parties appear to have accepted that. And, therefore,
25  it does stand as authority in Maryland for the

**Page 50**

1  proposition that circumstances certainly analogous to
2  this one and perhaps a little more distant from this one
3  where we have actually a communication from a court that
4  it was --
5       THE COURT: Well, you've made it a
6  communication from a court. I mean, Mr. Hyatt is
7  delivering a message, not quite the same as delivering
8  it from the court, but I recognize it as not an idle
9  form of correspondence.
10       MR. PIROZZOLO: Right. It's to be paid
11  attention to or consequences flow. And the consequences
12  are either they're made a party or, even worse, they're
13  not made a party and they don't get an opportunity to
14  participate in the PRP proceeding. They don't get an
15  opportunity to shape the record; they don't have an
16  opportunity to present their defenses; and they end up
17  exposed, after settlement, to liability from all the
18  unpaid amount that EPA can bring to the --
19       THE COURT: Well, but let's look at the Zecco
20  letter. I'm just trying to pull it out. Zecco receives
21  a letter from Marane Oil Corporation. Marane says that
22  Zecco caused a thousand-gallon sudden and accidental
23  release of petroleum products. Marane says that it's
24  taking the necessary and appropriate environmental
25  response actions at the site and says that Zecco is a

**Page 51**

1  potentially responsible party, directs them to Chapter
2  21(e), and then indicates that the letter is formal
3  notification under 4(e) which is -- 4(a), excuse me,
4  which is designed to encourage people to settle cases,
5  settle environmental liability suits without formal
6  litigation proceedings. Now, isn't that more or less --
7  but on a grander scale -- what Mr. Hyatt's letter is?
8       MR. PIROZZOLO: I think the fact that Mr.
9  Hyatt's letter transmits a court order makes it
10  substantially different from the Zecco. Zecco is made a
11  private party proceeding.
12       THE COURT: Well, there are court orders and
13  there are court orders. This is a court order for
14  essentially the organizational litigation.
15       MR. PIROZZOLO: And also saying that you'll be
16  made a party if you don't take the settlement.
17       THE COURT: You can be made a party.
18       MR. PIROZZOLO: In lieu of -- the letter says
19  "in lieu of being made a party" which fairly suggests
20  that if they don't participate, they're going to be made
21  a party. I would say that it's much more like a summons
22  with an opportunity to participate in something.
23       THE COURT: Well, I guess it's not -- I guess
24  it's whatever it is. I mean, it's not a summons and
25  it's not an RSVP.

**Page 52**

1       MR. PIROZZOLO: But it does meet the standard
2  -- as is stated in the Bausch & Lomb case -- of
3  coerciveness, constitutes sufficient coerciveness and
4  adversariousness to make it the functional equivalent of
5  a suit.
6       I would point out, Your Honor, to this case we
7  haven't previously cited because it's a new case. It
8  was Johnson Controls, a Wisconsin case.
9       THE COURT: Hold on just a second.
10       MR. PIROZZOLO: A Wisconsin case cited on July
11  11th of this year.
12       THE COURT: A Wisconsin case?
13       MR. PIROZZOLO: Yes, which reviews in great
14  detail this kind of situation and the policy involved.
15  It reverses an earlier Wisconsin case which applied a
16  very strict rule as to what constitutes --
17       THE COURT: What's the cite for it?
18       MR. PIROZZOLO: The cite is 665 NW.2d 257.
19  And it contains a very extensive discussion of the
20  policy behind considering a PRP letter to be the
21  functional equivalent of a suit and the rationale behind
22  that. And if you take from that case -- I don't want to
23  burden the Court by reading quotations from it. But if
24  we take the rationale of that case in terms of what
25  parties ought to be doing in this kind of unique

BLACK & DECKER                                      Page 49 - Page 52

**Page 53**

pollution type of environment and apply it to the BROS
situation, I think it argues that the BROS situation
fairly fits the functional equivalent of a suit.

THE COURT: Well, I'll look at it. It
obviously is not --

MR. PIROZZOLO: The main thing -- and I
emphasize one point. Because what you're dealing with
is what would flow from a conclusion that this was not a
functional equivalent of suit. It would mean that in
order to get insurance coverage, a party would have to
avoid discussing settlement at all, refuse to discuss
settlement, and cause a case to be brought. And this
case says, well, that doesn't make good sense.

THE COURT: And that certainly is the policy
that a number of the cases have dealt with. On the
other hand, inchoate diffuse and uncertain importunings
by private parties don't constitute a suit either, nor
in fact should they as a policy matter. Because all
we're doing is increasing cost of insurance by doing
that everytime somebody sends a threat across the --

MR. PIROZZOLO: But that's not anybody. We
have here in this case an ongoing proceeding --

THE COURT: I understand. I understand the
distinction. And I think we've exhausted the discussion
with respect to that.

**Page 54**

MR. PIROZZOLO: This is deliberate
non-compliance for the purpose of obtaining a defense
from an insurer. It's completely contrary to public
policy. And that would be what would flow from that.
The other thing I would emphasize a little bit -- and
it's in our brief and it's in the appendix -- is that
Liberty Mutual's own statement about this -- and it says
"the most powerful law regulating this" -- this is a
Liberty Mutual document. It is the EPA. Several
federal laws on how the EPA with widespread authority --
and it goes through the tremendous power of the EPA.
And then it advises that "litigation has been lengthy,
expensive, and generally unsuccessful from the   --
standpoint of the generators. It is usually in the best
interest of the generators, therefore, to unite while
cooperating with the EPA in negotiating an agreement for
a remedial action plan and a dump site." Now, this is
exactly what's involved here, is the generators are
being called together to unite to work out a settlement
in connection with the claim for remediation of the dump
site. And that's what Liberty Mutual itself says the
generators should be doing.

So, in this case, to stand on the argument
that there must be a formal suit is really arguing for
something that's contrary to its own advice, let alone

**Page 55**

1  public policy.
2      THE COURT: Well, I understand the -- I think
3  I understand those issues.
4      I do want to move on, however, to the
5  relatively more modest, but I think somewhat
6  distinguishable, circumstances unless there's something
7  else that people want to say about BROS --
8      MR. PIROZZOLO: No.
9      THE COURT: -- with respect to Burke's and
10 Huth there. Is there anything else that we haven't
11 touched on in discussing --
12     MR. PIROZZOLO: I think that's all in the
13 papers, Your Honor. And our view is very, very clear.
14 There are no arguments on those.
15     THE COURT: Okay. Let me just hear such as
16 you have.
17     MR. LEPORE: I didn't know we were going to
18 argue Burke's, Your Honor --
19     THE COURT: Okay. Then I will treat it --
20     MR. LEPORE: -- I mean, Jack Huth. And I am
21 not prepared to do that.
22     THE COURT: Okay. Well, then --
23     MR. LEPORE: I thought that that was going to
24 be a tier-2 site that we were going to hold in abeyance.
25     THE COURT: Well, I'm prepared for both of

**Page 56**

1  them, but I am not going to --
2      MR. LEPORE: Okay. Thank you, Your Honor.
3      THE COURT: -- force that issue.
4      Now, as I understand it, then, I will be
5  getting two weeks --
6      MR. LEPORE: Yes.
7      THE COURT: -- from today materials. And I
8  think they should be cross -- you understand the issues,
9  so they should be cross-filed --
10     MR. LEPORE: Yes.
11     THE COURT: -- on the excess policy that is
12 said to exist from '70 to '73 --
13     MR. LEPORE: Yes.
14     THE COURT: -- and its implications here,
15 and particularly its implications of duty to defend.
16 Because duty to defend is what I'm focusing on here.
17 In an effort to find if there are any places where summary
18 judgment can be granted, I'm focusing on the duty to
19 defend, which seems to me to be the broader set of
20 responsibilities that Liberty has. So that would be --
21 why don't we say September 12th? That's generously
22 offering you two more days to deal with that. Okay.
23     Then I will intend to take up the Beverly
24 case sometime toward the end of October.
25     MR. LEPORE: Yes.

**Page 57**

1  THE COURT: If I were to say -- your first
2  briefing in Beverly is September 5th?
3  MR. LEPORE:  September 5, yes.
4  OFF THE RECORD
5  THE COURT: I think I'm going to have make it
6  November 5th at 2:30 to deal with Beverly -- you know,
7  best laid plans and so on. I think that by that time or
8  shortly thereafter, it will be pretty clear to me what
9  the broad outlines of things that are in dispute are.
10 And then we can focus the question of how to deal with
11 trial for these. Because it's clear to me that there
12 are tryable issues in various aspects of this case and
13 I've got to figure out exactly how to deal with those.
14  MR. PIROZZOLO: Your Honor, just in terms of
15 long-range scheduling --
16  THE COURT: Right.
17  MR. PIROZZOLO: I'd just report to the Court
18 that I now have a fairly lengthy trial scheduled to
19 begin on November 24th before Judge Zobel. So that I
20 just will be engaged, I believe, mornings before her.
21  THE COURT: What is the -- we set a time, I
22 though, in the beginning of the year for --
23  MR. LEPORE: January 5.
24  MR. PIROZZOLO: January 5. We're not going to
25 that try the -- that trial will not run into the trial,

**Page 58**

1  Your Honor, that was set.
2  THE COURT: Okay.
3  MR. PIROZZOLO: But in terms of the
4  preliminary pretrial memorandum, pretrial hearing
5  conference and so on, I think I'm only available, while
6  that trial is going on, in the afternoon.
7  THE COURT: Okay.
8  MR. PIROZZOLO: And I certainly would like to
9  get as much business as possible done before that
10 starts.
11  THE COURT: Sure. Well, I think we probably
12 will be in a position to start talking this through by
13 --.I'd like to say mid-October. Things will be in
14 pretty good -- I think in pretty shape for me what I
15 can try reasonably and what would simply be a kind of
16 dog's breakfast of a trial and, consequently, not
17 comprehensible to a single jury. So, I may be trying to
18 parse it up in some ways do deal with it.
19  Now, you had a matter in Florida, was it?
20  MR. LEPORE: Houston, Your Honor. It's
21 scheduled still for January 5. But there is actually a
22 status conference in three weeks and I'll know much
23 better then, Your Honor.
24  THE COURT: All right. But I still have that
25 time blocked out.

**Page 59**

1  MR. LEPORE: Yes.
2  THE COURT: Your Honor, may I -- and I don't
3  want to revisit anything, but I just would ask. Your
4  Honor just mentioned something about that you're going
5  to be focusing on the duty to defend. And I understand
6  perfectly well why you want to do that. Under Maryland
7  law, I would just ask you to take a look at the
8  Baltimore Gas and Electric case, Your Honor, which
9  is 113 Md.App 540.
10  THE COURT: Hold on a second.
11  MR. LEPORE: And I think I gave you that
12 earlier --
13  THE COURT: This is the Northern Insurance v.
14 Baltimore?
15  MR. LEPORE: No. This is Baltimore Gas v.
16 Commercial Union. And the --
17  THE COURT: Give me the cite again.
18  MR. LEPORE: The second cite is 688A.2d --
19  THE COURT: 688A --
20  MR. LEPORE: -- 2d 496. And it's a Maryland
21 special appellate decision of 1997. And all it stands
22 for -- I'm not going to get into argument about it -- is
23 that Maryland recognizes that an insurer's duty to
24 defend can terminate at some point. It's not a forever
25 thing. And, so, when you're dealing with that duty to

**Page 60**

1  defend, Your Honor, I just throw that out. It does get
2  into the coverage issue as well. Because at some point,
3  you, Your Honor, can make a determination that the
4  uncontroverted evidence establishes as a fact that there
5  is no coverage as of X date. That means that the duty
6  to defend has terminated.
7  THE COURT: But where would it be, by your
8  view, in this case in BROS -- when the other PRPs
9  abandon the threat to sue BROS? Isn't that really when
10 it is? And that's when all of the defense money has
11 been expended. So, yes, there is a point. And, of
12 course, there's a mechanism for you, which is to defend
13 on a reservation.
14  MR. LEPORE: Yes, or file a DJ, which is what
15 we did. And we filed it before that was resolved.
16  THE COURT: So, all I'm saying, Your Honor, is that at
17 some point in time, there was a fact that was
18 determinative that there was no coverage. And at the
19 latest, it's uncontroverted. At the latest, it's when
20 Black & Decker says that there was nothing before 1973.
21 Now, our argument is it goes way back. But at some
22 point, it does terminate. I'm not going to get into the
23 argument anymore. I think Your Honor understands that.
24 I just wanted to point out that the duty to defend is
25 not forever.

CondenseIt!™                    **LIBERTY MUTUAL**

Page 61

THE COURT:  Right.

MR. LEPORE:  That's what that Maryland case stands for.

THE COURT:  Right.  But it may be coterminus with the expenditure of monies to defend by the private party.  Since presumably, once it's clear, they don't have to spend any money.  Nobody likes to spend money, by and large, gratuitiously.

MR. LEPORE:  Acknowledged, Your Honor.  Thank you.

THE COURT:  All right.  We'll be in recess. And I'll see you on the 17th.

MR. LEPORE:  Thank you, Your Honor.

THE COURT:  Thanks.

RECESSED AT 11:30 A.M.

Page 62

## CERTIFICATE

I, PAMELA R. OWENS, Official Court Reporter, U. S. District Court, do hereby certify that the foregoing is a true and correct transcription of the proceedings taken down by me in machine shorthand and transcribed by same.  I certify that the transcript fees charged and the page format used by me comply with the requirement of this Court's court reporter plan and the requirements of the Judicial Conference of the United States.

**BLACK & DECKER**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LIBERTY MUTUAL INSURANCE COMPANY,    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        CIVIL ACTION
                                     )        NO. 96-10804-DPW
THE BLACK & DECKER CORPORATION,      )
BLACK & DECKER, INC., BLACK & DECKER )
(U.S.) INC., EMHART CORPORATION, and )
EMHART INDUSTRIES, INC.,             )
                                     )
        Defendants.                  )
                                     )

MEMORANDUM REGARDING LIBERTY MUTUALS'
MISCITATION AND MISAPPLICATION OF
ALCOLAC IN CONNECTION WITH BROS SITE

During the summary judgment argument regarding the BROS site on August 27, 2003, counsel for Liberty Mutual relied upon Alcolac, Inc. v. St. Paul Fire and Marine Insurance Co., 716 F.Supp. 1541 (D.Md. 1989), for the proposition that, under Maryland law, environmental contamination is not an "occurrence." The Liberty Mutual reliance on Alcolac as a statement of applicable Maryland law is erroneous. Alcolac was decided on facts found in an action against the insured. Here, the issue is whether Liberty Mutual has a duty to defend. Accordingly, the issue is whether the complaining documents, not the findings of fact, raise a "potentiality" of coverage.

Alcolac was a coverage action in which Alcolac sought reimbursement for damages awarded against it and its defense costs in a prior environmental suit. In the prior suit Alcolac's conduct resulting in the award of damages was such that punitive damages were

awarded against it on a determination that its conduct was so egregious as to constitute intentional and expected damage to the environment. The denial of coverage was based on that underlying fact record - not on a proposition of Maryland law. The case has no application here.

In Alcolac, the plaintiffs in the underlying litigation against the insured had been awarded substantial punitive damages, a fact which the court found "crucially indicative of the nature of Alcolac's conduct." 716 F.Supp. at 1544. "[T]he award of punitive damages means that Alcolac [the insured] knew that its conduct 'was attended by a "high degree of probability that the action would result in injury."'" Id. Further, "the fact that the [punitive damage] award was made makes it clear that the systematic chemical intoxication of the plaintiffs -- which is what Alcolac now seeks to have indemnified by its insurers -- was not the result of covered occurrences...." Id. Based upon that factual finding in the underlying case, and the evidence supporting it, the Maryland court held that Alcolac was not entitled to indemnification because the underlying injuries were not "occurrences." Id., at 1543-44.

In Alcolac, the record in the underlying case overwhelmingly supported a finding that the injuries were not unexpected. See, Elam v. Alcolac, Inc., 765 S.W.2d 42 (Mo. App. 1988), cert. denied, 493 U.S. 817 (1989). The evidence showed that the underlying plaintiffs who lived near the facility suffered damage to their respiratory systems, skin, eyes, hearing, liver organ systems, immune systems, reproductive systems, and/or peripheral nervous systems from "haze, smoke, suds, vapors, acid mist and residues," when the insured, recognizing the danger in the chemicals it manufactured, constructed a state-of-the art environmental control system and then bypassed it, overloaded it, failed to replace or repair or redesign malfunctioning components, failed to add needed components, and put an untrained high school dropout in charge of it as "deliberate business decisions" which were "prompted by the motives of Alcolac

president Anderson to spare expense in order to enhance the profit on which his bonus depended." 765 S.W.2d at 220, 225-28. Then, once sued, Alcolac sought to destroy damaging files. 765 S.W.2d at 228.

The Alcolac court specifically acknowledged decisions holding that long-term exposure to conditions causing pollution were occurrences, stating that "pollution coverage under an occurrence policy may be found for long-term, unintentional pollution, which might not be promptly discoverable or which might be the result of a series of unexpected, unintended occurrences." 716 F.Supp. at 1544. As the court recognized, such cases were distinguishable from the case before it, as "[t]he jury's award of punitive damages ... shows a consciousness of wrongdoing on Alcolac's part that renders the consequences of that conduct 'expected' within the common meaning of that term." Id. at 1544-45.

Alcolac has no applicability to the case at bar. There is no fact record, as in Alcolac. There is no punitive damage award against Black & Decker. Rather it was alleged that Black & Decker's waste oil was picked up by A & A, and transported to the BROS site, a waste oil reprocessing, disposal, and storage facility. Black & Decker did not operate the BROS site, it was never found liable for contaminating the site, it never paid for remediation of the site, and, assuredly, no punitive damages were ever assessed against it for intentionally injuring the site. Further, the instant case involves only the duty to defend. Nothing in the complaining documents in BROS even hints at support for a finding such as that made in Alcolac.

The error in the Liberty Mutual reading of Alcolac also is demonstrated by two other federal court decisions applying Maryland law. In Icarom, PLC v. Howard County, 981 F.Supp. 379 (D.Md. 1997), aff'd, 178 F.3d 1284, 1999 WL 222368 (4th Cir. 1999) (table), the insured county sought coverage for damage from contamination at its landfills. In construing the

-3-

"all risk" policy, the court looked to Maryland decisions interpreting liability policies providing "occurrence" coverage, concluding that "the loss must be unplanned and unintentional." 981 F.Supp. at 389. It then found, as a matter of law, that these requirements were met. As the court put it, "[w]hile Howard County admittedly knew of the <u>dangers</u> associated with the pollutants and contaminants present in its landfills, it simply does not follow that it intended, expected or foresaw that pollution <u>damage</u> ultimately would occur." <u>Id.</u>, at 390 (emphasis in original). The Fourth Circuit affirmed "on the reasoning of the district court." <u>See</u>, 1999 WL 222368.

In Re <u>Wallace & Gale Co.</u>, 275 B.R. 223 (D.Md. 2002), <u>vacated in part on other grounds</u>, 284 B.R. 557 (D.Md. 2002), is to the same effect. There the bankrupt, a company that had supplied and installed asbestos-containing insulation materials, sought insurance coverage for asbestos-related bodily injuries. The policy included the standard definition of an "occurrence." 275 B.R. at 244. Earlier in the proceedings, the court had found a duty to defend. <u>See</u>, 275 B.R. at 228. Subsequently, regarding indemnification, two insurers argued that there was no "occurrence" because the damage was "expected" or "intended." (The other insurers stipulated that there had been an "occurrence." 275 B.R. at 228, n. 4). As shown below, the court rejected the argument out of hand.

Citing a Maryland decision, the federal court stated that, "'before the insurer may disclaim liability ..., it must be shown that the insured intended by his act to produce the damage which did occur.'" 275 B.R. at 245 (citations omitted). The inquiry is subjective, with the "focus ... upon what the insured actually intended" rather than on "what the insured knew, should have known or actually came to know after the act was committed." <u>Id</u>. The court then explained that, "[i]n ruling on the 'expected and intended' defense during arguments on the duty to defend, [it had] rejected the defense for these very reasons and does so again with regard to the matter of

-4-

indemnification." <u>Id</u>. As it pointed out, "[n]othing in the record suggests that Wallace & Gale subjectively expected or intended to produce bodily injuries <u>while it was installing the asbestos-related materials</u>." <u>Id</u>. (emphasis in original). Moreover, the court held that the insurer bore the burden of proving the exception to coverage, that the injury was "expected or intended from the standpoint of the insured," a burden which the insurer clearly had failed to meet. 275 B.R. at 244, n. 20.

Nothing in the complaining documents, or, indeed, in the record as a whole, suggests that Black & Decker "subjectively expected or intended" to produce property damage at the BROS site when A & A picked up its waste oil. There clearly was an "occurrence." The Liberty Mutual reliance upon <u>Alcolac</u> is totally misplaced.

By their attorneys,

Jack R. Pirozzolo, BBO# 400400
Richard L. Binder, BBO# 043240
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on ___4/13/03___

*telecopier and by*

-5-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 96-10804-DPW |
| THE BLACK & DECKER CORPORATION, ) | |
| BLACK & DECKER, INC., BLACK & DECKER ) | |
| (U.S.) INC., EMHART CORPORATION, and ) | |
| EMHART INDUSTRIES, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM REGARDING DUTY TO DEFEND
## UNDER 1970-1973 UMBRELLA EXCESS POLICY

This memorandum, submitted pursuant to the Court's Order at the August 27, 2003 hearing concerning the BROS site, addresses coverage from 1970 to 1973 under a Liberty Mutual umbrella excess policy which covers defense costs and contains no pollution exclusion.[1] Accordingly, even if the pollution exclusion in the Maryland primary policies for the period July 1, 1971 to July 1, 1973 were construed to bar coverage, this Umbrella Policy requires a defense.[2]

---

[1] That policy is Umbrella Excess Liability Policy No. LE1-131-01046-420 that Liberty Mutual issued to Black & Decker for the term July 1, 1970-July 1, 1973 ("Umbrella Policy"). It appears at Volume II pages 106-122 of the appendix to the Black & Decker summary judgment (hereinafter cited as App. II:106-122). A copy of that policy, with pertinent provisions highlighted, is attached.

[2] Black & Decker has explained the basis for its contention that the pollution exclusions in those policies (and all other policies) do not bar coverage.

The Umbrella Policy was issued for a three year term, July 1, 1970 to July 1, 1973 (Id.), that commenced prior to the first inclusion by Liberty Mutual of pollution exclusions in its policies. The policy contains exclusions (a) through (g) (App. II:117). Those do not include any form of pollution exclusion. The underlying CGL policy for the period July 1, 1970-July 1, 1971 also did not contain a pollution exclusion. Section II of the Umbrella Policy (App.II:117) expressly provides that Liberty Mutual has a duty to defend suits that are not covered under any underlying policy. The pertinent section of the Umbrella Policy states:

> With respect to personal injury, property damage or advertising injury or damage covered under this policy (or which would be covered under this policy but for the insured's retention as stated in the declarations), but not covered under any underlying policy or any other insurance, [Liberty Mutual] will
>
> (1) defend any suit against the insured seeking damages on account thereof, even if such suit is groundless, false or fraudulent,...

(emphasis added).

Under this provision, even if the pollution exclusions in the underlying Liberty Mutual CGL policies for July 1, 1971 to July 1, 1972 and July 1, 1972 to July 1, 1973 were deemed to bar coverage of the BROS claim,[3] the BROS claim would become a claim "not covered under any underlying policy or any other insurance" and, therefore be within the scope of the duty to defend contained in the Umbrella Policy. As Liberty Mutual, at pages 45-46 of its brief regarding the BROS claim, has conceded that the complaining documents allege events during the coverage period of the Umbrella Policy, it had a duty to defend.

---

[3]   There is no pollution exclusion in the underlying policy for July 1, 1970-July 1971.

The plain language of the Umbrella Policy requiring Liberty Mutual to defend a claim that is not within the scope of the underlying policies is a common feature of umbrella policies. As stated in Commercial Union Insurance Co. v. Walbrook Insurance Co., 7 F.3d 1047, 1053 (1st Cir. 1993), "[u]mbrella policies differ from standard excess policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage)." The basic principles concerning the differences between excess umbrella policies and standard excess policies not containing umbrella coverage have been explained as follows:

> Umbrella insurance generally provides two types of coverage. First, it provides standard excess coverage that attaches after a predetermined amount of primary coverage has been exhausted. An excess policy covering the same risks that are covered by the underlying policy is known as a "following form" policy. Second, an umbrella policy may provide broader coverage than the underlying policy in which case the umbrella will "drop down" and become primary. An umbrella policy will generally impose a duty to defend on the insurer when it "drops down" or when the limits of the underlying policy has been exhausted.

Coleman Co. v. California Union Insurance Co., 960 F.2d 1529, 1530 n.1 (10th Cir. 1992).

The language of the Umbrella Policy, quoted, supra, requiring Liberty Mutual to provide coverage "with respect to … property damage … covered under this policy (or which would be covered under this policy but for the insured's retention as stated in the declarations), but not covered under any underlying policy or any other insurance." "clearly contemplates a situation where the umbrella policy would provide primary coverage because the underlying insurance did not apply." Fidelity & Deposit Co. of Maryland v. Hartford Casualty Insurance Co., 189 F.Supp.2d 1212, 1223 (D. Kan. 2002). Here, one of the horizontal gaps covered by the Umbrella Policy is for claims that would otherwise be barred by the pollution exclusion.

In view of the language of the Umbrella Policy, Liberty Mutual owes Black & Decker a duty to defend the BROS claim regardless of the interpretation of the pollution exclusion in the underlying CGL policies. If, as Black & Decker contends, the pollution exclusion does not bar coverage under the underlying CGL policies, Liberty Mutual was obligated to defend Black & Decker and there would be no reason to call upon the Umbrella coverage at this time. However, if the pollution exclusion were construed to bar coverage under the CGL policies, the Umbrella Policy would then "drop down" to provide a defense.

By their attorneys,

Jack R. Pirozzolo BBO#400400
Richard L. Binder BBO#043240
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on *telecopier and by*  7/13/03

-4-



**DECLARATIONS**

**LIBERTY MUTUAL INSURANCE COMPANY**
Boston, Massachusetts

**UMBRELLA EXCESS LIABILITY**

| POLICY NO. | | TD CODE | SALES OFFICE | CODE | SALESMAN | CODE | N/R | PT YEAR |
|---|---|---|---|---|---|---|---|---|
| LE1-131-010406-420 | | 22 | Balt | 334 | Hamlin | 7480 | 2 | 67 |

Item 1. Named Insured: The Black and Decker Mfg. Company
Towson Md. 21204

Address

    Additional Named Insureds:

and:     Any other business organization while any of the foregoing named insureds owns an interest therein of more than fifty percent (50%) during the policy period.

Item 2   Policy Period: From 7 1 70 to 7 1 71
      12:01 A.M., standard time at the address of the named insured as stated herein.

Item 3   Limits of Liability: The limits of the company's liability under this policy are as stated herein, subject to all of the terms of this policy having reference thereto.

| | | | |
|---|---|---|---|
| Each occurrence | | $ | 5,000,000. |
| Aggregate products — completed operations | | $ | 5,000,000. |
| Aggregate property damage | | $ | 5,000,000. |
| Aggregate advertising injury or damage | | $ | 5,000,000. |
| Aggregate occupational disease | | $ | 5,000,000. |

Item 4   The insured's retention is  $  10,000.

Item 5   Computation of Premium

| EXPOSURE BASIS | CODE NO. | ESTIMATED ANNUAL EXPOSURE | RATE | ESTIMATED ANNUAL PREMIUM (324) |
|---|---|---|---|---|
| Per $1,000. Sales | 9640 | .125,216,000 | .054 | 6,762. |

Minimum Premium 6,750.       Deposit  Premium 6,762.

The premium for this policy is payable $      in advance, $     on first anniversary and
$     on second anniversary.

Audit Basis:   At Expiration ☑   Annual ☐   Semi-Annual ☐   Quarterly ☐   Monthly ☐   Flat Charge ☐

Item 6   Underlying Insurers       Underlying Policies       Limits of Liability (000's)

| Underlying Insurers | Policy Number and Type | | Each Person | Each Occurrence | Aggregate |
|---|---|---|---|---|---|
| Liberty Mutual Ins. Co. | Comprehensive General Liab. LG1-131-010406-150 | BI | | | |
| | | PD | 1,500,000 | Single Limit | |
| | | BI | | | |
| | | PD | | | |
| | Automobile Liab AE1-131-010406-110 | BI | | | |
| | | PD | 1,000,000. | Single Limit | |
| | Automobile Liab. AM1-131-010406-010 | BI | | 500 | 1,000 |
| | | PD | | each accident | |
| | | | | 250 | each accident |

This policy, including all endorsements issued therewith, is hereby countersigned by...........................................
                                                  Authorized Representative

| Work Units | Typed | Audit Basis | Periodic Payment | Pol. H. C. | Home State | Renewal of | |
|---|---|---|---|---|---|---|---|
| 1 1 | 8/27/70 | 3 | | ☐ -$ | Md. | LE1- 427 | |

GPO 2683 R2   Printed in U.S.A.

II-106

PRIVILEGED AND CONFIDENTIAL   B&D   MA LM     0002097

Amendatory Endorsement

It is agreed that Item 1 of the Declaration, "Additional Named Insured's" is amended to read as follows:

Additional Named Insureds:

Black & Decker, Inc., Van Dorn Electric Tool Co., Texas Tool Center, Inc., Dewalt Incorporated, Master Power Corporation, Carbide Router Company, Inc., Wisconsin Knife Works, Inc., Sterling Cutter Division of Wisconsin Knife Works, Inc., Anderson Knife Division of Wisconsin Knife Works, Inc., and Oceana Tool Mfg. Division of Wisconsin Knife Works, Inc.

This endorsement is executed by the company below designated by an entry in the box opposite its name.

☒ LIBERTY MUTUAL INSURANCE COMPANY          ☐ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*Bruce E. Boorman*     *Frank L. Farwell*          *Bruce E. Boorman*     *Frank L. Farwell*
    Secretary          President                       Secretary          President

Countersigned by_____          Countersigned by_____
                    AUTHORIZED REPRESENTATIVE                              AUTHORIZED REPRESENTATIVE

Effective Date  10/5/72 12:01 A.M.     Expiration Date  7/1/73
Audit Basis
Premium $ No Premium change.
For attachment to Policy or Bond No.  LE1-131-010406-420
Issued to   The Black and Decker Manufacturing Company

                                              Endorsement Serial No.    8

Work Units 1 —          Issued SEP 11/7/72     Sales Office & No.   Balt.334
                                                   Schuncke   7649

                    11-107

PRIVILEGED AND CONFIDENTIAL    B&D   MA LM          0002098

Amendatory Endorsement

It is agreed that Item 6 of the Declaration is amended to include the following underlying policies:

| Item 6 Underlying Insurers | Underlying Policies | Limits of Liability (00's) | | |
|---|---|---|---|---|
| | Policy Number and Type | Each Person | Each Occurrence | Aggregate |
| Liberty Mutual Ins. Co. | WC1-131-010406-142 Workmen's Compensation | 100 | Coverage B 100 | 100 |
| Liberty Mutual Ins. Co. | WC1-131-010406-352 Employer's Liability | 100 | Coverage B 300 | 300 |
| Liberty Mutual Ins. Co. | WC2-131-010406-492 Workmen's Compensation | | Coverage B | 500 |

This endorsement is executed by the company below designated by an entry in the box opposite its name.

Ⓔ LIBERTY MUTUAL INSURANCE COMPANY          ☐ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*[signatures]*                                      *[signatures]*

Countersigned by_____          Countersigned by_____
                AUTHORIZED REPRESENTATIVE                        AUTHORIZED REPRESENTATIVE
Effective Date   7-1-72  12:01 A.M.   Expiration Date   7-1-73
Audit Basis
Premium $  No Premium Change
For attachment to Policy or Bond No.  LE1-131-010406-426
Issued to  The Black & Decker Manufacturing Co.

                                              Endorsement Serial No.          7

Work Units 1 —          Issued sp 11/7/72   Sales Office & No.  Balt.334  Schuncke 7649

II-108

PRIVILEGED AND CONFIDENTIAL    B&D   MA LM          0002099

## Annual Premium Adjustment Endorsement

It is agreed that the deposit premium for the period  7/1/72

to  7/1/73          is $  9,287.          .

This endorsement is executed by the company below designated by an entry in the box opposite its name.

☒ LIBERTY MUTUAL INSURANCE COMPANY          ☐ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*Bruce E. Bowman*    *Frank L. Farwell*          *Bruce E. Bowman*    *Frank L. Farwell*

Countersigned by ............................................          Countersigned by ............................................

Effective Date  7/1/72          Expiration Date  7/1/73

Audit Basis  3

Premium $  9,287.  Add'l.

For attachment to Policy or Bond No.  LE1-131-010406-420

Issued to  The Black and Decker Mfg. Co.

2276M

Endorsement Serial No.  6

Work form          Issued  SP 10/2/72      Sales Office & No.  Balt.334  Hamlin 7486 /R

II-109

PRIVILEGED AND CONFIDENTIAL   B&D   MA LM          0002100

# AMENDATORY ENDORSEMENT

It is agreed that the Policy is amended as indicated by typed entries hereunder:

☐ Policy Number to read:

☐ Name:

☒ Address:    Towson, Md. 21204
              Attn: John McQuade

☐ Legal Status: ☐ Individual  ☐ Partnership  ☐ Corporation  ☐ _____
                                                                    (Other)

☐ Policy Period: From                    to                    12:01 A.M. Standard Time.

☐ Occupation or Business of Insured:

☐ Loss Payee: The interest of the following Loss Payee has ceased:

☐ Locations:

This endorsement is executed by the company below designated by an entry in the box opposite its name.

☒ LIBERTY MUTUAL INSURANCE COMPANY          ☐ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*Bruce E. Boorman*  *Frank L. Farwell*      *Bruce E. Boorman*  *Frank L. Farwell*
   Secretary          President                Secretary          President

Effective Date    1-1-71  12:01 A.M.
Expiration Date    7-1-73
Audit Basis      3
For attachment
to Policy No.     LE1-131-010406-420

Issued to    The Black and Decker Mfg. Company

**1227** ED. 4   |   br 2-3-72   Balt. 334  Hamlin 7486   | Countersigned by        | AUTHORIZED REPRESENTATIVE
Printed in U.S.A.  |   Issued            | Sales Office and No.   | R                      | End. Serial No.

5

II-110

PRIVILEGED AND CONFIDENTIAL    B&D   MA LM        0002101

UMBRELLA EXCESS POLICY

It is agreed that none of the exclusions of the policy apply to
personal injury, property damage or advertising injury or damage
with respect to which insurance is afforded on a primary basis by
an underlying policy insured by the company, or would be furnished
under such a policy except for the sole reason that its applicable
aggregate limit of liability has been exhausted.

This endorsement is executed by the company below designated by an entry in the box opposite its name.

☒ LIBERTY MUTUAL INSURANCE COMPANY          ☐ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*Bruce E. Doorman*    *Frank L. Farwell*          *Bruce E. Doorman*    *Frank L. Farwell*
   Secretary            President                    Secretary            President

Countersigned by _____          Countersigned by _____
              AUTHORIZED REPRESENTATIVE                           AUTHORIZED REPRESENTATIVE

Effective Date  7-1-71 12:01 A.M.   Expiration Date   7-1-73
Audit Basis
Premium $  No Change
For attachment to Policy or Bond No.   LE1-131-010406-4 C
Issued to    The Black and Decker Mfg. Company

                                    Endorsement Serial No. 4.

Form 102
Word Units 1 –        Issued 11 9-28-71-  Sales Office & No.  Hamlin 7486
                                 Baltimore ३२५

                          II—111

PRIVILEGED AND CONFIDENTIAL    B&D    MA LM          0002102

<u>AMENDATORY ENDORSEMENT</u>

It is agreed that the additional named insured's

under Item #1 of the Declarations is hereby amended to include

the following:

Wisconsin Knife Works, Inc.
Sterling Cutter Division of Wisconsin Knife Works, Inc.
Anderson Knife Division of Wisconsin Knife Works, Inc.
Oceana Tool Mfg. Division of Wisconsin Knife Works, Inc.

This endorsement is executed by the company below designated by an entry in the box opposite its name.

£ LIBERTY MUTUAL INSURANCE COMPANY          □ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*Bruce E. Brosman*    *Frank L. Farwell*          *Bruce E. Brosman*    *Frank L. Farwell*
   Secretary          President                      Secretary          President

Countersigned by_____          Countersigned by_____
                AUTHORIZED REPRESENTATIVE                              AUTHORIZED REPRESENTATIVE

Effective Date  12-12-72  12:01 A.M. Expiration Date   7-1-73
Audit Size      2
Premium $       To be adjusted at audit
For attachment to Policy or Bond No.   LE1-131-010406-420
Issued to     The Black and Decker Mfg. Company

                    II—112                    Endorsement Serial No.   3

Work Units 1 — dg 3/11/71 Issued Hamlin 7486  Sales Office & No.    Balt.  334      /R

PRIVILEGED AND CONFIDENTIAL   B&D   MA LM          0002103

## AMENDATORY ENDORSEMENT

It is agreed that the additional named insured's under Item #1 of the Declarations is hereby amended to include the following:

> CARBIDE ROUTER COMPANY, INC.
> 5 Willow St.
> Moonachie, Bergen County, New Jersey

This endorsement is executed by the company below designated by an entry in the box opposite its name.

☒ LIBERTY MUTUAL INSURANCE COMPANY     ☐ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*Secretary*   *President*       *Secretary*   *President*

Countersigned by_____        Countersigned by_____
           AUTHORIZED REPRESENTATIVE                      AUTHORIZED REPRESENTATIVE

Effective Date  7-1-70  12:01 A.M.   Expiration Date  7-1-73
Audit Basis  3
Premium $  To Be Adjusted on Audit
For attachment to Policy or Bond No.  LE1-131-010406-420
Issued to  The Black and Decker Mfg. Company

                        II-113          Endorsement Serial No. 2

Work Units 1 —        Issued            Sales Office & No.
              As 10/30/70        Balt  33h    Hamlin 7468        R

PRIVILEGED AND CONFIDENTIAL   B&D   MA LM       0002104

## COMPOSITE RATING PLAN

It is agreed that :

All premiums for this policy shall be computed on the following basis:

Per $1,000. Sales

This endorsement is executed by the company below designated by an entry in the box opposite its name.

☒ LIBERTY MUTUAL INSURANCE COMPANY        ☐ LIBERTY MUTUAL FIRE INSURANCE COMPANY

*Bruce E. Dooman* SECRETARY    *Frank L. Fairwell* PRESIDENT        *Bruce E. Dooman* SECRETARY    *Frank L. Fairwell* PRESIDENT

Countersigned by_____        Countersigned by_____
                    AUTHORIZED REPRESENTATIVE                                    AUTHORIZED REPRESENTATIVE

Effective Date _____ Expiration Date _____
Audit Basis
Premium $
For attachment to Policy or Bond No.   LE1-131-010406-42C
Issued to

                    II-114                    Endorsement Serial No. 1

Work Units 1 —        Issued            Sales Office & No.

PRIVILEGED AND CONFIDENTIAL   B&D   MA LM        0002105

| RISKS CONTROL UNIT | |
|---|---|
| NEW ENG. | CENTRAL |
| NEW YORK | MID. WEST |
| MID. ATLANTIC | SO. WEST |
| SOUTHERN | PACIFIC |

**INSTRUCTION SHEET**
Typing – Assembly

Risk No: LEL-131-
0/0406-420
Name The Black+
Decker Mfg.
Eff. 7-1-70

| | Red. Serial Number Issued + Duplicates | File | Sales Office | Accounting | Salesmen's Auditing | Bureau | | Div I.P. – Elevator | Rks Control Unit(WC) | GO ROS Risk | HO Stat-Gov't | TOTALS | Special Instructions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Symbol LE | | | | | | | | | | | | | |
| Jacket GPo 262 | 1 | | | | | | | | | | | 1 | |
| Dec. GPo 2683 | ✓ | ✓ | ✓ | | ✓ | | | | | ✓ | | 6 | Au-d |
| | | | | | | | | | | | | | |
| End 102 | 1 | ✓ | ✓ | | ✓ | | | | | ✓ | | 5 | of L- |

FILE 489-3

FIRE
Pol.
Cl.
PERMANENT

Interstate Rating ☐

**BILLING INSTRUCTIONS**

LEL420          6,762          Composite  ☒ Yes  No ☐

Balance Due $ 6,762.

O 210 R23          RATED
CHECKED          TYPED          ASSEMBLED
READ

II-115

PRIVILEGED AND CONFIDENTIAL   B&D   MA LM        0002106

## COUNTERSIGNATURE INSTRUCTIONS

| STATE | Employee Resident Agent | Non-Employee Resident Agent | STATE | Employee Resident Agent | Non-Employee Resident Agent |
|---|---|---|---|---|---|
| Alabama | | | # Nevada | | |
| # Alaska | | / | *New Hampshire | | |
| | | | New Jersey | | |
| *California | | | New Mexico | | |
| **Colorado | (2) | | New York | / | |
| Connecticut | | | North Carolina | | |
| Delaware | | | North Dakota | | |
| D.C. | | | Ohio | | |
| *Florida | / | | Oklahoma | | |
| Georgia | | | | | |
| Hawaii | | | Pennsylvania | | |
| Idaho | | | · Puerto Rico | | |
| Illinois | | | Rhode Island | | |
| Indiana | | | South Carolina | | |
| Kansas | | | *Texas | | |
| *Louisiana | (652-468A) | | Vermont | | |
| Maine | | | Virginia | | |
| Michigan | | | *Washington | | |
| Montana | | | W. Virginia | | |
| | | | Wyoming | | |

# Alaska — Insert estimated premium for period of Coverage on 1710.
# Nevada — Attach copy of Policy — to be sent with 1710.
*See your Manual for special procedure.
**Second copy to be attached to Colorado Commission Copy. (Declarations Only)
RATER — Complete the other half of "X" for each of the above states covered by the policy.
TYPIST — (a)  Pull 1710 Endorsement for each state "X"d.
            (b)  "Employee Resident Agent" — Type policy number and Sales Office code # on 1710.
            (c)  "Non-Employee Resident Agent" — Type in duplicate and fill in complete 1710.
PROOF-READER — Unless otherwise instructed only original need be countersigned.
ASSEMBLER — Attach 1710 Endorsement to policy for Employee Resident Agent.
Attach duplicate 1710 Endorsement stamped "To be replaced by countersigned copy" to policy and refer original to countersignature clerk
for handling for "Non-Employee Resident Agent".

## ABSTRACT CARD DISTRIBUTION

1. Circle proper numbers for policy(ies) for which abstract is being prepared.
2. If a one year and a three year are involved prepare two abstracts. Circle appropriate numbers.
3. Line out GL Loss Total Cards if annual premium is under $100.
4. Three Year Fixed rate policies circle only one (1) each for WC Premium and WC Loss Total.

| ONE YEAR AND/OR THREE YEAR POLICIES * | ANNUAL AUDIT and/or AUDIT AT EXP. | | | INTERIM AUDIT (Including PAE Pols) | | | T O T A L | SEND CARDS DAILY TO: |
|---|---|---|---|---|---|---|---|---|
| | WC only | GL only | WC & GL | WC only | GL only | WC & GL | | |
| WC Prem. (White ASC 260) | 1 / 3* | | 1 / 3* | 1 / 3* | | 1 / 3* | | HO Stat-WC |
| WC Loss Total (Cherry Act 167A) | 1 / 3* | | 1 / 3* | 1 / 3* | | 1 / 3* | | HO Stat-WC |
| GL Loss - (Salmon Act 25) None if Annual Premium is under $100 | | 1 / 3* | 1 / 3* | | 1 / 3* | 1 / 3* | 3 | HO Stat-PL |
| Audit (Buff PA 148) | 2 | 2 | 2 | | | | | Local Div. Auditing |
| Audit (White PA 149)  6 for Contracting  4 for all other | | | | 4 or 6 | 4 or 6 | 4 or 6 | 4 | Local Div. Auditing |
| WC State & Federal Coverage (X103S)  1 each State & 1 if Federal Coverage | | | | | | | | Local State File  Federal |
| NE Div. Only — 1 for WC New Bus. with ium over $?.. and a Mass. Mail address | | | | | | | | HO Legis. & Tax |

II-116

PRIVILEGED AND CONFIDENTIAL     B&D   MA  LM          0002107



UMBRELLA EXCESS LIABILITY POLICY

# LIBERTY MUTUAL
## INSURANCE COMPANY
### Home Office: Boston

FOR PROMPT INSURANCE SERVICE — CALL YOUR SERVICE OFFICE

(A mutual insurance company, herein called the company)

THIS POLICY IS CLASSIFIED IN DIVIDEND CLASS I
GENERAL CLASS

The named insured is hereby notified that by
virtue of this policy he is a member of Liberty
Mutual Insurance Company and is entitled to
vote either in person or by proxy at any and
all meetings of said company.

The annual meetings are held at its home
office, Boston, Massachusetts, on the second
Wednesday of April in each year, at eleven
o'clock in the morning.

---

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the named insured as follows:

## I   COVERAGE — EXCESS LIABILITY

(illegible)

(a) personal injury

(b) property damage or

(c) advertising injury or damage

with respect to which this policy applies and occurring during the policy period.

This policy does not apply:

(a) to personal injury, property damage or advertising injury or damage which is expected or intended from the standpoint of the insured;

(b) to personal injury or property damage occurring away from premises owned, rented or controlled by the named insured and arising out of the ownership, maintenance, operation, use, loading or unloading of any aircraft or watercraft owned by the named insured or hired by or on behalf of the named insured for a period of thirty days or more;

(c) to personal injury or property damage for which liability is assumed under any contract or agreement, if such injury or damage is due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

(d) to (1) any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation, or disability benefits law, or under any similar law, (2) any employee, as an insured, with respect to personal injury to another employee of the same employer, or (3) to any liability with respect to bodily injury of any employee of the insured arising out of and in the course of his employment by the insured, if such liability is assumed by the insured under a contract or agreement made with or for the benefit of such employee;

(e) to (1) property damage to property of any kind owned, or to aircraft hired for a period of thirty days or more, by the insured or by any named insured, or (2) to liability for property damage to other property rented to, used by or in the care, custody or control of the insured or any named insured, or as to which either of such insureds is exercising physical control, if such liability is in excess of the insured's common law or statutory liability therefor and is assumed under any contract or agreement other than a sidetrack agreement or agreement relating to the use of elevators or escalators;

with respect to premises alienated by the named insured, work performed by or on behalf of the named insured or the insured's products,

(1) to any property damage to such premises, work or product which arises out of any part or portion thereof or out of any materials, parts or equipment furnished in connection therewith;

(2) to personal injury or property damage resulting from the failure of such products or work to perform the function intended, or achieve the level of performance warranted, by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but part (2) of exclusion (f) shall not apply to any such injury, or to any such damage to property other than property of which such work or products are an integral part, directly inflicted by such work or products or by any thing or substance of which they are an integral part;

(3) to that portion of any damages for which claim is made or suit is brought and which represents the cost (including loss of use) of inspecting, repairing, replacing, modifying or withdrawing any property from the market or use in the interest of preventing accidents which may result from any known or suspected defect therein or in the interest of improving its quality or performance;

(g) to advertising injury or damage claimed for failure to perform any contract or by reason of a mistake in the advertised price or an incorrect description of any article or commodity.

## II   INVESTIGATION, DEFENSE, SETTLEMENT, ASSISTANCE AND COOPERATION

(illegible)

(2) pay all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;

(3) pay all premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the insured because of accident or traffic law violation arising out



GPO 2682 R2   Printed in USA      PAGE 1
8/1/69
LE

II—117

PRIVILEGED AND CONFIDENTIAL   B&D   MA LM      0002108

of any vehicle to which this policy applies, but the company shall have no obligation to apply for or furnish any such bonds;

(4) pay all reasonable expenses, other than loss of earnings, incurred by the insured at the company's request;

and the amounts so incurred, except settlement of claims and suits, are not subject to the insured's retention as stated in the declarations and are payable by the company in addition to the applicable limit of liability of this policy.

The insured agrees to reimburse the company promptly for amounts paid in settlement of claims or suits to the extent that such amounts are within the insured's retention as stated in the declarations.

The named insured agrees to arrange for the investigation, defense or settlement of any such claim or suit in any country where the company may be prevented by law from carrying out this agreement. The company will pay defense expenses incurred with its written consent in addition to its applicable limit of liability under this policy and will promptly reimburse the named insured for its proper share, subject to its applicable limit of liability under this policy, of any settlement above the retained limit made with the company's written consent.

The company shall have the right to associate at its own expense with the insured or any underlying insurer in the investigation, defense or settlement of any claim or suit which in the company's opinion may require payment hereunder. The insured, at the company's request shall assist and cooperate in every way with respect to the handling of all claims or suits and the enforcement of all rights of salvage, contribution or indemnity that may affect the company's obligations under this policy.

## PERSONS INSURED

Each of the following is an insured under this policy to the extent set forth below:

(1) The named insured and any executive officer, director, stockholder, partner or employee of the named insured, while acting in his capacity as such, and any organization or proprietor with respect to real estate management for the named insured, but not with respect to the operation of any vehicle owned by such person or organization;

(2) with respect to premises of the named insured or operations by or on behalf of the named insured, any person, organization, trustee or estate for whom the named insured must, by written agreement, provide liability insurance, but not for more or broader insurance than such agreement requires;

(3) any additional insured (not a named insured under this policy) included in an underlying policy, but not for broader coverage than is available to such additional insured under the underlying policy;

(4) any person while using on behalf of the named insured and with the named insured's permission any vehicle for which insurance is provided to the named insured hereunder, and any person or organization legally responsible for the use thereof, except:

(a) a person or organization, or an agent or employee thereof, operating a vehicle manufacturing or repair shop, hangar, public garage, shipyard, livery, sales agency, service station, public airport, public parking place, marina or boat yard, with respect to any occurrence arising out of the operation thereof;

(b) the owner of any such vehicle or any employee of such owner. This subdivision (b) shall not apply if it restricts the insurance granted under subdivision (3) above.

This policy applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability.

## LIMITS OF LIABILITY

Regardless of the number of insureds under this policy or the number of persons or organizations who sustain personal injury, property damage or advertising injury or damage, the company's liability is limited as follows:

Each Occurrence — The limit of liability stated in the declarations as applicable to "each occurrence" is the limit of the company's liability for all damages, direct and consequential, because of all personal injury, property damage and advertising injury or damage sustained by one or more persons or organizations as the result of any one occurrence.

Aggregate — The limits of liability stated in the declarations as (a) "aggregate products—completed operations", (b) "aggregate property damage", (c) "aggregate advertising injury or damage" and (d) "aggregate occupational disease" are, respectively, the total limit of the company's liability for all damages, direct and consequential, because of the following occurring during any one annual period during which this policy is in force: (a) all personal injury arising out of the products—completed operations hazard, (b) all property damage, (c) all advertising injury or damage and (d) all occupational disease sustained by employees of the named insured.

For the purpose of determining the limits of the company's liability:

(1) all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions; or

(2) all advertising injury or damage involving one or more causes of injury, including all reproductions or repetitions thereof, regardless of the number and kind of media used;

shall be considered as the result of one and the same occurrence.

Non-Cumulation of Liability — Same Occurrence — If the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs partly before and partly within any annual period of this policy, the each occurrence limit and the applicable aggregate limit or limits of this policy shall be reduced by the amount of each payment made by the company with respect to such occurrence, either under a previous policy or policies of which this is a replacement, or under this policy with respect to previous annual periods thereof.

## DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

"advertising injury or damage" means personal injury (other than bodily injury) and injury to intangible property sustained by a person or organization arising out of the named insured's advertising activities as the result of libel, slander, defamation, piracy, infringement of copyrights, invasion of the right of privacy or any negligent act, error or omission in the use of advertising or merchandising ideas.

"annual period" means the twelve month period following the effective date or any anniversary thereof falling within the policy period, or if the time between any such date and the termination of this policy is less than twelve months, such lesser period.

"bodily injury" includes sickness or disease and death resulting at any time therefrom.

"defense expenses" means all reasonable expenses (other than the amount of any settlement) incurred by the named insured in discharging the named insured's obligations under Section II. with respect to the investigation, defense or settlement of claims or suits, except (1) salaries of salaried employees of the named insured, and (2) any such expenses payable under an underlying policy or any other valid and collectible insurance.

"insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage.

"insured's products" means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name.

"named insured" means the person or organization named in Item 1 of the declarations of this policy.

"personal injury" means personal injury or bodily injury sustained by a natural person, but excluding any such injury included within the definition of advertising injury or damage.

"products-completed operations hazard" means (1) the insured's products, if the personal injury or property damage occurs after possession thereof has been relinquished to others, and (2) operations performed by or on behalf of the named insured (wherever

PRIVILEGED AND CONFIDENTIAL    B&D    MA LM    0002109

performed and whether or not involving the insured's products, if the personal injury or property damage occurs after such operations have been completed or abandoned. Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

"property damage" means (1) loss of, injury to or destruction of tangible property, and (2) injury to intangible property sustained by an organization as the result of false eviction, malicious prosecution, libel, slander or defamation, but excluding any such damage included within the definition of advertising injury or damage.

"retained limit" means as to each occurrence with respect to which insurance is afforded under this policy:

(1) if an underlying policy is also applicable or would be applicable but for breach of policy conditions; the relevant "each person", "each accident", "each occurrence" or similar limit of liability stated therein (less any reduction thereof by reason of an over-riding aggregate limit of liability) plus all amounts payable under other insurance, if any;

(2) if any underlying policy otherwise applicable is inapplicable by reason of exhaustion of an aggregate limit of liability: all amounts payable under other insurance, if any; or

(3) if neither paragraphs (1) or (2) above apply and

(a) the insured has other insurance: all amounts payable under such other insurance, but in no event less than the amount stated in the declarations as the insured's retention, or

(b) the insured has no other insurance: the amount stated in the declarations as the insured's retention.

For the purpose of determining the retained limit, "other insurance" means any other valid and collectible insurance (except under an underlying policy) which is available to the insured, or would be available to the insured in the absence of this policy, it being the intention that this policy shall not apply under or contribute with such other insurance unless the company's agreement thereto is endorsed hereon.

"underlying policy"    } mean, respectively, a policy listed as an
"underlying insurer"  } underlying policy in the declarations and insurer or insurers subscribing such a policy.

## CONDITIONS

**1** **Premium** The premium stated in the declarations is an estimated premium only. Upon termination of this policy the earned premium shall be computed in accordance with the premium rate and exposure basis stated in the declarations.

**2** **Inspection and Audit** The company shall be permitted but not obligated to inspect the named insured's property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the named insured or others, to determine or warrant that such property or operations are safe.

The company may examine and audit the named insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**Notice of Occurrence** Whenever the insured has information from which it may reasonably conclude that an occurrence has taken place which might involve this policy, notice shall be sent to the company or any of its authorized agents as soon as practicable.

**Appeals** In the event the insured or the insured's underlying insurers elect not to appeal a judgment which appears to the company as likely to involve payment under this policy, the company may elect to make such appeal at its own cost and expense, and shall be liable for the taxable costs, disbursements and interest incidental to the appeal, but in no event shall the liability of company for any one occurrence exceed the limit of liability

set forth in Section IV plus such incidental costs, disbursements and interest.

**5** **Subrogation** The company shall be subrogated to the extent of any payment hereunder to all the insured's rights of recovery therefor; and the insured shall do everything necessary to secure such rights. Any amounts so recovered shall be apportioned as follows:

Any interest (including the insured) having paid an amount in excess of the retained limit plus the limit of liability hereunder shall be reimbursed first to the extent of actual payment. The company shall be reimbursed next to the extent of its actual payment hereunder. If any balance then remains, it shall be applied to reimburse the insured or any underlying insurer, as their interests may appear. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries. If there is no recovery in proceedings conducted solely by the company, it shall bear the expenses thereof. The insured shall do nothing after loss to prejudice such rights.

**6** **Changes** Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by the President or a Vice-President and the Secretary or an Assistant Secretary of the company and, if such signatures are facsimile signatures, countersigned by a duly authorized representative of the company.

**7** **Assignment** Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, this policy shall cover the named insured's legal representative as named insured; provided that notice of cancellation addressed to the insured named in the declarations and mailed to the address shown in this policy shall be sufficient notice to effect cancelation of this policy.

**8** **Cancelation** This policy may be canceled by the named insured by mailing to the company written notice stating when thereafter the cancelation shall be effective. This policy may be canceled by the company by mailing to the named insured at the address shown in this policy written notice stating when not less than thirty days thereafter such cancelation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancelation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancelation is effected or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

**9** **Maintenance of Underlying Policies** The named insured shall maintain the underlying policies with limits of liability as stated in item 6 of the declarations and renewals thereof in full effect during this policy period, except for any reduction or exhaustion of the aggregate limit or limits contained in such policies solely by payment of claims arising out of occurrences which happen during this policy period. Failure of the named insured to comply with the foregoing shall not invalidate this policy but in the event of such failure the company shall be liable only to the extent that it would have been liable had the named insured complied therewith.

The named insured shall give the company written notice as soon as practicable of any change in the scope of coverage or in the amount of limits of insurance under any underlying policy, and of the termination of any coverage or exhaustion of aggregate limits of any underlying insurer's liability.

**10** **Action Against Company** No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally

PAGE 3

II-119

PRIVILEGED AND CONFIDENTIAL    B&D    MA LM        0002110

determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the company as a co-defendant in any action against the insured to determine the insured's liability.

Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

**11** **First Named Insured** The first insured named in Item 1 of the declarations shall be responsible for payment of all premiums, and

is authorized to act on behalf of all other insureds and named insureds with respect to giving and receiving notice of cancellation and to receiving any return premium or dividends that may become payable under this policy.

**Declarations** By acceptance of this policy the named insured **12** agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

**Mutual Policy Conditions** This policy is nonassessable. The **13** policyholder is a member of the company and shall participate to the extent and upon the conditions fixed and determined by the board of directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

In witness whereof, the company has caused this policy to be signed by its President and Secretary at Boston, Massachusetts, and countersigned on the declarations page by a duly authorized representative of the company.

*Bruce E. Boorman*
SECRETARY

*Frank L. Farwell*
PRESIDENT

PAGE 4

I1-120

PRIVILEGED AND CONFIDENTIAL    B&D    MA LM        0002111

> THIS ENDORSEMENT APPLIES TO ALL LIABILITY AND MEDICAL PAYMENTS COVER-
> AGES AFFORDED BY THIS POLICY, INCLUDING ANY SUCH COVERAGES ADDED BY
> ENDORSEMENT EITHER AT INCEPTION OR DURING THE POLICY PERIOD, EXCEPT
> UNDER COMPREHENSIVE PERSONAL AND FARMER'S COMPREHENSIVE PERSONAL
> INSURANCE.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

It is agreed that:

I. The policy does not apply:

   A. Under any Liability Coverage, to bodily injury or property damage

      (1) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

   C. Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

      (1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

      (2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (3) the bodily injury or property damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

II. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

      (a) any nuclear reactor,

      (b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

      (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

      (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

LIBERTY MUTUAL INSURANCE COMPANY

*Bruce E. Boorman*
SECRETARY

*Frank L. Farwell*
PRESIDENT

.3009
G320
10/1/66

II—121

PRIVILEGED AND CONFIDENTIAL     B&D     MA LM          0002112

## SHORT RATE CANCELLATION TABLE

| Days Policy in Force | Per Cent of One Year Premium | Days Policy in Force | Per Cent of One Year Premium |
|---|---|---|---|
| 1 | | 154–156 | 53 |
| 2 | 5 | 157–160 | 54 |
| 3– 4 | 6 | 161–164 | 55 |
| 5– 6 | 7 | 165–167 | 56 |
| 7– 8 | 8 | 168–171 | 57 |
| 9–10 | 9 | 172–175 | 58 |
| 11–12 | 10 | 176–178 | 59 |
| 13–14 | 11 | 179–182 (6 mos.) | 60 |
| 15–16 | 12 | 183–187 | 61 |
| 17–18 | 13 | 188–191 | 62 |
| 19–20 | 14 | 192–196 | 63 |
| 21–22 | 15 | 197–200 | 64 |
| 23–25 | 16 | 201–205 | 65 |
| 26–29 | 17 | 206–209 | 66 |
| 30–32 (1 mo.) | 18 | 210–214 (7 mos.) | 67 |
| 33–36 | 19 | 215–218 | 68 |
| 37–40 | 20 | 219–223 | 69 |
| 41–43 | 21 | 224–228 | 70 |
| 44–47 | 22 | 229–232 | 71 |
| 48–51 | 23 | 233–237 | 72 |
| 52–54 | 24 | 238–241 | 73 |
| 55–58 | 25 | 242–246 | 74 |
| 59–62 | 26 | 247–250 (8 mos.) | 75 |
| 63–65 (2 mos.) | 27 | 251–255 | 76 |
| 66–69 | 28 | 256–260 | 77 |
| 70–73 | 29 | 261–264 | 78 |
| 74–76 | 30 | 265–269 | 79 |
| 77–80 | 31 | 270–273 | 80 |
| 81–83 | 32 | 274–278 | 81 |
| 84–87 | 33 | 279–282 (9 mos.) | 82 |
| 88–91 | 34 | 283–287 | 83 |
| 92–94 (3 mos.) | 35 | 288–291 | 84 |
| 95–98 | 36 | 292–296 | 85 |
| 99–102 | 37 | 297–301 | 86 |
| 103–105 | 38 | 302–305 | 87 |
| 106–109 | 39 | 306–310 | 88 |
| 110–113 | 40 | 311–314 (10 mos.) | 89 |
| 114–116 | 41 | 315–319 | 90 |
| 117–120 (4 mos.) | 42 | 320–323 | 91 |
| 121–124 | 43 | 324–328 | 92 |
| 125–127 | 44 | 329–332 | 93 |
| 128–131 | 45 | 333–337 | 94 |
| 132–135 | 46 | 338–341 (11 mos.) | 95 |
| 136–138 | 47 | 342–346 | 96 |
| 139–142 | 48 | 347–351 | 97 |
| 143–146 | 49 | 352–355 | 98 |
| 147–149 | 50 | 356–360 | 99 |
| 150–153 (5 mos.) | 51 | 361–365 (12 mos.) 100 | |

If the policy has been in effect, for twelve months or less the above table applies. If the policy has been in effect for more than twelve months, the unearned premium will be determined as follows: (1) Determine the full annual premium for the term, or one-year period. (2) Deduct such premium, or one-year premium, from the total premium paid. (3) To the remainder, add such portion of the full annual premium, or one-year premium, for the last year during which the policy has been in effect, as computed from the above table. (6) The result is the unearned premium. (7) All unearned premiums shall be computed in accordance with the provisions (3) and (6) above, when the policy has been in effect.



OFFICES

IN

PRINCIPAL CITIES

THROUGHOUT

THE

UNITED STATES

AND

CANADA

II–122

PRIVILEGED AND CONFIDENTIAL    B&D    MA LM        0002113

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LIBERTY MUTUAL INSURANCE COMPANY,          )
                                           )
                Plaintiff,                 )
                                           )
v.                                         )      CIVIL ACTION
                                           )      NO. 96-10804-DPW
THE BLACK & DECKER CORPORATION,            )
BLACK & DECKER, INC., BLACK & DECKER       )
(U.S.) INC., EMHART CORPORATION, and       )
EMHART INDUSTRIES, INC.,                   )
                                           )
                Defendants.                )

SUPPLEMENTAL SUBMISSION IN RESPONSE TO
SUPPLEMENTAL BRIEF OF LIBERTY MUTUAL REGARDING
DUTY TO DEFEND BROS CLAIM UNDER
LIBERTY MUTUAL'S EXCESS UMBRELLA POLICY

The Supplemental Brief filed by Liberty Mutual on September 12, 2003, goes

well beyond the narrow scope of this Court's request for briefing on issues specific to Liberty

Mutual's excess umbrella policy. Moreover, insofar as it addresses those narrow issues, Liberty

Mutual makes misleading arguments based on its misreading of the cases it cites. It points to no

policy language and to no binding authority, indeed, no Maryland authority, which supports its

position. Liberty Mutual appears to be construing policy language in some "technical sense," a

construction which is unjustified and unjustifiable and which the Maryland courts would reject.

See Bausch & Lomb v. Utica Mutual Insurance Co., 625 A.2d 1021, 1031 (Md. 1993). Under

Maryland law, the phrase "not covered," which is at issue here, should be given its "usual,

ordinary, and accepted meaning." Id. An insured would read the words "not covered" to take

exclusions into account.

- 1 -

1.    The Term "Not Covered" Encompasses Exclusions

As pertinent here, the excess umbrella policy at issue provides a defense for claims "not covered under any underlying policy." Liberty Mutual apparently argues that the phrase "not covered" in an excess umbrella insurance policy does not encompass the situation where the claim is "not covered" due to a policy exclusion, such as the pollution exclusion in the primary policy here. As shown below, the cases it cites do not support its specious argument. As is also shown, the courts have taken exclusions into account in construing policies with the same "not covered" language.

a.    Westview and American States Reject Liberty Mutual's Contention

In Westview Associates v. Guaranty National Insurance Co., 717 N.Y.S.2d 75 (N.Y. 2002), an underlying policy had a lead paint exclusion. The claim involved lead paint. The umbrella policy, written by the same insurer, had a pollution exclusion but not a lead paint exclusion. The court held that Coverage B of the umbrella policy, which pertained to claims "not covered" by the underlying policy, was applicable. As a result, the umbrella policy covered the claim.

The same was true in American States Insurance Co. v. Maryland Casualty Co., 628 A.2d 880, 886-87 (Pa. Super. 1993). There the professional liability exclusion in the primary policy was absent from the excess umbrella policy. The court held that the excess umbrella insurer was in breach of its policy which provided for coverage of claims "not covered by the underlying policy" when it failed to defend a complaint with a colorable claim of professional liability.

Courts routinely consider language similar to the "no coverage" language here as including absence of coverage due to exclusions. Metlife Capital Corp. v. Westchester Fire

- 2 -

Insurance Co, 224 F.Supp.2d 374 (D.P.R. 2002), a decision upon which Liberty Mutual relies, is

one such case. There the watercraft exclusion excluded "coverage not provided by 'underlying

insurance,'" a reference which all parties and the court construed as referring back to the

watercraft exclusion in the underlying policy. See 224 F.Supp.2d at 383. Similarly, in

Westview, 740 N.E.2d at 221-22, the court held that a separate coverage provision specifically

incorporating "the coverage provisions" of the underlying policy incorporated "the exclusions" in

that policy.

> b.    Garmany and the $20,000 Policy Limit

Liberty cites Garmany v. Mission Insurance Co., 785 F.2d 941 (11th Cir. 1986),

for the proposition that the phrase "not covered" pertains to "the fact of coverage" and not the

"extent of coverage." Supp. Br. at 8. There the underlying automobile policy covered all drivers

but with low coverage limits if the driver was not an employee. The insurers defended in

succession and the only question was the point at which the excess umbrella insurer's obligation

to indemnify attached. In making that determination, the court held that the non-employee driver

was "covered" under the primary policy. 785 F.2d at 947. Plainly, "extent" in the quoted

phrase refers to policy limits, not exclusions. When viewed in context, the quotation has no

bearing on the case at bar.

> c.    A-Best, the Two Clauses, and an Exhausted Policy

Liberty Mutual also relies upon American Special Risk Insurance Co. v. A-Best

Products, Inc., 975 F.Supp. 1019, 1024-26 (N.D. Ohio), aff'd, 166 F.3d 1213 (6th Cir.

1998)(table). There the excess umbrella policy included two provisions utilizing the term "not

covered," one appearing in the body of the policy and the other being in a Defense Coverage

Endorsement. The question was which of these two provisions applied so as to determine

- 3 -

whether defense expenses were included, or excluded, from coverage limits. Inasmuch as the

underlying policy was exhausted, the court selected the provision in the underlying policy which

spoke to the duty to defend subsequent to exhaustion, rather than the special endorsement which

contemplated an immediate defense. The court harmonized the two provisions, holding that a

"covered" claim did not become a "not covered" claim within the meaning of the special

endorsement upon exhaustion of the underlying policy. Again, the case had nothing to do with

exclusions and nothing to do with the case at bar.

     d.    <u>Metlife and The Wrongful Denial</u>

     The third case that Liberty Mutual relies upon is <u>Metlife Capital Corp</u>. v.

<u>Westchester Fire Insurance Co</u>, 224 F.Supp.2d 374 (D.P.R. 2002). There the court dealt with

two separate issues. Liberty Mutual mixes the two together and misstates the court's holdings.

     First, the court addressed an exclusion in the excess umbrella policy which

expressly limited watercraft coverage under that policy to the watercraft coverage in the

underlying policy. 224 F.Supp.2d at 383-84. In contrast, there is no provision in Liberty

Mutual's excess umbrella policy adopting the underlying pollution exclusion. The excess

umbrella insurer argued that there was no coverage under either policy. The court disagreed,

finding that the watercraft exclusion in the underlying policy was not applicable. 224 F.Supp.2d

at 387.

     The court then went onto the next issue. In <u>dicta</u>, or what it termed "a purely

academic holding," the court concluded that a wrongful denial of coverage by the primary

insurer does not result in the insured being "not covered" so as to trigger the excess umbrella

insurer's duty to defend. 224 F.Supp.2d at 388-390. Liberty Mutual misreads <u>Metlife</u> when it

states that the court "held that there was no duty to defend under the umbrella excess policy,

- 4 -

because the underlying primary policy did provide coverage for property damage, notwithstanding the existence of the watercraft exclusion." Supp. Br. at 9. As noted above, the court had already held that the watercraft exclusion was inapplicable. The reason for the underlying insurer's wrongful denial was irrelevant. Surely, Liberty Mutual is not contending that it has no obligations under the excess umbrella policy it issued because it wrongfully failed to provide coverage under its primary policies.

While, in the course of its discussion, the court suggested that there was coverage under the primary policy because the insured "was covered for property damage," its conclusion was bolstered by an express excess umbrella provision, not present here, under which the excess umbrella insurer had no duty to defend upon the primary insurer's "failure to comply with any of its obligations." Id. In any event, by the time the court issued its opinion, the underlying insurer had reconsidered its denial, rendering the whole discussion moot. The only remaining issues were the extent of the excess umbrella insurer's defense and indemnification obligations due to the exhaustion of the underlying policy.

These cases do not support Liberty Mutual's position. In applying the "not covered" language of an excess umbrella policy, exclusions in the underlying policy, under which the claim becomes "not covered," cannot be ignored.

2.    "Not Covered" Reaches Beyond The Type of Insurance Provided

When Liberty Mutual argues that a claim is "covered" or "not covered" under an underlying policy based upon the type of risk covered by the underlying policy (see Supp. Br. at 6-7) it again attempts to import the underlying pollution exclusion into the excess umbrella policy. Even its own citation to language by which an excess policy drops down only where "the terms of the underlying policy do not provide coverage" fails to support its contention. Supp. Br.

at 7. The language is taken from a case, <u>Mission National Insurance Co</u>. v. <u>Duke Transportation Co</u>., 792 F.2d 550, 553 (5th Cir. 1986), where the terms of the underlying policy covered the claim but the underlying insurer was insolvent. Exclusions are among a policy's "terms." Surely, when a claim for a type of coverage, e.g., property damage, is made under a Liberty Mutual policy, the company does pay because its policy covers "property damage" without looking at the policy terms, including the definitions and the exclusions. There is no reason why the approach should be any different here.

3.    "Retained Limit" Goes Beyond Exhaustion

Liberty contends that its excess umbrella policy applies only where the underlying insurance is exhausted, relying upon the definition of "retained limit. Supp.Br. at 5-6. However, it omits any reference to subparagraph (3) of the definition, which provides for coverage where the underlying policy is not "applicable" and "the insured has no other insurance." See App.II:119. In any event, the definition of "retained limit" pertains only to indemnification and, indeed, only to <u>the amount</u> of indemnification. The defense obligation (see App II:117), which is at issue in BROS, does not turn upon the meaning of that term. Liberty Mutual cannot rely upon the indemnification clause and "retained limit" definition to read its defense obligation out of the policy.

4.    Liberty Mutual's Policy Does Not "Follow Form"

It is simple for an insurer to write an excess policy in which all terms, including exclusions, in an underlying policy are applicable. It only has to state that the excess policy follows the terms, definitions, and exclusions of the underlying policy. See, e.g., <u>Fidelity & Deposit Company of Maryland</u> v. <u>Hartford Casualty Insurance Co</u>., 189 F.Supp.2d 1212, 1223, n. 6 (D.Kan. 2002). Such a policy "follows form."

Liberty Mutual did not write such a policy here. It did not include "follow form" language. [1] Instead it wrote a complete policy, with its own definitions and and exclusions, and entitled the policy "umbrella excess policy." Where a policy does not "follow form" but provides coverage broader than that of the underlying policy, it must fill the gaps.

5.    Arguments Beyond Scope Of Brief

Black & Decker respectfully submits that the remaining arguments Liberty Mutual makes are beyond the scope of the briefing requested by the Court and should not be considered. If the Court determines to consider these arguments, Black & Decker will seek the opportunity to furnish a complete response. The response here is limited to two points which can be made quickly.

First, regarding the "occurrence" issue, Liberty Mutual cites Sheets v. The Brethren Mutual Insurance Co., 679 A.2d 540, 545 (Md. 1996), a decision by Maryland's highest court. Supp. Br. at 12. To be sure, as Liberty Mutual states, the court held that there is an "accident" when "the resulting damage was 'an event that takes place without [the insured's]foresight or expectation.'" 779 A.2d at 548. It then restated this holding, saying that, "[i]n other words, when a negligent act causes damage that is unforeseen or unexpected by the insured, the act is an 'accident' under a general liability policy." This is a case where Black & Decker's waste oil allegedly reached a third-party processing facility, not a case involving Black & Decker's own facility. As is abundantly clear from the Sheets decision, Maryland's highest

---

[1] In its footnote 3, Liberty Mutual purports to rely upon an endorsement to show that its policy "follows form." It misreads the policy language. The endorsement it quotes refers only to exclusions in the excess umbrella policy and provides that an exclusion in the excess umbrella policy will not limit coverage under the primary policy. In other words, the excess umbrella policy is at least as broad as the primary policy. However, nothing in the endorsement adopts exclusions in the underlying policy and nothing in the endorsement prevents the excess umbrella policy from being broader than the underlying policy. This endorsement is for the benefit of the insured and does not limit coverage in any way.

court completely rejected the inordinately narrow definition of "accident" which Liberty Mutual promotes.

Second, it is impossible to square Liberty Mutual's contention that Maryland requires the tender of a defense for coverage (see Supp. Br. at 15) with the ruling of Maryland's highest court in Sherwood Brands, Inc. v. Hartford Accident and Indemnity Co., 698 A.2d 1078 (Md. 1997), that an insurer who wrongfully refuses to defend for reasons unrelated to notice, as Liberty Mutual did here, must pay pre-tender attorney's fees. Liberty Mutual cites this case itself on another point but then ignores the holding, instead relying upon two decisions by a lower appellate court which were disapproved in Sherwin Brands. Compare Supp. Br. at 14 and at 15 and see Sherwin Brands, 698 A.2d at 1084-85.

By their attorneys,

Jack R. Pirozzolo BBO#400400
Richard L. Binder BBO#043240
Judith S. Ziss BBO #544937
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on _____

- 8 -



**LIBERTY MUTUAL INSURANCE COMPANY**
Home Office: Boston

DECLARATIONS

COMPREHENSIVE GENERAL LIABILITY POLICY

| Policy No. LG1- 131-010406-150 | TD Code 23 | Sales Office Baltimore | Code 334 | Salesman Hamlin | Code 6616 | N/R 2 | 1st Year 37 |
|---|---|---|---|---|---|---|---|

**Item 1.** Named Insured    The Black & Decker Manufacturing Co., Black & Decker, Inc., Van Dorn Electric Tool Co., Texas Tool Center, Inc., Dewalt, Incorporated and

Address    Master Power, Corporation
Towson, Maryland

The named insured is: Individual ☐, Partnership ☐, Corporation ☒, Other ☐ ————

Business of named insured is:    Tool Manufacturing

**Item 2.** Policy Period: From Mo. 7 Day 1 Year 70 to Mo. 7 Day 1 Year 71
12:01 A.M., standard time at the address of the named insured as stated herein.

Audit Basis: At Expiration ☐, Annual ☐, Semi-Annual ☐, Quarterly ☐, Monthly ☒, Flat Charge ☐

**Item 3.** The insurance afforded is only with respect to such of the following Coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such Coverage shall be as stated herein, subject to all the terms of this policy having reference thereto.

| COVERAGES | LIMITS OF LIABILITY | | ADVANCE PREMIUMS |
|---|---|---|---|
| A — BODILY INJURY LIABILITY | $ See End. #1 | each person each occurrence aggregate | $ 16,372. |
| B — PROPERTY DAMAGE LIABILITY | $ See End #1 | each occurrence aggregate | $ 7,106. |

| MINIMUM PREMIUMS: | Bodily Injury Liability $ 200. | Property Damage Liability $ 175. | Deposit TOTAL ADVANCE/PREMIUM | $ 23,478. |
|---|---|---|---|---|

**Item 4.** Computation of Premiums

| Classification and Locations | Code No. | Premium Base per $1,000. sales | Rates per $1,000. | | Advance Premiums | |
|---|---|---|---|---|---|---|
| | | | Bodily Injury Liability | Property Damage Liability | Bodily Injury Liability Code 318 | Property Damage Liability Code 338 |
| SEE SCHEDULE ATTACHED | | | | | | |

The policy, including all endorsements issued therewith, is hereby countersigned by ———— Authorized Representative

| Work Units 1- 8 | Typed 9/2/70 | Periodic Payment $ 6,303. | Rating Basis R ☐ NR ☒ | Audit Basis 8 | Home State Md. | Pol. H.G. S ☐ | Renewal of LG1-159 | Accounting Entry Dividend for Ean Period |
|---|---|---|---|---|---|---|---|---|

PRIVILEGED AND CONFIDENTIAL    B&D  MA LM    0001532    —

COMPREHENSIVE GENERAL LIABILITY

THIS POLICY IS CLASSIFIED IN THE
GENERAL CLASS

# LIBERTY MUTUAL INSURANCE COMPANY

### Home Office: Boston

FOR PROMPT INSURANCE SERVICE — CALL YOUR SERVICE OFFICE

The named insured is hereby notified that by virtue of this policy he is a member of Liberty Mutual Insurance Company and is entitled to vote either in person or by proxy at any and all meetings of said company.

The annual meetings are held at its home office, Boston, Massachusetts, on the second Wednesday of April in each year, at eleven o'clock in the morning.

(A mutual insurance company, herein called the company)

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the named insured as follows:

### I. COVERAGE A—BODILY INJURY LIABILITY
### COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or
Coverage B. property damage

to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

### Exclusions

This policy does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

(b) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
  (1) any automobile or aircraft owned or operated by or rented or loaned to the named insured, or
  (2) any other automobile or aircraft operated by any person in the course of his employment by the named insured;
but this exclusion does not apply to the parking of an automobile on premises owned by, rented to or controlled by the named insured or the ways immediately adjoining, if such automobile is not owned by or rented or loaned to the named insured;

(c) to bodily injury or property damage arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to the named insured;

(d) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of any watercraft, if the bodily injury or property damage occurs away from premises owned by, rented to or controlled by the named insured; but this exclusion does not apply to bodily injury or property damage included within the products hazard or the completed operations hazard or resulting from operations performed for the named insured by independent contractors or to liability assumed by the insured under an incidental contract;

(e) to bodily injury or property damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution

or to any act or condition incident to any of the foregoing, with respect to
  (1) liability assumed by the insured under an incidental contract, or
  (2) expenses for first aid under the Supplementary Payments provision;

(f) to bodily injury or property damage for which the insured or his indemnitee may be held liable, as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages or as an owner or lessor of premises used for such purposes, by reason of the selling, serving or giving of any alcoholic beverage
  (1) in violation of any statute, ordinance or regulation,
  (2) to a minor,
  (3) to a person under the influence of alcohol, or
  (4) which causes or contributes to the intoxication of any person;

(g) to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(h) to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured; but this exclusion does not apply to liability assumed by the insured under an incidental contract;

(i) to property damage to
  (1) property owned or occupied by or rented to the insured,
  (2) property used by the insured, or
  (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;
but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured;

(j) to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

(k) to bodily injury or property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

(l) to property damage to the named insured's products arising out of such products or any part of such products;

(m) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof,

GPO 2714
(10/1/66)
LG

Printed
USA

PAGE 1

PRIVILEGED AND CONFIDENTIAL    B&D MA LM        0002231

or out of materials, parts or equipment furnished in connection therewith;

(n) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

## II SUPPLEMENTARY PAYMENTS

The company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the company shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the insured for first aid to others at the time of an accident for bodily injury to which this policy applies;

(d) reasonable expenses incurred by the insured at the company's request, including actual loss of wages or salary (but not loss of other income) not to exceed $25 per day because of his attendance at hearings or trials at such request.

## II PERSONS INSURED

Each of the following is an insured under this policy to the extent set forth below:

(a) if the named insured is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor;

(b) if the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(d) any person (other than an employee of the named insured) or organization while acting as real estate manager for the named insured; and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of mobile equipment registered under any motor vehicle registration law.

   (i) an employee of the named insured while operating any such equipment in the course of his employment, and

   (ii) any other person while operating with the permission of the named insured any such equipment registered in the name of the named insured and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

provided that no person or organization shall be an insured under this paragraph (e) with respect to:

   (1) bodily injury to any fellow employee of such person injured in the course of his employment, or

   (2) property damage to property owned by, rented to, in charge of or occupied by the named insured or the employer of any person described in subparagraph (ii).

This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured.

## LIMITS OF LIABILITY    IV

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:

Coverage A—The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence".

Subject to the above provisions respecting "each person" and "each occurrence", the total liability of the company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate".

Coverage B—The total liability of the company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence".

Subject to the above provision respecting "each occurrence", the total liability of the company for all damages because of all property damage to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of property damage liability stated in the declarations as "aggregate":

(1) all property damage arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, including property damage for which liability is assumed under any incidental contract relating to such premises or operations, but excluding property damage included in subparagraph (2) below;

(2) all property damage arising out of and occurring in the course of operations performed for the named insured by independent contractors and general supervision thereof by the named insured, including any such property damage for which liability is assumed under any incidental contract relating to such operations, but this subparagraph (2) does not include property damage arising out of maintenance or repairs at premises owned by or rented to the named insured or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) all property damage included within the products hazard and all property damage included within the completed operations hazard.

Such aggregate limit shall apply separately to the property damage described in subparagraphs (1), (2) and (3) above, and under subparagraphs (1) and (2), separately with respect to each project away from premises owned by or rented to the named insured.

Coverages A and B—For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

## POLICY PERIOD; TERRITORY    V

This policy applies only to bodily injury or property damage which occurs during the policy period within the policy territory.

## DEFINITIONS    VI

When used in this policy (including endorsements forming a part hereof):

PAGE 2

PRIVILEGED AND CONFIDENTIAL    B&D MA LM    0002232

"automobile" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment;

"bodily injury" means bodily injury, sickness or disease sustained by any person;

"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3) when that portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury or property damage arising out of

(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in this policy or in the company's manual specifies "including completed operations";

"damages" includes damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage;

"elevator" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an automobile servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

"incidental contract" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement;

"insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

"mobile equipment" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2), maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

"named insured" means the person or organization named in Item 1 of the declarations of this policy;

"named insured's products" means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle), but "named insured's products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

"policy territory" means:

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"products hazard" includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

"property damage" means injury to or destruction of tangible property.

## CONDITIONS

Premium    All premiums for this policy shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the named insured, shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the company shall return to the named insured the unearned portion paid by the named insured.

The named insured shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the company at the end of the policy period and at such times during the policy period as the company may direct.

Inspection and Audit    The company shall be permitted but not obligated to inspect the named insured's property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the named insured or others, to determine or warrant that such property or operations are safe.

The company may examine and audit the named insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

Financial Responsibility Laws    When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The insured agrees to reimburse the company for any payment

PAGE 3

PRIVILEGED AND CONFIDENTIAL    B&D MA LM      0002233

made by the company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**Insured's Duties in the Event of Occurrence, Claim or Suit**

**4**

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable. The named insured shall promptly take at his expense all reasonable steps to prevent other bodily injury or property damage from arising out of the same or similar conditions, but such expense shall not be recoverable under this policy.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except as authorized by this paragraph, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**5**

**Action Against Company**   No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

**6**

**Other Insurance**   The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares**   If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount

of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits**   If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**7**

**Subrogation**   In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

**8**

**Changes**   Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by the President or a Vice President, and the Secretary or an Assistant Secretary of the company and, if such signatures are facsimile signatures, countersigned by a duly authorized representative of the company.

**9**

**Assignment**   Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such and (2) with respect to the property of the named insured, to the person having proper temporary custody thereof, as insured, but only until the appointment and qualification of the legal representative.

**1**

**Three Year Policy**   If this policy is issued for a period of three years, the limits of the company's liability shall apply separately to each consecutive annual period thereof.

**1**

**Cancellation**   This policy may be cancelled by the named insured by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the named insured at the address shown in this policy, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**1**

**Declarations**   By acceptance of this policy, the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

**1**

**Mutual Policy Conditions**   This policy is nonassessable. The policyholder is a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the board of directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

In witness whereof, the company has caused this policy to be signed by its President and Secretary at Boston, Massachusetts, and countersigned on the declarations page by a duly authorized representative of the company.

*Bruce E. Boorman*
SECRETARY

*Frank L. Farwell*
PRESIDENT

PAGE 4
(See Page 5)

PRIVILEGED AND CONFIDENTIAL    B&D MA LM              0002234

> THIS ENDORSEMENT APPLIES TO ALL LIABILITY AND MEDICAL PAYMENTS COVER-
> AGES AFFORDED BY THIS POLICY, INCLUDING ANY SUCH COVERAGES ADDED BY
> ENDORSEMENT EITHER AT INCEPTION OR DURING THE POLICY PERIOD, EXCEPT
> UNDER COMPREHENSIVE PERSONAL AND FARMER'S COMPREHENSIVE PERSONAL
> INSURANCE.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

It is agreed that:

I. The policy does not apply:

A. Under any Liability Coverage, to bodily injury or property damage

   (1) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Asso- ciation of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the opera- tion of a nuclear facility by any person or organization.

C. Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

   (1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

   (2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, trans- ported or disposed of by or on behalf of an insured; or

   (3) the bodily injury or property damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

II. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

   (a) any nuclear reactor,

   (b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

   (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

   (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to con- tain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

LIBERTY MUTUAL INSURANCE COMPANY

*Bruce E. Boorman*                           *Frank L. Farwell*

      SECRETARY                                          PRESIDENT

A0009
G320
10/1/66                                     PAGE 5

PRIVILEGED AND CONFIDENTIAL    B&D MA LM    0002235

OFFICES

IN

PRINCIPAL CITIES

THROUGHOUT

THE

UNITED STATES

AND

CANADA



COMPREHENSIVE GENERAL LIABILITY POLICY

LIBERTY MUTUAL
INSURANCE COMPANY
BOSTON, MASSACHUSETTS

THIS POLICY IS NONASSESSABLE

## SHORT RATE CANCELATION TABLE

| Days Policy in Force | Per Cent of One Year Premium | Days Policy in Force | Per Cent of One Year Premium |
|---|---|---|---|
| 1 | 5 | 164–166 | 63 |
| 2 | 6 | 167–169 | 64 |
| 3–4 | 7 | 161–164 | 65 |
| 5–6 | 8 | 165–167 | 66 |
| 7–8 | 9 | 168–171 | 67 |
| 9–10 | 10 | 172–175 (6 mos.) | 68 |
| 11–12 | 11 | 176–178 | 69 |
| 13–14 | 12 | 179–182 | 60 |
| 15–16 | 13 | 183–187 | 61 |
| 17–18 | 14 | 188–191 | 62 |
| 19–20 | 15 | 192–196 | 63 |
| 21–22 | 16 | 197–200 | 64 |
| 23–25 | 17 | 201–205 | 65 |
| 26–29 | 18 | 206–209 | 66 |
| 30 (1 mo.) | 19 | 210–214 (7 mos.) | 67 |
| 31–32 | 20 | 215–218 | 68 |
| 33–35 | 21 | 219–223 | 69 |
| 36–40 | 22 | 224–228 | 70 |
| 41–43 | 23 | 229–232 | 71 |
| 44–47 | 24 | 233–237 | 72 |
| 48–51 | 25 | 238–241 | 73 |
| 52–54 | 26 | 242–246 (8 mos.) | 74 |
| 55–58 | 27 | 247–250 | 75 |
| 59–62 (2 mos.) | 28 | 251–255 | 76 |
| 63–65 | 29 | 256–260 | 77 |
| 66–69 | 30 | 261–264 | 78 |
| 70–73 | 31 | 265–269 | 79 |
| 74–76 | 32 | 270–273 (9 mos.) | 80 |
| 77–80 | 33 | 274–278 | 81 |
| 81–83 | 34 | 279–282 | 82 |
| 84–87 | 35 | 283–287 | 83 |
| 88–91 (3 mos.) | 36 | 288–291 | 84 |
| 92–94 | 37 | 292–296 | 85 |
| 95–98 | 38 | 297–301 | 86 |
| 99–102 | 39 | 302–305 (10 mos.) | 87 |
| 103–105 | 40 | 306–310 | 88 |
| 106–109 | 41 | 311–314 | 89 |
| 110–113 | 42 | 315–319 | 90 |
| 114–116 | 43 | 320–323 | 91 |
| 117–120 | 44 | 324–328 | 92 |
| 121–124 (4 mos.) | 45 | 329–332 | 93 |
| 125–127 | 46 | 333–337 (11 mos.) | 94 |
| 128–131 | 47 | 338–342 | 95 |
| 132–135 | 48 | 343–346 | 96 |
| 136–138 | 49 | 347–351 | 97 |
| 139–142 | 50 | 352–356 | 98 |
| 143–146 | 51 | 357–360 | 99 |
| 147–149 | 52 | 361–365 (12 mos.) | 100 |
| 150–153 (6 mos.) | 52 | | |

If the policy has been in effect for twelve months or less, the above table applies. If the policy has been in effect for more than twelve months, the earned premium shall be determined as follows: (1) Determine the full annual premium as for a policy written for a term of one year. (2) Deduct such full annual premium from the original premium, and the remainder indicates the pro rata earned premium on the basis of the ratio of the length of time beyond one year the policy has been in effect to the length of time (in excess of one year) for which the policy was originally written. (3) Add premium produced in accordance with items (1) and (2) to obtain earned premium during period policy has been in effect.