# Tab 2.

# BROS SITE

## Entities and Time Periods

- Black & Decker, through its Hampstead, Maryland plant.

- Waste oil was allegedly hauled from Black & Decker's Hampstead, Maryland plant for disposal at the BROS Site in Logan Township, New Jersey on various occasions during the time period March, 1973 to July, 1979 or early 1980.

- The Bridgewater Rental and Oil Services ("BROS") Site was a waste oil processing and reclamation facility that operated from approximately 1950 through 1980. However, there is no evidence that Black & Decker had any involvement at BROS prior to March, 1973.

## Policies

- The Black & Decker policies for the period 1973 to 1979, all containing pollution exclusion.

- No Black & Decker policies implicated prior to 1973 as no evidence of any Black & Decker involvement prior to March, 1973.

## Applicable Law

- According to this Court's Order of October 30, 1998 and its May 17, 2002 Memorandum and Order, Maryland law applies to the Black & Decker policies.

- The pollution exclusion contained in the Black & Decker policies issued during the time period 1973 to 1979 is applicable, despite the "deletion endorsement", because the waste disposal at issue (i.e., the alleged "occurrence") took place in New Jersey, not Maryland.

## Undisputed Material Facts

- The BROS Settlement Process Committee alleged that Black & Decker's waste oil was transported to the BROS Site for disposal during only the following time periods:  3/73-3/74; 6/74-11/74; 1/75-1/78; 2/78-1/79; and 7/79.

- The BROS Settlement Process Committee calculated Black & Decker's volumetric share of the clean-up costs at the BROS Site on the basis of

a time period for disposal of Black & Decker's waste oil at the Site beginning no earlier than March, 1973.

- EPA's Record of Decision described three sources of contamination at the BROS Site: (1) a 12.7-acre lagoon containing waste oil and contaminated waste water; (2) a tank farm along the shore of the lagoon, containing hazardous substances; and (3) groundwater which came in contact with the lower portions of the lagoon.

- From approximately 1950 through 1980, the BROS Site accepted waste oil and other hazardous substances from numerous sources, collecting it in the lagoon system (See May 17, 2002 Draft Decision, at 34), but no Black & Decker involvement prior to March, 1973.

- In 1992, several private plaintiffs brought a CERCLA action for contribution to response costs they had already paid at the BROS Site against defendants who allegedly transported waste to the BROS Site or generated waste that was transported to the Site. This lawsuit, styled Rollins Environmental Services, Inc., et al. v. The United States of America, et al., C.A. No. 92-1253, was consolidated with a cost recovery action brought by the USEPA, styled United States of America v. Allied-Signal, Inc., et al., C.A. No. 92-2726, in the federal court in New Jersey. Among the defendants in Rollins was A&A Waste Oil, which allegedly transported Black & Decker's waste oil for disposal at the BROS Site on various occasions during the period March, 1973 to July, 1979. Black & Decker was not named as a party in either the Rollins or the Allied-Signal lawsuits.

- On December 17, 1992, Black & Decker received a letter from counsel to certain defendants in the consolidated CERCLA lawsuit notifying Black & Decker of the opportunity to participate in a court-sponsored, voluntary, informal, non-litigated settlement/mediation process, based on Black & Decker's status as a generator of waste transported by A&A to the Site. Black & Decker participated in that voluntary process, but withdrew when the PRP Group demanded that Black & Decker pay $895,000 as its share of remediation costs at the Site.

- Black & Decker did not pay for remediation of pollution damages at the BROS Site.

## No Coverage, As A Matter Of Law

- Pollution exclusion precludes coverage for damages arising from non-

sudden, non-accidental discharges of pollutants at BROS Site, which took place regularly and repeatedly as part of routine business operations over several decades.

- Black & Decker's references to a fire at the Site in 1964 and two releases of thousands of gallons of hazardous substances from storage tanks into the 70-million gallon lagoon cannot establish a triable issue of fact concerning the availability of coverage for damages resulting from "sudden and accidental" releases at the Site under the exception to the pollution exclusion, in view of the overwhelming evidence of regular pollutant releases from the lagoon and other equipment at the Site as a concomitant of routine business operations over a period of decades.

- Black & Decker cannot establish that any contamination which resulted from allegedly sudden and accidental releases at the Site was more than a de minimis source of pollution at the Site, given the vast quantities of waste oil and hazardous substances discharged into the lagoon on a continuous basis as part of the "pollution-prone" operations at the Site.

- No pre-pollution exclusion policies are applicable, because disposal of Black & Decker's waste oil is not alleged to have occurred prior to March, 1973, and Black & Decker has not raised a triable issue of fact concerning the commencement date of A&A's shipment of Black & Decker's waste oil to the Site.

- Black & Decker's allegation that A&A began picking up waste oil at Black & Decker's Hampstead facility in the 1960's does not establish a triable issue of material fact, because Black & Decker concedes that there is no evidence concerning the disposition of that waste oil at the BROS Site.

- Black & Decker's reference to alleged transactions between A&A and Regal Petroleum, one of the BROS Site operators, in the 1960's does not establish a triable issue of fact, because Black & Decker concedes that there is no evidence concerning the source of the waste oil which allegedly formed the basis of the transactions between A&A and Regal Petroleum.

- Black & Decker should be estopped from contending that its waste oil was, or could have been, disposed of at the Site prior to 1973, because it informed the BROS Site Settlement Process Committee that "although there is evidence that Black & Decker

- 3 -

used the services of A&A, there is no evidence that any of Black & Decker's material was transported to the BROS Site." <u>See</u> letter from Barry L. Malter and Julie A. Weisman, dated March 11, 1993, at 2 (Binder 19, at Tab 5).

- Policies issued during time periods predating the first alleged disposal of Black & Decker's waste oil at the Site in 1973 cannot be available to provide coverage, as a matter of law, because Black & Decker had no nexus to the BROS Site prior to its first alleged use of that Site in 1973, and therefore cannot be potentially liable for causing property damage during the policy period of policies predating 1973. Accordingly, there is no coverage under policies issued prior to 1973, because there were no damages at the Site for which Black & Decker had legal responsibility which occurred during the policy periods prior to 1973.

- No duty to defend, because no "suit"

  - Black & Decker was never named as a defendant in either of the underlying lawsuits (<u>Rollins</u> or <u>Allied-Signal</u>).

  - Black & Decker received an invitation from private parties to participate in a "voluntary, informal, non-litigated settlement/mediation process relating to the BROS Site", which does not constitute a "suit", as a matter of law. (<u>See</u> Hyatt Letter at 1 (Binder 19, at Tab 6)).

  - While PRP Group's "invitation" stated that the settlement process was "in lieu of joinder as a defendant", Hyatt Letter at 2 (Binder 19, at Tab 6), the process did not entail any penalty or indication that failure to participate would make "liability more likely or more devastating" (<u>Zecco</u>, 938 F. Supp. at 68); indeed, Black & Decker withdrew from the process and refused to pay its allocated share of the remediation costs, and was never pursued by the government or the PRP Group for those costs.

**References for this site:**

1. Exhibits to Liberty Mutual's Motion and Supporting Memorandum for Summary Judgment - Binder 2A (Black & Decker Policies)

2. Exhibits to Liberty Mutual's Motion and Supporting Memorandum for Summary Judgment - Binder 7 (Pleadings and Related Documents)

3. Exhibits to Liberty Mutual's Motion and Supporting Memorandum for Summary Judgment - Binder 12 (Secondary Evidence)

4. Exhibits to Liberty Mutual's Motion and Supporting Memorandum for Summary Judgment - Binder 19 (BROS Site)

5. Exhibits to Liberty Mutual's  Motion and Supporting Memorandum for Summary Judgment - Binder 26 (Tier II Sites)

6. Exhibits to Liberty Mutual's Opposition to Defendant's Motion for Partial Summary Judgment - Binder 28 (Supporting Documentation)

7. Exhibits to Liberty Mutual's Supplemental Submission in support of its Motion for Summary Judgment with respect to BROS, Berks Landfill, Huth Oil and Ansonia/Derby Sites - Binder 30 (Supporting Documentation)

8. Appendix to Black & Decker's Motion for Partial Summary Judgment - App. LXVIII (Invoices Part I)

9. Appendix to Black & Decker's Motion for Summary Judgment - App. XXVII, XXX, XXIX (BROS Site Documents Parts 1-3)

# Tab 3.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE BLACK & DECKER CORPORATION, BLACK & DECKER INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART INDUSTRIES, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 96-10804-DPW

-----------------------------------------------------------------------------------

**MOTION AND SUPPORTING MEMORANDUM OF LIBERTY MUTUAL**
**<u>INSURANCE COMPANY FOR SUMMARY JUDGMENT</u>**

-----------------------------------------------------------------------------------

Ralph T. Lepore, III, Esq.
Robert A. Whitney, Esq.
Kenneth R. Brown, Esq.
Warner & Stackpole LLP
75 State Street
Boston, MA 02109
(617) 951-9000

F.     **The BROS Site, Logan Township, New Jersey**

1.     **History of the Site**

The BROS Site was a waste oil storage, recovery and refining facility in operation from at least the 1950s. See Deposition of Harold Hartung ("Hartung Dep.") at 18 (Binder 19, at Tab 1). By 1984, commercial waste handling activities were prohibited at the Site by court order. See NUS Remedial Investigation Report dated July 1984 at SB214-0573 (Binder 19, at Tab 2).

The central feature of the BROS Site was a lake or lagoon which was used to accumulate waste oil as it was delivered to the facility. The lagoon was approximately 12.7 acres in size and held approximately 70 million gallons of contaminated wastewater and another 2½ million gallons of oil. Deposition of Robert Gregory ("Gregory Dep.") at 52-53 (Binder 19, at Tab 3); Hartung Dep. at 14-15 (Binder 19, at Tab 1). Around the shores of the lagoon were a number of tanks which stored other kinds of material and there was equipment used in the refining process. Hartung Dep. at 14-15 (Binder 19, at Tab 1). Heavy materials would settle out of the lagoon and as the sun shone on it, a chemical reaction would take place in the floating mass and more insoluble materials would form. Id. If an oil was suitable for that type of processing it would be reasonably well-refined just by floating on the surface for some time. Id. Initially, the material was successfully processed in this manner. Id at 18. The process, however, became more difficult in the late 1950s when oils used in the motors industry became more highly compounded. Id.

Periodically, oil from the lagoon would be refined. Id at 21. First, the material was acid treated with sulfuric acid. Id. The acid treated material was then distilled by vacuum distillation and it was clay filtered to remove color bodies. Id. The purpose of distillation was to remove

150

things such as fuel residues which would accumulate in certain oils. Id. The oil was extracted

from the lagoon by a skimmer which would take the oil off the surface and then pump it into the

acid-treating tank. Id. The oil would then travel through pipes. Id. at 22. A witness who worked

at the BROS facility in the 1960s reported seeing so many routine and operational releases and

spills such that the BROS Site was "pretty permeated with oil." Id. at 22-23. The witness noted

that the equipment at BROS was "not really very good" and that pipes would always leak and

drip. Id. At BROS, pipes were always weeping at the joints and the ground was quite corrosive.

Id. Indeed, pipes purposely were not buried underground because the ground was too corrosive

to sustain them. Id.

Liquid in the lagoon would overflow at the banks when it rained, id. at 24, and the

overflow would flow through a limestone pit. Id. at 25. Water thereafter permeated through the

limestone pit, id., and that which exited the limestone would become part of the ground water.

Id. at 26.

According to a Record of Decision prepared by the EPA on December 31, 1984, the

BROS Site consists of three sources of potential contamination: (1) the 12.7 acre lagoon

discussed above; (2) a tank farm area; and (3) groundwater that is in contact with the lower

portions of the lagoon. See Record of Decision dated December 31, 1984 at 0066849 (Binder 19,

at Tab 4).

Defendant Black & Decker's alleged connection to the BROS Site is that A&A Waste Oil,

Inc. ("A&A") removed a waste oil and water mixture from Black & Decker's facility in

Hampstead, Maryland and that some of the oil allegedly was transported to the BROS Site for

disposal. See Defendants' Int. Responses, Tier I Appendix, at 5 (Binder 8, at Tab 1). The

material that A&A removed from the Hampstead facility was a mixture of water, water-soluble lubricating oils and cutting oils, residue from cutting oils that was removed from sumps attached to metal cutting machines and solvents used for degreasing and general cleaning. Id.

Defendant Black & Decker has conceded that A&A picked up waste oil/water from the Hampstead plant between approximately 1973 and 1982. Id. In the BROS settlement/mediation process, however, Black & Decker took the position that "although there is evidence that Black & Decker used the services of A&A there is no evidence that any of Black & Decker's material was transported to the BROS Site." Letter from Barry L. Malter and Julie A. Wisman dated March 11, 1993 at 2 (Binder 19, at Tab 5).

## 2. Underlying Claim

On or about December 17, 1992, Black & Decker received an "invitation" to participate in a settlement/mediation procedure in two civil actions pending in the United States District Court for the District of New Jersey, Rollins Environmental Services (NJ) Inc., et. al. v. United States, et. al., No. 92-1253 (D.N.J.) and United States v. Allied-Signal, Inc., et. al., No. 92-2726 (D.N.J.), pertaining to contamination at the BROS Site. See Letter from William M. Hyatt, Jr. dated December 17, 1992 ("Hyatt Letter") (Binder 19, at Tab 6). Black & Decker has not been named as a defendant in either civil action. Id. In both civil actions, the plaintiffs seek to recover response costs for remedial measures at the BROS Site required by a December 31, 1984 Record of Decision issued by the EPA. See First Amended Complaint (Binder 19, at Tab 7); Complaint (Binder 19, at Tab 8). Liberty Mutual was first notified of Black & Decker's invitation to participate in the BROS settlement/mediation procedure some 14 months after the invitation was

made by way of a March 3, 1994 letter from Black & Decker's insurance broker, Alexander &
Alexander.  See Letter from Michael D. Margiotta dated March 3, 1994 (Binder 19, at Tab 9).

### 3.     Policies

In their Answer and Counterclaim, the Defendants contend that they have "incurred costs
and damages, within the meaning of the [Black & Decker Corporation] policies."  Answer and
Counterclaim, Counterclaim at ¶ 201 (Binder 7, at Tab 2).  There are no policies implicated
prior to March 1973, however, because the BROS Settlement Process Committee, which
invited Black & Decker to join the BROS settlement/mediation process, has only "alleged or
'determined' that Black & Decker's waste oil was transported to the BROS Site during the
following time periods: 3/73 - 3/74; 6/74 -11/74; 1/75 -1/78; 2/78 -1/79; and 7/79."
Defendants' Int. Responses, Tier I Appendix, at 3 (Binder 8, at Tab 1).  Because the BROS
Settlement Process Committee has limited its allegations to alleged shipments during the period
between March, 1973 and July, 1979, Black & Decker cannot possibly recover for claims
pertaining to the BROS Site under policies, if any, applicable prior to March, 1973.  Indeed,
courts have held that policies in effect before the insured became involved at a site do not
provide coverage for contamination at the site.  See discussion, supra, in Section VI(E).

Accordingly, Liberty Mutual requests that summary judgment be entered declaring that
there is no duty to defend or indemnify the Defendants for the BROS Site claims as to any
policies that expired prior to March, 1973.

4.    **The Defendants Are Not Entitled To A Defense Because, As A Matter Of Law, No "Suit" Exists That Triggers Liberty Mutual's Duty To Defend Or Indemnify**

The Black & Decker policies at issue with respect to the BROS Site, each provide that Liberty Mutual shall "defend any <u>suit</u> against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof . . ." <u>See</u> discussion, <u>supra</u>, in Section VI(F). Liberty Mutual, however, is entitled to a judgment in its favor as a matter of law at the BROS Site because no suit or its equivalent was commenced that relates to the Site.

Black & Decker has not been named as a defendant in any litigation pertaining to the BROS Site. Rather, Black & Decker has received a letter indicating that it was "to <u>invite</u> you to participate in a <u>voluntary</u>, <u>informal</u>, <u>non-litigated</u> settlement/mediation process relating to the BROS Site." <u>See</u> Hyatt Letter at 1 (emphasis added) (Binder 19, at Tab 6). The letter was sent from private parties, not a government agency. Under the criteria set forth in the <u>Zecco, Inc. v. Travelers, Inc.</u>, Black & Decker's invitation to participate in the settlement/mediation process for the BROS Site does not constitute a "suit" within the meaning of the Black & Decker policies. <u>See</u> discussion, <u>supra</u>, in Section III(C)(2)(c)(ii) and Section III(C)(1)(c)(iii).

Black & Decker which categorically denies any involvement at the Site, cannot show that a failure to comply with the BROS settlement/mediation letter would "itself somehow alter the substantiality of the insured's liability, by making liability more likely or more devastating or by giving rise to some particular penalty." <u>Zecco</u>, at 68. While the letter did indicate that the settlement process was "in lieu of joinder as a defendant," Hyatt Letter at 2 (Binder 19, at Tab 6), the letter did not attach any penalty or indication that failure to participate would make "liability more likely or more devastating." <u>Zecco</u>. at 68. Additionally, the letter was from private parties

and not from a governmental agency whose letters would "tend to have more severe consequences than those from private parties." Id. Finally, the letter was a "polite invitation" rather than a letter indicating that "the recipient cannot refuse." Id. Indeed, the letter stated that participation in the settlement process was "voluntary." Hyatt Letter at 2 (Binder 19, at Tab 6).

The application of the factors set forth in Zecco, as set forth above in Section VI(F) to the BROS settlement/mediation letter clearly negates the Defendants' claims that Liberty Mutual has a duty to defend at the BROS Site because there is no "suit" equivalent asserted against the Defendants concerning the Site.

5.     **Defendants Are Not Entitled To Coverage, As A Matter Of Law, For Purported Claims Relating To The BROS Site Because There Has Been No Sudden And Accidental Release At The Site**

Defendants cannot succeed on their claims for coverage at the BROS Site for the Black & Decker policies covering the period July 1, 1971 through July 1, 1979, which all contain the pollution exclusion, because the Defendants cannot show that the pollution at the BROS Site was both "sudden" and "accidental". See discussion, supra, in Section VI(C).

Waste liquids were discharged into the lagoon at the BROS Site as a part of the BROS Site's routine and deliberate business activities and, accordingly, the discharges to the lagoon were not "accidental" within the meaning of the "sudden and accidental" exception to the pollution exclusion. See discussion, supra, in Section VI(C). Moreover, the BROS Site used equipment that was "not really very good" and known to be leaking and weeping as part of its on-going operations. Hartung Dep. at 23 (Binder 19, at Tab 1). By the mid-1960s, the Site was "pretty permeated with oil." Id. at 22-23. The operators of the BROS Site thus knowingly and deliberately engaged in activities causing the pollution at the BROS Site - there quite simply has

been no accident. Moreover, the undisputed factual record establishes that the pollution at issue

at the BROS Site occurred continually over many years, and thus cannot possibly be construed as

being "sudden" within the meaning of the exception to the pollution exclusion. See discussion,

supra, in Section VI(C).

Defendants have attempted to elicit testimony concerning a discrete incident where a tank

at the BROS facility is alleged to have sprung a leak in June of 1971 with its contents escaping

across the BROS Site into the lagoon. See Deposition of Robert Gregory ("Gregory Dep.") at 23

(Binder 19, at Tab 3). Even assuming that the alleged release was both sudden and accidental,

such a discrete instance of leakage cannot give rise to coverage because the Defendants cannot

show that the instance of leakage was out of the ordinary or more than a de minimus source of

the pollution at the Site. See Highlands Ins., 424 Mass. at 233-34; and discussion, supra, in

Section VI(C). Indeed, according to a witness who was employed at the BROS Site in the 1960s,

the equipment at BROS was not really good and that pipes would leak and drip. Hartung Dep. at

23 (Binder 19, at Tab 1). Pipes at the BROS Site were always weeping at the joint. Id.

Moreover, a witness testified that the amount of fluid that flowed into the waste oil lagoon as a

result of the alleged tank leak in 1973 was "a small amount" relative to the size of the lagoon.

See Gregory Dep. at 52 (Binder 19, at Tab 3). It also cannot be disputed that the very purpose of

the lagoon was to receive waste liquids and that a leak contributed to a small additional amount

to the lagoon is of no import.

As a waste oil storage and recycling facility, the BROS Site was unquestionably

pollution prone. There, quite simply, has been no sudden and accidental event at the BROS Site

warranting coverage under the exception to the pollution exclusion, and for that reason, among

the others set forth herein, summary judgment in favor of Liberty Mutual should be entered as to all underlying claims against the Defendants arising out of the BROS Site.

G.    **Shaffer Landfill Site, Billerica, Massachusetts**

1.    **History Of The Site**

The Shaffer Landfill is a 95-acre facility located in Billerica, Massachusetts. Remedial Investigation Report dated November 1989 at ES-1 (Binder 20, at Tab 1). In 1966, the Boston & Maine Corporation sold the Site to Phillip Shaffer, as Trustee of the Gray Pond Realty Trust (the "Trust"). Id. at ES1-2. For at least twenty years prior to purchase by the Trust, the Site was used for rubbish disposal and as an open burning dump. Id. at ES-1. Prior to its use as an open burning dump, the area was a wetland. Id.

In 1968, the Town of Billerica issued regulations that required that the dump be operated as a sanitary landfill, and that open-burning cease, and that all rubbish be placed above the water table. Id. at ES-2. Despite the Town's regulations and pronouncements, open-burning continued and inadequate daily cover was used. Id. Indeed, even after the Town issued regulations relating to operations of the landfill, area neighbors observed windblown trash from the landfill in trees and waterways located hundreds of yards from the landfill. Deposition of Carl Moore ("Moore Dep.") at 15, 29 and 31 (Binder 20, at Tab 2); Letter from Helen Knight dated September 9, 1981 (Binder 20, at Tab 3). Further, Carl Moore, a neighbor living in the area of the landfill, observed leachate from the dump flow into the bed of the Old Middlesex Canal and into Content Brook, which in turn flows into the Shawsheen. Moore Dep. at 29, 34 and 46 (Binder 20, at Tab 2). Some of the leachate from the landfill migrated to the Content Brook as a result of trenches specifically dug by the Shaffer Landfill employees for this purpose. Id. at 43.

## IX.    CONCLUSION

For the reasons stated above, Liberty Mutual requests that the Court grant its motion for summary judgment in its favor with respect to its Complaint and the Defendants' Counterclaim.

### REQUEST FOR ORAL ARGUMENT

LIBERTY MUTUAL INSURANCE COMPANY

By its attorneys,

Ralph T. Lepore, III (BBO #294420)
Robert A. Whitney (BBO #545675)
Kenneth R. Brown (BBO #557052)
WARNER & STACKPOLE LLP
75 State Street
Boston, MA 02109
(617) 951-9000

DATED:  February 9, 1998

### CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the Defendants' counsel, Attorney Jack Pirozzolo, Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, MA 02110, by hand.

Kenneth R. Brown

February 9, 1998

260