# Tab 4.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LIBERTY MUTUAL INSURANCE COMPANY, )
                                      )
         Plaintiff, )
                                      )
v. )
                                      )
THE BLACK & DECKER CORPORATION, )
BLACK & DECKER INC., )
BLACK & DECKER (U.S.) INC., )
EMHART CORPORATION and )
EMHART, INC., )
                                      )
         Defendants. )
                                      )

CIVIL ACTION
NO. 96-10804-DPW

## MEMORANDUM OF BLACK & DECKER IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGEMENT

February 9, 1998

Jack R. Pirozzolo, BBO# 400400
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Attorney for Defendants

PROTECTED INFORMATION

By Order of Court, this
envelope is to remain sealed
and the Clerk of this Court
shall not reveal the contents
thereof to any person other
than the Court or attorneys of
record for the parties until
further order of this Court.

sites that Black & Decker waste was actually deposited.
Black & Decker has been alleged to be a potentially
responsible party with respect to BROS and Douglasville by
reason of its having used a waste hauler associated with
the site.  Both of these claims are closed, with Black &
Decker not having been required to pay anything for
remediation or other damages.  Only defense costs are in
issue.  The Huth claim, in which there are allegations that
oil was picked up at Black & Decker, remains open and is
being defended on behalf of Black & Decker.

    A.    Bridgeport Rental and Oils Services (BROS)

The primary site, and only Tier One site, which
gives rise to a claim under the Black & Decker policies is
Bridgeport Rental and Oils Services, Inc. ("BROS").
Located in Logan Township, New Jersey, BROS was a waste oil
processing and reclamation facility.   (App. XXVIII:086-87).
The site, prior to 1969, was operated by Regal Petroleum
and after Regal's bankruptcy in 1965 BROS took over the
site (App. XXIX:143).  BROS took over the site in 1969
(App. XXIX:178).  As will be shown below, the underlying
claim is based on allegations that Black & Decker furnished
waste oil from its Hampstead, Maryland, operations to A & A
Waste Oil ("A & A"), a Maryland company, and that A & A

134

transported waste oil of unknown origin to BROS for
recycling (App. XXIX:246).

When the PRP Group demanded that Black & Decker
pay $895,000 in settlement of its claim (App. XXX:154-159),
Black & Decker refused to accede to the demand (App.
XXX:152-153).  The underlying action has since been settled
(App. XXVIII:161) without the participation of Black &
Decker.

The claim documents make clear that the BROS site
was in operation beginning as early as the 1950's and
1960's (App. XXVIII:015).  There is a plethora of extrinsic
evidence which shows that the site was contaminated in the
1960's and before, that A & A began transporting waste oil
to BROS at least by 1959 or the early 1960's, and that A &
A began picking up waste oil from Black & Decker at least
by the late 1960's, when Howard Goldstein, the son of A &
A's founder, was still a teenager (App. XXIX:024).
Accordingly, whether the duty to defend is based upon the
underlying claim or upon a record supplemented by extrinsic
evidence, that duty arises under policies issued before the
pollution exclusion was added to Black & Decker's CGL
policies.

Moreover, Liberty Mutual could not have relied
upon the pollution exclusion to deny coverage of BROS even

135

if the site history and other evidence regarding the 1950's and 1960's were not so strong. The only two states that have an interest in the BROS claim are New Jersey and Maryland. Both have demonstrated an antipathy to the pollution exclusion: Maryland, through its regulatory authorities, by its deletion requirement and New Jersey, through its courts, by their adoption of regulatory estoppel in Morton. Thus, there is no conflict between the policies of the two states on this issue. Where, as here, the interests of the two interested states converge, Liberty Mutual's opportunistic forum shopping should not serve as a means of avoiding the public policies of both of them.

There can be no doubt that New Jersey would apply its law. See, Gilbert Spruance, Co. v. Pennsylvania Manufacturers' Association Insurance Co., 629 A.2d 885, 886 (N.J. 1993). Liberty Mutual's Mr. Hudson recognized in his memorandum, discussed below (App. XXX:160-62), that the claim was covered under New Jersey law.

In cases such as Morton, New Jersey's highest court has expressed its paramount interest in ensuring the availability of insurance proceeds for remediation of its contaminated sites. Even where a state has not demonstrated its interest as unmistakably as has New Jersey, this Court

136

has held that "the basic policies underlying the developing
law of environmental remedy strongly support making the
site of the alleged damage the governing jurisdiction for
choice of law purposes." A. Johnson & Co. v. Aetna
Casualty and Surety Co., 741 F.Supp. 298, 301 (D. Mass.
1990), aff'd, 933 F.2d 66 (1st Cir. 1991).

Maryland is in harmony with New Jersey on this
issue in that its law required deletion of the pollution
exclusion.  Application of Maryland law to the BROS claim
does no violence to New Jersey's strongly held interests.
In Alcolac Inc. v. St. Paul Fire and Marine Insurance Co.,
716 F.Supp. 1541 (D.Md. 1989), the court construed a
pollution exclusion deletion to protect a Maryland insured
even where the waste originated in, and was dumped in,
another state.  This case is stronger than Alcolac, and the
deletion should be given its full effect here.

As has been recognized by courts making choice of
law determinations under Massachusetts law, it is
appropriate to take into account the impact a choice of law
decision will have upon the parties and to ensure, so far
as possible, that that impact will advance the interests of
the competing jurisdictions. See discussion of Millipore,
supra.  Here, where the interests of Maryland in protecting
its insured coincides with the interests of New Jersey in

137

cleaning up its contaminated sites, the law of either
state, when properly construed, will achieve the same
result.

For its part, Massachusetts is a disinterested
forum. The BROS claim is before this Court only because
Liberty Mutual elected to bring a mega-case which includes
claims under policies purchased by USM, a company
historically headquartered in Massachusetts.  Massachusetts
has no contact with or interest in Black & Decker or the
contaminated sites.  Liberty Mutual's obvious forum
shopping should not result in the application of law of a
forum never contemplated by the parties to the insurance
contract.

The fact that Liberty Mutual is a Massachusetts
corporation does not affect the choice of law decision.
The First Circuit, in applying Massachusetts choice of law
rules, gives short shrift to the location of the
headquarters of the insurer. <u>Eagle-Picher</u> <u>Industries</u>, <u>Inc</u>.
v. <u>Liberty</u> <u>Mutual</u> <u>Insurance</u> <u>Co</u>., 829 F.2d 227, 248 (1st
Cir. 1987); <u>Canal</u> <u>Insurance</u> <u>Co</u>. v. <u>Carolina</u> <u>Casualty</u>
<u>Insurance</u> <u>Co</u>., 59 F.3d 281, 282 (1st Cir. 1995).
Massachusetts also has ignored the defendant's domicile in
non-insurance choice of law cases.  <u>Cohen</u> v. <u>Hathaway</u>, 595
F.Supp. 579, 582 (D.Mass. 1984); <u>Bi-Rite</u> <u>Enterprises</u> v.

138

<u>Bruce Miner Co.</u>, 757 F.2d 440, 441-42, 444 (1st Cir. 1985).
A federal district court sitting in Pennsylvania in
<u>Triangle Publications, Inc. v. Liberty Mutual Insurance</u>
<u>Co.</u>, 703 F. Supp. 367, 369 (E.D. Pa. 1989), was
particularly blunt when it announced that "[t]he interests
of Massachusetts, Liberty Mutual's domicile, are
insignificant." <u>Id.</u>  <u>See also</u>, <u>Pen Coal Corp.</u> v. <u>William H.</u>
<u>McGee and Co.</u>, 903 F.Supp. 980, 987, n.1 (S.D.W.Va. 1995),
where the court pointed out that "the domicile of the
insurer ... is generally not considered to be ...
significant when determining what law to apply in resolving
insurance coverage disputes."

In the discussion which follows, the relevant
facts are set out to show that the underlying claim is
based on pre-pollution exclusion events.  Afterwards, the
pollution exclusion deletion and the law of regulatory
estoppel are discussed.

1.  <u>Underlying Claim</u>

Black & Decker was among the recipients of a
letter, with attachments, dated December 15, 1992, from
William H. Hyatt, Jr. (App. XXVIII:008-097).  This material
was sent to it pursuant to ¶ 33 of Case Management Order
No. 1, issued in two consolidated cases then pending before
the United States district court in New Jersey

(App. XXVIII:029-030).  Those cases were <u>Rollins</u>
<u>Environmental Services</u> (<u>NJ</u>) <u>Inc.</u>, <u>et al</u>. v. <u>United States</u>,
<u>et al</u>., No. 92-1253 ("<u>Rollins</u>") and <u>United States</u> v.
<u>Allied-Signal</u>, <u>Inc.</u>, <u>et al</u>., No. 92-2726 ("<u>Allied-Signal</u>")
(App. XXVIII:008-097, particularly 011-020, 080-092).
Pursuant to that order, the plaintiffs in Rollins and the
defendants in Allied-Signal were to send "to each party
identified as an additional potentially liable party . . .
a letter inviting participation in the BROS Site Settlement
Protocol Process in lieu of joinder as a defendant in one
or both of the cases" (App. XXVIII:029).

     As directed by that Order, the letter enclosed
the complaints and certain other documents. These included
"a confidential packet of information identifying the
evidence currently available linking each company to the
BROS site" and "a Certification of Commitment to
Participate in Settlement Negotiations, which Certificate
is to be signed and returned" prior to a given date (App.
XXVIII:030).

     <u>Rollins</u> had been brought on March 20, 1992,
pursuant to CERCLA, by a group of plaintiffs who already
had paid portions of response costs in connection with the
BROS site (App. XXVIII:009, 080-097).  The complaint
targeted the United States, based upon the claim that tens

of millions of gallons of waste generated at federal
military facilities had been transported to BROS, but also
named other generators or transporters such as A & A (App.
XXVIII:080, 081-082, 084-086).  In the other case, Allied-
Signal, filed on June 30, 1992, the EPA sought relief under
CERCLA against two operators of the site, Rollins and
Allied-Signal (App. XXVIII:014), as well as against various
waste-generators and waste-transporters (App. XXVIII:015).

As the Rollins complaint stated, the site was
owned and operated "[d]uring the 1950's and 1960's" by
Regal Petroleum Company "for the recovery and re-refining
of waste oils and as a tank storage facility" (App.
XXVII:087).  It further reported that "the waste oil lagoon
was largely formed" during this period  Id.  That lagoon is
the basis for a major portion of the remediation at BROS
(App. XXVIII:091, 223-224).  The Rollins complaint also
pointed to a 1964 fire which "destroyed the oil refining
processes" at the site, to BROS' acquisition of the site on
April 15, 1969, and to its operation of the site between
1969 and 1980 (App. XXVIII:087-088).  Further, the Rollins
complaint reported that the New Jersey environmental
authorities became involved with the site in 1970, that
remediation was undertaken, and that litigation and
involvement of the federal authorities followed (App.

XXVIII:089-092).  The complaint in the <u>Allied-Signal</u> action
similarly refers to successive owners of the site between
1959 and October 1981 and alleges that periodic inspections
by governmental authorities from 1967 to 1981 revealed
contamination at the site (App. XXVIII:015; <u>see</u> <u>also</u>, <u>Id</u>.
at 041-042).

The <u>Rollins</u> complaint, which named A & A as a
defendant, did not specify the dates when A & A hauled
waste to the site (App. XXVIII:086, 095).  Except for the
<u>Rollins</u> allegations that "[b]etween 1960 and 1980 ... the
single largest contributor of waste" to the site was the
United States (App. XXVIII:081), the only dates that appear
in either complaint relate to the site as a whole (App.
XXVIII:011-020, 037-046, 080-097).  The <u>Allied Signal</u>
complaint alleged that inspections of the site between 1967
and 1981 "revealed numerous signs of leaks and spills from
storage tanks, lagoon overflows, and other instances of
poor housekeeping practices" (App. XXVIII:015).

These allegations, by any test, are sufficient to
establish a duty to defend under policies issued by Liberty
Mutual to Black & Decker prior to July 1, 1971, the first
date the pollution exclusion was included in the Black &
Decker policies.  Clearly, the court-directed letter from
Mr. Hyatt sought a payment from Black & Decker to help

142

remediate contamination which was already in place long

before the July 1971 date.

The packet of confidential information which

accompanied the court-directed letter, insofar as it

related to Black & Decker, provided as follows:

> Black & Decker is a PRP at the BROS by
> virtue of its having disposed of and/or
> arranged for the disposal of hazardous
> substances at the BROS Superfund site.
> Based upon documents obtained from the
> Maryland Department of Natural Resources as
> well as interviews with former A & A Waste
> Oil drivers, it is understood that Black &
> Decker disposed of some or all of its
> hazardous waste through A & A Waste Oil of
> Baltimore, Maryland.  A & A Waste Oil of
> Baltimore, Maryland, disposed of some or all
> of the hazardous waste that it collected at
> the BROS Superfund Site.

(App. XXVIII:079).  This sketchy statement makes no

reference to the dates when the alleged dealings either

between Black & Decker and A & A or between A & A and an

operator of the BROS site took place.  The paragraph

relating to Black & Decker in the confidential packet of

material was the only reference to Black & Decker in any of

the enclosures furnished by Mr. Hyatt (App. XXVIII:008-

097).  Thus, this statement also leaves open the

"potentiality" for coverage under pre-pollution exclusion

policies.  See, e.g., Aetna Casualty and Surety Co. v.

Cochran, 651 A.2d 859, 861 (Md. 1995).  Moreover, as shown

143

below, the extrinsic evidence confirms dealings between
Black & Decker and A & A, as well as dealings between A & A
and BROS or its predecessors, prior to July 1971.

    2.  <u>Evidence Relating to Black & Decker</u>

    It has never been established that Black & Decker
waste oil was ever transported to the BROS site or, if such
oil was transported, the dates of the deliveries.  However,
there is clear evidence that A & A collected waste oil from
Hampstead.  Howard Goldstein, whose father founded A & A in
the 1950's, testified that he started working for his
father before he turned sixteen and that he probably went
to Black & Decker's Hampstead plant to pick up waste oil
when he was a teenager (App. XXIX:029).  This means that he
started to work for his father no later than 1968.  <u>Id</u>.

    There also is extrinsic evidence of the dates
when waste oil from A & A was transported to BROS although
no evidence of the origin of that oil.  Harold Hartung, a
chemical engineer who was on-site on a part-time basis
between 1965 and 1966 in connection with the bankruptcy of
Regal (a prior owner of the BROS site), identified A & A as
a Regal supplier during that period (App. XXIX:003-004,
010-011).  David Chamberlain, a bookkeeper at Regal between
1959 and 1961 (App. XXIX:018), believed that A & A
delivered a 5,000 gallon load of waste oil every two to

144

three months (App. XXIX:019).   Chamberlain also worked at

the site briefly in approximately 1963 when BROS took over,

but did not know whether BROS had dealings with A & A

during that period (App. XXIX:020).   According to Mr.

Goldstein, Regal picked up waste oil from A & A in the

1960's (App. XXIX:029).

    3.   <u>Site History</u>

Extrinsic evidence also confirms that there was

serious contamination at the site by the middle 1960's and

that the contamination continued during the years which

followed. Prior to the filing of the above-referenced

actions, the EPA issued a Record of Determination ("ROD"),

dated December 31, 1984, in which it described extensive

contamination emanating from a 12.7 acre lagoon, a tank

farm, and groundwater in contact with the lagoon (App.

XXVIII:223).   There is evidence of a sudden and

uncontrollable leak in June 1971, when the entire contents

of a tank, some 59,000 gallons of a mixture of ammonium

methacrylate and Minerec caustic sulfide, drained into the

lagoon (App. XXX:265).

The New Jersey Department of Environmental

Protection ("NJDEP") and the EPA commenced proceedings to

close and remediate the facility (App. XXVIII:224-225; <u>see</u>

<u>generally</u> App. XXVIII:162-218).   The impetus to the

proceedings was flooding from the on-site lagoons and the
contamination of adjoining waters (App. XXVIII:224) from
the lagoon, tank farm and groundwater in contact with the
lagoon (App. XXVIII:226).

The lagoon was alleged to consist of a layer of
approximately 2,500,000 gallons of oil contaminated by PCBs
and other wastes, an aqueous layer containing approximately
44,000,000 gallons of water and a sludge layer consisting
of approximately 60,000 cubic yards of sludge contaminated
by PCBs that was in contact with the groundwater and was
contaminating the groundwater (App. XXVIII:226).  The ROD
also found that there was an urgent need for remediation to
prevent the lagoon from overflowing (App. XXVIII:226).  The
level of the lagoon rose with each rainfall.  Id.  The
sludge on the bottom partially sealed the lagoon and
prevented discharges from the bottom and the oil layer on
the top prevented significant evaporation.  Id.

The ROD stated that there was flooding that
impacted three acres of marsh land in the 1970's (App.
XXVIII:226).  The NJDEP investigation, which resulted in a
Directive dated March 28, 1989 ("Directive"), stated that
the prior site owners periodically opened the lagoon dikes
and discharged waste oils into a neighboring swamp (App.
XXX:174).

146

Harold Hartung, a chemical engineer who was on-site on a part-time basis during the Regal bankruptcy in the middle 1960's, testified in a deposition taken in the current case that the site was permeated with oil which appeared to have accumulated over one or two decades (App. XXIX:007). He further testified that pipes weeped at joints due to the corrosive effect of the soil, that oil was regularly released into an unlined lagoon as part of the refining process, that sludge from the acid treatment phase of the refining process also was released into the lagoon, that he thought the bottom of the lagoon was impermeable (like a parking lot) due to the material which had settled out, that the lagoon sometimes overflowed into a limestone pit, and that a barrier kept most of the oil from overflowing (App. XXIX:005-006). David Chamberlain, a bookkeeper at Regal between 1959 and 1961, testified that the lagoon was used for oil storage when holding tanks were full (App. XXIX:019).

4.   Liberty Mutual Was Required to Defend

As was initially shown, Liberty Mutual was required to defend the BROS claim based upon the allegations of the complaint. The extrinsic evidence outlined above, including the testimony of Mr. Hartung, confirms that there was contamination at the site well

before the pollution exclusion was first inserted in a
Black & Decker policy.  A NJDEP Directive lists several
transporters, including A & A, that transported waste to
the BROS Site during the 1960's (App. XXIX:173-174), both
Mr. Hartung and Mr. Chamberlain recalled A & A deliveries
to the site in that time period (App. XXIX-004, 019), and
Mr. Goldstein's testimony is consistent with A & A waste
oil collections from Hampstead in the 1960's (App.
XXIX:029).

Again putting aside Maryland's pollution
exclusion deletion or New Jersey's regulatory estoppel,
there is clear evidence that the contamination predated
July 1971 and that the "potentiality" exists that if any
Black & Decker waste oil ended up at BROS, it did so prior
to that date. For all of these reasons, Liberty Mutual had
a duty to defend under pre-pollution exclusion policies.

In addition, there is extrinsic evidence of a
sudden leak of 59,000 gallons of hazardous material at the
site (App. XXX:265), evidence which would bring the claim
within the "sudden and accidental" exception to the
pollution exclusion even if the exclusion were applicable.
Further, if the underlying litigation had gone to trial,
Black & Decker would have raised the defense that none of
its waste oil was transported to BROS.  An insurer cannot

148

rely upon a policy exclusion where the insured denies that
any facts existed to make the exclusion applicable.  <u>See</u>,
<u>e.g.</u>, <u>Litz</u> v. <u>State Farm Fire and Casualty Co</u>., 695 A.2d
566, 570, 572-73 (Md. 1997).  For these two reasons, the
pollution exclusion would not apply to BROS even if it had
not been deleted or even if regulatory estoppel were not
applicable.

However, as shown below, the pollution exclusion
deletion is applicable and, if it were not, New Jersey's
doctrine of regulatory estoppel should be applied.

5.  The Pollution Exclusion
    <u>Deletion Requires Coverage</u>

In the Black & Decker policies which contain a
pollution exclusion, the following language appears after
the exclusion:

> This endorsement does not apply to
> operations or occurrences in the following
> states:
>     Maryland ...

Here, if any waste oil was shipped to BROS, it originated
from Black & Decker's operations in Hampstead, Maryland.
The pollution exclusion deletion, as mandated by the
Maryland authorities, protects Maryland insureds.
Anomalous and tortured reasoning may not deprive a Maryland
insured of rights protected by the laws of its state.

In Alcolac, supra, the court, applying Maryland law, construed a pollution exclusion deletion similar to the one here. There the deletion was "applicable in the states of Maryland ... ." 716 F. Supp. at 1545. The court concluded that the phase "applicable in" was ambiguous and that the exclusion was deleted as to a Maryland insured even though the waste was generated in Missouri and contaminated a Missouri manufacturing site.

The current case is stronger than Alcolac both as to the facts of the discharge and as to the language of the policy. Here, not only is the insured based in Maryland, but the waste allegedly transported to BROS was generated in a Maryland manufacturing operation. Moreover, since the deletion applied both to "occurrences" and "operations," the two terms must have different meanings. If, as Liberty Mutual apparently asserts, the deletion only applies to contamination within the boundaries of Maryland and does not extend to hazardous waste generated in Maryland operations, then "occurrences" would set the scope of the deletion and the word "operations" would be surplusage. Any contamination on Maryland soil would be an "occurrence." By use of the word "operations," the deletion, of necessity, encompasses something more.

150

Further, "operations" is not defined in the
policy.  However, the dictionary definition establishes
that the scope of the word is very broad.  "Operations" is
defined as "the whole process of planning for and operating
a business or other organized unit."  Webster's Third New
International Dictionary, unabridged (1993).  As for the
meaning of "operating," a word which appears in the
definition of "operations," two definitions are pertinent.
"Operating" means "engaged in active business."  Id.  It
also means "arising out of or concerned with the current
operations of a concern engaged in transportation or
manufacturing as distinct from its financial transactions
and its permanent improvements."  Id.  The ultimate
disposal of waste generated by a manufacturer is certainly
part of its "active" business and its "current" operations
and is separate from "its financial transactions or its
permanent improvements."

Finally, the meaning of the deletion is, at best,
ambiguous when read in conjunction with the exclusion
itself. The exclusion pertains to injury or damage "arising
out of the discharge, dispersal, release or escape" of
certain pollutants.  It is not concerned with the identity
of the "operations" from which the contamination emanates.
If Liberty Mutual intended to draft the deletion so as to

151

make the pollution exclusion inoperable only with respect to a "discharge, dispersal, release or escape" in Maryland, it could easily have drafted the deletion in that manner. Instead, by selecting the word "operations," a word which does not appear in the exclusion, Liberty Mutual introduced a new concept which had no antecedent in the exclusion itself.  In the absence of such an antecedent, when the exclusion and deletion are read together, they do not support Liberty Mutual's contention that the referenced "operations" are those of the Superfund site and not those of the insured.

While the SJC in Nashua Corp. v. First State Insurance Co., 648 N.E.2d 1272, 1274 (Mass. 1995), read a similar deletion pertaining to New Hampshire so as not to encompass waste generated in New Hampshire, the Court did not consider how the scope of the term "operations" was affected by its usage in juxtaposition to the term "occurrences," it did not discuss the insurer's failure to furnish a definition, it did not review dictionary definitions of the term, and it did not discuss the meaning of the deletion in the context of the language of the exclusion.  Nashua cited no other cases construing the deletion or any authority for its narrow construction of

152

the word "operations." Massachusetts law is not applicable
to the BROS site, and <u>Nashua</u> should not be followed here.

      6.   <u>Regulatory Estoppel Requires Coverage</u>

      On May 25, 1993, Black & Decker asked its
insurance broker to notify the appropriate insurers of the
claim (App. XXX:163). Michael D. Margiotta of Alexander &
Alexander furnished this notice on March 3, 1994 (App.
XXIX:169).

      When Liberty Mutual denied the Black & Decker
claim (App. XXX:141), Black & Decker protested on the basis
of the pollution exclusion deletion in its policies (App.
XXX:164). Liberty Mutual responded that the pollution
exclusion was not applicable to the BROS claim because the
site was in New Jersey (App. XXX:166). This response was
in a letter from Kim Olson, Senior Environmental Claims
Specialist. <u>Id</u>. Ms. Olson, however, did not disclose that
her superior, David W. Hudson, the Unit Director of the
Liberty Mutual Environmental Department and the person in
charge of making the coverage decisions, was of the opinion
that New Jersey law was applicable and that for that reason
the pollution exclusion was unenforceable (<u>see</u>, App.
XXX:160-162).

      On December 8, 1994, after Liberty Mutual was
notified of the BROS claim by letter of March 3, 1994 (App.

XXIX:169-266), Mr. Hudson memorialized his view by an
internal memorandum, in which he set forth multiple reasons
why the claim would be covered (App. XXX:160-162).  Relying
on Morton, supra, he stated that New Jersey law would apply
under New Jersey's site-specific approach (App. XXX:161).
With respect to the pollution exclusion, Mr. Hudson
explained that, under Morton, "the pollution exclusion will
not apply unless the policyholder intentionally discharges
a known pollutant" (App. XXX:162).  He also stated that,
"as a matter of law," "the transfer of waste to an
independent hauler, which, in turn, disposes of the waste
at a landfill" is not within the scope of the pollution
exclusion as applied by the New Jersey courts Id.
Similarly, he pointed out that in New Jersey "the undefined
term 'damages' should be interpreted to encompass response
costs imposed to remediate environmental damage"
(App. XXX:161).

     Mr. Hudson's memorandum also suggests that
Liberty Mutual would be unable to avoid coverage by arguing
that events at the BROS site were not "occurrences" (App.
XXX:162).  As he explained, coverage may be avoided on that
basis only if the insured intended to injure, a showing
that could not be made when waste was provided to an
independent hauler.  Id. Nonetheless, on August 15, 1995,

by letter from Kim Olson to Michael Margiotta dated August

15, 1995, Liberty Mutual denied the claim (App. XXX:141-

146).

Mr. Hudson's characterization of New Jersey law

was accurate.  In <u>Morton</u>, <u>supra</u>, it adopted the following

rule:

> Accordingly, we construe and give effect to
> the standard pollution-exclusion clause only
> to the extent that it shall preclude
> coverage for pollution-caused property
> damage caused by an "occurrence" if the
> <u>insured</u> intentionally discharged, dispersed,
> <u>released</u>, or caused the escape of a known
> pollutant.

629 A.2d at 848 (emphasis in original).  Under this

test, the pollution exclusion would be inapplicable as

Black & Decker did not intentionally discharge a known

pollutant.  Rather, it provided its waste to a

licensed hauler for disposition at an appropriate

facility.

As discussed, <u>supra</u>, the regulatory estoppel

arises out of an explanatory memorandum that the Mutual

Insurance Rating Bureau ("MIRB") and Insurance Rating Board

("IRB") submitted to state insurance regulators in support

of their application to add the pollution exclusion to CGL

policies.  The memorandum misrepresented the scope of the

pollution exclusion by characterizing it as a mere

155

clarification of the definition of "occurrence" that was intended only to confirm that the policies excluded coverage for intentional discharges of known pollutants.

As <u>Morton</u> concluded, the following two statements in that memorandum are false and misleading:

> Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent.

629 A.2d at 852.  The court noted that the "first sentence is simply untrue" as "the prior 1966 version of the CGL policy covered property damage from gradual pollution and imposed no restriction on the 'suddenness' of the pollutant discharge." <u>Id.</u>  It concluded that "[t]he second sentence is even more misleading than the first" and "comes perilously close to deception".  629 A.2d at 852-53.  As the court recognized, the pollution exclusion radically altered the scope of coverage for unintentional pollution. For the insurance industry "to characterize so monumental a reduction in coverage as one that 'clarifies this situation' simply is indefensible".  <u>Id.</u>

Other courts, in ruling that the pollution exclusion did not bar coverage for gradual pollution, have noted the falsity of the industry presentations to the

insurance regulators concerning the pollution exclusion. New Castle County v. Hartford Accident & Indemnity Co., supra, 933 F.2d at 1196-98; Joy Technologies, supra, 421 S.E.2d at 498-501; Claussen, supra, 380 S.E.2d at 689. Morton differs from other decisions in a key respect.  The basis for its decision is that the insurers' conduct gave rise to an "estoppel" against the insurers' enforcement of an otherwise unambiguous exception to the pollution exclusion, not that the regulatory submissions are a tool to interpret an otherwise ambiguous policy term.  As such, a state may apply a regulatory estoppel argument even after it has ruled that the sudden and accidental exception is unambiguous and requires an "abrupt" release.

In view of the pollution exclusion deletion, it should be unnecessary to determine whether New Jersey law should apply or whether Maryland would follow New Jersey and other states in limiting an insurer's right to rely upon the pollution exclusion. However, if, for some reason, this Court finds it necessary to reach the question of whether the pollution exclusion bars coverage, it should then apply New Jersey's rule to BROS.  In the alternative, it should determine that Maryland would adopt the regulatory estoppel rule that prevails in New Jersey.

It may be that, since Maryland has deleted the pollution exclusion, its regulatory authorities were not affected by the representations of the insurance industry that led New Jersey and other states to accept the estoppel argument.  However, if Maryland required the deletion because it recognized the broad scope of the exclusion, that is all the more reason why the deletion should be applied.  Certainly, if a New Jersey insured is protected by the courts from misrepresentations made to its regulatory body, a Maryland insured should be equally protected if its regulatory body recognized the danger and acted to prevent it.  Liberty Mutual should not benefit from Maryland's action by avoiding both the deletion and the impact of the misrepresentations it made.

B.   <u>Douglassville</u>

1.   <u>Underlying Claim</u>

Douglassville was an oil reclamation facility located in Pennsylvania near the Schuylkill River. (App. XXXI:145).  The underlying litigation with respect to this site began on July 31, 1991, when the United States filed a CERCLA action, <u>United States</u> v. <u>Berks Associates</u>, <u>Inc.</u> <u>et</u> <u>al</u>., Civil Action No. 91-4868 ("Berks"), in the United States District Court for the Eastern District of Pennsylvania (App. XXXI:138-153; <u>see</u> <u>also</u> <u>id.</u> at 041).  The

158

seeks rulings from this Court that are consistent with the law of Connecticut with respect to those claims and sites governed by the law of that jurisdiction and, with respect to Massachusetts, rulings which distinguish between interpreting an arguably ambiguous insurance policy provision from creating an estoppel arising out of dishonest conduct by an insurance carrier in the regulatory process and its public posture.

For these reasons the defendants, the Black & Decker group, pray for partial summary judgment on the issues and claims that have been briefed here.

Respectfully submitted,

February 9, 1998

Jack R. Pirozzolo, BBO #400400
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Attorney for Defendants

240