# Tab 5.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COPY

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO. 96-10804-DPW |
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART, INC., | ) |
| | ) |
| Defendants. | ) |

OPPOSITION OF LIBERTY MUTUAL INSURANCE COMPANY
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Ralph T. Lepore, III (BBO #294420)
Robert A. Whitney (BBO #545675)
Kenneth R. Brown (BBO #557052)
Karen R. Sweeney (BBO #557050)
Peter J. Duffy (BBO #566682)
WARNER & STACKPOLE LLP
75 State Street
Boston, MA 02109
(617) 951-9000

duty to defend at the Harmonic Drive Site must be determined exclusively by reviewing this ILP Letter. However, it is clear under Massachusetts law that general, non-specific allegations such as those contained in the Letter are not construed <u>automatically</u> to state a claim within the coverage of the policy. <u>See</u> Liberty Mutual's Memorandum at 76-78.

Furthermore, as discussed in further detail above, this Court is not constrained to a review of the allegations contained in the ILP Letter in a sterile vacuum, but may look to the nature of the events giving rise to the alleged contamination. Moreover, the undisputed facts as set forth in Liberty Mutual's papers established that the contamination at the Harmonic Drive Site was the result of routine, ongoing operational releases not the result of one or more sudden and accidental events. Liberty Mutual's Memorandum at 148-149.

Based on the foregoing, the Defendants' Motion for Summary Judgment must be denied as to the Harmonic Drive Site. Moreover, summary judgment must enter in favor of Liberty Mutual.

F.      The BROS Site, Logan Township, New Jersey

Liberty Mutual is entitled to summary judgment as to the BROS Site because: (1) there has been no "suit" for damages within the meaning of the policies; and (2) any contamination at the BROS Site was not a result of a sudden and accidental event or events within the meaning of the exception to the pollution exclusion. Liberty Mutual's Memorandum at 118-127.

The Defendants concede that the waste lagoon at the BROS Site "is the basis for a major portion of the remediation at BROS." Defendants' Memorandum at 141. The Defendants also recite allegations that the lagoon was formed over a period of time in the 1950s and 1960s. <u>Id.</u> Because the contamination at the BROS Site unquestionably took place over an extended period

of time, the contamination cannot possibly be construed as being sudden and accidental within the meaning of the exception to the pollution exclusion. See Liberty Mutual's Memorandum at 155-157.

Notwithstanding the foregoing, the Defendants erroneously suggest that they merit summary judgment and argue that the pollution exclusion clause is "inapplicable" at the BROS Site because of the Maryland deletion endorsement contained in the Black & Decker policies. Defendants' Memorandum at 149-158. As discussed above, however, the pollution exclusion is fully applicable to the BROS Site as a matter of law because no pollution releases related to a Maryland operation took place in Maryland. See discussion *supra* at 28-32. Therefore, as the only courts that have addressed this issue have so determined, the deletion endorsement does not apply.

Perhaps recognizing the futility of their claim that the pollution exclusion does not apply to the BROS Site, the Defendants also try to avoid application of the pollution exclusion by: (1) contending that pre-pollution exclusion policies have been implicated at the BROS Site; and (2) identifying a single release of a liquid substance at the BROS Site that the Defendants contend was sudden and accidental. Defendants' Memorandum at 135, 148.

In support of their assertion that pre-pollution exclusion policies have been implicated at the BROS Site, the Defendants attempt to establish a connection between Black & Decker and the site dating to before the introduction of the pollution exclusion. Defendants' Memorandum at 135. The Defendants, however, do not and cannot succeed in this endeavor, and fail to show that any waste oil from Black & Decker arrived at the BROS Site prior to the pollution exclusion. At the very most, the Defendants have shown that A&A Waste Oil transported some unknown

waste oil to the BROS Site. Id. at 134-135. The Defendants cannot show that the waste oil

transported by A&A to BROS was Black & Decker's waste oil. Indeed, the Defendants' current

attempt to establish a connection between Black & Decker and the BROS Site during pre-

pollution exclusion years is puzzling, particularly because Black & Decker has previously

denied any connection between itself and the site. See Letter from Barry L. Malter and Julie A.

Wisman, dated March 11, 1993, at 2; Liberty Mutual's Exhibit Binder 19, at Tab 5.

Even assuming the Defendants could somehow establish a connection between Black &

Decker and the BROS Site prior to the introduction of the pollution exclusion, the Defendants

nonetheless cannot succeed on a claim for coverage at the BROS Site under any pre-pollution

exclusion policy because the BROS settlement/mediation committee did not make any

allegations against Black & Decker relating to pre-pollution exclusion periods. Indeed, the

Defendants concede that the BROS settlement/mediation committee has only "alleged or

'determined' that Black & Decker's waste oil was transported to the BROS Site during the

following time periods: 3/73 - 3/74; 6/74 -11/74; 1/75 -1/78; 2/78 -1/79; and 7/79." Defendants'

Int. Responses, Tier I Appendix, at 3; Liberty Mutual's Exhibit Binder 8, at Tab 1. Thus, the first

alleged shipment for which Black & Decker is alleged to be responsible took place in March of

1973, well after the introduction of the pollution exclusion.

Notwithstanding the foregoing, the Defendants erroneously suggest that they merit

summary judgment on the duty to defend issue based on the allegations of the complaints in the

Rollins and Allied Signal cases and a statement made in a packet of materials sent to Black &

Decker from the BROS Site settlement/mediation committee . See Defendants' Memorandum at

140-145. Black & Decker, however, has not been named as a defendant in either the Rollins case

- 62 -

or Allied Signal case and the complaints in those cases do not even mention Black & Decker or any period of alleged Black & Decker involvement at the site. See Complaint; Liberty Mutual's Exhibit Binder 19, at Tab 8; Complaint - Defendants' Appendix XXIX (29) at 174-183; Liberty Mutual's Exhibit Binder 28, at Tab 12. Furthermore, neither the Rollins complaint nor the Allied Signal complaint attribute any contamination at the BROS Site to a sudden and accidental event. Finally, the actual statement of the BROS settlement/mediation committee relied upon by the Defendants makes no reference to the dates of an alleged connection between Black & Decker and the BROS Site or the source of the contamination at the site. Defendants' Memorandum at 183.

The Defendants lastly assert that a "sudden and accidental" event took place at the BROS Site and introduce extrinsic evidence of a discrete incident where a tank at the BROS facility sprung a leak in June of 1971. Defendants' Memorandum at 148. As set forth in Liberty Mutual's prior papers, however, leakage routinely took place at BROS and the alleged instance of leakage in June of 1971 was a mere "drop in the bucket" when compared to the 12.7 acre on-site waste oil lagoon and the routine and decades-long discharges that took place on the site containing millions of gallons of waste oil. Liberty Mutual's Memorandum at 156. Accordingly, the Defendants cannot possibly meet their burden of demonstrating that the instance of leakage in June of 1971 was out of the ordinary or more than a de minimus source of the pollution at the site. See Highlands Ins., 424 Mass. at 233-234.

Based on the foregoing, the Defendants' Motion for Summary Judgment must be denied as to the BROS Site. Moreover, summary judgment must enter in favor of Liberty Mutual.

enter summary judgment in its favor as to the Tier I and Tier II Environmental Sites, and as

otherwise herein requested.

**LIBERTY MUTUAL INSURANCE COMPANY**

By its attorneys,

Ralph T. Lepore, III (BBO #294420)
Robert A. Whitney (BBO #545675)
Kenneth R. Brown (BBO #557052)
Karen R. Sweeney (BBO #557050)
Peter J. Duffy (BBO #566682)
WARNER & STACKPOLE LLP
75 State Street
Boston, MA  02109
(617) 951-9000

DATED:  March 2, 1998

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of March, 1998, I caused to be served a true and
correct copy of the foregoing Opposition Of Liberty Mutual Insurance Company To Defendants'
Motion For Partial Summary Judgment upon the Defendants' counsel, Attorney Jack Pirozzolo,
Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, MA 02110, by hand.

Kenneth R. Brown

# Tab 6.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> THE BLACK & DECKER CORPORATION, <br> BLACK & DECKER INC., <br> BLACK & DECKER (U.S.) INC., <br> EMHART CORPORATION and <br> EMHART, INC., <br><br> Defendants. | CIVIL ACTION <br> NO. 96-10804-DPW |

FURTHER MEMORANDUM IN SUPPORT
OF BLACK & DECKER MOTION FOR
SUMMARY JUDGMENT WITH RESPECT
TO BLACK & DECKER SITES
(BROS, DOUGLASSVILLE AND HUTH)

November 13, 1998

Jack R. Pirozzolo, BBO# 400400
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Attorney for Defendants

PROTECTED INFORMATION

By Order of Court, this
envelope is to remain sealed
and the Clerk of this Court
shall not reveal the contents
thereof to any person other
than the Court or attorneys of
record for the parties until
further order of this Court.

(App. XIII:121).  There is secondary evidence of property

damage coverage, in the form of leases, beginning in 1955.

The earliest Certificate of Insurance, confirming property

damage coverage of $1,500,000, dates from the 1963-64 policy

year.  The 1970-71 policy, the earliest policy in the record,

has the same coverage limits.[2]

The pollution exclusion does not appear in a Black &

Decker policy until July 1, 1971.  There also is a pollution

exclusion deletion, as required by Maryland law, in that policy

(App. I:037, 049).  The pollution exclusion was not approved by

the Maryland regulatory authorities until 1983 (App. XCVIII:

Graham Aff. at ¶¶49, 50) and therefore no pollution exclusion

was permissible until that time.

B.  BROS

1.  The Procedural History Of The Underlying Claim

a.  Case Management Order No. 1

In late 1992 two civil actions, Rollins Environmental

Services, Inc., et al. v. The United States of America, et al.,

Civil Action No. 92-1253 and United States of America v. Allied-

Signal Inc., et al., Civil Action No. 92-2726, which previously

had been consolidated, were pending before the United States

District Court for the District of New Jersey (App. XXVIII:011-

---

[2]    The Black & Decker policies of record are in Volumes I and II of the
Appendix.  Secondary evidence can be found in Volume XIV.  Standard jackets
are in Volume XII.  See, e.g., App. XII: 121-25.

-3-

020, 037-046, 080-097).  Allied-Signal was a cost recovery action by the EPA under Section 107(a) of CERCLA, 41 U.S.C.A. §9607(a) (App. XXVIII:012).  Rollins, in turn, was a cost recovery action by certain of the Allied-Signal defendants, who already had paid a portion of the response costs for the BROS site (App. XXVIII:081-82).  The defendants in Rollins were the United States, in its capacity as a waste generator, as well as certain waste transporters (App. XXVIII:095). In both suits the plaintiffs sought recovery of costs associated with the cleanup of the BROS (Bridgeport Rental & Oil Services) site in New Jersey, a contaminated former waste oil reprocessing, disposal, and storage facility (App. XXVIII:012, 015, 081).

On November 24, 1992, Case Management Order No. 1 (App. XXVIII:021-036) was entered by the court. In this Order, the court adopted "a dual case management approach utilizing simultaneously both a litigation track and a settlement track" (App. XXVIII:023).  The court's purpose in entering its Order was threefold.  Id.  It aimed to "bring potentially responsible parties into the settlement process so that the existence and extent of each participant's liability can be determined."  A second objective was to "reduce as far as possible for the Court and the litigants the time and transaction costs which inevitably arise from protracted CERCLA litigation and discovery."  Finally it hoped to "promote and encourage a series

-4-

of meaningful settlement opportunities which will allow the
parties and the participants to investigate the possibility of
amicable resolution of both of these cases at the earliest
possible date." Id.

By Paragraphs 31 and 33 of its Order, the court
directed the Rollins plaintiffs and the Allied-Signal defendants
to "identify those additional parties who appear to be
potentially liable parties at the BROS site and who appear to
have sent materials to the BROS site" (App. XXVIII:029). They
were further directed to send to each party so identified "a
letter inviting participation in the BROS Site Settlement
Protocol Process in lieu of joinder as a defendant in one or
both of the cases." Id.   Along with the letter, they were
ordered to transmit copies of the complaints and Case Management
Orders in both cases, "a confidential packet of information
identifying the evidence currently available linking each
company to the BROS site," a set of Guidelines governing the
Settlement Process Protocol, and a Certificate of Commitment to
be signed and returned by the recipient prior to a date set by
the court (App. XXVIII:029-030). All this was done pursuant to
court order.

Case Management Order No. 1 set forth specific time
periods when a party could move, or be moved, from the
settlement track to the litigation track (see, e.g., App.

XXVIII:025).  That portion of the Order devoted to the
settlement track directed "participants in the BROS Settlement
Process Protocol," as well as certain parties to the pending
suits, to negotiate specified issues and to exchange certain
information in accordance with a court-established schedule, to
appoint representatives for settlement negotiations, to submit a
report to the court, and to engage in mediation during a
specified time period by a mediator to be selected, if
necessary, by the court (App. XXVIII:031-034).

     The Certificate of Committment (App. XXVIII:052-056),
to be forwarded to each potentially responsible party for
execution, included an undertaking to comply with the BROS
Settlement Process Protocol and Confidentiality Order (App.
XXVIII:055). Pursuant to the Protocol (App. XXVIII:063-078) all
Participants in the settlement track would be "bound by . . .
any orders of the Court entered in the Actions pertinent to the
Process" (App. XXVIII:65).  "Informal Discovery" was to parallel
the formal discovery conducted in the litigation track and be in
accordance with the Federal Rules of Civil Procedure (App.
XXVIII:065, 067).

     b.  <u>The Hyatt Letter</u>

     In December 1992, William H. Hyatt, Jr., counsel for
certain parties in the <u>Rollins</u> and <u>Allied-Signal</u> cases, complied
with Case Management Order No. 1 by sending a letter, with the

underlying complaints and other enclosures, to each of the

potentially responsible parties identified pursuant to the Order

(App. XXVIII:004-005, 008-010).  Black & Decker was a recipient

of one of these letters. The confidential packet of materials

tying Black & Decker to the BROS site stated in full:

> Black & Decker is a PRP at the BROS by virtue of
> its having disposed of and/or arranged for the
> disposal of hazardous substances at the BROS
> Superfund Site.  Based upon documents obtained
> from the Maryland Department of Natural Resources
> as well as interviews with former A&A Waste Oil
> drivers, it is understood that Black & Decker
> disposed of some or all of its hazardous waste
> through A&A Waste Oil of Baltimore, Maryland.
> A&A Waste Oil of Baltimore, Maryland, disposed of
> some or all of the hazardous waste that it
> collected at the BROS Superfund Site.

(App. XXVIII:079).  A&A Waste Oil was a named defendant in the

Rollins action (App. XXVIII:086).

Black & Decker complied with the court order (App.

XXVII:098-102).  Over the following three and a half years, it

defended the claims against it, incurring defense costs of

approximately $436,000 (see invoices in App. LXVIII).  When the

PRP Group demanded that Black & Decker pay $895,000 as its share

of remediation costs (App. XXX:154-159), Black & Decker refused

to accede to the demand and withdrew from the proceedings (App.

XXX:152-153).  The underlying consolidated actions have since

been settled (App. XXVIII:116) without the participation of

Black & Decker.  Accordingly the defense has been successful.

2.  The Substance Of The Underlying Claim

a.  The Complaining Documents

According to the Rollins complaint, the BROS site was owned and operated "[d]uring the 1950's and 1960's" by Regal Petroleum Company "for the recovery and re-fining [sic] of waste oils and as a tank storage facility" (App. XXVIII:087).  The waste oil lagoon, which is the basis for a major portion of the remediation at BROS, was formed during this period (App. XXVIII:086-087).  There also are references to a 1964 fire, to BROS' acquisition of the site in 1969, to BROS' operation of the site until 1980, and to the treatment or disposal between 1960 and 1980 of "tens of millions of gallons of wastes containing hazardous substances" generated by the federal government (App. XXVII:087-088).  Although A&A was named as a defendant, the complaint did not specify the dates when it allegedly hauled wastes to the site (App. XXVIII:086, 095-096).

The Allied-Signal complaint similarly referred to successive owners of the site between 1959 and October 1981.  In addition, it alleged that periodic inspections by governmental authorities from 1967 to 1981 "revealed numerous signs of leaks and spills from storage tanks, lagoon overflows, and other instances of poor housekeeping practices" (App. XXVIII:015).

The information packet sent to Black & Decker (App. XXVIII:079), as set forth in full above, makes no mention of

-8-

dates.  Significantly, the Guidelines for the settlement track, which were promulgated pursuant to the court's Order and included with the Hyatt letter (App. XXVIII:029), require each participating party to address its transactions with A&A and the other listed transporters for the years 1958 through 1981 (App. XXVIII:060).

b.  Extrinsic Evidence

(1)  The Site

Two individuals who were deposed in this action, Harold Hartung and David Chamberlain, testified regarding conditions at the site in the 1950's and/or 1960's.  Mr. Hartung, a chemical engineer who was at the BROS site on a part-time basis during the Regal Petroleum bankruptcy in the middle 1960's, testified in a deposition taken in the current case that oil permeated the site.  The oil appeared to have accumulated over one or two decades (App. XXIX:007).  Regal Petroleum was BROS' predecessor at the site.  David Chamberlain, a Regal bookkeeper, testified that in the 1959 to 1961 time frame the unlined lagoon was used for oil storage when holding tanks were full (App. XXIX:018, 019).  There is evidence of a sudden and uncontrollable leak in June 1971, when the entire contents of a tank, some 59,000 gallons of a mixture of ammonium methacrylate and Minerec caustic sulfide, drained into the lagoon (App. XXX:200-201, 265).

(2)  <u>Connection Between A&A And The BROS Site</u>

Extrinsic evidence of the dates when waste oil from A&A was transported to BROS comes from three sources.  First, there is the testimony of the two individuals associated with Regal Petroleum, Harold Hartung and Donald Chamberlain.  Mr. Hartung who, as noted above, was on the site in connection with the Regal bankruptcy, identified A&A as a Regal supplier during the 1965 and 1966 period (App.  XXIX:003-004).  Mr. Chamberlain, a bookkeeper at Regal between 1959 and 1961, testified that A&A delivered a 5,000 gallon load of waste oil to BROS every two to three months (App. XXIX:018-019).

Second, there are bankruptcy records of Regal Petroleum which mention either A&A or Sam Goldstein, the owner of A&A during the relevant period.  These documents include receiver's operating accounts from the 1965 to 1967 period as well as an A&A claim in the Regal bankruptcy dated from 1966 (App. XXIX:048, 050-052, 055, 057, 143, 162).

Finally, A&A furnished evidence that it shipped waste oil to BROS.  Howard Goldstein, who worked for his father at A&A, testified at a deposition in this case that Regal picked up waste oil from A&A in the 1960's (App. XXIX:026-027).  That testimony was consistent with information furnished to the EPA (App. XXIX:043).

While it is clear that waste oil moved from A&A to the BROS site, there is no evidence of the origin of that oil.

### (3) Connection Between Black & Decker And A&A

There is evidence that A&A collected waste oils from Black & Decker but no evidence regarding the disposition of that oil. Howard Goldstein testified that his father founded A&A in the late 1950's, that he started to work for his father when he was sixteen (or no later than 1968), and that he picked up waste oil at the Black & Decker Hempstead plant when he was still a teenager (App. XXIX:029).

The only A&A log which has been produced dates from 1973, and it shows that there were pick-ups at Black & Decker during that year (App. XXIX:027; see _e.g._, App. XXIX:065). Black & Decker's interrogatory responses also refer to a relationship between Black & Decker and A&A in the 1970's, particularly as alleged by the BROS PRP group engaged in settlement track negotiatons (App. XXI:045).

### C. Douglasville/Berks

### 1. The Underlying Claim

The United States filed a CERCLA action, United States v. Berks Associates, Inc. et al., Civil Action No. 91-4868, in the United States District Court for the Eastern District of Pennsylvania (App. XXXI:138-153). A&A was named a defendant in that action. Black & Decker was brought into the litigation by

-11-

# Tab 7.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 96-10804-DPW |
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART INDUSTRIES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

---

**SUPPLEMENTAL MEMORANDUM SUPPORTING LIBERTY MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE BROS, BERKS LANDFILL, HUTH OIL, ANSONIA AND DERBY SITES**

---

Ralph T. Lepore, III, Esq.
Robert A. Whitney, Esq.
Kenneth R. Brown, Esq.
Peter J. Duffy, Esq.
HOLLAND & KNIGHT LLP
18 Tremont Street
Boston, MA 02108
(617) 619-9200

## I.    Introduction

Pursuant to the request of the Court made at the continued hearing on the cross-motions

for summary judgment on October 30, 1998, the plaintiff, Liberty Mutual Insurance Company

("Liberty Mutual"), respectfully submits this Supplemental Memorandum in further support of its

Motion For Summary Judgment with respect to the BROS, Berks Landfill[1], Huth Oil, Ansonia

and Derby Sites and in opposition to the Defendants' motion for partial summary judgment.

At the first hearing on the cross-motions for summary judgment in this case on May 18,

1998, this Court ruled that: (i) Maryland law governs all claims for insurance coverage under the

Black & Decker line of insurance policies at issue; and (ii) Connecticut law governs all claims

for insurance coverage under Farrel line of insurance policies at issue.  Furthermore, at the

continued hearing on the cross-motions for summary judgment of October 30, 1998, this Court

requested that the parties provide supplemental briefing with respect to: (i) the application of

Maryland law to the BROS, Berks Landfill and Huth Oil Sites for which Defendants have made

claims under the line of insurance policies issued to the "Black & Decker Manufacturing

Company" ("Black & Decker"); and (ii) the application of Connecticut law to the Ansonia and

Derby Sites for which Defendants have made claims under the line of insurance policies issued to

the "Farrel Company" ("Farrel").[2]  Accordingly, Liberty Mutual hereby respectfully submits this

Supplemental Memorandum.

---

[1]    In their papers, Defendants also refer to the Berks Landfill by its uncommon name "Douglasville".  See, e.g., Defendants' Further Memorandum in Support of Summary Judgment as to Black & Decker Sites at 1.

[2]    In this litigation, the Court has been asked to determine whether coverage exists under certain existing and alleged Liberty Mutual policies for the Defendants' defense and indemnification costs claimed in connection with 29 allegedly contaminated sites.  Of the 29 contaminated sites at issue, however, only 13 implicate the Black & Decker and Farrel lines of insurance coverage.  The Sites implicating the Black & Decker line of insurance coverage are: (1) BROS Site, Logan Township, NJ; (2) Berks Landfill Site, Berks County, PA; (3) Huth Oil Services Site, Cleveland,

& Co. court recognized that the filing of a formal lawsuit is a prerequisite to coverage. To the extent that the A. Johnson court stated that the filed lawsuit must claim "damages", as opposed to response costs, the court was merely recognizing the obvious proposition that the filed lawsuit must state a claim within the coverage of the policies at issue. The A. Johnson court did not suggest that there is any necessary correlation between the "as damages" and "suit" issues, as Defendants suggest.

In the absence of any controlling Maryland precedent addressing the meaning of the term "suit," this Court should be guided by the general principal of Maryland law that "when construing insurance contracts, words and phrases are given their ordinary meaning." See Kendall, 348 Md. at 171, 702 A.2d at 773. This Court should interpret the term "suit" according to its plain and ordinary meaning, that is a "suit" is a formal lawsuit instituted in a court.

B.   Site-By-Site Analysis

1.   The BROS Site, Logan Township, New Jersey

a.   History of the Site

The BROS Site was a waste oil storage, recovery and refining facility in operation from at least the 1950s. See Deposition of Harold Hartung ("Hartung Dep.") at 18 (Binder 19, at Tab 1). By 1984, commercial waste handling activities were prohibited at the Site by court order. See NUS Remedial Investigation Report dated July 1984 at SB214-0573 (Binder 19, at Tab 2).

The central feature of the BROS Site was a lake or lagoon which was used to accumulate waste oil as it was delivered to the facility. The lagoon was approximately 12.7 acres in size and held approximately 70 million gallons of contaminated wastewater and another 2½ million gallons of oil. Deposition of Robert Gregory ("Gregory Dep.") at 52-53 (Binder 19, at Tab 3); Hartung Dep. at 14-15 (Binder 19, at Tab 1). Around the shores of the lagoon were a number of

-42-

tanks which stored other kinds of material and there was equipment used in the refining process. Hartung Dep. at 14-15 (Binder 19, at Tab 1). Heavy materials would settle out of the lagoon and as the sun shone on it, a chemical reaction would take place in the floating mass and more insoluble materials would form. Id. If an oil was suitable for that type of processing it would be reasonably well-refined just by floating on the surface for some time. Id. Initially, the material was successfully processed in this manner. Id at 18. The process, however, became more difficult in the late 1950s when oils used in the motors industry became more highly compounded. Id.

Periodically, oil from the lagoon would be refined. Id. at 21. First, the material was acid treated with sulfuric acid. Id. The acid treated material was then distilled by vacuum distillation and it was clay filtered to remove color bodies. Id. The purpose of distillation was to remove things such as fuel residues which would accumulate in certain oils. Id. The oil was extracted from the lagoon by a skimmer which would take the oil off the surface and then pump it into the acid-treating tank. Id. The oil would then travel through pipes. Id. at 22. A witness who worked at the BROS facility in the 1960s reported seeing so many routine and operational releases and spills such that the BROS Site was "pretty permeated with oil." Id. at 22-23. The witness noted that the equipment at BROS was "not really very good" and that pipes would always leak and drip. Id. At BROS, pipes were always weeping at the joints and the ground was quite corrosive. Id. Indeed, pipes purposely were not buried underground because the ground was too corrosive to sustain them. Id.

Liquid in the lagoon would overflow at the banks when it rained and the overflow would flow through a limestone pit. Id. at 24-25. Water thereafter permeated through the limestone pit, id., and that which exited the limestone would become part of the ground water. Id. at 26.

According to a Record of Decision prepared by the EPA on December 31, 1984, the BROS Site consists of three sources of potential contamination: (1) the 12.7 acre lagoon discussed above; (2) a tank farm area; and (3) groundwater that is in contact with the lower portions of the lagoon. See Record of Decision dated December 31, 1984 at 0066849 (Binder 19, at Tab 4).

The Defendants maintain that Black & Decker's alleged connection to the BROS Site was that A&A Waste Oil, Inc. ("A&A") removed a waste oil and water mixture from Black & Decker's facility in Hampstead, Maryland and that some of the oil allegedly was transported to the BROS Site for disposal. See Defendants' Int. Responses, Tier I Appendix, at 5 (Binder 8, at Tab 1). The material that A&A removed from the Hampstead facility was a mixture of water, water-soluble lubricating oils and cutting oils, residue from cutting oils that was removed from sumps attached to metal cutting machines and solvents used for degreasing and general cleaning. Id.

The Defendants have conceded that it was being alleged that A&A picked up waste oil/water from the Black & Decker Hampstead plant only between approximately 1973 and 1982. Id. In the BROS settlement/mediation process, however, Black & Decker took the position that "although there is evidence that Black & Decker used the services of A&A there is no evidence that any of Black & Decker's material was transported to the BROS Site." Letter from Barry L. Malter and Julie A. Wisman dated March 11, 1993 at 2 (Binder 19, at Tab 5).

### b.    Underlying Claim

On or about December 17, 1992, Black & Decker received an "invitation" to participate in a settlement/mediation procedure in two civil actions pending in the United States District Court for the District of New Jersey, Rollins Environmental Services (NJ) Inc., et. al. v. United States, et. al., No. 92-1253 (D.N.J.) and United States v. Allied-Signal, Inc., et. al., No. 92-2726

(D.N.J.), pertaining to contamination at the BROS Site.  See Letter from William M. Hyatt, Jr.

dated December 17, 1992 ("Hyatt Letter") (Binder 19, at Tab 6).  Without question, Black &

Decker had not, and never was named as a defendant in either civil action.  Id.  In both civil

actions, the plaintiffs sought to recover response costs from other parties for remedial measures

at the BROS Site required by a December 31, 1984 Record of Decision issued by the EPA.  See

First Amended Complaint (Binder 19, at Tab 7); Complaint (Binder 19, at Tab 8).  Liberty

Mutual was first notified of Black & Decker's invitation to participate in the BROS

settlement/mediation procedure some 14 months after the invitation was made, by way of a

March 3, 1994 letter from Black & Decker's insurance broker, Alexander & Alexander.  See

Letter from Michael D. Margiotta, dated March 3, 1994 (Binder 19, at Tab 9).

<strong>c.   Policies</strong>

In their Answer and Counterclaim, the Defendants contend that they have "incurred costs

and damages, within the meaning of the [Black & Decker Corporation] policies."  Answer and

Counterclaim, Counterclaim at ¶ 201 (Binder 7, at Tab 2).  There are no policies implicated

prior to March 1973, however, because the BROS Settlement Process Committee, which

invited Black & Decker to join the BROS settlement/mediation process, has only "alleged or

'determined' that Black & Decker's waste oil was transported to the BROS Site during the

following time periods: 3/73 - 3/74; 6/74 -11/74; 1/75 -1/78; 2/78 -1/79; and 7/79."

Defendants' Int. Responses, Tier I Appendix, at 3 (Binder 8, at Tab 1).  Because the BROS

Settlement Process Committee has limited its allegations to alleged shipments during the period

between March 1973 and July 1979, however, Black & Decker cannot possibly recover for

claims pertaining to the BROS Site under policies, if any, applicable prior to March, 1973.

Indeed, courts have held that policies in effect before the insured became involved at a site do not provide coverage for contamination at the Site. See discussion, supra, in Section V(A)(3).

Because as of 1973, all of the Black & Decker policies unquestionably had a pollution exclusion, Defendants have asserted that pre-pollution exclusion policies are also allegedly implicated at the BROS Site. In support of their assertion that pre-pollution exclusion policies have been implicated at the BROS Site, the Defendants attempt to establish a connection between Black & Decker and the Site dating to before the introduction of the pollution exclusion. Defendants' Further Memorandum in Support of Summary Judgment as to the Black & Decker Sites at 10-11. The Defendants, however, do not and cannot succeed in this endeavor, and fail to show that any waste oil from Black & Decker was ever alleged to have arrived at the BROS Site prior to the pollution exclusion.

First of all, at the very most, the Defendants have shown that A&A Waste Oil transported some unknown waste oil to the BROS Site. The Defendants cannot show that the waste oil transported by A&A to BROS was Black & Decker's waste oil. Indeed, the Defendants' current attempt to establish a connection between Black & Decker and the BROS Site during pre-pollution exclusion years is remarkable, particularly because Black & Decker has previously denied any connection between itself and the Site. See Letter from Barry L. Malter and Julie A. Wisman, dated March 11, 1993, at 2 (Binder 19, at Tab 5).

Even assuming the Defendants could somehow establish a connection between Black & Decker and the BROS Site prior to the introduction of the pollution exclusion, the Defendants nonetheless cannot succeed on their claim for insurance coverage with respect to the BROS Site under any pre-pollution exclusion policy because at no time during which Liberty Mutual had notice of the BROS claim did the BROS settlement/mediation committee make any allegations

against Black & Decker relating to pre-pollution exclusion periods. As stated above, the first

alleged shipment for which Black & Decker is even alleged to be responsible took place in

March of 1973, well after the introduction of the pollution exclusion. Accordingly, even if

Black & Decker did send waste to the BROS Site before March of 1973, Black & Decker is not

being held responsible for such shipment.

It is indisputable that the allegations against Black & Decker regarding the BROS Site

were specifically limited to a time period beginning in 1973 and that at no time during which

Liberty Mutual had notice of the BROS Site claim was Black & Decker alleged to be accountable

for any shipments of waste prior to 1973. Black & Decker's present suggestion that the

allegations against Black & Decker at the BROS Site extended as far back as the 1950s is

frivolous and without merit.

Indeed, nearly one year before Black & Decker's March 3, 1994 notice to Liberty Mutual

regarding the BROS Site claim, an April 29, 1993 letter from Peri N. Mahaley, an attorney

representing Black & Decker, to Linda H. Biagioni, Black & Decker's Vice President of

Environmental Affairs, explained Black & Decker's connection to the BROS Site. Mr. Mahaley

wrote:

> Based on our investigation, Black & Decker paid A&A to remove
> waste oil from the Black & Decker facility in Hampstead,
> Maryland at various times in the 1970s and early 1980s. We have
> been provided information that suggests that material from A&A
> went to BROS on various occasions.

Letter from Peri N. Mahaley to Linda Biagioni dated April 29, 1993 (Binder 30, at Tab 5).

It is apparent that the BROS settlement/mediation committee accepted that the connection

between Black & Decker and the BROS Site began in the 1970s and at no time during which

Liberty Mutual had notice of the BROS claim did the committee allege differently. In fact, well

before Liberty Mutual was first notified of the BROS claim, on March 3, 1994, the allegations of

the BROS settlement/mediation committee against Black & Decker were specifically <u>limited</u> to

and <u>based upon</u> shipments of waste oil to the Site which purportedly took place in 1973 and

thereafter. Indeed, on September 10, 1993, the BROS Settlement Process Committee set forth its

claim against Black & Decker as follows:

> Black & Decker was assigned a preliminary volume of 133,714
> gallons of mixture of lube oil and cutting oil in the baseline
> category. This volume is based on the assumption that for one year
> A&A disposed of wastes removed from Black & Decker at the
> Site. The volume was calculated by taking the records provided by
> Black & Decker showing 78,000 gallons removed by A&A during
> a seven month period of time in 1973 and extrapolating that
> volume over a one year period. <u>The Committee has assumed that
> Black & Decker continued to use A&A for waste removal at a
> constant rate from 1/73 until 4/80, based on the recollection of
> B&D employees and purchase orders issued to A&A in the 1970s
> and early 1980s with no claim by the company that it used a
> different hauler during this time period.</u> The Committee only
> allocated volume to Black & Decker for one year of this course of
> dealing with A&A, 1979, and based on firm information that A&A
> used the Site in 1979.

<u>See</u> Memorandum to BROS Settlement Process Participants from the BROS Settlement Process

Committee dated September 10, 1993 and attachment at PRIV18-03178 (Binder 30, at Tab 6).

An August 19, 1994 letter to Barry Malter, an attorney representing Black & Decker,

from Lawrence A. Serlin of the BROS Settlement Process Committee confirmed that the

allegations against Black & Decker were specifically limited to the period beginning in March

1973. That letter states:

> Black & Decker has been assigned 136,012 gallons in the baseline
> category. This volume is derived by calculating a "market share"
> for Black & Decker of 7.94% of waste oil sent offsite by A&A and
> applying that market share to 1,713,000 gallons of waste oil
> calculated to have been sent by A&A to the BROS Site <u>during the
> period between 3/73 –7/79.</u>

Letter from Lawrence A. Serlin to Barry Malter, dated August 19, 1994 at PRIV18-03190 (Binder 30, at Tab 7).

Moreover, in a December 18, 1995 letter to Kim A. Olson of Liberty Mutual, Linda Biagioni of Black & Decker confirmed that the allegations against Black & Decker were limited to the period beginning in March 1973. Ms. Biagioni wrote: "[t]he other potentially responsible parties in the BROS matter continue to allege that Black & Decker is responsible for shipments during the period March 1973 through July 1979." Letter to from Linda Biagioni to Kim A. Olson, dated December 18, 1995 (Binder 30, at Tab 8).

Accordingly, Liberty Mutual requests that summary judgment be entered declaring that there is no duty to defend or indemnify the Defendants for the BROS Site claims as to any policies that expired prior to March, 1973.

> **d.    The Defendants Are Not Entitled To A Defense Because, As A Matter Of Law, No "Suit" Exists That Triggers Liberty Mutual's Duty To Defend Or Indemnify**

The Black & Decker policies at issue with respect to the BROS Site, each provide that Liberty Mutual shall "defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof . . ." See discussion, supra, in Section II(B)(3)(b). Liberty Mutual, however, is entitled to a judgment in its favor as a matter of law at the BROS Site because no "suit" or its equivalent was ever commenced against Black & Decker that relates to the Site.

Black & Decker has not been named as a defendant in any formal lawsuit pertaining to the BROS Site. Accordingly, this Court should find that coverage is precluded based on that fact alone. See discussion, supra, in Section V(A)(4)(a); Foster-Gardner, 18 Cal. 4th at 879, 959 P.2d

at 280.  Moreover, even if this Court were to extend the definition of the term "suit" beyond its customary meaning of formal lawsuit to also encompass functional equivalents to a suit, this Court should nonetheless find that the Defendants cannot succeed in their claim for coverage.

With respect to the BROS Site, "Black & Decker" had received a letter indicating that it was "to invite you to participate in a voluntary, informal, non-litigated settlement/mediation process relating to the BROS Site."  See Hyatt Letter at 1 (emphasis added) (Binder 19, at Tab 6). The letter was sent from private parties, not a government agency.  Under the criteria set forth in the Zecco case, the invitation to participate in the settlement/mediation process for the BROS Site does not constitute a "suit" within the meaning of the Black & Decker policies.  See discussion, supra, in Section V(A)(4)(b).

The Defendants, who categorically deny any involvement at the Site, cannot show that a failure to comply with the BROS settlement/mediation letter would "itself somehow alter the substantiality of the insured's liability, by making liability more likely or more devastating or by giving rise to some particular penalty."  Zecco, 938 F. Supp. at 68.  While the letter did indicate that the settlement process was "in lieu of joinder as a defendant," Hyatt Letter at 2 (Binder 19, at Tab 6), the letter did not attach any penalty or indication that failure to participate would make "liability more likely or more devastating."  Zecco, 938 F.Supp. at 68.  Additionally, the letter was from private parties and not from a governmental agency whose letters would "tend to have more severe consequences than those from private parties."  Id.  Finally, the letter was a "polite invitation" rather than a letter indicating that "the recipient cannot refuse."  Id.  Indeed, the letter stated that participation in the settlement process was "voluntary."  Hyatt Letter at 2 (Binder 19, at Tab 6).

-50-

As a substitute for any real analysis of the factors set forth in the Massachusetts Courts' Hazen and Zecco decisions upon which they themselves rely, Defendants inappropriately and in an extremely misleading manner attempt to suggest that they were responding to a court order, and then purposefully misquote from the Hazen decision by inserting the name "Black & Decker" into the text of the decision. See Defendants' Further Memorandum in Support of Summary Judgment as to Black & Decker Sites at 26-27. The thrust of Defendants' argument with respect to the "no suit" issue appears to be that "it would have been 'dangerous to ignore' the PRP proceedings" and that "[e]arly involvement in the settlement discussions" was necessary. Id. Defendants' suggestion that there would have been dire consequences if they did not participate in the BROS settlement/mediation process, however, is belied by the undisputed facts regarding the settlement/mediation and what, in fact, occurred.

Indeed, Defendants concede that "[w]hen the PRP Group demanded that Black & Decker pay $895,000 as its share of remediation costs, Black & Decker refused to accede to the demand and withdrew from the proceedings." See Defendants' Further Memorandum in Support of Summary Judgment as to Black & Decker Sites at 7. Thereafter, without Defendants' participation, the BROS claims settled. Id. Defendants have not and cannot point to any adverse consequences that have resulted from their withdrawal from the BROS settlement/mediation process. In fact, the Defendants were never sued, or joined as a "party" to the then pending actions. In its demand for coverage from Liberty Mutual, the Defendants have identified only $5,686.00 as allegedly paid "remediation" costs. As to defense costs, the Defendants allege that they expended $383,134.00 See Defendants' September 6, 1996 Statement at 4 (Binder 30, at Tab 3). Therefore, Defendants should not be heard now to complain that "it would have been

-51-

dangerous to ignore the PRP proceedings" because that is ultimately what Defendants did in fact do, with no adverse consequences.

Accordingly, notwithstanding Defendants' erroneous assertions to the contrary, the application of the factors set forth in the Hazen and Zecco cases to the BROS settlement/mediation letter clearly negates the Defendants' claims that Liberty Mutual has a duty to defend at the BROS Site because there was no "suit" or any "suit" equivalent ever asserted against the Defendants concerning the Site.

        e.     **Defendants Are Not Entitled To Coverage, As A Matter Of Law, For Purported Claims Relating To The BROS Site Because There Has Been No Sudden And Accidental Release At The Site**

Even assuming that the Court determines that the allegations being brought against Black & Decker constituted a "suit," nevertheless, the Defendants cannot succeed on their claims for coverage at the BROS Site under any of the Black & Decker policies covering the period July 1, 1972 through July 1, 1979, which all contain the pollution exclusion, because the Defendants cannot show that the pollution at the BROS Site were both "sudden" and "accidental". See discussion, supra, in Section V(A)(2)(b); ARTRA, 338 Md. 560, 659 A.2d 1295.

Waste liquids were discharged into the lagoon at the BROS Site as a part of the BROS Site's routine and deliberate business activities and, accordingly, the discharges to the lagoon were not "accidental" within the meaning of the "sudden and accidental" exception to the pollution exclusion. See discussion, supra, in Section V(A)(2)(b). Moreover, the BROS Site used equipment that was "not really very good" and known to be leaking and weeping as part of its on-going operations. Hartung Dep. at 23 (Binder 19, at Tab 1). By the mid-1960s, the Site was "pretty permeated with oil." Id. at 22-23. The operators of the BROS Site knowingly and

deliberately engaged in activities causing the pollution at the BROS Site. Moreover, the undisputed factual record establishes that the pollution at issue at the BROS Site occurred continually over many years, and thus cannot possibly be construed as being "sudden" within the meaning of the exception to the pollution exclusion. See discussion, supra, in Section V(A)(2)(b); ARTRA, 338 Md. 560, 659 A.2d 1295.

Defendants have alleged a discrete incident where a tank at the BROS facility is alleged to have sprung a leak in June of 1971 with its contents escaping across the BROS Site and leaking into the lagoon, which was precisely where the material was going to be placed in any event. See Deposition of Robert Gregory ("Gregory Dep.") at 23 (Binder 19, at Tab 3). Even assuming that the alleged release was both sudden and accidental, such a discrete instance of leakage cannot give rise to coverage because the Defendants cannot show that the instance of leakage was out of the ordinary or more than a de minimus source of the pollution at the Site. See discussion, supra, in Section V(A)(2)(b); ARTRA, 338 Md. at 589-90, 659 A.2d at 1309-10. Indeed, according to a witness who was employed at the BROS Site in the 1960s, the equipment at BROS would leak and drip. Hartung Dep. at 23 (Binder 19, at Tab 1). Pipes at the BROS Site were always weeping at the joint. Id. Moreover, a witness testified that the amount of fluid that flowed into the waste oil lagoon as a result of the alleged tank leak in 1973 was "a small amount" relative to the size of the lagoon. See Gregory Dep. at 52 (Binder 19, at Tab 3). It also cannot be disputed that the very purpose of the lagoon was to receive waste liquids and that a leak contributed an amount equal to a drop in the bucket is of no import.

As a waste oil storage and recycling facility, the BROS Site was unquestionably "pollution prone." There have been no sudden and accidental events at the BROS Site warranting coverage under the exception to the pollution exclusion, and for that reason, among

the others set forth herein, summary judgment in favor of Liberty Mutual should be entered as to

all underlying claims against the Defendants arising out of the BROS Site.

     2.     **The Berks Landfill (a/k/a Douglasville), Berks County, Pennsylvania**

     a.     **Factual Background and Allegations of Contamination at the Site**

This Site, a landfill located in Berks County, Pennsylvania, was the subject of the 1991

action <u>United States v. Berks Associates, Inc.</u> which was initiated by the government to seek

remediation cost recovery under CERCLA.  On October 9, 1992, 32 Defendants in the <u>Berks</u>

<u>Associates</u> litigation filed a third-party complaint against Black & Decker and 184 other third-

party defendants seeking contribution for $5 million in past response costs and future costs.  It

was alleged therein that in 1973, A&A Waste Oil, Inc. ("A&A") transported waste oil to the Site,

some portion of which may have originated at Black & Decker's facility in Hampstead,

Maryland.  Defendants' Int. Responses, Tier II Appendix, at 16 and 19 (Binder 8, at Tab 1).

On August 17, 1993, Black & Decker was dismissed from the lawsuit without prejudice

due to lack of evidence linking the company's waste to the Site.  <u>Id.</u> at 22.  In this action at bar,

the Defendants maintain that they made no "remediation" payments, and that they expended

$33,700.00 in defense costs.  Defendants' September 6, 1996 Statement at 35 (Binder 30, at Tab

3).

     b.     **There Is No Coverage Under The Black & Decker Policies With Respect To Any Alleged Property Damage At The Site**

     i.     **There Is No Coverage Because There Was No Valid Tender Of The Claim To Liberty Mutual**

In the action at bar, Defendants' broker, Alexander & Alexander, did not notify Liberty

Mutual with respect to Black & Decker's involvement at the Berks Landfill Site until March 3,

1994. See Letter from Michael Margiotta, Alexander & Alexander, dated March 3, 1994 (Binder 26, at Tab E-1). The Defendants maintain that they are not seeking any indemnity payments from Liberty Mutual with respect to this Site, and are only seeking the reimbursement of attorneys' fees incurred in defense of Black & Decker's involvement in the Berks Associates action. Defendants' September 6, 1996 Statement at 35 (Binder 30, at Tab 3).

Under Maryland law, an insurer has no duty to defend an insured absent a request by the insured to do so and the insurer's obligations under an insurance contract are ordinarily triggered only when the insured tenders the defense of an action potentially within the policy coverage. See discussion, supra, in Section V(A)(1); Washington, 60 Md. App. at 297, 482 A.2d at 507. With respect to the Berks Landfill Site, no "tender" was made to Liberty Mutual with respect to the defense of Black & Decker until almost seven months after Black & Decker had already been dismissed from the lawsuit. As such, when Liberty Mutual was first notified on March 3, 1994, of Black & Decker's purported involvement at the Berks Landfill Site, there was no "suit" pending for which Liberty Mutual could provide a defense. The fees now sought from Liberty Mutual had already been incurred and Liberty Mutual was merely being asked to reimburse Black & Decker for the same without ever having an opportunity to participate -- or even monitor -- the defense. No reimbursement of defense costs is therefore owed to the Defendants.

     ii.    **The Pollution Exclusion Contained In The Black & Decker Policies Precludes Coverage For Any Alleged Contamination At The Site**

There is no coverage under any of the Black & Decker policies at issue with respect to any alleged property damage at the Berks Landfill Site because none of the pollution at issue at the Site was the result of any "sudden and accidental" release. See discussion, supra, in Section V(A)(2)(b); ARTRA, 338 Md. at 589-90, 659 A.2d at 1309-10. Because the Defendants have

failed to meet their burden of establishing any sudden and accidental release at the Berks Landfill

Site which resulted in the environmental contamination, summary judgment is properly awarded

to Liberty Mutual. The earliest that the Defendants assert that Black & Decker's waste was

shipped to the Site is 1973. As such, there could not be any alleged "property damage" resulting

from those shipments until after the first shipment date. Therefore, the only Black & Decker

policies that allegedly could be at issue with respect to any property damage at the Berks Landfill

Site would be those Black & Decker policies in effect in 1973 and thereafter.

As discussed previously, during this time period, the insurance policies provided to Black

& Decker by Liberty Mutual all contained the pollution exclusion with the sudden and accidental

exception. There can be little doubt, however, that the leakage and spills at the Berks Landfill

Site which caused contamination, resulted from the long-term operations and routine and

deliberate business activities which took place at the Site, and accordingly those routine

discharges were neither "accidental" nor "sudden." Indeed, Lester Schurr, a former employee of

Berks Associates who worked at the Site, testified that there were spills and leaks taking place at

the Berks Landfill facility for many, many years which occurred as routine activities at the

facility. Deposition of Lester Schurr, dated October 7, 1997 ("Shurr Dep.") at 33-50 (Binder 26,

at Tab E-2).

The only "sudden and accidental" release that the Defendants apparently even point to in

an attempt to satisfy their burden of demonstrating coverage under the Liberty Mutual insurance

policies, is the alleged overflow of waste oil lagoons reportedly caused by ten days of heavy rain

in 1970 and by Hurricane Agnes in 1972. See Defendants' Further Memorandum in Support of

Summary Judgment as to Black & Decker Sites at 37; Schurr Dep. at 37-43. Mr. Schurr further

testified that immediately after Hurricane Agnes, the government came in and did an extensive

cleanup of the area. Id. at 41-42. There is no dispute, however, that the materials allegedly sent

to the Site by A&A, which may or may not have included waste oils originated at the Black &

Decker Hampstead, Maryland facility, were not delivered to the Site until 1973, a year after the

alleged "overflows."[15]

### 3.     The Huth Oil Services Site, Cleveland, Ohio

#### a.     Factual Background And Allegations Of Contamination At The Site

The Huth Oil Services Site is a waste oil reclamation facility and is operated by the Huth

Oil Service Company ("Huth Oil") in Cleveland, Cuyahoga County, Ohio. By letter dated April

6, 1994, Huth Oil PRP Group made up of Huth Oil Services Company, Ashland Chemical

Company, General Electric Company and Cleveland Electric Illuminating Company, requested

that Black & Decker voluntarily participate with the Group in investigating the Site, and

requested that Black & Decker pay towards the cost of alleged remediation of activities at the

Site. See Letter from D. Dumas of Thomas, Mine & Flory, counsel to the Huth Oil PRP Group

to H. Rodgville, Black & Decker, dated April 6, 1994 (Binder 26, at Tab H-1). The letter

indicated that if Black & Decker chose not to pay the requested amount, it would be joined in a

suit. Black & Decker has alleged that it received an apparent "receipt and ledger sheet" from

Huth Oil that indicated that an unknown Black & Decker facility paid Huth Oil $300 on

January 20, 1970 for unknown services; Black & Decker however, denies ever shipping any oil

wastes to the Huth Oil Services Site. Defendants' Statement Pursuant to Order of July 29, 1996

_____

[15]     Even if the "overflow" were to be considered "sudden and accidental," any property damage purported to
have resulted from the hurricane could not have included any waste oil materials sent to the site by Black & Decker.
To the extent that property damage in the form of environmental contamination is claimed to have taken place after
1973, which would have included the waste oil from Black & Decker, there is no evidence, or allegations for that

at 38 (Binder 7, at Tab 4);  Defendants' Int. Responses, Tier II Appendix, at 52 (Binder 8, at Tab 1).

On or about August 4, 1994, the action of Centerior Services Co., et al. v. Allied-Signal, et al., Case No. 1:94CV 1590 (N.D. Ohio) against Black & Decker among others was filed.  On October 7, 1994, Black & Decker filed a motion to dismiss in the Centerior litigation.  Black & Decker then filed a motion for summary judgment, which is still pending.  Defendants' Int. Responses, Tier II Appendix, at 57 (Binder 8, at Tab 1).

### b.   There Is No Coverage Under The Black & Decker Policies With Respect To Any Alleged Property Damages At The Site

The demand made upon Black & Decker by the Huth Oil PRP Group, specifically referenced the $300 payment made by an unknown Black & Decker facility on January 20, 1970, to Huth Oil for "unknown services."  No other demand against Black & Decker with respect to any shipments of waste oil from any of its facilities is set forth in the April 6, 1994 letter.  After Black & Decker failed to pay the requested amount of $50,000 to the Huth Oil PRP Group, Black & Decker was joined as a defendant in the Centerior Service Company action.  In that complaint against Black & Decker in the action, no other purported shipments of materials are identified as having been sent to the Huth Oil facility, and Black & Decker is described only as a purported "generator."  Therefore, the demand against Black & Decker, as set forth in the complaint, is limited to allegations of property damage resulting from a single shipment alleged to have come from a Black & Decker facility in 1970.

---

matter, that any such contamination was ever caused by the supposed "sudden and accidental" releases.  In fact, the evidence is only of long-term, operational leaks and discharges.

All Black & Decker policies from July 1, 1971 and forward, contain the standard pollution exclusion clause with the "sudden and accidental" exception. As such, there can be no coverage under these policies because the pollution at issue at the Site which resulted in property damage was neither "sudden" nor "accidental." See discussion, supra, in Section II(B)(3)(e); ARTRA, 338 Md. 560, 659 A.2d 1295.

The only evidence of any "releases" of contamination at the Site was that oil which had accumulated in the dike adjacent to several of the above ground oil storage tanks was contaminated by PCBs. See U.S. EPA Administrative Order pursuant to CERCLA dated October 5, 1990 (Binder 26, at Tab H-2). There are no allegations nor any documented evidence, however, of any non-routine, sudden and accidental releases which would have resulted in this contamination. As such, the discharge of pollutants at the facility must be deemed to have been part of the facility's routine and deliberate business activities. Accordingly those discharges at the Site were not "accidental" within the meaning of the "sudden and accidental" exception to the pollution exclusion. See discussion, supra, in Section V(A)(2)(b); ARTRA, 338 Md. 560, 659 A.2d 1295.

c.     **Black & Decker's Failure To Cooperate Precludes Coverage**

The Black & Decker Policies provide that "the insured shall cooperate with the company and, upon the company's request, assist in making settlements . . . ." See, e.g., Black & Decker Policy in effect July 1, 1971 (Binder 2A, at Tab 1, at MA LM 0001447). In the present case, Black & Decker failed to cooperate with Liberty Mutual in making settlement of the Huth Oil claim because it failed to notify Liberty Mutual of the settlement offer made by the Huth Oil PRP Group. Black & Decker's failure to cooperate precludes coverage under the Black & Decker Policies, because Liberty Mutual has been prejudiced thereby. Although under Maryland law an

-59-

insurer may deny coverage based on an insured's failure to cooperate only where the failure to cooperate has resulted in prejudice to the insurer, see Fidelity. & Casualty, Co. v. McConnaughy, 228 Md. 1, 179 A.2d 117 (1962), in the present case Liberty Mutual has established such prejudice.

By letter dated April 6, 1994, Huth Oil PRP requested that Black & Decker voluntarily participate with the Group in investigating the Site, and requested that Black & Decker pay $50,000 in full settlement of any obligations in an enclosed memorandum, dated March 25, 1994, for remediation of the Site. See Letter from D. Dumas of Thomas, Mine & Flory, counsel to the Huth Oil PRP Group to H. Rodgville, Black & Decker, dated April 6, 1994 (Binder 26, at Tab H-1), and the Memorandum from Huth Oil Group to Huth Oil Site PRPs, dated March 25, 1994 ("Huth Oil March 25, 1994 Settlement Memorandum") (Binder 30, at Tab 9). As set forth above, Black & Decker was named as a defendant in the Centerior Service Company action only after Black & Decker failed to pay the requested amount of $50,000 to the Huth Oil PRP Group.

Black & Decker did not notify Liberty Mutual of the settlement offer by the Huth Oil PRP group that all the claims against Black & Decker could be settled for $50,000. In fact, Liberty Mutual was not provided with a copy of the Huth Oil March 25, 1994 Settlement Memorandum until it was produced after an order by this Court. When the April 6, 1994 Letter from Mr. Dumas, counsel to the Huth Oil PRP Group, to Black & Decker was transmitted to Liberty Mutual in conjunction with the Defendants' demand for defense and indemnity, the Huth Oil March 25, 1994 Settlement Memorandum was specifically withheld from Liberty Mutual by the Defendants. As such, Liberty Mutual was never informed that the Huth Oil PRP Group had offered to settle the dispute for only $50,000.00, and the Defendants hid this settlement offer from Liberty Mutual. Although Black & Decker was ultimately dismissed from the underlying

action without payment of any remediation costs, it expended $71,356.00 in attorneys' fees for which it now seeks reimbursement from Liberty Mutual.  <u>See</u> Defendants' September 6, 1996 Statement at 48 (Binder 30, at Tab 3).

Liberty Mutual has unquestionably been prejudiced by Black & Decker's failure to forward the Huth Oil PRP Group's settlement request for Liberty Mutual to act upon.  Because Liberty Mutual was not forwarded the settlement request, Liberty Mutual lost the opportunity to settle the Huth Oil matter early on for $50,000.

### d. There Has Been No Accident Or Occurrence At the Huth Oil Site

Defendants are not entitled to coverage with respect to the Huth Oil Site claim because the alleged property damage at issue at Huth Oil did not result from an accident or occurrence within the meaning of the Black & Decker policies.

In order for coverage to be available to Defendants under the Black & Decker policies, the Defendants must first prove that the underlying actions for which they now seek coverage, sought damages because of property damage arising from an "occurrence."  The Black & Decker policies define "occurrence" to mean:

> . . . an <u>accident</u>, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

<u>See</u>, <u>e.g.</u>, Black & Decker Policy in effect July 1, 1970 (Binder 2A, at Tab 1, at MA LM 0002233) (emphasis added).  Thus, as a general matter, the definition of "occurrence" has three components: (1) there must be an "accident"; (2) the "accident" must result in "bodily injury" or

"property damage"; and (3) the "bodily injury" or "property damage" cannot be "expected [or] intended from the standpoint of the insured."

Moreover, Maryland courts have repeatedly recognized that there can be no "occurrence" in an occurrence-based policy if the alleged injury is not the result of an accident. <u>See</u> <u>Sheets v.</u> <u>The Brethren Mut. Ins. Co.</u>, 342 Md. 634, 646, 679 A.2d 540, 545 (1996); <u>Lerner Corporation v.</u> <u>Assurance Company of America</u>, 120 Md. App. 525, 707 A.2d 906, 1998 Md. App. LEXIS 74 at *18 (April 2, 1998) ("there is an occurrence only upon the happening of an 'accident'"). Maryland courts have repeatedly held that an occurrence-based policy requires an accident as a prerequisite to coverage. <u>See</u> <u>Sheets v. The Brethren Mutual Insurance Company</u>, 342 Md. 634, 646, 679 A.2d 542, 545 (1996) (in determining the existence of an occurrence, "the question before us is whether the [alleged injury-producing event] was an 'accident'"); <u>Lerner Corporation</u> <u>v Assurance Company of America</u>, 120 Md. App. 525, 707 A.2d 906 (1998) ("there is an occurrence only upon the happening of an 'accident'"). The Court of Appeals recently definitively established that an accident will be found where the "resulting damage was 'an event that takes place without [th:: insured's] foresight or expectation'". <u>See</u> <u>Sheets</u>, 342 Md. At 652, 679 A.2d at 548, quoting <u>Harleysville v. Harris & Brooks</u>, 248 Md. 148, 154, 235 A.2d 556, 559 (1967) (smoke damage resulting from careless burning of refuse was <u>not</u> "caused by accident") (emphasis added).

In the present case, Defendants cannot contend that the property damage at Huth Oil resulted from an accident. As set forth above, the only evidence of any "releases" of contamination at the Site was that oil which had accumulated in a dike adjacent to several above ground oil storage tanks was contaminated. <u>See</u> U.S. EPA Administrative Order pursuant to CERCLA dated October 5, 1990 (Binder 26 at Tab H-2). Defendants, however, have no

**VII.    Conclusion**

For the reasons stated above, Liberty Mutual requests that the Court grant its Motion for Summary Judgment with respect to its Complaint and the Defendants' Counterclaim, and deny the Defendants' Motion for Partial Summary Judgment.

**LIBERTY MUTUAL INSURANCE COMPANY**

By its attorneys,

Ralph T. Lepore, III BBO 294420
Robert A. Whitney BBO 545675
Kenneth R. Brown BBO 557052
Peter J. Duffy BBO 566682
HOLLAND & KNIGHT LLP
18 Tremont Street
Boston, MA 02108
(617) 619-9200

DATED:  December 1, 1998

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of December, 1998 a true copy of the above document was served upon the Defendants' counsel, by hand.

Robert A. Whitney

-136-