# Tab 8.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE BLACK & DECKER CORPORATION, ) <br> BLACK & DECKER INC., ) <br> BLACK & DECKER (U.S.) INC., ) <br> EMHART CORPORATION and ) <br> EMHART, INC., ) <br> ) <br> Defendants. ) <br> ) | CIVIL ACTION <br> NO. 96-10804-DPW |

REPLY MEMORANDUM REGARDING
MARYLAND AND CONNECTICUT SITES

December 4, 1998

Jack R. Pirozzolo, BBO# 400400
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Attorney for Defendants

PROTECTED INFORMATION

By Order of Court, this
envelope is to remain sealed
and the Clerk of this Court
shall not reveal the contents
thereof to any person other
than the Court or attorneys of
record for the parties until
further order of this Court.

## THE BLACK & DECKER SITES

Suit:  BROS originated with a judicially mandated "invitation", "in lieu of joinder as a defendant" in on-going EPA-instituted CERCLA litigation.  This was far closer to suit than the PRP letter held to be the functional equivalent of suit in Hazen[1].  The Hyatt letter was not a "private communication", sent, as it was, pursuant to a Federal court order, which, if ignored, would have resulted in joinder.  Ignoring the PRP process, as Liberty Mutual's ("LM's") documents emphasize (App. XXIII:130), is perilous - thus, the Hazen rule - consistent with the majority and with logic.

There is a "suit" where an insured, though not an actual party, is threatened.[2]  The Maryland court, in Bausch & Lomb, found "suit" without a PRP letter; the insurer dropped the suit argument on appeal.  Maryland would not buck the majority.  Black & Decker ("B&D") was not required to defy the federal court to preserve its insurance coverage.

Duty to Defend:  Maryland law precludes an insurer's reliance upon extrinsic evidence (BD Md 29-30)[3].  LM relies

---

[1]     Cases previously discussed are referenced without full citation; a list of full citations is attached.

[2]     Continental Cas. v. Cole, 809 F.2d 891, 897-99 (D.C.Cir. 1987); Clarke v. Fidelity and Cas. Co. of N.Y., 285 N.Y.S.2d 503 (N.Y.Sup. Ct. Tr. Term 1967).

[3]     November 13, 1998 Further Memorandum in Support of Black & Decker Motion for Summary Judgment With Respect to Black & Decker Sites (BROS, Douglassville and Huth) ("BD Md").  Other references are to the November 13, 1998 Further Memorandum in Support of Black & Decker

exclusively on such forbidden evidence, a PRP calculation which post-dates the complaining documents by nine months (RApp 1-3). Forbidden evidence is also proffered regarding Huth and Berks.

The complaining documents, silent as to dates on which B&D waste oil allegedly reached the sites, embrace long periods of pre-pollution exclusion deliveries, implicating the pre-pollution exclusion policies (BD Md 8-9, 12, 14, 30-32). The alleged 1973 deposits do not establish the absence of earlier deposits. The PRP Group claimed evidence of events starting in 1964 (RApp 3, 5, 10). In negotiations it adopted the 1973 date (RApp 12). It would have been contrary to B&D's interests to show the earlier link through A&A to BROS. Instead, it argued that despite its use of A&A, there was no evidence its waste reached the sites (see, e.g., RApp 16). B&D's answers to interrogatories in this case do not limit the proof in light of subsequent third party discovery.[4] That B&D prevailed is not a basis to deny defense costs.

Moreover, under CERCLA, a depositor of waste is liable jointly and severally for all depositors, past and future.[5] LM's

---

Motion for Summary Judgment With Respect to Farrel and SHW Sites ("BD Ct"), Liberty Mutual's December 1, 1998 Memorandum ("LM") and to the Appendix to Reply Memorandum Regarding Maryland and Connecticut Sites ("RApp"), filed herewith.

[4] F.R.Civ.P. 33, 1970 Advisory Committee Notes to Subd. (b); Wright & Miller, Federal Practice and Procedure, §2181.

[5] Highlands Ins. Co. v. Aerovox, 676 N.E.2d 801, 806 (Mass. 1997); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 868 F.Supp. 1278,

_-•-_

citations regarding absence of coverage for disposals subsequent to policy expiration are inapposite. Here there was coverage throughout the period of operation at the sites. LM's cases relate to a corporate parent's policy which does not cover pre-acquisition subsidiaries, or to industrial (rather than landfill or reclamation) sites, where the dates of site-operation are set forth in the complaint, or they discuss only indemnification or do not suggest the defense determination must be based solely upon the four-corners of the underlying complaint.

No Pollution Exclusion: The pollution exclusion is void (BD Md 38-39). Maryland protected its insureds by rejecting the pollution exclusion in the absence of "lowered rates or statistical support given to show that the rates would not be excessive." Id., App. XCVIII, Graham Aff., ¶¶ 49-50, Ex. 6. LM relies upon the flawed reasoning of Nashua, ignores the regulatory history and misreads "operations" cases, such as Quaker State, which specifically include off-site waste disposal in an insured's "operations." Further, "operations" is ambiguous. National Union Fire Ins. Co. v. CSX Corp., 982 F.Supp. 1050, 1051-52 (D. Md. 1997). Maryland, particularly given its requirement that the pollution exclusion be deleted, would construe "operations" to favor the insured and find coverage. Finally, it is unthinkable that a jurisdiction that

-----

1305 (D. Utah 1994), aff'd on other grounds, 52 F.3d 1522 (10th Cir. 1995).

-3-

requires deletion of the pollution exclusion would enforce it
with respect to a site in a jurisdiction that has determined the
pollution exclusion to be unenforceable.  The pollution
exclusion is not in play.  And even if it were, there were
sudden and accidental events at all three sites (BD Md 37-38).

Pre-notice Attorneys Fees:  Sherwood is controlling.
Pre-notice attorney's fees are recoverable for all three sites.
The LM "tender" cases (see, LM 22-23 and n. 8) were expressly
rejected by Sherwood.  Also see, n. 11, infra.

Huth:   The "cooperation" argument is (1) belated,
(2) disingenuous, and (3) belied by the fact that notice of the
$50,000 settlement proposal was given to LM by B&D on August 16,
1994 (XXXIII:226, 230, 232-33) and LM took no steps to
participate or pay.  LM persists in its "groundless suit"
argument in a "property damage" disguise without distinguishing
the dispositive Sheets decision (BD Md 46-48).  LM's new
"accident" argument also flies in the face of Sheets.  And LM
inexplicably continues to base its Huth pollution exclusion
argument upon extrinsic evidence of an alleged deposit that it
concedes was made before adoption of the pollution exclusion
(LM 58-59).

THE FARREL AND SHW CLAIMS

Perversion of Policy Coverage:  The pollution exclusion
is irrelevant as the Farrel and SHW complaints allege pre-

-4-

# Tab 9.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE BLACK & DECKER CORPORATION, ) <br> BLACK & DECKER INC., ) <br> BLACK & DECKER (U.S.) INC., ) <br> EMHART CORPORATION, and ) <br> EMHART INDUSTRIES, INC. ) <br> ) <br> Defendants. ) | CIVIL ACTION <br> No. 96-10804-DPW |

BLACK & DECKER'S SUPPLEMENTAL SUBMISSION
REGARDING DECEMBER 8, 1998 HEARING

One question addressed at the hearing on December 8, 1998 concerned the consequences to Black & Decker of failing voluntarily to join the court ordered settlement and mediation process concerning the BROS site. Following the hearing, it occurred to counsel that the focus was upon the possibility that upon the failure to join, Black & Decker would be made a party in the then pending consolidated Allied Signal and Rollins actions, in which the court-ordered settlement process was implemented, and did not focus upon the different and more disadvantageous and dire consequences to Black & Decker of not joining the settlement process and not being made a party in that then pending litigation.

12-9-98

5758

Black & Decker faced draconian consequences if it chose not to join the Court-ordered settlement process, was not made a party in the Allied Signal/Rollins action, and said action resulted in the PRP Group reaching a settlement with the EPA (the EPA was a party plaintiff in the Allied Signal action). If such a settlement occurred without the participation of Black & Decker, Black & Decker would lose the benefit of being a PRP that had entered into a judicially approved settlement with the EPA, including insulation from a CERCLA contribution action filed by other PRPS (see 42 U.S.C. § 9613(f)(2)) and insulation from a subsequent action filed by the EPA (see 42 U.S.C. § 9613 (f)(3)(A)). If, as frequently occurs, the EPA settlement with the PRP Group did not result in full satisfaction of EPA demands, the EPA would be in a position, following settlement, to issue an administrative order that a non-participating party, here Black & Decker, take the full responsibility for unfunded response costs at RROS, including clean-up and related costs. Black & Decker would then be required to comply with EPA demands for response actions, with its only remedy being thereafter to assert that the response action selected by the EPA "was arbitrary and capricious or otherwise not in accordance with law". 42 U.S.C. § 9613(j)(3).

In addition to losing the insulation from liability flowing from a settlement with the EPA, Black & Decker would lose other benefits of PRP Group membership. It would not have

-2-

available to it the opportunity to participate in negotiations with the EPA concerning the scope of remediation, nor would it have the benefit of investigatory work performed by the PRP Group and the work of the PRP Group's consultants and counsel.

This is exactly the kind of exposure that resulted in the determination in Hazen Paper Co. v. United States Fidelity and Guaranty Co., 407 Mass. 689 (1990), that an EPA PRP letter was the functional equivalent of suit. As in this case, Hazen recognized that "'[i]dentification [of insureds] ... as PRPs carries more serious consequences than, for example, a demand letter between private parties'".  407 Mass. at 696 [citation omitted].  As noted in Hazen, "[Black & Decker's] prospects of avoiding financial responsibility were minimal because liability is not based on fault … and the available defenses are very limited".  407 Mass. at 696-97.

As in Hazen, "the risk to which [Black & Decker] was exposed was substantial because, as a practical matter, its liability is joint and several".  407 Mass. at 697.  Here, as in Hazen, "[e]arly involvement in the settlement discussions is thus often crucial to protect one's interests" [and] [a]ny court action by the EPA is limited to the administrative record… {statutory citation omitted] and judicial review considers only whether the EPA 'decision was arbitrary and capricious or otherwise not in accordance with law'".  407 Mass. at 697 (quoting 42 U.S.C. § 9613(j)(2)).  Particularly here, where

-3-

Black & Decker denies any connection with the site, as explained in _Hazen_, the insured's "participation in the development of [the EPA administrative] record can be crucial". 407 Mass. at 697. Nothing differentiates the judicially-ordered BROS settlement process from the _Hazen_ explanation that "settlement of EPA claims against potentially responsible parties, with protection against claims for contribution, is a desired goal". _Id_.

Here, as in _Hazen_, failure to participate in the settlement process was "such that the opportunity to protect [Black & Decker's] interest could well have been lost, long before any (subsequent) law suit would be brought". 407 Mass. at 697. Here, as in _Hazen_, "[i]t would be naive to characterize [the BROS settlement process] as a request for voluntary action. [Black & Decker] had no practical choice other than to respond actively to the [court-ordered Hyatt] letter". _Id_.

Liberty Mutual's argument is particularly hypocritical in light of statements in its internal directive to its claim handling personnel (App. XXIII-130), attached as Exhibit 1, that "[l]itigation [of "dump site claims"] has been lengthy, expensive and generally unsuccessful from the standpoint of the generators. It is usually in the best interest of the generators, therefore, to unite while cooperating with the EPA in negotiating an agreement for a remedial action at a dumpsite". The Liberty Mutual position is disingenuous in view

-4-

of the statement in <u>Hazen</u> that "[t]he early involvement of an
insurer in such a process is obviously important to the insured
(and very possibly to the insurer), assuming, of course, that
the claim is one that falls within the coverage of the policy".
407 Mass. at 697.

The suggestion that the <u>Hazen</u> rule applies when the
EPA sends a PRP letter, but not when a Court orders that PRPs
should be added to a pending action is the type of "formalistic
ritual[]" decried by <u>Hazen</u> and its progeny.  The following
statement in a post-Hazen decision, <u>Aetna</u> <u>Casualty</u> <u>&</u> <u>Surety</u> <u>Co</u>.
v. <u>Pintlar</u> <u>Corp</u>., 948 F.2d 1507, 1517-18 (9th Cir. 1991), is
applicable.

> The rationale behind defending insureds when
> a complaint has been filed is that,
> traditionally, that is when the jeopardy to
> the insureds' rights can be adversely
> affected.  The focus should be on the
> underlying rationale and not on the
> formalistic rituals.  If the threat is
> clear, then coverage should be provided.

The consequences to Black & Decker of failing to join
the BROS process are also discussed in the affidavit of Barry L.
Malter, an attorney experienced in CERCLA litigation who
represented Black & Decker in the BROS settlement process, which
attaches his expert report, previously furnished to Liberty
Mutual (attached as Exhibit 2).  That report, particularly pages
5-13, explains the statutory provisions that expose Black &
Decker to severe consequences if it were not a party to a
settlement between the PRP Group and the EPA and the application

-5-

of those statutory provisions to the situation confronting Black & Decker in BROS.

This demonstrates that if Black & Decker were not joined in the BROS settlement process and that process resulted in settlement with the EPA, its failure to participate in the BROS settlement process would result in dire consequences following settlement that Black & Decker would not suffer if it had participated in the settlement process. The rationale of Hazen and many similar cases is four square with BROS.

By their attorney,

Jack R. Pirozzolo, BBO #400400
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand on 12/9/98

-6-

HO-CLAIMS
B L HAMPTON

**5**     **GENERAL LIABILITY**     No. ⸺

SUBJECT: <u>HAZARDOUS WASTE DUMP SITE CLAIMS</u>
<u>BROUGHT BY GOVERNMENTAL AGENCIES</u>

### REMARKS

In 1980, Congress passed the Comprehensive Environmental Response,
Compensation and Liability Act (CERCLA or Superfund).  This act
created a new class of claims for the Claims Department.  These
claims are commonly referred to as "dump site cases".

This memo is the culmination of Home Office Special Claims' exper-
ience with dump site cases.  While it is necessarily long and
complicated, the directives herein must be followed carefully to
insure consistent handling of these claims.  <u>This memo must be</u>
<u>read in its' entirety by those branch office personnel handling</u>
<u>dump site cases.</u>

### BRANCH OFFICE RESPONSIBILITY

The management of each dump site case is the responsibility of the
branch office which services the jurisdiction where the dump site is
located.  This includes file creation, the sending of an initial
coverage position letter, investigation and recommendations for dis-
position.  In those divisions with Division Pollution Specialists
responsibility for handling shifts to the Division Specialist.

### HOME OFFICE RESPONSIBILITY

All pollution cases will be examined by Home Office Special Claims.
Any problems or questions that arise in the handling of a pollution
claim should be reviewed with Special Claims.

### BACKGROUND

Dump site claims arise when a governmental agency, usually at the
state or federal level, asks an insured to participate in the clean-
up of a hazardous waste site.  Parties identified by the regulator
are commonly referred to as potentially responsible parties (herein-
after called PRP's).  Their involvement stems from attempts to dispose
of waste material containing components considered toxic by federal
standards.  Transporters of wastes to the site may also be implicated.

Dump sites can be legal or illegal, licensed or unlicensed.  The
insured may have shipped directly or used a transporter.  The
transporter may be "discretionary" or "non-discretionary".  In other
words, the insured may have predetermined the disposal site and hired
the transporter solely for shipping or the insured may have contracted
with the transporter to remove the waste and dispose of it properly.

<table>
<tr><td>CIRCULATE BEFORE FILING</td><td rowspan="2"></td><td>DATE<br>June 16, 1986</td></tr>
<tr><td>[X] SUPVR'S  [X] ADJR'S<br>[ ] C.R.S   [ ] OTHERS:</td><td>PAGE   MEMO NO.<br>1     21 ▾</td></tr>
</table>

CLAIMS DEPARTMENT



XXIII-129          *GEM   CD*          200609

PRIVILEGED/CONFIDENTIAL B AND D MA   LM   0095514

## LAW

The most powerful of all regulators is the United States Environmental Protection Agency (USEPA). Several federal laws endow this EPA with widespread authority in these matters. The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) empowers the USEPA to take necessary action when there is a release or substantial threat of a release into the environment of any hazardous substances which are present an imminent and substantial danger to the public health or welfare. This law is commonly referred to as "Superfund". Other related environmental statutes include the Resource Conservation Recovery Act (RCRA), the Clean Water Act and the Clean Air Act. These laws set standards for acceptable levels of contaminants and give the government additional regulatory authority.

If the USEPA files suit against the identified PRPs to recover resources expended in remedial or response costs at a site it will seek to apply strict, joint and several liability against the defendants. While there is no express joint or several liability provision in the Superfund law some court decisions have imposed this standard. It is conceivable that a minor generator could be held responsible for all cleanup costs pursuant to this judicial attitude. In many instances local laws and courts parallel the thinking of the federal system, which further increases the imposition of liability against a minor site participant.

Litigation has been lengthy, expensive and generally unsuccessful from the standpoint of the generators. It is usually in the best interests of the generators, therefore, to unite while cooperating with the EPA in negotiating an agreement for a remedial action plan at a dumpsite.

## TYPICAL CASE SCENARIO

Toxic waste dump sites may have been legal landfills or illegal dumping grounds created by so-called "midnight dumpers". Regardless of how the sites came into existence or were operated, if an insured's wastes are present at a site the insured may be held responsible for response costs.

A site identified by environmental authorities may be ranked on the National Priorities List if certain criteria are met. It will then automatically become eligible for cleanup under Superfund. The USEPA has the option of instigating immediate cleanup to stabilize a site, or requesting the generators to voluntarily assume that responsibility. Initial cleanup may consist of drum removal, lagoon and tank drainage, security to prevent public access and other action deemed necessary by the regulator.

The second phase of a remedial action plan usually consists of extensive testing of the groundwater and soil to determine the extent of the contamination. This procedure is called the Remedial Investigation and Feasibility Study (RI/FS). The "RI" portion of the test examines the extent of damage and the "FS" portion suggests alternatives for cleanup. Two areas of major concern are contaminated soil (hotspots) and groundwater. Eventual migration of contaminated groundwater may affect off-site

*GEM CD*          200610

PRIVILEGED/CONFIDENTIAL B AND D MA  LM  0095515

wells or other bodies of water which pose threats to the communities served by those resources.

The investigation and evaluation work is done by qualified engineering firms and can be funded by the USEPA or the PRPs if the USEPA approves. If the PRPs are united, but unwilling to fund the work, it is common them to hire an engineering firm to oversee the work being done by the USEPA's firm.

Once the study is completed there is a period for public comment and negotiations between the PRPs and USEPA will ensue if the USEPA is satisfied that a settlement is possible. Be cognizant that the USEPA can institute suit or issue a Section 106 or 107 order (under CERCLA) at any time to compel the PRPs to clean the site.

The process which culminates in complete site cleanup may take years. It is essential, however, that an early determination of Liberty's position with respect to each insured at a site is made to insure consistent handling and appropriate communication of coverage details to the insured.

## COVERAGE

The application of insurance coverage to pollution dump site cases is an extremely complicated study. New judicial decisions are constantly changing the manner in which the courts are interpreting our general liability policies. As such it is impossible to set forth the most current interpretations in this type of a memo.

Attached to this memo is a standarized dump site coverage position letter (CPL) which should be sent to our insured when we receive a dump site claim. Upon completion of our investigation the branch office should evaluate the facts in conjunction with the points raised in the CPL. Keep in mind that this is a standard CPL, and as with any coverage problem the policy itself should be reviewed to determine the exact coverage afforded.

Submit your final recommendations with respect to coverage to Special Claims before writing the insured. This should include a draft of our final coverage position. After this has been approved by Special Claims be certain to advise the Sales Department of our proposed action.

## FILE CREATION

All dump site cases must be created using the following format. THIS IS IMPORTANT. PLEASE FOLLOW CLOSELY.

Date of Accident -

Use the date the property damage was first discovered or could have reasonable been discovered. Use an estimate

| DATE | | PAGE | MEMO NO. |
|------|------|------|----------|
| June 16, 1986 | CLAIMS DEPARTMENT | 3 | 21 |

XXIII-131     GEM   CD       200611

PRIVILEGED/CONFIDENTIAL  B AND D MA  LM  0095516

6

D. Intent – Determine why the insured chose this site. Did the insured ever visit the site or obtain proof of proper licensing? Did the insured expect their wastes to be recycled, destroyed or buried? If recycled, did the insured repurchase any waste after recycling? What effort did the insured make to determine whether the site was capable of handling their particular wastes? Finally, attempt to determine why the insured stopped using the site.

II. DUMPSITE

History: Obtain a complete and concise history of the site. Usually the EPA has completed such an analysis which is made available at the initial PRP meeting. This will verify the nature of the operation, the problems encountered, governmental intervention and official closing date.

Manifestation of damage: Look for documentation of when damage to the environment was first discovered. On-site accidents, including spills and fires or dates of soil and groundwater sampling, will provide insight into the time frame of when damages began.

## REPORTS

Once the investigation is complete a full formal type report should be prepared and submitted to Home Office with your office's recommendation on disposition. It should address each of the points raised under coverage, defense and investigation. It is due within 90 days of init receipt of notice from the policyholder.

## FOLLOW-UP

It is necessary to keep abreast of all developments at the site. This can usually be accomplished by obtaining copies of steering committee reports and staying in close contact with the attorney representing our policyholder. It is essential that we remain aware of all developments because once a proposal for settlement is made, the response time is usually quite short.

In most instances settlement is accomplished in phases. The first phase may be a reimbursement for government expenses incurred for surface cleanup and study work. An agreement between parties may be finalized in a court approved Consent Decree. Usually this is a partial settlement with further payment required at a later time. The regulator generally leaves a reopener clause in all consent decrees, thus there is no such thing as a "final release" on these cases. It is this reason that Home Office approval is need for case closings.

XXIII-132    GEM CD    200612

PRIVILEGED/CONFIDENTIAL  B AND D  MA  LM  0095517

CASE CLOSING

All dump site pollution case closings must be approved by Home Office Special Claims unless the case has been reverted.

| DATE | | PAGE | MEMO NO. |
|------|------|------|----------|
| June 16, 1986 | CLAIMS DEPARTMENT | 7 | 21 |

XXIII-133          GEM  CD       200615

PRIVILEGED/CONFIDENTIAL B AND D MA  LM  0095518

<u>DUMP SITE COVERAGE POSITION LETTER</u>                    (DATE)

Dear

We have received your notification of your company's involvement as a potentially responsibility party at the hazardous waste site noted above. In accord with our company policy, we will initiate an immediate investigation of the site and the circumstances of your alleged involvement. Your cooperation in this effort is important to its success; an initial request for information is therefore included in this letter.

<u>POTENTIAL COVERAGE CONSIDERATIONS:</u>

We presently lack sufficient information to comment specifically on how your policies may relate to the particular facts of this case, but we do wish to alert you to the potential coverage issues present in environmental claims of this nature.

The following provisions commonly found in liability insurance policies may have application.

Part I:  The company will pay on behalf of the <u>insured</u> all sums which the <u>insured</u> shall become legally obligated to pay as damages because of

    Coverage A.  <u>bodily injury</u> or

    Coverage B.  <u>property damage</u>

to which this policy applies, caused by an occurrence....

Part VI: <u>occurrence</u> means an accident, including continuous or repeated exposure to conditions, which results in <u>bodily injury</u> or <u>property damage</u> neither expected nor intended from the standpoint of the insured.

<u>property damage</u> means (1) physical injury to or destruction of tangible property which occurs during the policy period....

Part I. Exclusions:  This policy does not apply:

| DATE | | | PAGE | MEMO NO. |
|------|--|--|------|----------|
| June 16, 1986 | | CLAIMS DEPARTMENT | CPL 1 | 21 |

GEM  CD        200614

XXIII-134

PRIVILEGED/CONFIDENTIAL  B AND D MA  LM  0095519

2

(f) to <u>bodily injury</u> or <u>property damage</u> arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape if sudden and accidental;

The questions that this type of case typically generates are:

1. Whether all of the relief sought, which may include injunctive orders and recovery of governmental agency response costs incurred under statutory authority, qualifies as "damages because of <u>bodily injury</u> or property damage"?

2. When did property damage for which damages are sought occur?

3. Whether any such property damage was neither "expected nor intended"?

4. Whether any such property damage arose from a release or escape of pollutants which was both "sudden and accidental"?

<u>PRELIMINARY INFORMATION REQUESTED</u>:

In order for us to begin our evaluation of this claim, we request that you supply certain information to us. If you have responded to an information request from a regulatory agency, please forward a copy of your response.

If the response does not contain the following information, please include it with a copy of the response that was sent to the regulator:

1. Shipping origin of the waste.

2. The exact waste product(s) generated at this plant.

3. The method of shipment: ie, drum or bulk form? If in drums, how were they sealed?

4. Whether a transporter was involved. If so, was there a contract? Please submit a copy.

5. The exact quantity of waste shipped.

6. The dates of each shipment.

7. Why the site was chosen. Dates of site inspections by any personnel from your company.

8. How waste was disposed of before and after this site was used.

XXIII-135          *GEM  CD*          *200615*

PRIVILEGED/CONFIDENTIAL  B AND D MA  LM  0095520

We will be in further contact with you once we have received and reviewed your response to the information requested in this letter. We will review this information as well as our records of your policies and will advise you in more detail of our coverage position once this has been completed. In the interim, please keep us fully informed of any further developments and, should you have any questions, please contact us.

Very truly yours,



DATE
June 16, 1986

CLAIMS DEPARTMENT

PAGE
CPL 3

MEMO NO.
21

XXIII-136

GEM CD        200616

PRIVILEGED/CONFIDENTIAL B AND D MA  LM  0095521