

12/08/98  TUE 16:59 FAX 3012294463          Malter/Bregman
SENT BY:WILLCOX PIROZZOLO Mc  ;12- 8-98 ; 16:09  ;WILLCOX PIROZZOLO Mc→                     3012294463;# 3

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE BLACK & DECKER CORPORATION, )<br>BLACK & DECKER INC., )<br>BLACK & DECKER (U.S.) INC., )<br>EMHART CORPORATION, and )<br>EMHART INDUSTRIES, INC. )<br><br>Defendants. ) | CIVIL ACTION<br>No. 96-10804-DPW |

### AFFIDAVIT OF BARRY L. MALTER

I, Barry L. Malter, hereby give this affidavit in the above entitled action.

Attached hereto is my expert report which I have provided for use in the above entitled action.  All statements and opinions therein are true.

Signed under the pains and penalties of perjury this 8th day of December 1998.

Barry L. Malter

# EXPERT REPORT OF BARRY L. MALTER

## FOR USE IN

## LIBERTY MUTUAL INSURANCE COMPANY

## v.

## THE BLACK & DECKER CORPORATION, et al.

## Civil Action No. 96-10804-DPW (D. Mass.)

This report, prepared at the request of counsel for The Black & Decker Corporation in Liberty Mutual Insurance Co. v. The Black & Decker Corp., et al. Civil Action No. 96-10804-DPW (D. Mass.), discusses the substantive law and procedures applicable to matters arising under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, as well as matters arising under analogous state statutes. The subjects covered by this report include: the identity of persons who may be liable, referred to as potentially responsible parties ("PRPs"), under CERCLA and analogous state statutes; the nature of the liability scheme under CERCLA and analogous state statutes; the enforcement alternatives available to the United States Environmental Protection Agency ("EPA") and to state agencies; the defenses potentially available in proceedings under CERCLA and analogous state statutes; the potential exposure of a PRP or a defendant in litigation under CERCLA and analogous state statutes; the general conduct of CERCLA litigation and litigation under analogous state statutes; the import of receiving a notice letter, sometimes referred to as a PRP Letter, from the EPA or a state agency; the actions generally taken in response to a PRP letter; factors usually considered in determining whether to settle a CERCLA proceeding; the methods for allocating liability among multiple PRPs in a CERCLA proceeding or analogous state proceeding; and the impact of CERCLA and analogous state statutes on corporate behavior and transactions, including acquisitions and divestitures.

The statement of opinion and conclusions set forth herein are based on my nearly eighteen (18) years of experience in the private practice of law, devoted almost exclusively to hazardous substance and hazardous waste counseling and litigation, including matters arising under CERCLA and analogous state statutes; my review of the decisional law under CERCLA

- 2 -

and analogous state statutes, as well as the policies and procedures of EPA and numerous state agencies; my review of publications, including law review articles, commercial periodical publications, and treatises; my attendance at numerous seminars, including seminars at which I served as a faculty member; and my review of documents produced in this matter.

My legal experience and educational background are set forth in an affidavit executed by me in this matter on February 5, 1998. (I expect to provide the opinions set forth in that affidavit.) I have not authored any publications within the preceding ten (10) years and I have not testified as an expert at trial or by deposition within the preceding four (4) years. For my work as an expert in this matter, including my preparation of this report, I am being compensated at my customary rate of $290 per hour.

The Comprehensive Environmental Response, Compensation, and Liability Act, often referred to as "CERCLA" or "Superfund," was enacted by Congress in 1980, partly in response to the Love Canal situation and the realization that inactive hazardous waste sites presented great risks to public health and the environment. With the enactment of CERCLA, Congress created a tax-funded Hazardous Substance Superfund and authorized the United States Environmental Protection Agency ("EPA") to respond in a comprehensive fashion to the problems associated with sites contaminated with hazardous substances. The statute authorizes EPA to clean-up these sites with monies from the Superfund or to require designated classes of liable persons to perform such clean-ups. It provides EPA with extraordinary power and discretion, severely limits procedural protections and defenses, and exposes potentially responsible parties, commonly referred to as "PRPs," to enormous financial burdens and a draconian enforcement scheme.

- 3 -

Following the enactment of CERCLA, many states enacted their own comprehensive environmental response programs, sometimes referred to as "mini-Superfund" laws. Rather than attempting to generalize about those laws, I will focus my discussion on CERCLA. Thereafter, I will discuss peculiar features of some state programs, such as the program established by the Commonwealth of Massachusetts.

Under § 104(a)(1) of CERCLA, EPA is authorized to act whenever there is a release or a substantial threat of a release of a hazardous substance into the environment, or, whenever there is a release or a substantial threat of release into the environment of any pollutant or contaminant that may present an imminent and substantial danger to public health or welfare. When confronting a situation requiring a response, EPA has two basic options under CERCLA. First, it may conduct the clean-up itself, using Fund monies, and later seek to recover its costs from PRPs in a cost recovery action under CERCLA § 107. Second, it can compel PRPs to perform the clean-up, either through issuance of an administrative order or institution of an abatement action in federal district court, pursuant to § 106(a) of CERCLA. Because the consequences of non-compliance with a CERCLA § 106(a) administrative order are so severe and because evidentiary hearings are available in judicial abatement actions, EPA has virtually abandoned the use of abatement actions in favor of issuing CERCLA § 106(a) administrative orders. A person who, without sufficient cause, violates or fails to comply with an administrative order under CERCLA § 106 may be fined up to $25,000 for each day of violation and, if EPA performs the clean-up, may face punitive damages in the amount of three times the costs incurred by the Fund. _See_ CERCLA § 106(b)(1) and § 107(c)(3). Furthermore, the statute prohibits pre-enforcement review of a CERCLA § 106 order and precludes judicial review of an EPA clean-up decision

- 4 -

until after EPA actually conducts the clean-up and seeks cost recovery. CERCLA § 113(h).

The classes of persons who may be found liable under CERCLA -- the PRPs -- are identified in §107(a) of the statute. These persons include: (1) the current owner and operator of a facility from which there is a release of a hazardous substance; (2) the owner and/or operator of any such facility at the time hazardous substances were disposed thereon; (3) any person who arranged for disposal or treatment of hazardous substances at such a facility; and (4) any person who transported hazardous substances to such a facility, selected by such person.

The persons designated above may be held liable for all costs of removal and remedial action (which are statutorily defined terms) incurred by the United States or by a state in a manner not inconsistent with the National Contingency Plan (a regulation promulgated by EPA under CERCLA § 105). The removal and remedial costs that may be recovered from PRPs include direct costs, such as the costs of environmental investigations, the costs of environmental clean-up, monitoring costs, costs for technical assistance grants that may be given to local communities, travel costs, and salaries for EPA and Department of Justice personnel, and indirect costs, such as rent and utilities and other EPA overhead costs, calculated according to a formula developed by EPA. It is not unusual for total removal and remedial costs at a site to be in the range of $20 million to $60 million. Indeed, response costs at a number of sites have exceeded $100 million.

Other costs, in addition to governmental response costs, may be recovered from PRPs. For example, PRPs may be held liable for necessary costs of response incurred by any person in a manner consistent with the National Contingency Plan. CERCLA § 107(a)(4)(B). Moreover, Section 107(a) provides for the recovery of damages for injury to, destruction of, or loss of

- 5 -

natural resources, the costs of any health assessment or study performed under the statute, and pre-judgment interest on all recoverable costs.

Courts have found that CERCLA imposes strict, retroactive, and, in most cases involving multi-party sites, joint and several liability, with no requirement that a PRP's hazardous substances have been the cause for the clean-up. The concept of strict liability means that liability is imposed whether or not the PRP was negligent or whether its activities were consistent with standard industry practices or whether it acted lawfully or whether it was in any way "at fault." The concept of retroactivity means that CERCLA applies to conduct prior to enactment of the statute. The concept of joint and several liability means that one PRP at a Superfund site may be held individually responsible for all clean-up costs at the site, even costs attributable to substances released prior to a PRP's involvement at a site. The minimal causation standard has been interpreted, for the most part, as requiring only a showing that a release or threatened release has caused the incurrence of response costs; at multi-party sites, it has typically not mattered whether a PRP's own waste was released, as long as some hazardous substance at the site was released.

The defenses to liability under CERCLA are extremely limited. They are (1) an act of God; (2) an act of war; and (3) an act or omission of a third party unrelated to the defendant, so long as the defendant took precautions against the acts and omissions of such third party and the consequences thereof.

The practical effect of the statutory liability scheme is vast governmental power and simple enforcement pitted against virtually defenseless PRPs, burdened not only with the prospect of paying all response costs at a site, but also with the prospect of pursuing costly

contribution actions against PRPs which EPA has chosen not to pursue. Because of joint and several liability and concomitant contribution rights, litigation under CERCLA is extraordinarily complex and costly, usually involving third-party claims, fourth-party claims, cross-claims, and counterclaims. Such litigation may involve hundreds of parties. Furthermore, experience has demonstrated that there is only a very small chance of success for a PRP in litigation commenced by the Government. Accordingly, it has been my practice and the practice of most CERCLA practitioners to attempt to keep their clients out of court.

From the perspective of a private party, a typical government-initiated Superfund proceeding usually begins with the receipt of a letter from an EPA Enforcement Official. Such a letter, usually referred to as a "notice letter" or a "PRP letter," advises the recipient of its potential liability under CERCLA for past and future costs associated with investigation and remediation of a particular site, and frequently requires the submission of documents and other information under authority of CERCLA § 104(e). An EPA "notice letter" typically asks the recipient to undertake "voluntary" action at the site. The tone, content, and context of such a letter, however, clearly signifies to the recipient that, should he or she refuse to "voluntarily" undertake the action requested by EPA, which may be environmental investigation, environmental remediation, or both, an EPA lawsuit or order under CERCLA § 106 or a cost recovery action under CERCLA § 107 will ensue.

Moreover, in the content of CERCLA, as administered by EPA, the word "voluntary" means that a notice letter recipient may undertake the requested action only if it enters into an administrative order on consent or a consent decree in accordance with EPA's enforcement policies. Such orders and decrees contain stipulated penalties and other sanctions for failure to

- 7 -

comply with their terms. In the event that "voluntary" action is not taken by the recipient, EPA will either issue a § 106 administrative order requiring investigation and clean-up activity, or undertake the activity itself and seek to recover the costs from the PRPs under CERCLA § 107. If a recipient of a notice letter wishes to protect itself against the consequences of an EPA order or cost recovery action, it must respond to the notice letter by providing clear evidence demonstrating that it is not properly a PRP or by advising EPA that it will "voluntarily" undertake the action requested by EPA or, at a minimum, engage in good faith negotiations with the Agency.

Since the inception of the Superfund program, EPA has made it clear that those who fail to undertake "voluntary" action in response to a notice letter will face severe consequences. For example, EPA may settle its claims against cooperative PRPs by requiring them to do something less than might otherwise be considered their "fair share" and providing them protection from contribution actions by non-settling PRPs. Thereafter, a non-settling PRP will be faced with litigation by EPA, in which a "disproportionate share" of costs is sought, and will also be faced with contribution claims by the settling PRPs. Additionally, EPA has adopted enforcement programs and policies specifically designed to punish those PRPs, labeled "recalcitrants," who fail to act "voluntarily."

Even apart from the foregoing consequences stemming from a failure to take "voluntary" action, there are many reasons why I and other Superfund practitioners have advised clients to take "voluntary" action in response to a PRP letter and to settle with EPA. For example, cooperating PRPs usually are given the opportunity to perform the Remedial Investigation and Feasibility Study ("RI/FS"), on which EPA's selection of a remedy is premised. By performing

- 8 -

the RI/FS, the PRPs are able to influence the remedy selection process and, thus, minimize their damages. Moreover, it has long been recognized that the private sector is able to perform environmental investigation and remediation at a lower cost than can EPA.

Thus, in response to a PRP letter regarding a site with multiple PRPs, I and most Superfund practitioners advise clients to organize the PRPs, draft an agreement governing the structure of the organization, often headed by a "steering committee," and commence negotiations with EPA. Depending on the status of the site (i.e., whether a Remedial Investigation has been performed, whether a Feasibility Study has been performed, whether any remedial work has been performed, etc.), negotiations with EPA include technical negotiations, aimed at developing an appropriate scope of investigatory or remedial work, and legal negotiations, aimed at drafting an acceptable administrative order on consent or judicial consent decree.

In most government-initiated multi-PRP matters, EPA plays a minimal role in the allocation of costs among the PRPs. Where records concerning the types and amounts of waste and other substances sent to the site are available, EPA provides those records to the organized PRP Group. Such records may include shipping documents, invoices, records from federal and state environmental agencies, witness interviews, and depositions taken by EPA pursuant to CERCLA § 104 or depositions taken in prior civil or criminal proceedings. Usually, the PRP Group appoints an allocation committee whose task is to develop and propose to the PRP Group a framework for allocating costs among the PRPs.

The most frequent allocation method utilized by allocation committees is referred to as a straight volumetric allocation. In other words, each PRP's share of costs relating to the site is

based on its percentage of waste sent to the site, regardless of the type of waste. There are situations, however, in which straight volumetric allocations are not utilized. For example, at sites where PRPs have sent different types of wastes and the components of the remedy may be attributed to those different types of wastes, the allocation may consider both the volume and nature of waste sent to the site. Where the PRPs at a multi-party site include the owner and/or operator of the site (frequently they are bankrupt or otherwise non-viable), the allocation may assign a share of liability based on ownership or operator status, with the remaining costs allocated among the remaining PRPs (usually those who sent waste to the site, known as the "generators") on another basis, such as a volumetric basis.

The type of allocation adopted for a site depends on the nature of the site, the number of PRPs, the identity of the PRPs, the amount of documentation available, the nature of the remedy, the distribution of data, the personalities of the attorneys, and a host of other factors. I have been involved in matters in which allocation has been based on volume alone, volume and toxicity, contribution of contaminants of concern (those "driving" the remedy), contribution to baseline risk, and PRP status (i.e., owner, operator, generator, transporter). I have also been involved in matters where allocation has been on a per capita basis. Because the mutual goal of the PRPs is to take control of the RI/FS and perform the remedy under an administrative order on consent or judicial consent decree, whatever method the PRPs find acceptable is the allocation method utilized.

There are many occasions when PRPs at a multi-party site are unable to agree on an allocation developed by an internal allocation committee. In fact, as the Superfund program has matured over the years, there has developed a practice of PRP Groups' retaining allocation

- 10 -

consultants, mediators, arbitrators, and other third-party neutrals to perform the allocation.
Allocations by third-party neutrals, like internal allocation committee proceedings, vary from site
to site, depending on the factors recited above and on the expertise and experience of the third-
party neutral. These types of allocation proceedings may involve the submission of position
papers and rebuttal positions papers, the presentation of oral argument, the interviewing of
witnesses, the taking of depositions, etc. I have even been involved in cases where allocations
have been performed on the basis of what is sometimes known as a "blind pool." In these types
of cases, the PRPs may advise the neutral of the amount of costs that they are willing to bear,
which the neutral keeps secret from the other PRPs. In another type of "blind pool" allocation,
the neutral may ask each PRP in a private session for a particular amount, keeping the amount
secret from the other PRPs. Like allocations performed by internal allocation committees, a
successful allocation by a third party neutral is whatever methodology and result that is
acceptable to the greatest number of PRPs.

When the PRPs are able to agree on an allocation of costs, they enter into an
administrative order on consent or a judicial consent decree to perform the investigatory or
remedial activity "requested" by EPA. Notwithstanding the separate allocation agreements
among the PRPs, the administrative orders on consent and judicial consent decrees usually bind
the PRPs on a joint and several basis. The orders and decrees contain various schedules for
performance, require various deliverables, and contain stipulated penalty and other penalty
provisions, reporting requirements, record keeping requirements, etc. Usually, the PRPs
establish bank accounts, escrow accounts, trusts, and other financial mechanisms and retain
consultants and contractors to perform the work required by the order or decree.

- 11 -

In cases where settlement with EPA is by administrative order on consent (usually for the performance of environmental investigations and studies), the order is made known to the general public by publication of notice in the *Federal Register* and is subject to public comment. When settlement with EPA is by a consent decree, which is required by statute for remedial action, a complaint is filed in federal district court, accompanied by the consent decree negotiated by the PRPs and EPA. The consent decree also is subject to pubic notice and comment and must be approved by the United States District Court.

Thus far, I have discussed CERCLA proceedings involving multiple PRPs initiated by EPA's issuance of a notice letter. A particular PRP's involvement at a multi-party CERCLA site or proceeding may arise in a different manner. For example, often the PRPs notified by EPA are able to identify additional PRPs, who, for one reason or another, escaped EPA's notice. In these cases, a PRP Group may send notice letters to particular PRPs "inviting" them to "voluntarily" participate in the proceeding. For the most part, my discussion of EPA-initiated proceedings applies to situations in which a party's first involvement comes about through a notice letter from a PRP Group. Although it may be prudent to view such notice letters with a bit more skepticism, (i.e., demanding more critical evaluation of the evidence), PRP Group "invitations" usually are no more "voluntary" than are EPA "invitations" to participate in a proceeding. If there is any evidence tending to substantiate a PRP's involvement at a site, "voluntary" participation is the most prudent course of action. A party who refuses an "invitation" from a PRP Group is almost certain to face contribution litigation by the PRPs who settle with EPA, and may also face cost recovery or other enforcement action by EPA (who will be advised of the identity of the "invitees" who declined to participate).

- 12 -

As previously discussed, when a CERCLA proceeding leads to contested litigation in federal district court, such litigation is costly and complex, involving third-party and often fourth-party practice. Because of the complexity of such litigation, the United States District Court judges often take extraordinary steps to bring about settlement prior to trial. For example, district courts often require the litigants to appear at lengthy settlement conferences convened by United States magistrates. Additionally, magistrates often require the litigants to retain mediators or other "facilitators" to foster settlement.

In some situations, district courts have fashioned or approved unusual procedures to settle controversies and/or to contain the size and complexity of the litigation. For example, in a matter involving the Bridgeport Rental and Oil Services ("BROS") Site, the United States District Court for the District of New Jersey approved a case management order requiring the retention of a mediator to facilitate resolution of the dispute between the litigants. In addition, the court approved settlement process protocols and authorized the litigants to "invite" non-litigants to join in the settlement process, in lieu of being brought into the litigation as third-party defendants. The settlement process protocols approved by the district court included interrogatories and document requests to be answered by the "invitees" and specific requirements for good faith investigations prior to answering the interrogatories and document requests.

In my opinion, most Superfund practitioners would not view the "invitations" issued in the BROS matter as a request for "voluntary" participation any more than they would view an EPA-issued notice letter as a mere invitation for "voluntary" action. Indeed, the fact that the "invitation" procedure and settlement process protocols had been approved by the district court made the case for participation more compelling.

- 13 -

There are many CERCLA proceedings that do not involve multiple parties and do not involve sites where hazardous waste was sent for treatment or disposal. Indeed, many sites on the National Priorities List ("NPL"), promulgated under CERCLA, are present or former manufacturing facilities. Although the formal processes and procedures (e.g., notice letter, RI/FS, administrative order on consent or consent decree) in such cases are virtually identical to the multi-party cases described above, the dynamics of such cases are vastly different. Under CERCLA § 107(a)(1), the current owner of a facility from which there is a release or threat of release of a hazardous substance is strictly liable, subject only to the limited defenses in CERCLA § 107(b). One of those defenses, as previously stated, is that the release or threat of release was caused by an act or omission of a person unrelated by contract or otherwise to the current owner.

Prior to the amendment of CERCLA in 1986, the courts were nearly unanimous in holding that alleged contamination by a prior owner was not a defense, because the prior and current owners were related by contract (for the purchase of the property). In a case involving a present owner, therefore, EPA's burden of proof was far lower than in a multi-party case and the defenses available to the current owner were far more limited than the defenses available to the alleged generator of waste shipped to a commercial disposal or treatment site. In these situations, the owner had virtually no choice but to comply with EPA "requests" or directives under CERCLA. Prior to 1986, the only choice for a current owner was to try to convince EPA to bring into the proceeding the prior owner and/or operator of the property. Failing that, the current owner could do the clean-up and bring a civil action, under CERCLA § 107, for recovery of costs from the prior owner/operator.

- 14 -

In 1986, Congress amended CERCLA with the Superfund Amendment and Reauthorization Act of 1986, commonly referred to as "SARA." Among other things, SARA provided that a contract for the purchase of property would not be considered a "contractual relationship" so as to deprive the current owner of the third-party defense in CERCLA § 107(b), so long as the current owner had performed the appropriate due diligence and failed to discover the problem or contamination at the time of the purchase. Thus, since the enactment of SARA, there has been "innocent purchaser" defense available to a current owner of contaminated property.

Due to the potentially huge liabilities associated with the purchase of contaminated property, the practice developed, even prior to the enactment of SARA, for purchasers to conduct due diligence or "environmental audits" of property under consideration for purchase. Over the years since the enactment of CERCLA and after the enactment of SARA, commercial transactions (i.e., purchases and sales of property, asset acquisitions and divestitures, and stock acquisitions and divestitures) have increasingly involved environmental investigations, environmental disclosures, and environmental representations, warranties, and indemnity agreements.

In any particular transaction, whether environmental liabilities will be retained by the seller or assumed by the buyer or in some manner split between the parties is a matter for negotiation between the parties. The manner in which environmental liabilities are handled depends on the bargaining power of the parties and the relative motivations of the parties to complete the transaction. Thus, there are instances in which purchasers agree to assume the environmental liabilities of sellers. In my experience, however, I have found, more often than

- 15 -

not, that sellers are required to retain the environmental liabilities.

When considering environmental remediation and indemnity agreements in these commercial transactions, the major challenge for the seller is to prevent the buyer from cleaning the property to a greater extent or to levels more stringent than required by law, at the expense of the seller. If, for example, the seller agrees to pay for all environmental remediation and restoration performed by the buyer, attributable to conditions existing prior to the closing, the buyer has every motivation to spend the seller's money so as to enhance the value of the property. An example of such a situation would be a buyer purchasing industrial property and, with the seller's money, cleaning the property to residential clean-up levels.

Therefore, sophisticated sellers have devised mechanisms to protect themselves against unwarranted clean-ups by buyers. An example of such a protection mechanism is an agreement which provides the seller with the right to perform the remediation after (or before) the closing to levels required by law or regulation, and which prevents the buyer from interfering with the negotiations between the seller and the responsible governmental authority. Such an agreement is exemplified by the "Environmental Remediation and Responsibility Agreement," dated December 17, 1987, between Emhart Industries, Inc. ("Emhart") and PCI Group, Inc. ("PCI") (attached hereto as Exhibit A).

Based on my review of the agreement between Emhart, as seller, and PCI, as purchaser, I believe that Emhart did an excellent job of protecting itself in the transaction. Because there was known environmental contamination of the properties at issue, Emhart, as the current owner of the properties, was clearly a liable party under CERCLA and analogous state statutes (discussed below). Apparently, PCI would not purchase the property and subject itself to liability, unless

- 16 -

Emhart paid for environmental remediation. Rather than allowing PCI to remediate the property at the expense of Emhart, the agreement gives Emhart the right to conduct the remediation to the extent lawfully required by governmental authorities and provides Emhart "sole control over any remedial measures and sole authority to negotiate, dispute or litigate with responsible authorities concerning the scope, execution or completion of any remedial measures." Exhibit A at 17. Furthermore, the agreement provides that PCI, subject only to limited exceptions, "shall take no action with respect to environmental conditions or remedial measures including, without limitation, any communication by PCI to responsible authorities, without the prior written approval of Emhart." Id. at 7. The agreement is favorable to Emhart in many other respects, including the provisions absolving Emhart of any liability for business interruption due to remediation, the provisions granting Emhart access to the facilities, the provisions requiring PCI to cooperate in the performance of remedial measures, and the provisions voiding Emhart's obligations in the event of various breaches by PCI.

Another example of a seller protecting itself with regard to environmental liabilities is found in the transaction between Black & Decker, Inc., Adhesive Acquisition Corp., and Orkem, S.A., which involved the sale of Black & Decker's worldwide Bostik business, including a facility in Middleton, Massachusetts. That facility faced a number of environmental liabilities under M.G.L. Chapter 21E, the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, which was modeled after CERCLA. To the extent that M.G.L. Chapter 21E is modeled after CERCLA, much of my discussion regarding CERCLA applies to M.G.L. Chapter 21E.

The Massachusetts statute, which has been amended a number of times since its original

- 17 -

enactment, obligates owners and operators of facilities from which there is a release of hazardous substances to evaluate and remediate such releases. Under M.G.L. Chapter 21E, a facility owner must report a release to the Massachusetts Department of Environmental Protection ("DEP"), formerly known as the Department of Environmental Quality Engineering ("DEQE"), which may require the facility owner to conduct a comprehensive environmental assessment and remediation of the entire facility at which the release occurred. A particularly interesting feature of Chapter 21E is that, after the Massachusetts environmental authorities became overwhelmed with oversight of environmental investigations and remediations, the program was amended to allow a facility owner to employ a Licensed Site Professional ("LSP") to perform many of the functions previously performed by the authorities and, thereby, lessen the burden on the environmental agencies.

Commencing in 1984, when the Middleton facility was owned and operated by USM Corporation, a subsidiary of Emhart Corporation, the Massachusetts authorities issued a number of Notices of Responsibility under Chapter 21E, requiring various environmental site assessments and remedial actions. (Failure to respond to a Notice of Responsibility under Chapter 21E brings about many of the same consequences as failure to respond to an EPA notice letter under CERCLA.) Following the receipt of those notices, the Chapter 21E liability of USM Corporation (which later merged into Emhart Industries, Inc., a subsidiary of Emhart Corporation) for the Middleton facility was unlimited. This state of unlimited environmental liabilities under M.G.L. Chapter 21E continued after Black & Decker's acquisition of Emhart Corporation (and its subsidiaries) in April of 1989.

In June of 1990, when Black & Decker sold the entire worldwide Bostik business,

- 18 -

liability and all environmental liability in excess of $15 million. Compared to the many situations in which sellers are required to retain all pre-closing environmental liabilities, the 1990 transaction was favorable to Black & Decker.

_Barry L. Malter_
Barry L. Malter

_April 17, 1998_
Date

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by-mail-hand on _5/5/98_

2072622.1

- 20 -