

EXHIBIT "O"

## ENVIRONMENTAL REMEDIATION AND RESPONSIBILITY AGREEMENT

Agreement made this 17th day of December, 1987 between Emhart Industries, Inc. a Connecticut corporation ("Emhart") and PCI Group Inc., a Delaware corporation ("PCI").

WHEREAS, Emhart has agreed to sell or lease, and PCI has agreed to purchase or lease, certain businesses and assets including real estate, and assume certain liabilities, of Emhart's PCI Division, in accordance with a certain Purchase and Sale Agreement (the "Purchase and Sale Agreement") of even date herewith; and

WHEREAS, the real estate to be sold or leased pursuant to said Purchase and Sale Agreement includes manufacturing plants and improved parcels of land located at New Bedford, MA, (the "Rhodes facility"), and Jaffrey, NH (the "Cross facility") as further defined in the Purchase and Sale Agreement; and

WHEREAS, Emhart has disclosed to PCI in the course of negotiations for the sale of the PCI Division certain known or suspected Environmental Conditions (as defined herein); and

WHEREAS, Emhart and PCI desire to define their respective obligations, undertakings and responsibilities with respect to such Environmental Conditions, known and unknown;

CONFIDENTIAL INFORMATION

MS116998

(2)

NOW, THEREFORE, the parties agree:

1. <u>Definitions</u>. The following words and phrases shall have
   the meanings set forth:

   a) "Environmental Conditions" shall mean: 1) those
      specific matters listed on Exhibit "A", attached
      hereto and made a part hereof; 2) any other
      environmental conditions caused by the presence,
      discharge or release of Hazardous Materials, prior
      to the date hereof and discovered by PCI or
      Responsible Authorities and disclosed to Emhart in
      writing within 2 years from the date hereof which
      are on or under, relate to, or emanate from, any
      part of the Rhodes site, or the defined area of the
      Cross site identified as "PCI environmental area" in
      Exhibit B; 3) any other environmental condition
      known or unknown caused by the presence, discharge
      or release of Hazardous Materials prior to the date
      hereof which is located on or under, relates to, or
      emanates from the defined area of the Cross site
      identified as "Emhart environmental area" in Exhibit
      B.

   a) "Responsible Authorities" shall mean the U.S.
      Environmental Protection Agency, the Massachusetts
      Department of Environmental Quality Engineering, the
      New Hampshire Department of Environmental Services

CONFIDENTIAL
INFORMATION

MS116999

(3)

and any other Federal, local or state regulatory agency or commission, court or other body with jurisdiction over matters concerning environmental compliance.

b) "Remedial Measures" shall mean any action designed to investigate, monitor or remedy an Environmental Condition including, without limitation, engineering studies, site investigations, soil and water sampling and analysis, groundwater monitoring and treatment, and water, soil or Hazardous Materials treatment, removal and disposal.

c) "Business Interruption Losses" shall mean such losses, damages (including exemplary or punitive damages), claims, expenses (including reasonable attorney fees), liabilities or similar detrimental occurrences arising from or relating to interruptions or interference with manufacturing or business operations or use of the Cross or Rhodes facilities, including without limitation, loss of production, loss of profits, loss of business opportunities, and business interruption.

d) "Hazardous Materials" shall mean oil, hazardous wastes, hazardous or toxic substances, priority pollutants and hazardous materials as those terms are defined under applicable provisions of Federal,

CONFIDENTIAL
INFORMATION

MS117000

(4)

state and local laws and regulations existing at the date hereof, including without limitation, the Comprehensive, Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.); the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.); the Federal Water Pollution Act, (33 U.S.C. Section 1251 et seq.); the Clean Air Act, (42 U.S.C. Section 7401 et seq.); the Toxic Substance Control Act (15 U.S.C. Section 2601 et seq.); the provisions of Chapter 21C and Chapter 21E, Massachusetts General Laws and Chapters 147-A and 147-B of the New Hampshire RSA, and any regulations promulgated thereunder, existing at the date hereof.

2.  Conduct of Remedial Measures.  Emhart agrees to conduct such Remedial Measures, as specifically defined herein, with respect to Environmental Conditions, as specifically defined herein, at the Cross and Rhodes facilities as may be lawfully required by Responsible Authorities or as may be in Emhart's sole judgment or discretion, deemed necessary, appropriate or desirable.

3.  No Unreasonable Interference.  Notwithstanding any other provision of this Agreement to the contrary, and subject to PCI's agreement that Emhart shall not be responsible

CONFIDENTIAL
INFORMATION

MS117001

(5)

for Business Interruption Losses in paragraph 10, Emhart agrees that in exercising its responsibilities under this Agreement, Emhart shall make reasonable best efforts to avoid and minimize any interference with the operations and businesses of the Cross and Rhodes facilities to enable PCI to continue such operations and businesses materially and substantially as it had before the implementation of any such actions by Emhart.  To this end, Emhart shall consult fully with PCI in the planning and execution of Remedial Measures pursuant to this Agreement and assure that the execution and results of said Remedial Measures, to the fullest extent reasonably possible, do not intrude upon or disrupt PCI's operations and business whether over the short or long-run.  Emhart shall provide PCI with reasonable prior notice of all on-site work, consult with PCI prior to the start of all such work, provide PCI with the opportunity for review and comment on work plans and specifications prior to commencement of Remedial Measures and periodically consult and coordinate with PCI during the course of all Remedial Measures.  Prior to commencing any site work, Emhart shall provide PCI with a description of the work to be performed and an approximate schedule.

CONFIDENTIAL
INFORMATION

MS117002

(6)

4.  <u>Methods for Implementation of Remedial Measures</u>.  During
the course of this Agreement, Emhart shall not be
required (except for emergency situations involving
immediate and serious harm to safety, health or the
environment) to implement Remedial Measures using
overtime, premium time, 24-hour-a-day basis or similar
unusual measures or to resort to extraordinary measures
or technologies to respond to Environmental Conditions
which are not both cost-effective and feasible under the
circumstances, provided however, that if a particular
Remedial Measure conducted by Emhart has a disruptive
and materially adverse effect on the manufacturing
operations of the Cross or Rhodes.facilities, and such
effect causes a total cessation of operations at either
facility which exceeds 2 weeks in continuous duration
(excepting normal facility shutdowns), then Emhart
agrees to expedite such Remedial Measure by the use of
premium time, overtime or similar ~~reasonable~~ *other* efforts.  *see p4*

5.  <u>PCI Performance of Remedial Measures</u>.  If Emhart fails
to commence or to reasonably proceed with Remedial
Measures required by this Agreement to be performed by
Emhart, then, after 30 days' written notice thereof to
Emhart by PCI and the failure of Emhart to reasonably
proceed, PCI may proceed with performance of such
Remedial Measures at Emhart's expense, to be paid upon
demand by PCI.

CONFIDENTI/
INFORMATIO!

MS117003

(7)

6. <u>Communications and Other Responses by PCI</u>.  PCI shall
promptly inform Emhart of all communications from any
Responsible Authorities concerning Environmental
Conditions or Remedial Measures.  Except as provided in
paragraph 5, 8 and below, PCI shall take no action with
respect to Environmental Conditions or Remedial Measures
including, without limitation, any communication by PCI
to Responsible Authorities, without the prior written
approval of Emhart.  Notwithstanding the above, PCI may
respond to any lawful request, subpoena, order, process
or other mandatory requirement issued by Responsible
Authorities with respect to Environmental Conditions,
provided that PCI provides reasonable notice thereof to
Emhart and a reasonable opportunity, if feasible, for
Emhart to consult and comment upon PCI's proposed
response prior to submission of PCI's response to such
request, subpoena, order or other ~~request.~~ *mandatory requirement.*

7. <u>Emhart Control of Remedial Measures</u>. Subject to
Paragraph 5, 6 and 8, ~~above~~, Emhart shall have sole
control over any Remedial Measures and sole authority to
negotiate, dispute or litigate with Responsible
Authorities concerning the scope, execution or
completion of any Remedial Measures.  PCI hereby grants
to Emhart the authority to enter into such agreements
with Responsible Authorities pertaining to Environmental

CONFIDENT
INFORMATIC

MS117004

(8)

Conditions as Emhart in its sole discretion deems
necessary, appropriate or desirable, provided however,
that any Remedial Measures shall be performed in
accordance with all applicable requirements of federal,
state and local law and requirements of Responsible
Authorities.  Prior to Emhart entering into any written
agreement with Responsible Authorities or commencing
litigation concerning the scope, performance or
completion of Remedial Measures, Emhart agrees to
consult in good faith with PCI, and to provide PCI with
an opportunity to comment to Emhart about such proposed
agreement or litigation.

Notwithstanding the above, if any such proposed
settlement or agreement between Emhart and Responsible
Authorities is reasonably anticipated ~~by Emhart~~ to have
a disruptive and materially adverse effect (including a
permanent shut-down) upon the manufacturing operations
of the Cross or Rhodes facilities, which effect is
reasonably anticipated ~~by Emhart~~ to exceed 2 weeks in
continuous duration (excepting normal facility
shutdowns), then such settlement or agreement shall
require the prior approval of PCI, whose decision shall
be promptly made and such approval shall not be
unreasonably withheld.

CONFIDENTIAL
INFORMATION

MS117005

(9)

8.  **PCI Permits**. If PCI is required by Responsible
    Authorities or applicable laws and regulations, to apply
    for, procure, or maintain permits, licenses or other
    authorizations and if PCI is required to submit notices,
    analyses, reports or other documents relating to
    Environmental Conditions at the Cross or Rhodes sites,
    then Emhart shall be provided reasonable opportunity by
    PCI to review, and comment upon such applications or
    other submissions relating to such permits, licenses,
    analyses and other information prior to their submission
    by PCI to the Responsible Authorities. The cost of all
    such required PCI permits, licenses, information ~~and~~
    ~~analyses~~ under this paragraph shall be divided equally
    between the parties except that expenses for permits,
    licenses, etc., which are part of PCI's on-going
    manufacturing operations shall be borne solely by PCI.

9.  **Emhart Access to the Facilities**. Emhart and its
    engineers, consultants, contractors, agents and
    employees shall have access to the plant and property at
    the Rhodes and Cross facilities upon reasonable notice
    to PCI for the purpose of carrying out the Remedial
    Measures under this Agreement, and PCI shall direct its
    employees and representatives at such facilities to
    fully cooperate with Emhart in carrying out any Remedial
    Measures with respect to the Agreement.

CONFIDENTIAL
INFORMATION

MS117006

(10)

10. <u>PCI Assistance with Remediation Measures</u>.  PCI agrees to
cooperate in the supply of storage space, electricity,
water, compressed air and other utilities, space and
services to Emhart which are necessary or useful to
Emhart, its representatives, consultants and contractors
for implementation of Remedial Measures.  PCI further
agrees to provide use of its waste water treatment
facilities, for processing or treatment of liquids
associated with Remedial Measures conducted by Emhart.
Notwithstanding the above, PCI shall not be required to
supply or continue to supply such utilities, services,
or facilities if:

　　1) Such supply would violate, or could cause PCI
　　　　to violate PCI permits, applicable laws and
　　　　regulations: or

　　2) Responsible Authorities forbid such supply; or

　　3) Such supply will or could unreasonably
　　　　interfere with operations at the Cross or
　　　　Rhodes facilities, or

　　4) Such supply could require PCI to obtain a
　　　　permit or approval as a Treatment, Storage and
　　　　Disposal facility under RCRA or other
　　　　applicable laws.

Emhart will reimburse PCI for out-of-pocket expenses and
actual costs directly related to PCI's supply of such
utilities, services and facilities.  Emhart further
agrees, at its expense, to obtain permits or approvals

CONFIDENTIAL
INFORMATION

MS117007

(11)

from Responsible Authorities or to reimburse PCI for procuring such permits or approvals, which are necessary to make use of such supply and Emhart will comply with all applicable laws and regulations during the course of Emhart's use of such supply.

11. PCI Environmental Site Assessments.  Emhart understands and agrees that PCI may, at its own expense, conduct environmental site investigations on and under or related to the Rhodes site and on and under or related to the "PCI environmental area" of the Cross site as designated in Exhibit B, attached hereto, provided that any such investigations at the Cross facility shall be strictly limited to the areas designated as the "PCI environmental area" in Exhibit B, unless PCI is required by responsible authorities or by operation of law to conduct site investigations on other portions of the Cross facility, in which case PCI shall give prompt notice of such requirement to Emhart, and Emhart may in its sole discretion, assume the obligation to conduct such site investigation.  PCI agrees to keep Emhart informed about the progress of such investigations, and shall deliver to Emhart complete sets of reports, analyses and studies resulting from such investigations. The voluntary commencement by PCI or its representa-tives, engineers or consultants of any field site assessment, involving environmental sampling or analyses

CONFIDENTIA
INFORMATION

MS117008

(12)

of known or suspected Environmental Conditions at the
Cross facility in the areas designated as the "Emhart
environmental area" on Exhibit B, without the express
prior written consent of Emhart shall immediately and
irrevocably void and release all of Emhart's obligations
under this Agreement pertaining to the Cross facility,
including but not limited to, Emhart's obligation to
implement Remedial Measures and to indemnify PCI
hereunder.

12. <u>Business Interruption</u>.  PCI specifically acknowledges
that Remedial Measures may interfere with the use of the
Rhodes and Cross facilities and appurtenant properties.
Notwithstanding any provision to the contrary herein,
Emhart shall not be responsible for any Business
Interruption Losses caused by, or arising out of conduct
of Remedial Measures pursuant to this Agreement so long
as Emhart is in material compliance with the terms of
this Agreement pertaining to its obligations to conduct
specific Remedial Measures.  This provision shall not
affect Emhart's responsibility under any other
provisions of this Agreement for any damages or losses,
other than Business Interruption Losses, arising out of
or in connection with implementation of Remedial
Measures at the Rhodes or Cross facilities, or other
actions.

CONFIDENT
INFORMATI

MS117009

(13)

13. **Limitations of Emhart's Obligations.**  Emhart shall in no
event be responsible for any additional Remedial
Measures or portions thereof, caused by acts or
omissions of PCI, its agents, employees or others acting
on PCI's behalf, to the extent that the scope, expenses
or costs of such Remedial Measures or portions thereof
have been directly increased or altered by such acts or
omissions; which shall include, without limitation:
PCI's failure to promptly inform Emhart (subject to
Paragraph 6 herein) of any communications from
Responsible Authorities relating to Environmental
Conditions; or PCI's conduct of Remedial Measures
without Emhart's prior written approval (except as
provided in paragraph 5 or except as may be otherwise be
required by Responsible Authorities); or PCI's failure
to grant access to Emhart and cooperate with Emhart in
the implementation of Remedial Measures, in accordance
with Paragraph 9, herein.

In addition, Emhart shall not be responsible for any
increase in costs, liabilities, damages, claims, or
other expenses for any additional Remedial Measures or
portions thereof required as a direct result of changes
in the use of the Cross and Rhodes facilities from those
uses presently existing.

CONFIDENTIA
INFORMATION

MS117010

(14)

Subject to the provisions of Paragraph 2 and
notwithstanding any other term or condition to the
contrary in this Agreement or in the Purchase and Sale
Agreement, Emhart shall have no obligation whatsoever to
assume responsibility for Remedial Measures with respect
to, and no obligation to take any action what
concerning any Environmental Condition, unde
any other agreement between Emhart and PCI (o
transferees of PCI's interests hereunder), un
Environmental Condition:  a) has been specified
written report by a competent professional engin
environmental consultant or a Responsible Authority
such report has been delivered to Emhart within two (2)
years from the date hereof; or b) is specifically listed
in "Exhibit A" hereto; or c) concerns Environmental
Conditions at the Cross facility in the "Emhart
environmental area" defined on Exhibit B; or d) is
otherwise required to be performed by Emhart for PCI by
Responsible Authorities.

14.  **Emhart Indemnities.**

(a)  Subject to the limitations set forth in
subparagraphs (d) and (e) of this section and
provided that PCI observes all material provisions
of this Agreement, Emhart agrees to indemnify and

CONFIDENTIAL
INFORMATION

MS117011

(15)

save harmless PCI, each of its officers, directors,
employees, agents, successors, assigns and
affiliates from and against all losses, penalties,
claims, actions, proceedings, costs, damages,
expenses (including court costs, reasonable expert
witness fees, consultants fees, and attorney's fees
directly connected with the prosecution, defense or
investigation of any claim covered by this
indemnity) and liabilities, (specifically excluding
herefrom Business Interruption Losses) arising from
claims, whether now known or unknown, asserted by
any third party (including Responsible Authorities)
to the extent based upon Environmental Conditions
at the Cross and Rhodes facilities.

(b)    Subject to subparagraph (e) of this section Emhart
further agrees to indemnify and save harmless PCI,
each of its officers, directors, employees, agents,
successors, assigns and affiliates from and against
all losses, costs, penalties, claims, actions,
proceedings, damages, expenses (including court
costs, reasonable expert witness fees, consultant
fees, and attorneys' fees directly connected with
the prosecution, defense or investigation of any
claim covered by this indemnity) and liabilities
(specifically excluding herefrom Business

CONFIDENTIAL
INFORMATION

MS117012

(16)

Interruption Losses) whether now known or unknown,
to the extent caused by Emhart's acts or omissions
while performing Remedial Measures and other
actions at the Cross and Rhodes facilities.

(c)  Emhart further agrees to indemnify and save
harmless PCI, each of its officers, employees,
agents, successors, assigns and affiliates from and
against all losses, costs, penalties, claims,
actions, proceedings, damages, expenses (court
costs, including reasonable expert witness fees,
consultant fees and attorney's fees directly
connected with the prosecution, defense or
investigation of any claim covered by this
indemnity) and liabilities (specifically excluding
herefrom Business Interruption losses) whether now
known or unknown, to the extent caused by: (a)
actual or alleged discharges, spills, or releases
of Hazardous Materials from, or the existence at
any time of, the former Cross filter bed identified
on Exhibit C, attached hereto; or (b) Environmental
Conditions with respect to machinery and equipment
purchased by PCI from Emhart's Whitman Division
which are relocated to the Cross or Rhodes
facilities, or (c) conduct of Remedial Measures or
other action by Emhart at the former Cross filter
bed.

CONFIDE
INFORMA

MS117013

(17)

(d)  Notwithstanding the foregoing indemnities, Emhart
     shall not in any event be responsible for, or
     indemnify against, any costs, damages, liabilities,
     expenses, fines or penalties etc. which are caused
     directly by: (i) the failure of PCI to cooperate
     with Emhart as provided in Paragraph 9 herein; or
     (ii) acts or omissions of PCI after the date hereof
     which result in adverse changes to Environmental
     Conditions including but not limited to, any spills
     or releases of Hazardous Materials commencing after
     the date hereof and not caused by an existing
     Environmental Condition; or (iii) PCI's commence-
     ment of field site assessments involving environ-
     mental sampling and analyses at the Cross facility
     in the "Emhart environmental area" defined on
     Exhibit B, without Emhart's consent, unless
     required by Responsible Authorities or unless
     commenced by PCI pursuant to Paragraph 5.

(e)  Notwithstanding the foregoing indemnities, Emhart
     shall not in any event indemnify PCI against any
     claims or demands by any existing or former
     employee of PCI or Emhart (or any other person
     claiming through such employee) to which worker's
     compensation coverage applies or which are covered
     by the exclusive remedy provided by applicable
     worker's compensation statutes.

CONFIDEN
INFORMAT

MS117014

(18)

(f) Any claims pursuant to this indemnity shall be made in writing in accordance with paragraph 16 and with notice thereof in accordance with paragraph 33 of the Purchase and Sale Agreement. Notice by Emhart of such claimed breach shall be given to PCI and to Fleet National Bank, 111 Westminster Street, Providence, Rhode Island 02904 (attention: Phillip Fitting).

15. PCI Indemnity.

(a) Provided that Emhart observes all material provisions of this Agreement, PCI agrees to indemnify and save harmless Emhart from and against all costs, losses, claims, damages, expenses (including consultants, witness, and attorney's fees directly connected with matters covered by this indemnity) and liabilities arising from acts or omissions of PCI or others acting on PCI's behalf and directly resulting from spills, releases or discharges of Hazardous Materials on, under, or in the Cross and Rhodes facilities (other than acts or omissions of Emhart or Emhart's representatives, contractors, agents during the course of Remedial Measures by Emhart) on or after the date hereof. Any claims pursuant to this indemnity shall be made in writing with notice in accordance with paragraph 33 of the Purchase and Sale Agreement.

(b) Notwithstanding the foregoing indemnities, PCI shall not in any event indemnify Emhart against any

CONFIDEN INFORMATI

MS117015

(19)

claims or demands by any existing or former
employee of Emhart or PCI (or any other person) to
which worker's compensation coverage applies or
which are covered by the exclusive remedy provided
by applicable worker's compensation statues.

16. Procedure for Indemnity.

   (a)  Upon the occurrence of an event giving rise to any
        indemnity obligation under this Agreement, the
        indemnified party shall promptly notify the
        indemnifying party requesting indemnification and
        setting forth specific particulars of such event.
        The indemnifying party shall take all actions
        necessary to perform such indemnity in accordance
        with section (b) hereof; pay any undisputed amounts
        due to the other party (or third parties) within 30
        days of receipt of such notice; and pay all costs
        and expenses (including court costs, attorneys'
        fees, consultant's fees and expert witness fees)
        incurred by the indemnified party to enforce the
        indemnity.

   (b)  In the event of a formally asserted claim or
        litigation or similar proceeding which the
        indemnified party reasonably believes will give
        rise to any obligation of the other party under the
        indemnity provisions of this Agreement, the
        indemnified party shall promptly notify the

CONFIDENTI
INFORMATIC

MS117016

(20)

indemnifying party of the existence of the claim,
litigation, or similar proceeding. The
indemnifying party shall be entitled to direct the
defense at its sole expense through legal counsel
which it shall select and the indemnified party
shall cooperate with the indemnifying party in the
defense of such claim; provided, however, that the
indemnified party shall have the right, at its own
expense, to participate (but not to direct or
control) in the defense of any such matter or its
settlement, and provided further that if the
indemnifying party elects not to direct such
defense, then the indemnifying party shall promptly
notify the indemnified party in writing of election
not to defend, and the indemnified party will have
the right, at its sole discretion, to direct such
defense at the indemnifying party's sole expense.
The indemnifying party shall have the right to
compromise or settle, with the indemnified party's
prior written approval (which shall not be
unreasonably withheld or delayed), any claim,
litigation, or similar proceeding over which the
indemnifying party has assumed control. In the
event the indemnified party refuses to approve any
compromise or settlement recommended by the

*money damages* ~~of~~
*solely* ~~for~~ *providing for*

CONFIDEN
INFORMAT

MS117017

(21)

indemnifying party which would have been concluded
but for the indemnified party's failure to give
approval, the indemnifying party's liability with
respect to any such claim, litigation, or similar
proceeding shall not exceed the amount which the
indemnifying party would have paid pursuant to such
compromise or settlement.

17. Engineers, Contractors and Attorneys. For the purpose
of performing the Remedial Measures pursuant to this
Agreement, Emhart and PCI shall engage qualified
environmental consulting firms and qualified contractors
and subcontractors and attorneys.

18. Letter of Compliance. Emhart agrees, within 14 days
after receipt of written request thereof by PCI, to
issue a written statement declaring whether, to its
knowledge, Emhart has any reason to believe that PCI (or
its assignee) is not then in compliance with all
material provisions of this Agreement and that the
Agreement remains in full force and effect. Such
statement may contain other appropriate qualifications.
In rendering such statement Emhart may request and rely
upon written statements of PCI's (or its assignees')
employees at the Cross and Rhodes facilities. Emhart's
statement under this paragraph shall not prejudice any
rights it may have under this Agreement, or its rights
to claim a subsequent breach hereunder.

CONFIDENTIAL
INFORMATION

MS117018

(22)

19. <u>Statute of Limitations</u>.  To the extent that Emhart's or
PCI's duties and obligations pursuant to this Agreement
may exceed applicable statutes of limitation regarding
such duties and obligations, each party expressly waives
operation of such statutes and each party agrees that
such duties and obligations shall be enforceable in
accordance with this Agreement.  However, neither party
waives any rights to plead any statute of limitations or
repose in order to defend claims made by third parties.

20. <u>Assignment</u>.  All rights, liabilities and obligations of
Emhart and PCI hereunder may not be transferred or
assigned by either party, except upon prior written
consent of the other party, but such consent shall not
be unreasonably withheld and shall be rendered in
writing not more than 14 days after receipt of notice of
such transfer or assignment.  Notwithstanding the
foregoing, PCI may assign its rights hereunder to any
bona fide bank or other lending institution in
connection with maintaining or obtaining any financing
of the Cross and Rhodes facilities.

21. <u>Incorporation of Purchase and Sale Agreement, Conflicts</u>.
Emhart and PCI acknowledge that they have entered into
the Purchase and Sale Agreement concerning purchase of
the Cross and Rhodes facilities.  Paragraphs 32, 33, 35,
and 36 of the Purchase and Sale Agreement are hereby
incorporated by reference into this Agreement with
Emhart substituted for the word "Seller" and PCI

CONFIDENTI
INFORMATIO

MS117019

(23)

substituted for the word "Purchaser". In the event of any conflict or ambiguity between the Purchase and Sale Agreement and this Agreement, the provisions of this Agreement shall be controlling.

22. **Additional Liabilities.** All rights, liabilities and obligations of Emhart and PCI hereunder shall be cumulative and in addition to any rights, liabilities and obligations either of them may have under the Purchase and Sale Agreement, under law or otherwise.

23. **Choice of Law; Terminology.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Connecticut, except that any Remedial Measures required of Emhart shall be governed by the laws applicable to such Measures. All capitalized terms used herein, but not otherwise defined, shall have the meanings assigned to them in the Purchase and Sale Agreement.

24. **Survival of Obligations.** All obligations, liabilities, commitments and responsibilities of Emhart and PCI pursuant to the Agreement shall survive and continue after the date hereof. Both Emhart and PCI agree to execute additional instruments and documents and do all such further things as each party may reasonably request of the other in order to carry out the intent of this agreement.

CONFIDEN
INFORMATI

MS117020

(24)

25. <u>Waivers and Amendments.</u>

    a.    This Agreement may be amended, modified or supplemented, and any obligation hereunder may be waived, only by a written instrument executed by the parties hereto. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate as a waiver of any subsequent breach.

    b.    No failure on the part of any party to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or remedy by such party preclude any other or further exercise thereof or the exercise of any other right or remedy.

26. <u>Arbitration.</u> If, in the event of any dispute or controversy arising out of this contract, its performance or breach, the parties hereto are unable to settle the dispute themselves, such dispute shall be submitted to arbitration by a panel of arbitrators, two chosen by the parties respectively, and the third chosen by the first two arbitrators. The decision in writing of the panel shall be binding on the parties. The arbitration shall proceed under the Commercial Arbitration Rules of the American Arbitration Association, except that each

MS117021

(25)

party shall be responsible for its costs and expenses
(including attorneys', consultants' and witness' fees)
and the fees for the arbitrators shall be paid equally
by the parties. .The parties shall proceed with the
arbitration as expeditiously as possible.  In
particular, any dispute not directly related to the
existence, definition or cause of an Environmental
Condition, or to the scope, necessity or conduct of any
Remedial Measures, shall be subject to the Commercial
Arbitration Rules regarding Expedited Procedures, except
that the arbitration panel shall be chosen as described
herein.  If the dispute or controversy involves a matter
concerning an Environmental Condition or Remedial
Measure, all arbitrators chosen for the panel shall have
demonstrated expertise with respect to environmental
conditions involving Hazardous Materials.

27. Burden of Proof.  In determining the obligations and
responsibilities of Emhart and PCI under this Agreement
for Environmental Conditions alleged by Emhart to have
occurred after the date hereof, or to have been caused
by the acts or omissions of PCI, its representatives,
employees or contractors, on or under, relating to or
emanating from, the defined area of the Cross site
identified as "Emhart environmental area" in Exhibit B,
Emhart hereby agrees that it shall have the burden of

CONFIDENTIAL
INFORMATION

MS117022

(26)

proving such allegations.  However, if at any time
Emhart, by written notice thereof, removes the
restriction barring PCI *from* voluntary commencement of
any field site assessment involving environmental
sampling or analyses at the Cross facility in the
"Emhart environmental area", then this provision shall
be null and void, and the burden with respect to such
allegation shall be in accordance with standard civil
procedure.  Emhart, in its sole discretion, may release
and remove the foregoing restriction contained in
paragraph 11, at any time, by notice thereof to PCI.

28. Notice of Non-Compliance.  If any party deems the other
party to be out of compliance with any term of this
Agreement, before invoking any of the provisions of this
Agreement which provide for the avoidance or mitigation
of a party's obligations because of the failure of the
other party to comply with the terms of this Agreement
(including without limitation, paragraphs 11, 12, 13,
14, and 15) the party seeking to invoke such provision
shall first give notice to the other party of such
claimed breach and the opportunity to cure the claimed
breach.  Upon the other party's failure to reasonably
proceed to cure or failure to cure within 20 days of
notice of any alleged non-compliance, the party seeking

CONFIDENTIAL
INFORMATION

MS117023

(27)

to invoke such provision may rely on such provision.
~~Repeated non-compliance within 180 days of the last~~
~~notice given hereunder shall not require additional~~
~~written.~~

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed by their duly authorized officers on the
day and year first written above.

_____
VICE PRESIDENT
Emhart Industries, Inc.

_____
PCI Group, Inc.

CONFIDENTIAL
INFORMATION

MS117024

EXHIBIT A

ENVIRONMENTAL CONDITIONS

Note:     All Environmental Conditions listed in this Exhibit are
limited to those known, suspected, or existing at the
date hereof, based upon information supplied to PCI by
Emhart.

1.   J.C. Rhodes facility, New Bedford, MA.

a.) potential groundwater and soil contamination as
documented in Haley & Aldrich reports No. 622301, dated
July 17, 1987, and No. 622302, December, 1987 (draft
only).

b.) suspected leaking underground fuel oil storage tanks
which have been removed prior to the date of this
Agreement, including potential soil and groundwater
contamination.

c.) potential air emissions problems associated with the
existing nitric acid scrubber.

2.   W.W. Cross facility, Jaffrey, N.H.

a.) potential soil and groundwater contamination surrounding
the sump in the steel pickling/cleaning area.

b.) compliance with local, state and federal requirements
existing as of the date of this Agreement (or proposed

CONFIDENTIA
INFORMATIO

MS117025

to be in effect prior to completion of the pretreatment facility) for the wastewater pretreatment facility and other water discharges, including roof drains, air compressor and boiler blowdown.

c.) potential soil and groundwater contamination in the "first" surface impoundment identified as Solid Waste Management Unit ("SWMU") No. 1 in the "SWMU letters" referenced below.

d.) potential soil and groundwater contamination of the "tack pile" area, as identified as SWMU No. 2 in the "SWMU letters" referenced below.

e.) potential soil and groundwater contamination under the plating line.

f.) potential soil and groundwater contamination in or under the earth embankment separating the fire pond and the upper pond.

"SWMU" Letters

1. Letter dated July 11, 1985 from J. B. Blatz (Emhart Corporation) to the U.S. E.P.A. and the New Hampshire Division of Public Health Services.

2. Letter dated October 30, 1985 from J. B. Blatz to the U.S. E.P.A. and the New Hampshire Division of Public Health Services.

3. Letter dated November 15, 1985 from J. B. Blatz to the U.S. E.P.A. and the New Hampshire Division of Public Health Services.

CONFIDENTIAL
INFORMATION

MS117026

