# Tab 10.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION No. 96-10804-DPW |
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**LIBERTY MUTUAL INSURANCE COMPANY'S RESPONSE
TO THE DEFENDANTS' SUPPLEMENTAL SUBMISSION
REGARDING DECEMBER 8, 1998 HEARING**

Pursuant to the direction of the Court, the plaintiff, Liberty Mutual Insurance Company

("Liberty Mutual"), now submits this Response to the Supplemental Submission Regarding

December 8, 1998 Hearing submitted by defendants The Black & Decker Corporation, Black &

Decker Inc., Black & Decker (U.S.) Inc., Emhart Corporation, and Emhart, Inc. (collectively,

"Defendants"). The Defendants' latest submission repeats the arguments made by Defendants'

counsel during the almost three-hour hearing which took place on December 8, 1998, before the

Court, concerning the BROS site. Although the Court during the argument indicated to

Defendants' counsel that it "understood" the Defendants' position with respect to the site, and

that further, repetitive argument was unnecessary, the Defendants, nevertheless, filed this

Supplemental Submission repeating their same arguments. Our brief response is set forth below.

**ARGUMENT**

As the Court well knows by now, the Defendants' position with respect to its claims for insurance coverage at the BROS site is that although no suit was <u>ever</u> filed against them with respect to liabilities at the site, and although the USEPA <u>never</u> issued any form of "PRP" notice or sent any demand letter to the Defendants concerning the site, nevertheless, this Court must construe the December 15, 1992 letter from Mr. Hyatt, the BROS Settlement Committee's counsel[1], inviting the defendant Black & Decker to participate in a "voluntary, informal, non-litigated settlement mediation process," as the equivalent of a "suit" for purposes of triggering Liberty Mutual's duty to defend under certain policies issued to Black & Decker. The Defendants' position is that when Mr. Hyatt, in his December 15, 1992 letter, stated that the purpose of his letter was to "invite" Black & Decker to "participate in BROS site settlement process in lieu of joinder" as a defendant in either the <u>Rollins</u> or <u>Allied Signal</u> actions, that this "threat of joinder" was sufficient to turn Mr. Hyatt's invitation into a "suit."

The Defendants also argue, however, that the letter from Mr. Hyatt must be deemed to be the equivalent of a "suit" because Black & Decker would face "disadvantageous and dire consequences" if Black & Decker chose to <u>ignore</u> the letter from the BROS Settlement Committee's counsel Mr. Hyatt, and then the settlement committee chose <u>not</u> to join Black & Decker as a defendant in the underlying actions. <u>See</u> Defendants' Supplemental Submission Regarding December 8, 1998 Hearing at 1-2. Under this scenario, the Defendants would be somehow "harmed" because they would lose out on the opportunity of being sued by the BROS Settlement Committee, and as a result of not being sued, they would then lose out on the opportunity of then being able to participate in a settlement of the underlying actions. <u>Id.</u> at 2.

---

[1]    A copy of Mr. Hyatt's December 15, 1992 letter is set forth in Liberty Mutual's Exhibit Binder 19, at Tab 6, and is also attached hereto as Exhibit A.

Thus, it is the Defendants' position that the Hyatt letter was the equivalent of a "suit" both because of the "threat" that the BROS Settlement Committee might join Black & Decker as a party to the underlying actions and because of the "threat" that BROS Settlement Committee might choose not to join Black & Decker as a party to the underlying actions. As the saying goes, the Defendants would like to have their cake, and eat it too. As Liberty Mutual has already detailed for the Court in its prior submissions, however, and during oral argument, the Defendants suffered no adverse consequences whatsoever, as a result of their ultimate refusal to participate in the BROS settlement process. Nor could they have.

As the Court pointed out during the hearing on December 8, 1998, because Black & Decker was never made a party to either the Rollins or the Allied Signal actions, res judicata never could have attached as to Black & Decker, and no pronouncement by the court in the underlying actions could have any binding effect upon Black & Decker. The Defendants maintain that the because the court in the underlying actions ordered the BROS Settlement Committee to "invite" Black & Decker to participate in the settlement process, it was as if the court itself had ordered Black & Decker to participate. See Defendants' Further Memorandum As To Black & Decker Sites at 27.

Yet, when Black & Decker ultimately chose not to further participate in the settlement process, nothing happened to it, for the reason that it was not a party to the action, and thus there were no adverse consequences to be suffered as a result of any action by or order from the underlying court. Indeed, the Defendants have conceded that "[w]hen the PRP Group demanded that Black & Decker pay $895,000 as its share of remediation costs, Black & Decker refused to accede to the demand and withdrew from the [BROS settlement] proceedings." See Defendants' Further Memorandum As To Black & Decker Sites at 7 (emphasis added). Thereafter, without the Defendants' participation, the underlying actions involving the BROS site settled, without the

Defendants paying anything towards remediation of the site. Id.[2] The Defendants have not and cannot point to any "dire consequences" that resulted from their withdrawal from the BROS settlement process.

As set forth in more detail below, the Defendants would have this Court believe that they were named as parties to complaints in the underlying Allied Signal and Rollins litigation, when in fact they were not. Moreover, Defendants would have this Court believe that "non-participation" in the BROS settlement/mediation process would have resulted in "dire consequences" for Defendants, when the underlying facts belie any such assertion.

The Defendants' attempt to have this Court focus on the alleged "dire consequences" to Black & Decker of not being made a party in that then pending litigation must be rejected out of hand. The Defendants cite to no case authority whatsoever in support of their unprecedented argument that "dire consequences" would result from not being sued, or from not being compelled to participate in the settlement process, and that therefore, the Court must find that potential threat of not being sued is the equivalent of being "sued" for purposes of the duty to defend.

Defendants additionally contend that they were somehow "compelled" to participate in the BROS settlement/mediation process to avoid losing "the opportunity to participate in negotiations with the EPA concerning the scope of remediation" and "the benefit of investigatory work performed by the PRP Group and the work of the PRP Group's consultants and counsel." Defendants' Supplemental Submission Regarding December 8, 1998 Hearing at 2-3. The Defendants, however, have put before this Court absolutely no evidence regarding any particular negotiations they had with the USEPA concerning the scope of Black & Decker's participation

---

[2]    In their demand for insurance coverage from Liberty Mutual, the Defendants have identified only $5,686.00 as allegedly paid "remediation" costs. While the Defendants have claimed that these payments represented "remediation costs," there is no evidence in the record whatsoever that the Defendants ever made any payments towards the actual remediation of contamination at the BROS site. Instead, it appears that the payments were for expenses incurred during the settlement process.

in the remediation of the site, or of any investigatory work performed by the BROS PRP group, its consultants or counsel, of which Black & Decker would not otherwise been able to avail itself. Moreover, even if the Defendants had put forth evidence of such negotiations and investigatory work, the Defendants cannot show how their alleged inability to otherwise voluntary participate in such negotiations or investigatory work would have resulted in any "dire consequences." Indeed, until the present coverage litigation, Defendants steadfastly denied any connection between themselves and the BROS site.

In denying liability, the Defendants simply withdrew from the BROS settlement process without any adverse effect whatsoever, and thereafter have <u>not</u> been pursued for any cost of remediation or investigatory work by either the USEPA or any other party. This contrasts sharply with the situation in the <u>Hazen Paper</u> case relied upon so heavily by the Defendants, where the Court addressed an administrative action brought by the USEPA directly against an insured and where the Court found it likely that the insured's "prospects of avoiding financial responsibility were minimal because liability is not based on fault." <u>Hazen Paper Co. v. United States Fidelity and Guaranty Co.</u>, 407 Mass. 689, 696 (1990), a copy of which is attached hereto as Exhibit B. The Massachusetts Supreme Judicial Court also noted that if a recipient of a formal PRP notice from the USEPA failed to respond to the notice, the recipient could be fined for failure to cooperate with the USEPA's process of planning the cleanup at issue, and if the USEPA ultimately recovers the costs of response, the recipient's failure to settle prior to litigation commencing could increase the amount of recovery against it. <u>Id.</u> at 696. The Court in <u>Hazen Paper</u> also noted that USEPA demand letters to a potential PRP would be "dangerous for the alleged polluter to ignore because they often result in dispositive, extrajudicial solutions," including the allocation of potential responsibility at a site and the conclusion of settlements concerning the site at issue neither of which are subject to judicial review. <u>Id.</u> at 695 – 696 & n. 4.

-5-

In the present case, the Defendants simply walked away from the BROS settlement process and thereby avoided any financial responsibility whatsoever, and without threat of any adverse consequences from either the USEPA or the underlying court.  Unlike the situation in Hazen Paper, in the present case, no claim or demand was ever made by the USEPA against Black & Decker, and thus, Black & Decker could suffer no adverse consequences by failing to respond to demand never made against it by the USEPA.  Instead, the Defendants' involvement was limited to a brief and casual participation in an otherwise "voluntary, informal, non-litigated settlement/mediation process."  See Hyatt Letter at 1 (emphasis added), attached hereto as Exhibit A.

In support of their arguments, the Defendants purport to rely upon the decision of the Ninth Circuit Court of Appeals in Aetna Casualty & Surety Co. v. Pintlar Corp., 948 F. 2d 1507 (9th Cir. 1991), a copy of which is attached hereto as Exhibit C.  The Ninth Circuit's decision, however, actually supports Liberty Mutual's position.  In concluding that a PRP demand letter which had been sent from the USEPA to the insured Pintlar was the equivalent of a "suit" for purposes of the duty to defend, the Court of Appeals distinguished that factual situation from the situation where, as is before this Court, the "demand letter" came not from the USEPA, but only from a private party:

> Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and sever implications.  Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insured's rights.  However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process.

Pintlar, 948 F. 2d at 1516.  In their paper, the Defendants quote from the Ninth Circuit's decision for the proposition that "[i]f the threat is clear, then coverage should be provided."  Defendants' Supplemental Submission Regarding December 8, 1998 Hearing at 5, quoting Pintlar, 948 F. 2d at 1518.  While the Defendants pretend that the Ninth Circuit was referring to the situation where

no USEPA demand letter has been sent, that is simply not the case.  The next sentence which

follows in the Court of Appeals' decision immediately after the text quoted by the Defendants is

self explanatory:  "The <u>filing of an administration claim</u> is a clear signal that legal action is at

hand."  <u>Pintlar</u>, 948 F. 2d at 1518 (emphasis added).

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in its previous submissions,

Liberty Mutual respectfully requests that this Court enter summary judgment in its favor with

respect to the BROS site.[3]

---

[3]   The Defendants attempt to rely upon the alleged "expert" report and affidavit of Barry Malter, one of the
Defendants' attorneys, for the proposition that as a matter of law, the "invitation" letter from Mr. Hyatt, the BROS
Settlement Committee's counsel's, was the equivalent of a "suit." See Defendants' Supplemental Submission
Regarding December 8, 1998 Hearing at 5, citing to Affidavit of Barry Malter, and his Report ("Malter Affidavit
and Report") at 5 – 13.  Inasmuch as the Malter Affidavit and Report contains only the Defendants' counsel's
conclusions of law as to the legal merits of the Defendants position, the affidavit may be entirely disregarded by the
Court.  See <u>Vitug v. Multistate Tax Comm'n</u>, 860 F. Supp. 546 (N.D. Ill. 1994); <u>Campell v. Metropolitan Life Ins.</u>
<u>Co.</u> , 812 F. Supp. 1173 (E.D. Ok. 1992);  <u>U.S. v. Coleman Capital Corp.</u>, 295 F. Supp. 1016 (N.D. Ill. 1969).

The Defendants also purport to rely upon an internal Liberty Mutual "directive" in which Liberty Mutual
allegedly informed its claims representatives that because "[l]itigation [of "dump site claims"] has been lengthy,
expensive and generally unsuccessful," therefore generators should unite while cooperating with the USEPA "in
negotiating an agreement for a remedial action at a dumpsite."  See Defendants' Supplemental Submission
Regarding December 8, 1998 Hearing at 5, citing to "App. XXIII-130 (attached at Exhibit 1 to Defendants'
Supplemental Submission).  The excerpt from one of Liberty Mutual's claims manuals, however, specifically
follows from the previous paragraph in the claims manual which indicates that negotiations with the USEPA occur
"[i]f the <u>USEPA files suit against the identified PRPs</u> to recover resources expended in remedial or response costs at
a site."  (emphasis added).  Thus, Liberty Mutual's statement to its claims representatives concerned a situation
which did <u>not</u> happen at the BROS site.

LIBERTY MUTUAL INSURANCE COMPANY

By its attorneys,

Ralph T. Lepore, III  BBO 294420
Robert A. Whitney  BBO 545675
Peter J. Duffy  BBO 566682
HOLLAND & KNIGHT LLP
18 Tremont Street
Boston, MA  02108
(617) 619-9200

DATED:  December 16, 1998

## CERTIFICATE OF SERVICE

I hereby certify that the above document was caused to be served by hand upon Defendants' counsel on December 16, 1998.

Robert A. Whitney

-8-

# Tab 11.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) | |
| Plaintiff and Defendant in | ) | CIVIL ACTION NO. |
| Counterclaim, | ) | 96-10804-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| THE BLACK & DECKER CORPORATION, | ) | |
| BLACK & DECKER INC., | ) | |
| BLACK & DECKER (U.S.) INC., | ) | |
| EMHART CORPORATION, AND | ) | |
| EMHART INDUSTRIES, INC., | ) | |
| Defendants and | ) | |
| Counterclaimants. | ) | |

# D R A F T

MEMORANDUM AND ORDER
May 17, 2002

# D R A F T

**5/17/02 DRAFT**                    1

Mem. at 22.)  The defendants claim that coverage began in 1967 and continued through 1978.  (Defs.' Mem. at 23.)

The three environmental remediation claims[19] at issue with respect to Black & Decker concern CERCLA Superfund sites in New Jersey, Pennsylvania, and Ohio.

a.  <u>Bridgeport, NJ</u> - The first claim involves the Bridgeport Rental and Oil Services (BROS) site, a waste oil processing and reclamation facility.  (Defs.' Answers to First Interrogs., Tier I App., at 1; BROS Complaint ¶¶ 33-38, Defs.' Vol. XXVIII at 86-87.)  From approximately 1950 through 1980, the BROS site accepted waste oil and other hazardous substances from numerous sources, collecting it in a large thirteen acre "lagoon" system. (BROS Complaint ¶¶ 38-42.)

In 1992, several private plaintiffs brought a CERCLA action against defendants who allegedly transported waste to the BROS site or generated waste that was transported to it.  (<u>See id.</u>) Among the defendants was A&A Waste Oil Company, Inc. (A&A), a Maryland corporation that apparently transported waste oil produced by Black & Decker to the BROS facility from approximately 1973 to 1979.[20]  (<u>See</u> BROS Complaint ¶ 30; BROS

---

[19]  There are also three long term exposure claims that implicate Black & Decker policies.  As noted, I address all of the long term exposure claims below.

[20]  It is unclear the length of time that A&A transported oil waste for Black & Decker.  In their answers to interrogatories, the defendants claim that any such

Settlement Proposal, Defs.' Vol. XXVIII at 79; Deposition of Howard J. Goldstein (Goldstein Dep.) at 7-15, Defs.' Vol. XXIX at 24-26; Defs.' Answers to First Interrogs., Tier I App., at 3.) On December 17, 1992, the defendants received notice to participate in a court-sponsored settlement of the CERCLA action based on their status as a generator of waste transported by A&A to the BROS site. (BROS Settlement Proposal, Defs.' Vol. XXVIII at 79.) With respect to this claim, the defendants paid $5,492.87 in remediation and claim defense costs of $435,817.34. (Defs.' SOF, BROS ¶¶ 11-12, at 17.)

        b. <u>Douglassville, Berks County, PA</u> - The Douglassville claim also involves an oil reclamation facility located in Berks County, Pennsylvania, to which oil waste produced by Black & Decker was transported by A&A in 1973. (Defs.' Answers to First Interrogs., Tier II App., at 16; Berks Complaint ¶¶ 41-44, at 145-46.) The initial CERCLA action was commenced by the United States in 1991 in the Eastern District of Pennsylvania. (<u>See</u> Berks Complaint.) Black & Decker was named as a defendant in a third party complaint filed on September 16, 1992, by, among others, A&A. (Berks, Third Party Complaint, Defs.' Vol. XXXI at

_____

transportation must have occurred between 1973 and 1979. (Defs.'
Answers to First Interrogs., Tier I App., at 3.) In their
memorandum of law, they argue that A&A began transporting waste
oil "at least by the late 1960's." (Defs.' Mem. at 135.) The
plaintiff claims in its memorandum that the defendants "conceded"
that A&A picked up waste oil from them from 1973 to 1982. (Pl.'s
Mem. at 152.)

# Tab 12.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 96-10804-DPW |
| | ) |
| THE BLACK & DECKER CORPORATION, | ) |
| BLACK & DECKER INC., BLACK & DECKER | ) |
| (U.S.) INC., EMHART CORPORATION and | ) |
| EMHART INDUSTRIES, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## JOINT SUPPLEMENTAL SUBMISSION

Pursuant to this Court's Procedural Order of May 17, 2002, the parties jointly
file this supplemental submission, first, addressing proposed modifications to this
Court's Draft Memorandum and Order on the pending cross-motions for summary
judgment, and second, providing this Court with an updated Status Report,
including anticipated further proceedings.

In recognition of the Court's Order that this not be an argumentative
submission, the parties have withheld argument concerning each other's proposed
changes to the Court's draft Order, and await the Court's invitation, if appropriate,
to set forth reasons they believe the matter proposed by the opposing party is

BOS1 #1251359 v2

policies."

5.   <u>Black & Decker Claims</u>

**Agreed suggested change:** p. 33, line 17 – insert "July 1" before "1970"

**Agreed suggested change:** p. 33, line 19 – dates from "1970-1978", should be changed to "July 1, 1970-July 1, 1978."

a)   <u>Bridgeport, NJ (BROS)</u>

**Plaintiff's suggested change:** p. 34, lines 10-13 – add "The lagoon held approximately 70 million gallons of contaminated wastewater and another 2 1/2 million gallons of oil. Storage tanks and equipment used in the oil refining process were located on the shore of the lagoon. Dep. of Robert Gregory at 52-56 (Binder 19, at Tab 3); Dep. of Harold Hartung at 14-15 (Binder 19, at Tab 1). According to the USEPA's December 31, 1984 Record of decision concerning the BROS Site, there were three sources of potential contamination at the Site: (1) the lagoon; (2) a tank farm area; and (3) groundwater that came in contact with the lower portions of the lagoon. <u>See</u> Record of Decision dated December 31, 1984 at 0066849 (Binder 19, at Tab 4)."

**Plaintiff's suggested change:** p. 34, lines 13-19 and p. 35, lines 1-3 – revise to state: "In 1992, several private plaintiffs brought a CERCLA action for contribution to response costs they had already paid at the BROS Site against defendants who allegedly transported waste to the BROS site or generated waste that was transported to it. This lawsuit, styled <u>Rollins Environmental Services, Inc., et al. v. The United States of America, et al.,</u> Civil Action No. 92-1253, was consolidated with a cost recovery action brought by the USEPA, styled <u>United States of America v. Allied-Signal, Inc., et al.,</u> Civil Action No. 92-2726, in the federal district court in New Jersey. Among the defendants in the <u>Rollins</u> case was A&A Waste Oil Company, Inc. ("A&A"), a Maryland corporation that

apparently transported waste oil produced by Black & Decker to the BROS facility from approximately 1973 to 1979.  Black & Decker was never named as a defendant in either the Rollins or the Allied-Signal lawsuits."

**Defendants' suggested change**:  p. 34, line 19 - replace "approximately 1973 to 1979" with "during part of the period 1973 to 1979 and, possibly, earlier periods."

**Plaintiff's suggested change**:  p. 35, lines 4-7 – change to "On December 17, 1992, defendants received a letter inviting them to participate in a voluntary, informal, non-litigated settlement/mediation process of the CERCLA action based on their status as a generator of waste transported by A&A to the BROS site."  (See Hyatt letter at 1, Binder 19, at Tab 6)."

**Defendants' suggested change**:  p. 35, line 6 -  replace "a generator" with "an alleged generator."

**Agreed suggested change**:  p. 35, lines 8-10 – delete the phrase "With respect to this claim", and rephrase as "Defendants claim that as of the time of the filing of the summary judgment motions, they paid $5,492.87 in remediation costs and defense costs of $435,817.34 with respect to the BROS Site, and that they subsequently incurred additional costs."

(b)    <u>Douglassville, Berks County, PA</u>

**Agreed suggested change**:  p. 35, lines 13-14 – add "allegedly" after Black & Decker.

**Plaintiff's suggested change**:  p. 36, lines 1-2 – change "In August 1993, Black & Decker was dismissed from the lawsuit by an order of the court.  (Dismissal Order, Defs.' Vol. XXXII at 145)" to "Black & Decker was dismissed from the lawsuit on August 17, 1993 due to lack of evidence linking B&D's wastes to the site."  (Pl.'s Response to SOF, citing Defs.' Interrog. Answers, Tier II App. at 22 (Binder 8, at Tab 1)."

**Plaintiff's suggested change**:  p. 36, lines 3-4 -  at the end of line 4, add: "All of the alleged defense costs claimed

BOS1 #1251359 v2                    - 28 -

# Tab 13.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 96-10804-DPW |
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION and EMHART INDUSTRIES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## REVISED JOINT SUPPLEMENTAL SUBMISSION

Pursuant to the Court's request at the conference on August 1, 2002, the parties file this Revised Joint Supplemental Submission setting forth proposed modifications to the Court's Draft Memorandum and Order dated May 17, 2002, along with brief statements of the rationale for objecting to the other party's proposed changes in the Court's draft Order. For the convenience of the Court, these responses appear in italics following the suggested change to which the response relates.

The Revised Joint Supplemental Submission also contains, in Part Two, a Status Report describing anticipated further proceedings, which was contained in the Joint Supplemental Submission as originally filed with the Court on July 24, 2002. Pursuant to the Court's August 2, 2002 Notice of

*This suggested change consists of immaterial detail.*

5.    <u>Black & Decker Claims</u>

**Agreed suggested change:** p. 33, line 17 – insert "July 1" before "1970"

**Agreed suggested change:** p. 33, line 19 – dates from "1970-1978", should be changed to "July 1, 1970-July 1, 1978."

a)    <u>Bridgeport, NJ (BROS)</u>

**Plaintiff's suggested change:** p. 34, lines 10-13 – add "The lagoon held approximately 70 million gallons of contaminated wastewater and another 2 ½ million gallons of oil. Storage tanks and equipment used in the oil refining process were located on the shore of the lagoon. Dep. of Robert Gregory at 52-56 (Binder 19, at Tab 3); Dep. of Harold Hartung at 14-15 (Binder 19, at Tab 1). According to the USEPA's December 31, 1984 Record of decision concerning the BROS Site, there were three sources of potential contamination at the Site: (1) the lagoon; (2) a tank farm area; and (3) groundwater that came in contact with the lower portions of the lagoon. <u>See</u> Record of Decision dated December 31, 1984 at 0066849 (Binder 19, at Tab 4)."

*Response to plaintiff's suggested change above:*

*This suggested change contains excessive detail for an overview. To the extent that it purports to be a complete statement of conditions at the site, it is not complete.*

**Plaintiff's suggested change:** p. 34, lines 13-19 and p. 35, lines 1-3 – revise to state: "In 1992, several private plaintiffs brought a CERCLA action for contribution to response costs they had already paid at the BROS Site against defendants who allegedly transported waste to the BROS site or generated waste that was transported to it. This lawsuit, styled <u>Rollins Environmental Services, Inc., et al. v. The United States of America, et al.</u>, Civil Action No. 92-1253, was consolidated with a cost recovery action brought by the USEPA, styled <u>United States of America v. Allied-Signal, Inc., et al.</u>, Civil Action No. 92-2726, in the federal district court in New Jersey. Among the defendants in the <u>Rollins</u> case was A&A Waste Oil Company, Inc. ("A&A"), a Maryland corporation that apparently transported waste oil produced by Black & Decker to the BROS facility from approximately 1973 to 1979. Black & Decker was never named as a defendant in either the <u>Rollins</u> or the <u>Allied-Signal</u> lawsuits."

*Response to plaintiff's suggested change above:*

*This suggested change is unduly difficult to identify and follow. It consists of immaterial detail and wordsmithing.*

- 37 -

**Defendants' suggested change:**  p. 34, line 19 -  replace "approximately 1973 to 1979" with "during part of the period 1973 to 1979 and, possibly, earlier periods."

> *Plaintiff's response to defendants' suggested change:*
>
> *Defendants have not cited any evidence in the record concerning the "possibly, earlier periods" alleged in defendants' suggested change.*

**Plaintiff's suggested change:**  p. 35, lines 4-7 – change to "On December 17, 1992, defendants received a letter inviting them to participate in a voluntary, informal, non-litigated settlement/mediation process of the CERCLA action based on their status as a generator of waste transported by A&A to the BROS site." (See Hyatt letter at 1, Binder 19, at Tab 6)."

> *Response to plaintiff's suggested change above:*
>
> *This suggested change mischaracterizes the Hyatt letter.  The Court's finding is correct in noting that the process was court-sponsored.*

**Defendants' suggested change:**  p. 35, line 6 -  replace "a generator" with "an alleged generator."

> *Plaintiff's response to defendants' suggested change:*
>
> *Plaintiff does not object to defendants' suggested change.*

**Agreed suggested change:**  p. 35, lines 8-10 – delete the phrase "With respect to this claim", and rephrase as "Defendants claim that as of the time of the filing of the summary judgment motions, they paid $5,492.87 in remediation costs and defense costs of $435,817.34 with respect to the BROS Site, and that they subsequently incurred additional costs."

b)     Douglassville, Berks County, PA

**Agreed suggested change:**  p. 35, lines 13-14 – add "allegedly" after Black & Decker.

**Plaintiff's suggested change:**  p. 36, lines 1-2 – change "In August 1993, Black & Decker was dismissed from the lawsuit by an order of the court. (Dismissal Order, Defs.' Vol. XXXII at 145)" to "Black & Decker was dismissed from the lawsuit on August 17, 1993 due to lack of evidence linking B&D's wastes to the site." (Pl.'s Response to SOF, citing Defs.' Interrog. Answers, Tier II App. at 22 (Binder 8, at Tab 1)."

> *Response to plaintiff's suggested change above:*

- 38 -