# Tab 14.

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3        * * * * * * * * * * * * * * * *
                                        *
4        LIBERTY MUTUAL                  *
                         Plaintiff       *
5                                        *
             VERSUS                      *    CA-96-10804-DPW
6                                        *
         BLACK & DECKER                  *
7                        Defendant       *
                                         *
8        * * * * * * * * * * * * * * * *

9            BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

10             UNITED STATES DISTRICT COURT JUDGE

11                    HEARING - BROS SITE

12                     AUGUST 27, 2003

13    APPEARANCES:

14        RALPH T. LEPORE, III, ESQ. AND JANICE KELLEY
          ROWAN, ESQ., Holland & Knight, LLP, 10 St. James
15        Avenue, Boston, Massachusetts  02116, on behalf
          of the Plaintiff
16
          JACK R. PIROZZOLO, ESQ. AND RICHARD L. BINDER, ESQ.,
17        Willcox, Pirozzolo & McCarthy, 50 Federal Street,
          Boston, Massachusetts  02110, on behalf of the
18        Defendants

19
      ALSO PRESENT:  Linda Biagioni
20
                          Courtroom No. 1 - 3rd Floor
21                        1 Courthouse Way
                          Boston, Massachusetts 02210
22                        10:00 A.M. - 11:30 A.M.

23            Pamela R. Owens - Official Court Reporter
            John Joseph Moakley District Courthouse
24              1 Courthouse Way - Suite 3200
                 Boston, Massachusetts  02210
25
          Method of Reporting:  Computer-Aided Transcription

1          CA-96-10804-DPW

2          AUGUST 27, 2003

3          THE COURT:  Well, just a kind of scheduling

4    thing.  We're on for Jaffrey/Cross on September 17th and

5    then Bostick/Middleton October 3rd, is it --

6          MR. LEPORE:  8th.

7          THE COURT:  8th.  Okay.  What is the timing

8    that you anticipate for Beverly to be put in a context

9    of summary judgment?

10          MR. LEPORE:  Summary judgment motions are due

11   September 5th, next Friday; and the oppositions are due

12   October 3, I think, four weeks after that.  So, I would

13   expect, barring any necessary replies, if there were

14   replies, I can imagine we could do it in ten days.  But

15   probably the end of October, Judge.

16          THE COURT:  Okay.  So, --

17          MR. LEPORE:  Is that fair, Jack, for argument

18   on Beverly?

19          MR. PIROZZOLO:  That's fine with me.

20          THE COURT:  So, then, that would be the next

21   argument, I think.

22          MR. PIROZZOLO:  I thought we had --

23          THE COURT:  There's a long-term exposure

24   that's out there as well.

25          MR. PIROZZOLO:  But we'll leave Cross as the

1    next time.

2              THE COURT:  Yes.  Cross is the 17th and then --

3              MR. PIROZZOLO:  I thought we had a different

4    one for October.

5              MR. LEPORE:  Yes, Bostick/Middleton.

6              MR. PIROZZOLO:  You mean next after Bostick?

7              THE COURT:  Yes.  Okay.  So, I will try and

8    set a date in October for that.

9              Now, there were lingering questions about

10   discovery in Beverly.  Have they been worked out?

11             MR. LEPORE:  By and large, we have worked --

12   in fact, Mr. Pirozzolo and I spoke yesterday.  Over the

13   last six weeks, they have produced a numerous amount of

14   materials and documents, in large respect that are

15   responsive, but have raised other questions.  My

16   preference -- and I talked to Mr. Pirozzolo last night

17   about this -- is to defer that motion until we've had a

18   chance to work it out over the next two weeks so that if

19   on September 17 when we're back, we'll be able to tell

20   you one way or the other whether there's anything

21   remaining if that's fair, Your Honor.

22             THE COURT:  That's fine with me.

23             MR. PIROZZOLO:  I see no reason to involve the

24   Court in this at this stage.

25             THE COURT:  Okay.  And it's not going to

1    interfere with the briefing?

2         MR. PIROZZOLO:  No.

3         MR. LEPORE:  I don't believe so.  I think, as

4    I said, the documents that have been produced over the

5    last four to six weeks have been helpful.

6         THE COURT:  Will be adequate.  Okay.

7         Now, let me turn to the BROS and Brooks and

8    Huth materials.  Again, the issue -- and it's becoming

9    more clear to me that the factual resolution is likely

10   to focus to a fairly large degree on the policies that

11   are involved and whether or not they can properly be

12   said to be involved.  But I want to skip over that for a

13   moment.  That is, I find it difficult to believe that I

14   can grant summary judgment with respect to the policies

15   really up to 1970, that really I'm dealing with policies

16   from '70 to '79 that can be dealt with on a summary

17   judgment basis.

18        MR. PIROZZOLO:  Your Honor, I believe the

19   record shows that the policies through 1971 have no

20   pollution exclusion.

21        THE COURT:  Well, I understand that.  The

22   problem is --

23        MR. PIROZZOLO:  The policies -- I don't think

24   it has ever been brought specifically to the Court's

25   attention.  There is an excess policy that runs from

1    1970 through 1973 --

2              THE COURT:  Right.

3              MR. PIROZZOLO:  -- that has been no pollution

4    exclusion and that also does not have provisions that

5    the underlying policy terms are incorporated.  So, there

6    would be a right to a defense.

7              THE COURT:  Let me understand about the -- I

8    was thinking of the '69 to '70 excess policy, but '70 to

9    '73?

10             MR. PIROZZOLO:  Nothing before 1971 has --

11             THE COURT:  But there is an excess policy from

12   '70 to '73?

13             MR. PIROZZOLO:  Excess policy from '70 to '73,

14   three-year policy.

15             THE COURT:  You say that hasn't been brought

16   to my attention before?

17             MR. PIROZZOLO:  Well, it's in the record, Your

18   Honor.  I mean, we haven't emphasized it.  It's in the

19   record.  And it has no pollution exclusion.  And I'm

20   losing the phrase.  It does not incorporate in it --

21   follow form.  It doesn't follow form.  So it stands on

22   its own.  So, if there's no underlying coverage, it

23   drops down.  And we have the right under that policy to

24   a defense regardless of any arguments about the

25   pollution exclusion.

1          THE COURT:  Well, let me -- I simply am

2  unfamiliar with it, so I haven't focused on it.

3          MR. PIROZZOLO:  I didn't think so.  I don't

4  think we have briefed it that way and I don't think we

5  have previously argued it orally.

6          THE COURT:  All right.

7          MR. LEPORE:  If I may, Your Honor, --

8          THE COURT:  Right.

9          MR. LEPORE:  -- with respect to that excess

10  policy, there is no duty to defend in any excess policy.

11  So, regardless, the drop-down has to do with the

12  indemnification issue.  That's the purpose of excess

13  policies is to deal with that.

14          MR. PIROZZOLO:  I don't think that's correct.

15  When the Court reads the excess policy, it will see that

16  there's a duty to defend.

17          THE COURT:  Well, the Court hasn't, so the

18  Court better.

19          MR. PIROZZOLO:  And, frankly, what tipped us

20  off on this in preparation for this hearing is to go

21  back and study the motion for summary judgment.  And

22  Liberty Mutual's motion for summary judgment seeks a

23  judgment through March of 1973 which is before the

24  expiration of this excess policy.  And in looking at it,

25  why did they move just through March of 1973?  We then

1    realized that the excess policy imposes a defense

2    obligation regardless of the underlying --

3              THE COURT:  Well, you know, I've tried to be

4    fairly diligent in going through these materials.  And

5    it just didn't come out to me in this fashion.  And

6    while I am loathe to impose additional obligations of

7    briefing and so on, I think it would be helpful to me to

8    have some briefing on the 1970 to '73 excess policy and

9    its implications here.  But I can't talk about it

10   because I don't know it.  And you're not going to teach

11   me enough about it --

12             MR. PIROZZOLO:  Today.

13             THE COURT:  -- today for me to deal with that.

14             MR. PIROZZOLO:  We're happy to -- whatever the

15   Court says, we'll abide or submit on whatever schedule

16   the Court wants.

17             THE COURT:  A couple of weeks.

18             MR. PIROZZOLO:  Fine, no problem.

19             THE COURT:  Two weeks to address the

20   implications of -- the dimensions of and the

21   implications of 1970 to '73 excess policy on this

22   matter.  And it will probably be sharpened a bit by our

23   discussion here today.

24             MR. PIROZZOLO:  Thank you, Your Honor.

25             THE COURT:  But that -- putting that to one

1    side, dealing with it, I think the only thing that is

2    available for summary judgment, although I haven't

3    finally decided, is the policies that can provide a

4    basis for summary judgment and the policies from '70 to

5    '79 here.  The previous policies seem to me to raise

6    factual questions about their existence, their

7    provisions, that sort of thing that I hope to be able to

8    clarify for you at some point.

9           But for purposes of discussion here today, I

10   want to focus on really '70 to '79.

11          Now, turning to the BROS circumstances -- and

12   maybe I want to go back a bit on this to deal with

13   pollution exclusion a bit more specifically with the

14   deletion of the pollution exclusion in this context --

15   my view of the deletion provision has come to the belief

16   that we have to be dealing with operations in Maryland.

17   And I have come, I think, to view the <u>Minut-Lube</u>, if

18   I pronounce that correctly, case as to some degree

19   dealing with the essential operations of the entity, a

20   lubrication business and, consequently, distinguishable

21   from the activities of Black & Decker that led to the

22   potential here for exposure.  And, so, I would be

23   inclined to believe that the deletion provision is going

24   to displace any claim after 1971 of Black & Decker for

25   indemnification and perhaps if it hinges on that,

1    although I don't think it does, the duty to defend.

2    Now, I'll hear some argument about that, but I'm pretty

3    much on that ground.  Mr. Pirozzolo, you may want to

4    address the question of the deletion provision here.  If

5    it's there, you're pretty much dead in the water as to

6    indemnification, aren't you?

7         MR. PIROZZOLO:  If I understand Your Honor's

8    comment, first, within the four corners of the

9    provision, as is included in the policy --

10         THE COURT:  Right.

11         MR. PIROZZOLO:  -- it says the exclusion is

12    not applicable to operations, its disjunctive operations --

13         THE COURT:  Right.

14         MR. PIROZZOLO:  -- or occurrences in Maryland.

15    And the facts of this case are such that Black & Decker's

16    alleged fault or alleged action that gives rise to the

17    claim against it arises out of its plant in Maryland and

18    its delivering its waste to A&A Disposal in Maryland.

19    And, therefore, I think it falls squarely within the

20    provision that it is arising under an operation in

21    Maryland.

22         THE COURT:  That turns on the belief that this

23    is an occurrence in Maryland, doesn't it?

24         MR. PIROZZOLO:  There's operation or

25    occurrence.

1       THE COURT:  It's not an operation in Maryland

2   unless everything you do that goes out of the state

3   becomes an operation in Maryland.  It seems to me fairly

4   clear -- and in this, I'm influenced, I suppose, by the

5   SJC in Nashua having in mind, of course, that we're

6   dealing with New Hampshire law, but the reading that

7   they give to this provision.  I have looked carefully at

8   Minut-Lube because I think it arguably supports

9   your case.  But I view that as a special kind of

10  operation, special intensively oil discharge petroleum

11  discharge operation, and would distinguish it on those

12  grounds.  But if I were to take and say whenever it

13  comes to it, the Maryland courts are going to say that

14  "we block with Nashua," doesn't that end the matter

15  for you?  They're treating the same -- essentially the

16  same provision.

17       MR. PIROZZOLO:  But I don't think they would.

18  Because you begin with the proposition that there should

19  not be a pollution exclusion at all in Maryland, that

20  Maryland bars the pollution exclusion.  Liberty Mutual

21  has placed into the policy a cleverly-drafted pollution

22  exclusion which now they argue will take it outside

23  -- take their policy outside the policy of Maryland.  We

24  have a case that we cite, the Alcolac case --

25       THE COURT:  Right.

1          MR. PIROZZOLO:  -- where the operation -- the

2     generator was in Missouri and the pollution was in

3     Missouri.  And it was held that the pollution exclusion,

4     very similar to the one involved here, did not apply.

5     And that was so determined by the District Court in

6     Maryland which would presumably be closer to Maryland

7     law than Nashua was.  That's 16 F.Supp 1541.

8          THE COURT:  Well, you see, the problem I have

9     with Alcolac is the suggestion of ambiguity that it

10    seems to rest on.  I guess it puts it at direct

11    opposition to Nashua.  I'm not sure that I think it

12    is as well developed as Nashua.  I'm not sure that I

13    would be inclined to follow it here.  Of course, it's

14    not the definitive statement of Maryland law because

15    it's a --

16         MR. PIROZZOLO:  With respect, I don't think

17    either the 4th Circuit or the Court of Appeals in

18    Maryland would follow Nashua.

19         THE COURT:  Well, that's your -- as you said,

20    the question for me is let's assume -- as I do -- that

21    they find that more persuasive than Alcolac, what

22    does that do to your case?

23         MR. PIROZZOLO:  Well, we still have pre-

24    pollution exclusion.

25         THE COURT:  For summary judgment purposes,

1    which is how I raise this by talking about the period

2    '70 to -- we're really talking about the period '70 to

3    '71, aren't we?

4         MR. PIROZZOLO:  We would have pre-pollution

5    exclusion activities on the site.  Well, it's a little

6    difficult because Black & Decker denies that it ever

7    shipped material to this site.

8         THE COURT:  I'll go back to that.  But let me

9    say --

10        MR. PIROZZOLO:  But the allegations -- the

11   claims would --

12        THE COURT:  Let me say that I think that there

13   is the potentiality for liability for activities on the

14   site by Black & Decker.  Whether denied or not, there

15   is.  That's a duty to defend kind of issue, but it

16   frames it.  Aren't we then talking about '70 to '71?

17        MR. PIROZZOLO:  And also pre-'70.

18        THE COURT:  Well, pre-'70.  I've indicated my

19   view that that's not summary judgment material because

20   of the uncertainties in respect of whether and, if so,

21   what dimensions there are to the policies that Liberty

22   had -- or Black & Decker had with Liberty.

23        MR. PIROZZOLO:  One other -- before I answer

24   that question directly, I'd point out the Liller

25   case which defines operations.  That's a Maryland

1       it says -- it embraces the Webster's New International

2       Dictionary definition of "operations" as "the whole

3       process of planning for and operating a business or

4       other organized unit."  And in a non-environmental case,

5       it says it is "a course or a procedure of productive or

6       industrial activity."  So that at the very least, there

7       is a fact dispute as to whether Black & Decker engaged

8       in operations and whether the operations of which we are

9       concerned were conducted entirely in Maryland.  So, I

10      don't think it's -- I don't think the Court could grant

11      summary judgment for Liberty Mutual as a matter of law.

12      What ought to happen is the definition should be given

13      to the jury and the jury should then determine whether

14      or not under these circumstances these are operations in

15      Maryland.

16              So, for summary judgment purposes, it would

17      probably defeat our motion for summary judgment.

18              THE COURT:  Yes.

19              MR. PIROZZOLO:  But I don't believe that it

20       leads to granting Liberty Mutual's motion for summary

21      judgment.

22              THE COURT:  If I accept the characterization

23      of operations for purposes of this provision as, at a

24      minimum, ambiguous, that's really what it comes down

25      to, doesn't it, for that to stay alive?

1          MR. PIROZZOLO:  But at some point, the Court

2    will define that.  But then it would be the question for

3    the jury to fit in the facts to see if the facts --

4          THE COURT:  Well, but let's say that I provide a

5    definition that effectively mimics <u>Nashua</u>.  The only

6    way that you get to the jury is if you say, "No, no,

7    this is ambiguous."  And the jury has to decide what they

8    meant by "operations" under these circumstances.

9          MR. PIROZZOLO:  I could see it going that way.

10          THE COURT:  All right.

11          MR. PIROZZOLO:  The more direct answer to the

12    Court's question is that it's all a question of which

13    policies are implicated and whether we would be

14    implicating the policies right through the '70s or just

15    the policies up to 1971 or, based on what I've just

16    alerted the Court to about the excess policies, the

17    policies through 1973.

18          THE COURT:  Okay.  Let's just assume that

19    we're -- because I want to clarify for my own purposes

20    where the disputes are in the policies themselves

21    that I think are subject to summary judgment or, more

22    specifically, one policy that's subject to summary

23    judgment.

24          We're dealing from '70 to '71.  And I think

25    that I want to understand the view of Liberty on even

1    that thin eye of a needle, because I read <u>Bausch & Lomb</u>

2    fairly broadly here and I want to understand how you

3    think you're going to get out of it for '70 and '71.

4             MR. LEPORE:  The second <u>Bausch & Lomb</u>, Your

5    Honor?

6             THE COURT:  Yes.

7             MR. LEPORE:  The '99 decision?

8             THE COURT:  Yes.

9             MR. LEPORE:  I think the second <u>Bausch & Lomb</u>

10    decision actually can be helpful to Liberty Mutual in

11    the following respects, Your Honor.  It addresses the

12    situation where the Court concluded that coverage could

13    be determined if the damage to the environment occurred

14    after the dumping.  We acknowledge that that is the

15    issue.  Ours is the reverse situation.  And that is as

16    follows, Your Honor:  There is no evidence whatsoever --

17    to the extent that there's any evidence that BROS

18    accepted any B&D waste -- that it occurred before 1973.

19    There is no evidence at all.

20             THE COURT:  But now we're talking -- let me

21    focus it on duty to defend.

22             MR. LEPORE:  Yes.

23             THE COURT:  And there, you don't get to rely

24    upon extrinsic evidence.

25             MR. LEPORE:  Let me address that in three

1    separate points, Your Honor, because -- and I'm glad

2    that you've focused on that.

3           The duty to defend in Maryland is that you

4    have to deal with the four corners of the complaint and

5    the four corners of the policy.

6           THE COURT:  And the insurer can adduce

7    extrinsic evidence to support that.

8           MR. LEPORE:  The insured, you mean?

9           THE COURT:  The insured.  Excuse me.

10          MR. LEPORE:  That's right.  However, there is

11   a case that -- there are two cases, Your Honor, that

12   have come down recently.  I'm going to give you one

13   cite.  The Northern Insurance Company of New York versus

14   Baltimore Business Communications, 2003 U.S.App. Lexis

15   12318.

16          THE COURT:  Hold on a second, 12318.

17          MR. LEPORE:  Fourth Circuit, June 19th, 2003.

18   And I'm going to just recite that and then I'll get to

19   the second case.  The Fourth Circuit pointed out that,

20   "Significantly, Maryland recognizes two limited

21   exceptions to the general rule against an insurer's use

22   of extrinsic evidence.  First, when the underlying tort

23   plaintiff has amended his allegations against the

24   insured, the insurer may utilize the amendments as

25   extrinsic evidence.  If the amended allegations no

1   longer raise a potentiality for coverage, the insurer

2   no longer has a duty to defend."

3          Okay.  Now, that doesn't apply here, that

4   first exception.  I will acknowledge that.

5          THE COURT:  And it sounds wrong.  All

6   that's happened is that you've got a new operative

7   document.

8          MR. LEPORE:  That is correct.

9          THE COURT:  I mean, it's not extrinsic

10  evidence.  It's simply the new -- the four corners are

11  redefined.

12         MR. LEPORE:  Exactly.  But this is where we

13  end up going to the second exception, Your Honor.  And

14  that is in Universal Underwriters v. Lowe, 135 Md.App.

15  122 --

16         THE COURT:  Hold on.  I'm slow.

17         MR. LEPORE:  -- the dual cite -- I'm sorry,

18  135 Md.App. 122.  And the dual cite is 761, Atl.2d 997,

19  2000.

20         THE COURT:  This is the Maryland intermediate

21  appellate court?

22         MR. LEPORE:  Yes.  That's correct.  And it

23  says, "In other words, an insurer may utilize

24  uncontroverted extrinsic evidence from the underlying

25  lawsuit if such evidence clearly establishes that the

1    suit's allegations are beyond the scope of coverage."

2         Now, I point these out to you because we

3    start from the premise that we're dealing with the four

4    corners of the so-called complaint and the four corners

5    of the policy.  Over the last couple of years, we have

6    seen two exceptions to that.  And it has to do with

7    throughout all of our arguments over the past several

8    months, Your Honor, having to do with understanding that

9    the duty to defend is at a specific point in time to be

10   determined with coverage for the overriding, underlying

11   lawsuit to be determined at a later date, which is what

12   the insurer is entitled to do.

13        THE COURT:  Let me be sure I understand what

14   you mean by that.  I look at -- or we look at the time

15   of the -- I won't say tender because that --

16        MR. LEPORE:  Right.

17        THE COURT:  -- incorporates a different

18   concept, but more or less at the time that the insured

19   is put on notice of the potentiality.

20        MR. LEPORE:  Right.

21        THE COURT:  Then your duty to defend, if it

22   is within the potentiality, continues until there is

23   some basis for saying there's no longer a potentiality.

24   I'm using the language of Maryland.  Is that it?

25        MR. LEPORE:  Fair enough.  Now let's start

1    going backwards in time.  Liberty Mutual became aware

2    of this underlying claim in March of '94.  That's

3    uncontroverted.

4         THE COURT:  Now we're just dealing with BROS.

5         MR. LEPORE:  Yes.  What did they become aware

6    of in March of '94?  They were presented with a cover

7    letter and two complaints that date back to October of

8    '92, I believe.  October, yes, of '92.  Okay.  Liberty

9    didn't find out until about -- whatever, how many months

10   that is -- 17 or 18 months after Black & Decker became

11   aware of this.  What is important to understand about

12   what Liberty became aware of in March of '94 is that in

13   the cover letter and in the two underlying complaints

14   that were submitted with the cover letter was that

15   Black & Decker was not a defendant in either of those

16   lawsuits.  That is uncontroverted.

17        THE COURT:  All right.

18        MR. LEPORE:  Okay.  So the question is when

19   Liberty Mutual became aware of this claim in '94, was

20   that a suit?

21        THE COURT:  All right.

22        MR. LEPORE:  We all acknowledge that Maryland

23   hasn't addressed that situation yet.

24        THE COURT:  Yes.

25        MR. LEPORE:  And the question is whether they

1    are going to follow certain case law and decide that it

2    was a suit or whether they're going to follow other

3    cases in the country where it wasn't a suit.  All right.

4    Our position, of course, is that it wasn't a suit.  It

5    didn't trigger anything.  Now, assume for a moment that

6    Your Honor concludes otherwise, that that letter --

7              THE COURT:  What is the duty --

8              MR. LEPORE:  Yes.

9              THE COURT:  Do you have a duty at that point

10   when there is uncertainty about that then to seek a

11   declaratory judgment?  That is to say, you're faced with

12   case law around the country.  You know, I suppose it's

13   -- I keep forgetting the Maine case.  But Maine goes one

14   way and Massachusetts goes the other --

15             MR. LEPORE:  That's correct.

16             THE COURT:  -- on this.  Do you simply take

17   your chances?

18             MR. LEPORE:  Maryland law is not decided on

19   that.  And that's a fair question to ask.

20             THE COURT:  Right.

21             MR. LEPORE:  And I understand where Your Honor

22   is headed.  So, let me just follow the thought process

23   for just a moment.

24             THE COURT:  Okay.

25             MR. LEPORE:  Assume for a moment that Your

1    Honor decides that this letter is sufficient to

2    transform the letter into a suit so that it's within the

3    coverage arguably.  There is no case law in Maryland

4    that decides what a suit is.  We start from that

5    premise.

6              THE COURT:  All right.

7              MR. LEPORE:  There are only a few cases in the

8    country that have decided whether a PRP letter or a DEP

9    letter is a suit.  There's only one case that I'm aware

10   of -- and that is the Zecco/Hazen line of cases here in

11   Massachusetts that sets out the criteria for determining

12   whether a private party letter is a suit.  This under

13   any set of circumstances must be considered a private

14   party letter.  It is a letter from the BROS settlement

15   committee inviting Black & Decker to participate in a

16   settlement process.

17             THE COURT:  Well, giving them an alternative,

18   one track or the other.  Do you want to be in

19   litigation?  Do you want to be in settlement?

20             MR. LEPORE:  And as we know, they were never

21   sued.  In fact, your question earlier to Mr. Pirozzolo

22   about indemnity is not particularly helpful here because

23   there is no indemnity.  All we're dealing with are

24   defense costs.

25             THE COURT:  All right.

1          MR. LEPORE:  And we're only dealing with duty

2     to defend.  So, the question then becomes at the time

3     that Liberty Mutual became aware of this in '94, what

4     did they have in front of them?  They have a letter

5     inviting Black & Decker to participate in a settlement

6     process.  It says in it -- it does say "or the

7     alternative is to face a lawsuit."  The face -- the

8     uncontroverted fact is that they weren't sued.  Black &

9     Decker went through the settlement process, refused to

10    settle, and never got sued.  Okay.  Now, if you look

11    at the Zecco and Hazen line of cases, they set

12    forth the criterion for determining whether or not

13    a PRP letter is a suit or not a suit.  They talk about

14    three different criteria:  First, a failure to comply

15    with the letter should itself somehow alter the

16    substantiality of the insured's liability.  Okay.  You

17    look at this particular letter.  It doesn't do anything

18    like that because all it does is say if you don't agree,

19    we're going to sue you.  It doesn't establish liability.

20          THE COURT:  Isn't that enough?

21          MR. LEPORE:  No.

22          THE COURT:  That is, it says -- whether or not

23    it's realized, it says it's going to result in the

24    lawsuit.

25          MR. LEPORE:  Which never happened.

1          THE COURT:  That's what you -- well, but never

2     happened is something occurs after the time at which

3     there is what loosely I'll call the tender.

4          MR. LEPORE:  Which I will get to in a second.

5     Because the 16-month delay is important, Your Honor.

6     It's vitally important and I'll get to that in a second.

7     But I need to go through the Hazen/Zecco line first.

8     Because I firmly believe that this was not a suit that

9     would have triggered any duty to defend.

10          The second part of that is that the SJC here

11     has said that government letters, as opposed to private

12     party letters, carry much more substantial weight.  The

13     government generally follows through on their threats.

14          Number three, the tone of the letter is

15     relevant to determine whether or not it's a suit that

16     triggers the duty to defend.  This letter, however

17     described, was an invitation.  In fact, the word is in

18     there.  "We invite you to participate in a settlement

19     process."

20          So, we look at those three factors.  Does the

21     failure to comply with the settlement process alter the

22     insured's liability?  No.  It doesn't do anything.  If

23     they had complied, which they took the invitation, it

24     didn't do anything because nothing happened.  If they

25     didn't comply, nothing happened because they never got

1    sued.

2           Number two, this is plainly a private party

3    letter.

4           Number three, it was an invitation.

5           So I don't think there was a suit.  But here's

6    the vitally important point.  When Liberty Mutual became

7    aware of this in March of '94, Black & Decker had

8    already been involved in this settlement process for 18

9    months.  It is uncontroverted that during that 18-month

10    period of time, they obtained information which

11    established that they had no connection to the BROS

12    site.  Now, they knew that in March of '94.  They didn't

13    tell Liberty Mutual that.  Now, why is that?  I don't

14    know.  But why is it that they ignored their own

15    counsel's advice to tell Liberty Mutual about the years

16    of involvement?  I don't know.  I can only speculate as

17    to that.

18           But the bottom line is at that point when

19    Black & Decker notified Liberty Mutual of this so-called

20    claim and lawsuit, they had definitive uncontroverted

21    information that they had involvement at BROS before

22    1973.  In fact, there is a letter that's in the record

23    from Swidler & Berlin, the counsel, that as early

24    as April 19 of 1993, they knew that there was no

25    involvement before '73.  There were letters and they

1    are all in the record.

2            THE COURT:  Well, let me ask this:  So that's

3    their position.

4            MR. LEPORE:  I'm sorry?

5            THE COURT:  That's their position, that they

6    have no involvement.

7            MR. LEPORE:  Right.

8            THE COURT:  From whose perspective do we view

9    this?  Isn't it whether or not it is possible for an

10   alternative position to be taken?

11           ME. LEPORE:  That's a very good question,

12   except that the only opposing party arguably was the

13   BROS settlement committee.  Okay.

14           THE COURT:  Not necessarily.  It's tiering.

15   And ultimately, I suppose EPA can get into it.  They,

16   for a variety of reasons, don't go down the tiers.  They

17   look to second- and third-party actions to do that.  But

18   ultimately, the obligation is to EPA -- or for the

19   remediation is to EPA.

20           MR. LEPORE:  I agree with that.

21           THE COURT:  So it's attenuated, but it's still

22   there.

23           MR. LEPORE:  And, yet, there's still no

24   evidence.  No one is even alleging that B&D was at the

25   BROS site before '73.  No one.  Now, let me --

1      THE COURT:  Well, but what do I -- is it Mr.

2  Goldstein?  Is that the fellow's name?  I'm trying to

3  remember who the fellow -- the son of the founder of

4  A&A.

5      MR. LEPORE:  That's right.

6      MR. PIROZZOLO:  Before Mr. Lepore was on his

7  feet.  But the record shows that A&A picked up waste

8  from Black & Decker all through the '60s and that the

9  son of Mr. -- I believe it's Mr. Goldstein -- that he

10  picked up waste at Black & Decker when he was still a

11  teenager and puts that in the -- at least in the late

12  '60s.  And there is a document in the record.  This is

13  at Appendix R, Appendix O10, that shows on a site

14  questionnaire that shows that Black & Decker waste --

15  I'm sorry -- that A&A waste went to the BROS site from

16  1964 through 1979.  Their record -- the extrinsic

17  evidence is abundant except there is the possibility of

18  a claim that Black & Decker waste went to the BROS site.

19  Of course, Black & Decker has maintained right along

20  that none of it went to the BROS site.

21      THE COURT:  But let me just pause for a moment

22  to focus on this.  So we're back to there's somebody out

23  there who says that it did.  Black & Decker says that

24  it didn't.  Well, you know, I look --

25      MR. LEPORE:  But that's not true, Your Honor.

1    That's a misstatement of the record.  The record

2    reflects that it is possible that A&A picked up waste

3    from B&D.  Okay.  Goldstein said that, but he doesn't

4    remember specifically.  But there's no connection

5    between A&A picking up the waste and bringing it to

6    BROS.  There is evidence that at that period of time,

7    A&A brought that particular waste to Burke's.  There is

8    no connection between A&A picking up B&D waste and

9    bringing it to BROS until March of 1973.  That is

10   uncontroverted.  There is nothing in the record,

11   notwithstanding everything that they have done to create

12   an issue of fact here, there is nothing to make that

13   connection before March of 1973.  And I say that

14   emphatically because, Your Honor, there is information

15   in the record.  There is a letter that I just referred

16   to, April 29th of 1993.  There's a September 20th, 1993,

17   letter from Swidler & Berlin to Ms. Biagioni.

18         THE COURT:  Well, but, see, let me just stop

19   on that.  That there are internal discussions in which

20   they say that they did not -- that their waste never

21   made its way to BROS, it seems to me, is interesting,

22   but not immediately relevant on the question of duty to

23   defend.

24         The more fundamental question is whether or

25   not a finder -- there is a potentiality that a finder of

1    evidence.  Are you permitted to do that?  I don't think

2    so.

3            THE COURT:  Why not?

4            MR. LEPORE:  And I'll tell you why.  I think

5    what you're entitled to do -- and follow me out, hear me

6    out.  If you're going to look back in 1994 as to what

7    Black & Decker knew and include extrinsic evidence at

8    the time that they had a letter inviting them to

9    participate and two complaints of which they were

10   neither a defendant in.  What extrinsic evidence are you

11   permitted to look at?  Are you only permitted to look at

12   the stuff that's helpful to them as opposed to all of

13   the stuff that they knew at the time, including a letter

14   from the BROS settlement committee setting forth the

15   parameters of the years of involvemenet?

16           THE COURT:  Well, I think I have to look at

17   all that stuff.

18           MR. LEPORE:  That's my point.  And if you do

19   that --

20           THE COURT:  But let me just step back for a

21   minute.

22           MR. LEPORE:  Okay.

23           THE COURT:  But if there is enough in that

24   to create a question of fact, then the existence of

25   contrary positions is interesting, but not compelling on