1    the question of duty to defend.  I mean, if there is

2    someone at Black & Decker who says "absolutely, never

3    did it, I always have everything to go to Burke's, even

4    told them we wanted it to go to Burke's" and then there's

5    somebody who says "uh-uh, we took it to BROS or Regal,"

6    well, I don't resolve that and you don't resolve that.

7    What you do is offer a defense until it is determined.

8         MR. LEPORE:  Okay, I understand that.  All

9    right.  Let me go on, because I can understand your

10   point, Your Honor.  I respectfully disagree.  But here's --

11        THE COURT:  Well, is there something out

12   that says that that isn't what happens under these

13   circumstances, some case that says that that isn't what

14   happens?

15        MR. LEPORE:  Your Honor, I come back to --

16   Yes.  And here's where we are with this:  Your focus

17   right now is on the duty to defend.

18        THE COURT:  Well, it is.

19        MR. LEPORE:  And my focus --

20        THE COURT:  Let me just go back to Universal

21   Underwriters --

22        MR. LEPORE:  Yes.

23        THE COURT:  -- the most recent case that you've

24   called to my attention --

25        MR. LEPORE:  Yes.

1          THE COURT:  -- talking about an exception.

2     And it is uncontroverted evidence.

3          MR. LEPORE:  Yes.

4          THE COURT:  So if there's some dispute, then

5     that exception isn't in play.

6          MR. LEPORE:  I understand that.  Now, let me

7     point to the uncontroverted absolute answer.  It is in

8     Volume 30-001.  It is a letter from Black & Decker's

9     insurance broker, Alexander, dated October 7th, 1994, in

10    which it responds to Liberty Mutual's questions after

11    Liberty -- just to backtrack for a second, Your Honor.

12    After Liberty Mutual became aware of this claim in March

13    of '94, they sent out the acknowledgment letter and

14    asked for certain information.  The classic request for

15    information is the years that they were at the site.  In

16    response to that, on October 7th, 1994, Black & Decker's

17    broker said, "It does not predate 1973."  Now, that's

18    uncontroverted.  There is nothing -- this is an

19    admission from them that nothing was sent to the BROS

20    site before 1973.

21         THE COURT:  You mean if someone writes back to

22    their insurer that "I didn't hit the little kid, I'm

23    telling you that as emphatically as I can," even though

24    somebody else out there says that I did, that I have

25    an alibi and that, as a consequence, you don't have to

1    provide a defense?

2        MR. LEPORE:  Well, that's a fair point.

3    But then they supply the information, the backup

4    information.

5        THE COURT:  Right.  And, so, I provide the

6    letter from my girlfriend who says --

7        MR. LEPORE:  But they won't have that.

8        THE COURT:    -- I was somewhere else on that

9    occasion.

10        MR. LEPORE:   I understand your point.  But --

11    and I understand it completely, Your Honor.  But they

12    have to come up with something.  They can't just say,

13    "yes, well, that's true, but maybe there was something

14    else."  They haven't done that.  They come up with a

15    guy whose name is Goldstein saying that "yes, maybe," but

16    there's no connection between A&A and BROS.

17        THE COURT:  He didn't parachute in there.  The

18    guy whose name was Goldstein wasn't somebody walking by

19    the BROS site.  He's the son of the owner.

20        MR. LEPORE:  Right.  I understand that.  But

21    let's look at -- again, if we're going to deal with the

22    charging documents, all right --

23        THE COURT:  Right.

24        MR. LEPORE:  -- what's in the charging

25    documents about Black & Decker?  Nothing.  They don't

1    even reference Black & Decker, right?

2            THE COURT:  When you say "charging documents,"

3    you mean the two complaints?

4            MR. LEPORE:  Right.

5            THE COURT:  Okay.  So --

6            MR. LEPORE:  The complaints are irrelevant.

7            THE COURT:  Well, no, they are not irrelevant.

8    They shape the area of dispute and they allege that

9    there is a right on the part of EPA.  And then the PRPs

10   bring their own lawsuit or the first tier bring their

11   own lawsuit alleging a right to recover for whatever

12   costs of remediation they have.  So, that sets the

13   broader playing field.  And that broader playing field

14   extends beyond 1973.

15           MR. LEPORE:  I will acknowledge that the two

16   complaints beyond -- but the connection is -- the

17   question is what is Black & Decker's connection to that?

18           THE COURT:  Okay.  And then they get the

19   letter from -- is it Mr. Hyatt --

20           MR. LEPORE:  Yes.  That's correct.

21           THE COURT:  -- that fellow who represents as

22   current counsel for the PRPs.  You know, kind of border

23   state gentility which you call an invitation.  I'm not

24   sure that it falls quite in that category.  But in any

25   event, just looking for a way in which he characterized

1    it --

2         MR. LEPORE:  I think he says "we invite you to

3    participate."

4         THE COURT:  He does.  But he also --

5         MR. LEPORE:  It's on the second page of the

6    information you're looking for at the bottom, "In lieu

7    of" --

8         THE COURT:  Right.  But he's got a broader

9    statement of what it is that he thinks Black & Decker is

10   in for.  It's not quite in English or at least there are

11   a series of typographical errors, I suppose.  I'm just

12   searching for the particular language because I made

13   notes of it just this morning.  Well, I can't put my

14   hands on it right now, I'm afraid.  But he does not

15   foreclose anything after -- anything before 1973 for the

16   potential obligation of BROS --

17        MR. LEPORE:  Black & Decker.

18        THE COURT:  -- of Black & Decker, does he?

19        MR. LEPORE:  I will acknowledge that, Your

20   Honor.  That is not foreclosed.

21        THE COURT:  So here is what you have.  You

22   have something that says you may be in the ball park.

23        MR. LEPORE:  Yes.

24        THE COURT:  And Black & Decker vigorously

25   saying, "uh-uh, we weren't there" or "at least if we

1    were there, we were there after 1973." But that's

2    the state of the record at that point.

3         MR. LEPORE: Agreed.

4         THE COURT: A potentiality and a denial. That

5    seems classic duty to defend.

6         MR. LEPORE: Okay. Let me address those

7    points and I understand your point. It's well taken,

8    Your Honor. Let's step back for a minute.

9         Understanding that it is Black & Decker's

10   obligation and burden to establish a claim within

11   coverage. All right. We understand that. Assume for a

12   moment -- and I don't acknowledge this, but assume that

13   that letter and those underlying complaints are a suit

14   that would trigger a duty to defend analysis.

15        THE COURT: Yes.

16        MR. LEPORE: Is a duty to defend triggered in

17   March of '94? And the answer to that question is no.

18   And the reason for that, Your Honor, is because if you

19   look at that letter and you look at the underlying

20   complaints, at anyone's reasonable understanding or

21   reading of that, it alleges long-term contamination.

22   There's no doubt about it. They're alleging that it's a

23   dump site that's contaminated over decades.

24        THE COURT: All right.

25        MR. LEPORE: All right. So, assume for a

36

1 moment that we jump to the pollution exclusion.  And

2 before we get to the pollution exclusion, of course we

3 have to deal with whether or not it's an accident --

4     THE COURT:  We're talking about '70 to '71?

5     MR. LEPORE:  Exactly.  So the question then --

6 we'll ignore the pollution exclusion just for a minute.

7 Assume that we're dealing with an accident or an

8 occurrence, right, which is the language.  At '70 to '71

9 was the occurrence language.

10     THE COURT:  Yes.

11     MR. LEPORE:  It requires an accident.  Okay.

12 Is there anything in there that could be fairly read to

13 be an accident?  It describes in great detail

14 contamination of a long-standing event.  The case law in

15 Maryland is clear there is no coverage for gradual

16 pollution under Maryland law.  We have cited numerous

17 cases in that regard.

18     THE COURT:  Well, but let me step back on

19 that.  If I don't accept the sudden and accidental

20 exception --

21     MR. LEPORE:  Yes.

22     THE COURT:  -- being read in quite the way

23 you do --

24     MR. LEPORE:  Yes.

25     THE COURT:  -- then we're really back to you

1    had a duty to defend, aren't we?

2              MR. LEPORE:  No.  Here's the -- I think --

3              THE COURT:  If I say, well, sudden and

4    accidental, that's giving a capacious reading.  I may

5    not because I may find that that has a resonance here.

6    But that really is focused on a period after 1971,

7    right?

8              MR. LEPORE:  Yes.  I agree with that.

9              THE COURT:  So, let's talk about '70 to '71.

10             MR. LEPORE:  That's what I was talking about.

11   It's still an occurrence-based policy, Your Honor.  In

12   order to -- before you get to the exclusions, you have

13   to figure out what's covered.  And in order for it to

14   be covered, they've got to establish that there's an

15   occurrence alleged.  In order to establish that an

16   occurrence has been alleged, they have to at least argue

17   that there was an accident.  There is no accident that

18   could be fairly read into the underlying documents.

19   This was ongoing pollution on a regular basis.  Maryland

20   does not recognize that for coverage.

21             THE COURT:  What do I do with the June 1971

22   broken nozzle at the storage tank?

23             MR. LEPORE:  Okay.  That's another good

24   question.  Assume for a moment that the pollution

25   exclusion is in effect from '71 on.  Just assume that.

1    The question then becomes was the June '71 event a

2    sudden and accidental event within the terms of the

3    policy.  First of all -- and, again, you won't know

4    this, obviously, from looking at the documents that were

5    given to us in March of '94 because there's no evidence

6    of any June '71 accidental event.  You need to look at

7    extrinsic evidence.  Okay.

8         What is extrinsic evidence regarding the BROS

9    site that's important?  This BROS site was probably one

10   of the worst sites in the country.  And what was the

11   central focus of the pollution?  It was a lagoon in the

12   middle of the site that was about 12-1/2 acres in size.

13   It contained over 70 million gallons of liquid waste,

14   another 2-1/2 million gallons of petroleum waste, over

15   72-1/2 million gallons of waste in this 12-1/2-acre size

16   lagoon.  What happened in June of '71?  As best can be

17   determined -- and for purposes of summary judgment, this

18   is what I understand it to be -- one of the tanks leaked

19   approximately 59,000 gallons.  Where did it go?  It went

20   right into the lagoon.  That's where it was designed to

21   go.  What was the pollution event?  And assume for a

22   moment that it was a sudden and accidental event.

23   There couldn't be anything that was more de minimis than

24   a 59,000 gallon leak into a 72-1/2 million gallon

25   lagoon.  The math ends up to be less than .07 percent.

1    Now, if there's anything that's de minimis, it's

2    something that's less than .1 percent.  And, again,

3    we're talking about unrebutted, uncontroverted evidence.

4    That's what our experts say.  That's what you have

5    before you, Your Honor.  This is a drop in the bucket.

6         THE COURT:  Yes.  That aspect of it is a

7    little different.  That is, that your expert is saying

8    that.  You know, one way of looking at it is 59,000

9    gallons is a fair amount.  Now, if you say, "well, you

10   know, among PRPs, then, particularly a modest PRP like

11   this, it's not much."  But I guess I want to go back

12   to this.  Maybe I'm misunderstanding and I want to

13   understand more fully --

14        MR. LEPORE:  Yes.

15        THE COURT:  -- because I don't think I've

16   looked at this as carefully on this issue as I should

17   have.  Prior to '71 --

18        MR. LEPORE:  Yes.

19        THE COURT:  -- there has to have been an

20   occurrence.

21        MR. LEPORE:  Yes.

22        THE COURT:  You're saying that Maryland law

23   will not recognize, as some law does, this kind of

24   accretion of exposure to waste as an occurrence -- that

25   is, someone comes and they dump on a periodic basis,

1    they dump at the location.

2            MR. LEPORE:  Well, that's what <u>Alcolac</u>

3    stands for.

4            THE COURT:  Well, yes and no.

5            MR. LEPORE:  It says "no occurrence where

6    pollutants escaped over a period of years."  That's

7    the Maryland case.  Now, the reason that Black & Decker

8    wants the <u>Alcolac</u> case is because of the dicta

9    regarding the deletion endorsement, but it's different

10   language.  But they ignore the primary holding, which is

11   that there's no occurrence where the pollutants escape

12   over a period of years.

13           THE COURT:  Let me -- point me to the

14   particular language that I can look at here.

15           MR. LEPORE:  I don't have the jump cite, Your

16   Honor.  I'm sorry.

17           THE COURT:  Okay.  Let me just look at it real

18   quick.  Okay.  "The better reasoned authority is to the

19   effect that when pollutants regularly have escaped over

20   a period of years, especially when management was either

21   deliberately indifferent to the situation or consciously

22   disregarded it, coverage is excluded under the policy

23   definition of occurrence because damage is to be

24   expected with a substantial degree of probability.

25   The better reasoned authority construing the sudden

1    and accidental language of the pollution exclusion

2    reaches a similar result."

3            MR. LEPORE:  That's correct.

4            THE COURT:  I see.

5            MR. LEPORE:  And you won't find any Maryland

6    law to contradict that.  In fact, the cases go on.  With

7    respect to the ARTRA case, the Bentz case,

8    there's nothing unclear about sudden or accidental.

9    That's what they focus on.

10            THE COURT:  Well, sudden and accidental are a

11    little bit --

12            MR. LEPORE:  And I understand.  But all I'm

13    saying is that they've assumed that the underlying issue

14    with respect to occurrnece is not in dispute.

15            THE COURT:  Right.  So, let me take this part

16    of it:  That you are entitled to take the position

17    that unless they say that this was the result of an

18    occurrence as defined by Maryland law, you don't have to

19    provide a defense.  They have to show you in some

20    fashion that it was an occurrence.

21            MR. LEPORE:  Yes.  There has to be something

22    in the underlying documents.

23            THE COURT:  What else?  I just want to move

24    on.  I understand that argument.  I want to move on to

25    anything else on that.

42

1          MR. LEPORE:  No.

2          THE COURT:  Okay.  So, Mr. Pirozzolo?

3          MR. LEPORE:  Thank you, Your Honor.

4          MR. PIROZZOLO:  Your Honor, a few points.

5   First of all, I'd like to emphasize the charging

6   document, which is the thing that came with the

7   invitations.  And that appears at Appendix 28-XXVII-79.

8   And it has Black & Decker's -- the claim against Black &

9   Decker.  And it says, "Black & Decker's a PRP at the

10  BROS by virtue of its having disposed of or arranged for

11  disposal of hazardous substances at the BROS superfund

12  site.  Based on documents obtained from the Maryland

13  Department of Natural Resources as well as interviews

14  with former A&A waste oil drivers, it is understood that

15  Black & Decker disposed of some or all of its hazardous

16  waste through A&A, a bulk from Maryland.  A&A waste oil

17  bulk, Maryland.  Maryland disposed of some, if not all,

18  of its hazardous waste that it collected at the BROS

19  superfund site."  That is without time.  And, therefore,

20  the potentiality of liability is there on the face of

21  the charging document.

22          THE COURT:  Okay.  You're treating the Hyatt

23  letter as the charging document?

24          MR. PIROZZOLO:  Well, that's certainly a

25  reasonable place to go.

1          THE COURT:  Okay.  But now let's talk about

2     the occurrence aspect of this.  What is described in the

3     underlying complaints which Mr. Hyatt's letter forwards

4     is, at least as I recall -- I haven't gone back and

5     looked at it this carefully.  I went through that aspect

6     of it carefully.  I went through them very quickly.  But

7     it raises some questions about whether or not what was

8     involved here is an occurrence, doesn't it, within the --

9          MR. PIROZZOLO:  We're in an anomalous

10    position.  In a sense, there's no occurrence because our

11    stuff never went there.

12         THE COURT:  Oh, no.  This is -- that may be

13    so.  But you have to show that somebody is saying -- it

14    seems to me you have to show that somebody is saying --

15    making the argument, exposing you to risk that you

16    engaged in an occurrence.

17         MR. PIROZZOLO:  I think that's what they're

18    saying.  They're saying that A&A picked up our waste

19    and brought it to the BROS site.

20         THE COURT:  Well, what do I do with that

21    language that I just recited from Alcolac?

22         MR. PIROZZOLO:  The policy provides coverage

23    for continued -- repeated or continuous exposure to

24    conditions.  And what we're dealing with is -- what Mr.

25    Lepore is talking about is well like a gradual leak or

1    something.  But this is oil.  The facts show, if they

2    were proven, that A&A came to Black & Decker and picked

3    up large loads of oil and then mixed it with other oil

4    at its facility in Maryland and then brought that to

5    BROS.  That's not gradual.  Those are specific --

6              THE COURT:  But that's not the occurrence

7    either.  The occurrence is the escape from the lagoon.

8    It sounds like a horror film.  But that's what it's

9    about.  That's what the occurrence is.

10             MR. PIROZZOLO:  And if our oil is in the

11   lagoon and it escapes --

12             THE COURT:  Right.  But what do I do with

13   Judge Smalkin's language that "when pollutants regularly

14   have escaped over a period of years, especially when

15   management was either deliberately indifferent to the

16   situation or consciously disregarded it, coverage is

17   excluded under the policy definition of occurrence

18   because damage is to be expected with a substantial

19   degree of probability."  What do I do with that?  You

20   know, they're dumping into the lagoon.  The lagoon is

21   leaking.  He says that's not an occurrence.

22             MR. PIROZZOLO:  I think you go to the policy

23   language.  And the policy says it covers repeated

24   exposure to conditions and that is what the contractual

25   obligation is.

1          THE COURT:  Is there anything -- any case law

2     or anything dealing with repeated exposure conditions as

3     distinguished from occurrence?

4          MR. PIROZZOLO:  I think the insurer is

5     occurrence including -- I don't know if I'm quoting it.

6     It's approximately this.  An occurrence including

7     continuous exposure to conditions.

8          THE COURT:  Well, was Judge Smalkin dealing

9     with the same policy?

10         MR. PIROZZOLO:  Maybe he wasn't dealing with

11     the same policy or maybe he was wrong.  But the policy

12     very plainly covers and defines occurrence as including

13     continuous exposure to conditions.  So, if we say the

14     leaking from the landfill into the swamp is the

15     occurrence,  that is a continuous exposure to

16     conditions.  And I would remind the Court there's some

17     secondary evidence that Liberty Mutual so interpreted

18     that because they have that brochure saying that if the

19     pollutant escapes and it goes into the river and it goes

20     downstream and it injures the cows and so on, that that

21     is continuous exposure to conditions.

22         THE COURT:  All right.

23         MR. PIROZZOLO:  The other point is that on the

24     duty to defend, the complaint is neutral as to how it

25     occurred, anyway.  The complaint doesn't say that it

1    occurred continuously.  It says that the complaint could

2    be read to say that A&A went to the site and dumped it

3    right into the swamp.  The complaint does not specify

4    how the pollution occurred, anyway.  So the duty to

5    defend -- in fact, what I was going to say to Mr.

6    Lepore's argument is that he really confuses the duty to

7    defend with the defense.  It was Liberty Mutual's duty

8    to make the arguments that Black & Decker's waste did

9    not go to the site to make the arguments, if there are

10    arguments, that there's insufficient evidence that A&A

11    brought the Black & Decker waste to the site.  That in

12    the course of providing a defense ourselves, we

13    discovered that.  It doesn't militate against Liberty

14    Mutual having a duty to defend.

15            THE COURT:  I don't disagree with that.

16    I guess I'm onboard on that.  I'm more bothered, I

17    think, by the occurrence dimension to this, which is

18    what do you have to present them with?  And you say the

19    plain vanilla complaints plus Mr. Hyatt's letter saying

20    you're within the heartland of these complaints.  That's

21    enough.

22            MR. PIROZZOLO:  There is the potential of

23    liability based on the complaints in the litigation along

24    with the invitation document that came to Black &

25    Decker.

1            THE COURT:  Okay.  Now, do you want to --

2            MR. PIROZZOLO:  And that's enough for them to

3      -- we go to extrinsic evidence only to the extent that

4      it helps the insurer, not to the extent that it helps

5      the insured.

6            THE COURT:  Well, some of the language says

7      that.  I guess I treat it a little bit differently which

8      is -- and it comes out, I suppose, the same way.  But it

9      is is there evidence from which a finder of fact could

10     find that there has taken place something for which

11     coverage would be provided?

12            MR. PIROZZOLO:  I think there is.

13            THE COURT:  I'd be very surprised if he said

14     it --

15            MR. PIROZZOLO:  It apparently resolves the

16     issue.

17            THE COURT:  No, it doesn't, but it -- well, it

18     would if you said no.  Okay.

19            Now, let me step back a bit on this to

20     deal with the question of the role of the kind of

21     Hazen/Zecco, what is called Hazen/Zecco.  I'm

22     sure that Judge O'Toole would like to be made equivalent

23     with the SJC on these issues.  But --

24            MR. PIROZZOLO:  Well, there again, I have some

25     disagreement with what Mr. Lepore says is uncontested.

1    First of all, this is characterized as an invitation.

2    Maybe we're dealing with southern hospitality.  This is

3    a letter that says you join this -- and it's a letter

4    from the Court.  Although it's transmitted by a

5    lawyer -- it's transmitted by a lawyer.  It's a lawyer

6    transmitting the court order.  And as the Court knows,

7    very often, a court order is transmitted through

8    counsel.  So, it must fairly be read as a court order

9    that says "join the settlement process or be named as a

10   party."  And that is a fairly coercive document saying

11   if you don't join, some unpleasant things are going to

12   occur.

13          Now, I believe -- I think it's quite clear --

14   that the <u>Bausch & Lomb</u> case decided by the Court of

15   Appeals in Maryland deals quite explicitly with this

16   kind of a situation.  In that case, the party accused of

17   pollution was not under any state order.  There was no

18   suit.  There was no administrative proceeding.  They

19   voluntarily complied with the need to clean up.  The

20   operative language appears in the second column on page

21   five of the opinion where it says "B & L's Director of

22   Services wish to cooperate with the state in cleaning up

23   the Diecraft pollution and, in so doing, avoid being

24   subjected to an administrative order to perform the

25   work."  And it then goes on to elaborate by saying that

1    "Bausch & Lomb's posture in its response to the Diecraft

2    pollution was one of uncontested compliance."  At no

3    time does it state that any neighboring land owners sue

4    Bausch & Lomb for money damages or injunctive relief,

5    nor did the state file administrative procedures against

6    Bausch & Lomb or any writ to clean up the Diecraft

7    facility.  At no time did the federal Environmental

8    Protection Agency ever send a PRP letter to Bausch &

9    Lomb designating it as a potentially responsible party

10   in regard to the pollution.

11         The trial court, in delivering its opinion in

12   that case said, "There is no question in my mind but

13   that the total circumstances constitute the sufficient

14   coerciveness and adversariousness of an administrative

15   body and a degree of definiteness which indicate that

16   this was, in fact, a suit, a demand for damages and

17   money to a certain extent that the State had the right

18   to require it be paid.  There was no question but that

19   they were going to require compliance and that Bausch &

20   Lomb did make that compliance.  Now, that finding of the

21   trial court was not contested on appeal.  It was the

22   trial court's opinion as reported in the appellate

23   decision, but it is not an issue raised on appeal.  The

24   parties appear to have accepted that.  And, therefore,

25   it does stand as authority in Maryland for the

1    proposition that circumstances certainly analogous to

2    this one and perhaps a little more distant from this one

3    where we have actually a communication from a court that

4    it was --

5              THE COURT:  Well, you've made it a

6    communication from a court.  I mean, Mr. Hyatt is

7    delivering a message, not quite the same as delivering

8    it from the court, but I recognize it as not an idle

9    form of correspondence.

10             MR. PIROZZOLO:  Right.  It's to be paid

11   attention to or consequences flow.  And the consequences

12   are either they're made a party or, even worse, they're

13   not made a party and they don't get an opportunity to

14   participate in the PRP proceeding.  They don't get an

15   opportunity to shape the record; they don't have an

16   opportunity to present their defenses; and they end up

17   exposed, after settlement, to liability from all the

18   unpaid amount that EPA can bring to the --

19             THE COURT:  Well, but let's look at the Zecco

20   letter.  I'm just trying to pull it out.  Zecco receives

21   a letter from Marane Oil Corporation.  Marane says that

22   Zecco caused a thousand-gallon sudden and accidental

23   release of petroleum products.  Marane says that it's

24   taking the necessary and appropriate environmental

25   response actions at the site and says that Zecco is a

1    potentially responsible party, directs them to Chapter

2    21(e), and then indicates that the letter is formal

3    notification under 4(e) which is -- 4(a), excuse me,

4    which is designed to encourage people to settle cases,

5    settle environmental liability suits without formal

6    litigation proceedings.  Now, isn't that more or less --

7    but on a grander scale -- what Mr. Hyatt's letter is?

8              MR. PIROZZOLO:  I think the fact that Mr.

9    Hyatt's letter transmits a court order makes it

10   substantially different from the Zecco.  Zecco is made a

11   private party proceeding.

12             THE COURT:  Well, there are court orders and

13   there are court orders.  This is a court order for

14   essentially the organizational litigation.

15             MR. PIROZZOLO:  And also saying that you'll be

16   made a party if you don't take the settlement.

17             THE COURT:  You can be made a party.

18             MR. PIROZZOLO:  In lieu of -- the letter says

19   "in lieu of being made a party" which fairly suggests

20   that if they don't participate, they're going to be made

21   a party.  I would say that it's much more like a summons

22   with an opportunity to participate in something.

23             THE COURT:  Well, I guess it's not -- I guess

24   it's whatever it is.  I mean, it's not a summons and

25   it's not an RSVP.

1          MR. PIROZZOLO:  But it does meet the standard

2    -- as is stated in the Bausch & Lomb case -- of

3    coerciveness, constitutes sufficient coerciveness and

4    adversariousness to make it the functional equivalent of

5    a suit.

6          I would point out, Your Honor, to this case we

7    haven't previously cited because it's a new case.  It

8    was Johnson Controls, a Wisconsin case.

9          THE COURT:  Hold on just a second.

10          MR. PIROZZOLO:  A Wisconsin case cited on July

11    11th of this year.

12          THE COURT:  A Wisconsin case?

13          MR. PIROZZOLO:  Yes, which reviews in great

14    detail this kind of situation and the policy involved.

15    It reverses an earlier Wisconsin case which applied a

16    very strict rule as to what constitutes --

17          THE COURT:  What's the cite for it?

18          MR. PIROZZOLO:  The cite is 665 NW.2d 257.

19    And it contains a very extensive discussion of the

20    policy behind considering a PRP letter to be the

21    functional equivalent of a suit and the rationale behind

22    that.  And if you take from that case -- I don't want to

23    burden the Court by reading quotations from it.  But if

24    we take the rationale of that case in terms of what

25    parties ought to be doing in this kind of unique

1    pollution type of environment and apply it to the BROS

2    situation, I think it argues that the BROS situation

3    fairly fits the functional equivalent of a suit.

4         THE COURT:  Well, I'll look at it.  It

5    obviously is not --

6         MR. PIROZZOLO:  The main thing -- and I

7    emphasize one point.  Because what you're dealing with

8    is what would flow from a conclusion that this was not a

9    functional equivalent of suit.  It would mean that in

10   order to get insurance coverage, a party would have to

11   avoid discussing settlement at all, refuse to discuss

12   settlement, and cause a case to be brought.  And this

13   case says, well, that doesn't make good sense.

14        THE COURT:  And that certainly is the policy

15   that a number of the cases have dealt with.  On the

16   other hand, inchoate diffuse and uncertain importunings

17   by private parties don't constitute a suit either, nor

18   in fact should they as a policy matter.  Because all

19   we're doing is increasing cost of insurance by doing

20   that everytime somebody sends a threat across the --

21        MR. PIROZZOLO:  But that's not anybody.  We

22   have here in this case an ongoing proceeding --

23        THE COURT:  I understand.  I understand the

24   distinction.  And I think we've exhausted the discussion

25   with respect to that.

54

1          MR. PIROZZOLO:   This is deliberate

2     non-compliance for the purpose of obtaining a defense

3     from an insurer.   It's completely contrary to public

4     policy.   And that would be what would flow from that.

5     The other thing I would emphasize a little bit -- and

6     it's in our brief and it's in the appendix -- is that

7     Liberty Mutual's own statement about this -- and it says

8     "the most powerful law regulating this" -- this is a

9     Liberty Mutual document.   It is the EPA.   Several

10    federal laws on how the EPA with widespread authority --

11    and it goes through the tremendous power of the EPA.

12    And then it advises that "litigation has been lengthy,

13    expensive, and generally unsuccessful from the

14    standpoint of the generators.   It is usually in the best

15    interest of the generators, therefore, to unite while

16    cooperating with the EPA in negotiating an agreement for

17    a remedial action plan and a dump site."   Now, this is

18    exactly what's involved here, is the generators are

19    being called together to unite to work out a settlement

20    in connection with the claim for remediation of the dump

21    site.   And that's what Liberty Mutual itself says the

22    generators should be doing.

23          So, in this case, to stand on the argument

24    that there must be a formal suit is really arguing for

25    something that's contrary to its own advice, let alone

1    public policy.

2         THE COURT:  Well, I understand the -- I think

3    I understand those issues.

4         I do want to move on, however, to the

5    relatively more modest, but I think somewhat

6    distinguishable, circumstances unless there's something

7    else that people want to say about BROS --

8         MR. PIROZZOLO:  No.

9         THE COURT:  -- with respect to Burke's and

10   Huth there.  Is there anything else that we haven't

11   touched on in discussing --

12        MR. PIROZZOLO:  I think that's all in the

13   papers, Your Honor.  And our view is very, very clear.

14   There are no arguments on those.

15        THE COURT:  Okay.  Let me just hear such as

16   you have.

17        MR. LEPORE:  I didn't know we were going to

18   argue Burke's, Your Honor --

19        THE COURT:  Okay.  Then I will treat it --

20        MR. LEPORE:  -- I mean, Jack Huth.  And I am

21   not prepared to do that.

22        THE COURT:  Okay.  Well, then --

23        MR. LEPORE:  I thought that that was going to

24   be a tier-2 site that we were going to hold in abeyance.

25        THE COURT:  Well, I'm prepared for both of

1    them, but I am not going to --

2                MR. LEPORE:  Okay.  Thank you, Your Honor.

3                THE COURT:  -- force that issue.

4                Now, as I understand it, then, I will be

5    getting two weeks --

6                MR. LEPORE:  Yes.

7                THE COURT:  -- from today materials.  And I

8    think they should be cross -- you understand the issues,

9    so they should be cross-filed --

10               MR. LEPORE:  Yes.

11               THE COURT:  -- on the excess policy that is

12   said to exist from '70 to '73 --

13               MR. LEPORE:  Yes.

14               THE COURT:  -- and its implications here,

15   and particularly its implications of duty to defend.

16   Because duty to defend is what I'm focusing on here.

17   In an effort to find if there are any places where summary

18   judgment can be granted, I'm focusing on the duty to

19   defend, which seems to me to be the broader set of

20   responsibilities that Liberty has.  So that would be --

21   why don't we say September 12th?  That's generously

22   offering you two more days to deal with that.  Okay.

23               Then I will intend to take up the Beverly

24   case sometime toward the end of October.

25               MR. LEPORE:  Yes.

1      THE COURT:  If I were to say -- your first

2  briefing in Beverly is September 5th?

3      MR. LEPORE:  September 5, yes.

4              OFF THE RECORD

5      THE COURT:  I think I'm going to have make it

6  November 5th at 2:30 to deal with Beverly -- you know,

7  best laid plans and so on.  I think that by that time or

8  shortly thereafter, it will be pretty clear to me what

9  the broad outlines of things that are in dispute are.

10  And then we can focus the question of how to deal with

11  trial for these.  Because it's clear to me that there

12  are tryable issues in various aspects of this case and

13  I've got to figure out exactly how to deal with those.

14      MR. PIROZZOLO:  Your Honor, just in terms of

15  long-range scheduling --

16      THE COURT:  Right.

17      MR. PIROZZOLO:  I'd just report to the Court

18  that I now have a fairly lengthy trial scheduled to

19  begin on November 24th before Judge Zobel.  So that I

20  just will be engaged, I believe, mornings before her.

21      THE COURT:  What is the -- we set a time, I

22  though, in the beginning of the year for --

23      MR. LEPORE:  January 5.

24      MR. PIROZZOLO:  January 5.  We're not going to

25  that try the -- that trial will not run into the trial,

1    Your Honor, that was set.

2              THE COURT:  Okay.

3              MR. PIROZZOLO:  But in terms of the

4    preliminary pretrial memorandum, pretrial hearing

5    conference and so on, I think I'm only available, while

6    that trial is going on, in the afternoon.

7              THE COURT:  Okay.

8              MR. PIROZZOLO:  And I certainly would like to

9    get as much business as possible done before that

10   starts.

11             THE COURT:  Sure.  Well, I think we probably

12   will be in a position to start talking this through by

13   -- I'd like to say mid-October.  Things will be in

14   pretty good -- I think in pretty shape for me what I

15   can try reasonably and what would simply be a kind of

16   dog's breakfast of a trial and, consequently, not

17   comprehensible to a single jury.  So, I may be trying to

18   parse it up in some ways do deal with it.

19             Now, you had a matter in Florida, was it?

20             MR. LEPORE:  Houston, Your Honor.  It's

21   scheduled still for January 5.  But there is actually a

22   status conference in three weeks and I'll know much

23   better then, Your Honor.

24             THE COURT:  All right.  But I still have that

25   time blocked out.

1          MR. LEPORE:  Yes.

2          THE COURT:  Your Honor, may I -- and I don't

3     want to revisit anything, but I just would ask.  Your

4     Honor just mentioned something about that you're going

5     to be focusing on the duty to defend.  And I understand

6     perfectly well why you want to do that.  Under Maryland

7     law, I would just ask you to take a look at the

8     Baltimore Gas and Electric case, Your Honor, which

9     is 113 Md.App 540.

10          THE COURT:  Hold on a second.

11          MR. LEPORE:  And I think I gave you that

12     earlier --

13          THE COURT:  This is the Northern Insurance v.

14     Baltimore?

15          MR. LEPORE:  No.  This is Baltimore Gas v.

16     Commercial Union.  And the --

17          THE COURT:  Give me the cite again.

18          MR. LEPORE:  The second cite is 688A.2d --

19          THE COURT:  688A --

20          MR. LEPORE:  -- 2d 496.  And it's a Maryland

21     special appellate decision of 1997.  And all it stands

22     for -- I'm not going to get into argument about it -- is

23     that Maryland recognizes that an insurer's duty to

24     defend can terminate at some point.  It's not a forever

25     thing.  And, so, when you're dealing with that duty to