# Exhibit E.

PRIVILEGED AND CONFIDENTIAL
JOINT DEFENSE PRIVILEGE
SETTLEMENT NEGOTIATIONS
ATTORNEY WORK PRODUCT

**MEMORANDUM**

TO:        BROS Settlement Process Participants

FROM:      The BROS Settlement Process Committee

DATED:     September 10, 1993

RE:        Proposed Findings of the BROS Settlement Process
           Committee

In accordance with the Case Management Order and the BROS
Settlement Process Protocol, the BROS Settlement Process Committee
for the past several months, has spent many hours reviewing
participant's informal discovery submissions and held numerous
lengthy meetings at which the evidence of each participant's nexus
to the BROS site was discussed.  This process has two objectives:
1) the preparation of an encoded volume-in list for use in the
mediation with the United States and the State of New Jersey; and
2) the preparation of an apportionment report which divides up
private party shares of the site.  The process must be completed
before either one of the objectives can be attained, and we are now
facing a mediator-imposed deadline of October 15, 1993 to have the
volume-in list prepared for mediation.  Therefore, **PLEASE
IMMEDIATELY REVIEW THIS MEMORANDUM AND YOUR COMPANY SPECIFIC
INFORMATION SINCE ANY APPEALS MUST BE RECEIVED BY SEPTEMBER 27,
1993**.

The purposes of this memo are:  (1) to update you on the
status of the BROS Settlement Committee's efforts; (2) to review
the general process by which the BROS Settlement Process Committee
has reached its preliminary determinations regarding each
participant's materials into the BROS site; (3) to provide you with
a summary of the specific determination made by the Committee as to
your client's or company's material into the site; and (4) to
advise you of the procedure by which any participant may appeal the
Committee's determination.  **Please note that this memo and its
enclosures are subject to the strict confidentiality provisions of
the BROS Settlement Process Protocol.**

---
¹        The governments will not be given any of the names of the
         non-litigant process participants.  However, the
         mediators have requested access to that information and
         absent objection from the participants it will be
         provided.

CONFIDENTIAL INFORMATION
PRIV18-03173

2

The Settlement Process Committee has made preliminary determinations as to the material sent to the BROS site by each participant.  At this point, the Committee is circulating its findings for review by the participants as a preliminary step to the preparation of both a volume-in list for the mediation and an apportionment report for use exclusively by the private parties.

Solely for purposes of a possible eventual allocation among the private parties, the Committee may recommend certain weighting factors and adjustment considerations for categories of materials/nexus, as described in detail below.  These adjustments are intended to take into account various equitable considerations in attempting to assign relative shares of liability among the participants for the private party share only of remediation costs.

## GENERAL PROCEDURES AND PRINCIPLES

In making its determinations, the Committee followed certain general procedures and principles.  With regard to the Committee's procedures:

- Each participant was required to provide sworn responses to the same set of informal interrogatories based upon a "reasonable investigation".

- Folders were compiled by Pitney Hardin, as common counsel, consisting of the informal responses, any formal discovery responses, any witness interviews or deposition testimony relating to the participant and any BROS PRP Group information gathered regarding the participant.

- After screening the Committee members for conflicts, each folder was assigned to and reviewed independently by two Committee members.  Where the reviewers felt that additional information was needed, participants were requested to supplement their submissions.  The reviewers then conferred and consolidated their findings into a "composite review" form for each participant.

- The composite reviews were then presented to the Committee as a whole for discussion.  Where the Committee felt that additional information was needed, participants again were requested to supplement their responses.  When the Committee felt that it had received information sufficient to make a proper evaluation, the Committee met, considered the evidence in its possession and reached its preliminary conclusions as to each participant.

Given the unsurprisingly imperfect nature of available evidence in a matter as complex and remote in time as the BROS site, it was necessary for the Committee to develop certain general

CONFIDENTIAL INFORMATION
PRIV18-03174

3

principles in order to have a consistent approach in determining when and how to credit various evidence of nexus to BROS. Among the principles followed:

- As an initial matter, "rules" were established for determining whether and to what extent transactions with various private material haulers (Jack Wolf, PITCCO, and GRIGCO) would be deemed to have been taken to the BROS site. These "rules", which were distributed to all participants in an earlier mailing, are restated in the enclosures for your convenience.

- An average was used wherever a witness' recollection was imprecise (e.g., assuming 2.5 loads where a witness testified to making 2 or 3 trips).

- It was assumed that a typical tank truck holds 5,000 gallons and that a typical drum holds 55 gallons, unless specific evidence indicated otherwise.

- A course of dealing was presumed where there was deemed to be sufficient evidence indicating an ongoing relationship, even though information for each transaction was not present.

- Extrapolations and estimates were used to fill gaps in information where deemed appropriate.

- Categories of private party materials into the BROS site were developed and defined as follows:

    - **Baseline** - consists of material sent to the site where there is reason to believe that it was re-refined or blended into product. The evidence indicates that all wastes from these processes were disposed of at the site.

    - **Storage** - consists of material that was stored and removed from the site.

    - **Disposal** - consists of material sent to the site where there is reason to believe that it was placed directly in the lagoon or otherwise disposed of at the site.

    - **PCBs** - consists of material that was processed or disposed where there is reason to believe that the material contained PCBs.

The preliminary and approximate total gross private party participant volume of material into the BROS site is 13,000,000 gallons, of which about 60% is storage, 20% baseline and 20% disposal with a very small amount of PCBs.

CONFIDENTIAL INFORMATION
PRIV18-03175

4

For purposes of weighting these categories in order to account for their differing potential contributions to the site, the following weighting factors are being considered by the Committee. In as much as the Committee has not reached a consensus as to a recommendation, these factors are offered for your comment:

| | |
|---|---|
| Baseline | 1.0x |
| Storage | .2x |
| Disposal | 1.3x |
| PCB Disposal | 2.0x |

The Committee believes that further adjustments in these weighting factors may be necessary and appropriate in individual cases for various factors, such as:

- Virgin petroleum storage;

- Storage of product (rather than other material);

- Evidence of lack of spillage or leakage in storing material;

- Very low concentration/low toxicity type material (i.e., only minimally hazardous substances)

The Committee solicits your comments on these weighting and adjustment factors in general and as applied to your specific situation.

SPECIFIC FINDINGS

The enclosed summary provides the preliminary findings of the Process Committee as to the amount, type and disposition of material attributed to your company which it is believed was sent to the BROS site. Where an explanation beyond the general procedures and principles noted above is indicated, an effort has been made to further explain the Committee's rationale. Anyone wishing to review their file should contact Jeffrey Pollock, Esq. at 201-966-8199 to make appropriate arrangements.

Participants whose representatives serve on the Committee, as with all other participants, are not bound by this report or any ultimate allocation.

PROCEDURE FOR APPEALS

These findings are subject to your right to present an appeal to the Committee if you wish to challenge the determination made

CONFIDENTIAL INFORMATION
PRIV18-03176

5

for your company.  The appeal can be made in writing or in person
or both.  All writings which you wish the Committee to consider
<u>must be received by</u> no later than <u>Monday, September 27, 1993</u>.  The
Committee has reserved the dates of September 28, 29 and October 1
to meet in Philadelphia to hear appeals.  Those wishing to present
their position in person should contact Jeff Pollock not later than
<u>Wednesday, September 22</u> to reserve a date.  **No appeal will be
considered unless it is received in writing by September 27 or
presented in person by no later than October 1.**

Participants wishing to appeal are strongly urged to
limit any written comments to <u>two pages</u> and to limit any oral
presentation to <u>20 minutes</u>.  As with all other Committee meetings,
the appeals are open to any participant wishing to attend.  As a
reminder, the Settlement Process Protocol agreement provides that
the allocation determination of the Process Committee will not be
altered unless the appealing participant demonstrates that the
determination was "prepared arbitrarily, capriciously or
unreasonably or is based upon clearly erroneous information."  As
always, the success of the Settlement Process depends upon the good
faith efforts of the participants to try to reach reasonable
accommodations in order to avoid the expense of formal joinder,
discovery and litigation.

CONFIDENTIAL INFORMATION
PRIV18-03177

## Black & Decker

Black & Decker was assigned a preliminary volume of <u>133,714 gallons</u> of a mixture of lube oil and cutting oil in the <u>baseline</u> category. This volume is based on the assumption that for one year A&A disposed of wastes removed from Black & Decker at the Site. The volume was calculated by taking the records provided by Black & Decker showing 78,000·gallons removed by A&A during a seven month period of time in 1973 and extrapolating that volume over a one year period. The Committee has assumed that Black & Decker continued to use A&A for waste removal at a constant rate from 1/73 until 4/80, based on the recollection of B&D employees of purchase orders issued to A&A in the 1970s and early 1980s with no claim by the company that it used a different hauler during this time period. The Committee only allocated volume to Black & Decker for one year of this course of dealing with A&A, 1979, and based on firm information that A&A used the Site in 1979.

Volume for years other than 1979 have not yet been allocated. In its 104 response, A&A stated that in the mid-1960s it took one or two loads a week to the Site. A&A appears in the Regal Bankruptcy records as a supplier of waste oil to the Site. In his deposition, Richard Smith testifies that he saw "A&N" trucks at the Site regularly in the early 1970s and saw small trucks unloading directly into the lagoon. We have excerpts from 1979 BROS ledger sheets showing four 6000 gallon deliveries of oil by A&A to the Site in July of that year. In his deposition, Armen DeCola identified Sam Goldstein (the owner of A&A) as a waste oil dealer (Tr. 47) and recalled A&A selling oil to Regal (Tr. 250) In his interview, Armen DeCola stated that he recalled A&A using the Site throughout the Regal and BROS era. In his interview, Chamberlain stated that A&A brought 5000 gallons a month to the Site in the BROS era. Finally, Frank Maule, an A&A employee, stated in an interview that the sole market for the oil that A&A collected was a site located right over the Delaware Bridge operated by two guys with Jewish sounding names. When asked if he recalled the Borrellis, he said yes. According to Maule, Tony Alestra used to come and pick up A&A waste oil and take it back to BROS. Tony Alestra is scheduled to be deposed on September 18, 1993. In addition, A&A is a defendant in the Rollins case and has been served with discovery requesting information about the sources of its oil and its use of the Site. We expect to have additional information about A&A shortly.

If the newly developed evidence further supports the contention that A&A used the Site virtually exclusively throughout the 1970s and into 1980, Black & Decker may be assigned a volume of 969,428 gallons in the baseline category based on its use of A&A from 1/73 until 4/80 (when the Site closed) and extrapolating the 78,000 gallons known to be picked up in a seven month period in 1973 over 7.25 years.

CONFIDENTIAL INFORMATION
PRIV18-03178

## Grigco Summary

Began hauling to Site in 6/60. The date is based on Grigsby's deposition testimony that he used the Site in the late 1950s, definitely before his daughter was born in 1962, and Chamberlain's deposition testimony that private haulers did not come to the Site until a month or so after he began work in April 1960.

Ceased hauling to the Site in July 1965. This date is based on (1) the 90 day preference period for bankruptcy actions because Grigsby does not appear as a creditor in the Regal Bankruptcy, and (2) Grigsby's deposition testimony that he did not lose any money in the Regal bankruptcy because he ceased using the Site prior to the bankruptcy. (Note: Grigsby was unclear on dates and also testified that he continued to use the Site into the 1970s before he opened Sharptown in 5/73.)

No shipments between 7/65 and 11/75. Based on operation of Sharptown from 5/73 until 5/75 and Grigsby's testimony that he processed and sold his own oil while Sharptown was in operation and after Sharptown closed in 5/75, he sold unprocessed oil to Almo for six months before he learned that BROS was operating.

Exclusive use of Site between 11/75 and 4/11/80. Based on recollection of Grigco drivers Carroll McGinnis, Harvey Snow and Richard Cochran of material going to BROS or "New Jersey" where a person named "Armand" was in charge post-Sharptown and documents from Region III that indicate that Grigsby did not send material to Berks from 1975 until 4/15/80, after BROS closed.

All fuel oil to BROS. Based on testimony that Berks did not take fuel oil. Fifty-fifty split of lube oil between Berks and BROS for the pre-Sharptown era, based on Grigsby's testimony.

## PITCCO Summary

Volume in to BROS between 1975 and 1980 is documented. Tank cleanings by PITCCO are documented. To match tank cleanings with BROS shipments, "Pitcco rules" were established.

Based on average holding period of 10 days, "gap periods" between shipments by Pitcco to BROS were established. Tank cleanings that occurred in the gap periods are assumed to have gone somewhere other than BROS. Tank cleanings not in a gap period are assumed to have gone to BROS.

CONFIDENTIAL INFORMATION
PRIV18-03179


"Gap Periods"

| | | |
|---|---|---|
| 12/10/75 | to | 02/09/76 |
| 09/27/76 | to | 02/15/78 |
| 05/22/78 | to | 07/20/78 |
| 08/01/78 | to | 11/24/78 |
| 12/13/78 | to | 03/03/79 |
| 04/26/79 | to | 09/24/79 |
| POST | 01/28/80 | |
| PRE | 02/01/75 | |

If no tank size is given, and absent other information, assume a 5000 gallon tank.

If no waste volume is given, assume 12% of tank size based on Ken Prickett's statement that a typical 5000 gallon tank would contain on average 600 gallons of sludge.

## Jack Wolf Summary

In his interview Jack Wolf stated that all oil he collected went to the Site during his 1/1/79 to 4/30/80 exclusive use agreement with BROS. We have Jack Wolf invoices. The volume is all based on documents.

## MARS Summary

MARS cleaned tanks and oil spills at the Site. They also leased tanks there. All allocated MARS volume is based on documents. Currently, it is unclear whether or not all waste removed by MARS from individual companies went to the Site. Only wastes manifested to BROS have been allocated to Participants thus far. Currently, it is unclear whether or not MARS disposed of material at the Site, sold material to BROS for processing, or stored material there. Accordingly, waste manifested to BROS preliminarily has been placed in the "baseline" category. There are manifests showing shipments by MARS out of BROS to American Recovery, but it unclear whether or not those shipments are of material generated from the cleaning of tanks and spills by MARS at the Site. MARS is a defendant in the Rollins case. MARS recently agreed to provide the

- 2 -

CONFIDENTIAL INFORMATION
PRIV18-03180

Rollins plaintiffs with information.  Based on the this information, additional MARS volume may be allocated.

- 3 -

CONFIDENTIAL INFORMATION
PRIV18-03181

## BROS SETTLEMENT PROCESS -- COMPOSITE EVALUATION FORM

1.    **PRP:**  Black & Decker ("B&D")

2.    **SITES INVESTIGATED:**  626 Hanover Pike
                    Hampstead, MD  21074

3.    **TRANSACTIONS (date, volume, nature, and disposition):**

   a.  **Acknowledged:**  Documents submitted by B&D from the Berks case listing transactions by A & A Waste Oil for the period from 3/73 thru 9/73 show pickups by A & A from B&D every 7-10 days of 2,000 gals.  According to B&D, the material consisted of a waste oil and water mixture, which included cutting oils used to lubricate the cutting of metals for the manufacture of gears and steel parts and lubricating oils used in the cutting machines.  The key B&D employee responsible for waste oil disposal is deceased.  B&D employees recall issuing purchase orders to A & A at different times in the 1970s and early 1980s but do not recall the exact years in which the company used A & A or whether that use continued uninterrupted for any period of time.

   Transaction records show pickups by A & A from B&D as follows:

|      | DATE    | AMOUNT                  |
|------|---------|-------------------------|
| 1)   | 3/6/73  | ? (assume 2,000 gals.)  |
| 2)   | 3/12/73 | 2,000 gals.             |
| 3)   | 3/16/73 | "                       |
| 4)   | 3/21/73 | "                       |
| 5)   | 3/26/73 | "                       |
| 6)   | 3/30/73 | "                       |
| 7)   | 4/3/73  | "                       |
| 8)   | 4/7/73  | "                       |
| 9)   | 4/14/73 | "                       |
| 10)  | 4/21/73 | "                       |
| 11)  | 4/27/73 | "                       |
| 12)  | 5/4/73  | "                       |
| 13)  | 5/10/73 | "                       |

CONFIDENTIAL INFORMATION
PRIV18-03182

14)  5/15/73                          2,000 gals.
15)  5/21/73                             "
16)  5/29/73                             "
17)  6/1/73                              "
18)  6/6/73                              "
19)  6/11/73                             "
20)  6/18/73                             "
21)  6/22/73                             "
22)  7/3/73                              "
23)  7/10/73                          ? (assume 2,000)
24)  7/13/73                          2,000 gals.
25)  7/20/73                          ? (assume 2,000)
26)  7/26/73                          2,000 gals.
27)  8/1/73                              "
28)  8/3/73                           ? (partially illeg.)
29)  8/10/73                          ? (assume 2,000)
30)  8/17/73                             "
31)  8/23/73                             "
32)  8/28/73                             "
33)  9/1/73                              "
34)  9/7/73                           2,000 gals.
35)  9/11/73                             "
36)  9/18/73                             "
37)  9/21/73                             "
38)  9/25/73                             "
39)  9/29/73                             "

2

CONFIDENTIAL INFORMATION
PRIV18-03183

Based on these transactions, which total 78,000 gals. in a 7-month period, and extrapolating for 7.25 years (from 1/73 – 3/80)= 969,428 gals.

SUBTOTAL: 969,428 gals.

b. Disputed: B&D disputes any nexus between A & A and the BROS site.

c. Combined Total: 969,428 gals.

4.    TRANSPORTER/DRIVERS:  A & A Waste Oil

5.    OTHER EVIDENCE OF NEXUS:  B&D's interviews of current and former employees confirms generally the use of A & A over a wide time frame, with the only uncertainty being whether that use was consistent and continuous throughout the suspected time period.

6.    FOLLOW-UPS/INADEQUACIES:  Unclear whether B&D used anyone other than A & A for removal of waste oils -- no information submitted by B&D on this.  Also unclear when B&D began using A & A and whether this would coincide with the period that the Hampstead plant began operations.  If so, need to obtain date that Hampstead plant started up.  Also, is there any reason that B&D would not have needed waste removal service of the type and/or frequency reflected by the A & A ledger throughout the 1970s (e.g., was the Hampstead plant closed or production significantly reduced (or increased) during any of the relevant time period.

7.    OTHER COMMENTS:  Allocation assumes A & A only began removing waste in 1973 and also assumes a consistent frequency and volume of removal throughout.  If B&D has any information to suggest that these assumptions are inappropriate, it should be provided to the Committee.

B&D has no documents for the relevant time period and asserts that it is unable to calculate the total volume of waste removed by A & A.

3

CONFIDENTIAL INFORMATION
PRIV18-03184

8.  **ISSUES TO BE RESOLVED:**  A & A's nexus to the BROS site, given B&D's argument that A & A went to sites other than BROS.

9.  **CONCLUSIONS:**  Assess 969,428 gals., baseline, subject to any further information from B&D suggesting another approach.

10.  **REVIEWERS:**  L. Serlin

4

CONFIDENTIAL INFORMATION
PRIV18-03185

# Exhibit F.



Alexander & Alexander Inc.
111 Market Place
Baltimore, Maryland 21202
Telephone 410 547-2800
FAX 410 547-2914

Writer's Direct Dial:
(410)547-2815

March 3, 1994

<u>Certified Mail/Return Receipt Requested</u>

THE INTERESTED UNDERWRITERS (per attached list)

RE:    Insured:      Black & Decker
       Claimant:     USEPA
       Location:     Bridgeport Rental and Oil Services Site
                     Logan Township, NJ

Ladies/ Gentlemen:

Enclosed is documentation received from the insured on the above matter.  The insured has requested that we supply this information to you as notice of this loss under your respective policies.  Please acknowledge receipt of this material in writing to our office.

Black & Decker hereby demands that you provide Black & Decker a defense in this action and that you pay and/or indemnify Black & Decker for all damages, costs and expenses incurred by Black & Decker arising out of this matter.

For prompt and proper response to this loss, defense counsel has been assigned by the insured.  Acknowledgment of receipt of this loss should also be directed to assigned counsel.

If specific questions arise on this loss, please direct inquiries to the undersigned.  By copy of this letter to the insured, I ask that this office be advised of all significant developments.

Thank you for your attention.

Respectfully,

Michael D. Margiotta, AVP

Enclosure     1) Case Summary
              2) Litigation Documents

PRIVILEGED AND CONFIDENTIAL B&D MA LM          0035475



**Alexander & Alexander Inc.**
111 Market Place
Baltimore, Maryland 21202
Telephone 410 547-2800
FAX 410 547-2914

**BLACK & DECKER**
**PRIMARY ENVIRONMENTAL UNDERWRITERS**

March 3, 1994
Claimant: USEPA

cc:  Ms. Kim Olson                         Ms. Peri N. Mahaley
     Liberty Mutual                        Swidler & Berlin
     100 Main Street                       3000 K Street, N.W.
     P.O. Box 1525                         Suite 300
     Dover, NH  03822                      Washington, DC
                                                    20007-5116

     Mr. Matt Refsin
     Home Insurance Company
     One Independence Mall
     Philadelphia, PA  19106

     Twin City Fire Insurance
     c/o ITT Hartford Insurance Group
     Coporate Claim Headquarters
     Hartford Plaza
     Hartford, CT    06115

     Mendes & Mount
     750 7th Avenue
     New York, NY    10019

     Mr. Adrian White
     Price Forbes Limited
     Victoria House
     Queens Road
     Norwich, NR1 3QQ England

     Ms. Linda H. Biagioni
     Black & Decker
     701 East Joppa Road (TW173)
     Towson, MD  21286



# Exhibit G.

**PRIVILEGED AND CONFIDENTIAL
SETTLEMENT PRIVILEGE
JOINT DEFENSE PRIVILEGE AND
ATTORNEY WORK PRODUCT**

August 19, 1994

<u>Via Fax and Regular Mail</u>
Barry L. Malter, Esq.
Swidler & Berlin
300 K Street, N.W.
Suite 300
Washington, D.C.  20007-5116

RE:  BROS Settlement Process Committee's Review and
<u>Analysis of Black and Decker Volume</u>

Dear Barry:

The BROS Settlement Process Committee has further reviewed and considered the information pertaining to Black & Decker in light of all of the arguments raised by both oral and written appeals.  In so doing, the Committee has attempted to work within the framework of analysis presented by Black & Decker while at the same time giving credence to all of the evidence and information available and applying the same general principles as have been developed in determining other parties' waste-in volume.

Based upon the foregoing, Black & Decker has been assigned <u>136,012</u> gallons in the baseline category.  This volume is derived by calculating a "market share" for Black & Decker of 7.94% of the waste oil sent offsite by A & A and applying that market share to 1,713,000 gallons of waste oil calculated to have been sent by A & A to the BROS site during the period between 3/73 – 7/79.

<u>Calculation of Market Share</u>

Black & Decker's market share was determined by the Committee on the basis of comparing the net recoverable oil from Black & Decker with the net amount of recovered oil leaving the A & A facility, as reflected by the Berks ledger sheets from the late 1960s and early 1970s.  The average monthly gross volume of material from Black & Decker was assumed to be 9,833

CONFIDENTIAL INFORMATION
PRIV18-03190

2

gallons/month[1].  Assuming a 10% deduction for road spraying and a 65% deduction for water settling out at the A & A facility, the net amount of oil recovered and available to be sent off-site on a monthly basis is 3,097 gallons.  The Committee's review of the Berks ledgers indicates consistent use of that site during the period reported, with the average volume being approximately 39,000 gallons/month.[2]  Comparing the net Black & Decker waste oil volume with the 39,000 gallons of net oil believed to be all of the A & A shipments offsite for that period yields a "market share" of 7.94%.[3]

Calculation of Total Volume from A & A to BROS

In calculating the volume of waste oil assumed to have been sent to BROS by A & A during the period that Black & Decker was a customer of A & A, the Committee assumed the following:

|            |                 |                      |
|------------|-----------------|----------------------|
| 3/73 - 3/74 | 292,500 gals.   | (13 mo. @ 22,500/mo.) |
| 6/74 - 11/74 | 135,000 gals.  | ( 6 mo. @ 22,500/mo.) |
| 1/75 - 1/78 | 832,500 gals.   | (37 mo. @ 22,500/mo.) |
| 2/78 - 1/79 | 429,000 gals.   | (11 mo. @ 39,000/mo.) |
| 7/79       | 24,000 gals.    |                      |
| Total:     | 1,713,000 gals. |                      |

The 22,500 gal./mo. figure is an average of 6,000 gal./mo. (based on the DeCola interview, using 6,000 gals. based on evidence from the Kell ledger, the A & A 104(e) response and Alestra's testimony that each shipment was at least that amount) and 39,000 gal./mo., which the Berks ledgers and Alestra's testimony indicate was a typical amount sent either to Berks or

---

[1]    This is based on an average of 11,000 gallons/month derived from the 1973 A & A document and the 8,667 gallons/month derived from the 1982 Maryland Department of Health report reflecting a pick-up of 2,000 gallons/week.

[2]    The 39,000 gallons/month observed in the Berks ledgers is consistent with the 39,000 gallons/month calculated on the basis of Tony Alestra's testimony with respect to the late 1970s, suggesting that each period reflects a time of exclusive use by A & A of the respective sites.

[3]    The Committee recognizes that this is only one of several possible approaches to determining a market share; however, based upon the imperfect nature of the information available, it was felt that this analysis required the least degree of reliance on either unknowable or questionable data.  Moreover, it was felt that the market share calculated, if not "correct", is at least a reasonable estimate.

CONFIDENTIAL INFORMATION
PRIV18-03191

3

BROS during portions of the early and late 1970s.[4]

The periods for which volume was assigned gives credence to Black & Decker's arguments. March 1973 was used as the starting date based upon Black & Decker's assertion in reliance on the A & A documents (although those records clearly are incomplete and, when combined with Goldstein's testimony in 1982 that Black & Decker had been a customer for 10 years, could easily support an earlier start date). Also, no volume was assigned from A & A to BROS for April 1974 and May 1974 since the Berks ledgers show shipments received from A & A, nor was any volume assigned for December 1974, despite there being only two documented shipments into Berks in that month. Further, no volume was assigned for the period of 2/79 - 6/79, in accordance with Black & Decker's arguments based upon the Kell affidavit, notwithstanding the Committee's reservations regarding the reliability of the views expressed in that affidavit.

## Calculation of Black & Decker's Assigned Volume

The Black & Decker volume is that portion of the total volume from A & A into BROS represented by Black & Decker's market share of net recoverable oil sent offsite by A & A:

1,713,000 gallons x .0794 = 136,012 gallons.

The Committee appreciates Black & Decker's efforts and patience in what has been a difficult process for all of us. While the Committee does not intend to consider this issue further, I would be happy to answer any questions you may have concerning the foregoing analysis.

Sincerely,

Lawrence A. Serlin

For the BROS Settlement Process Committee

---

[4]    It is apparent that the DeCola estimate for the frequency of A & A shipments into BROS is unreliable for the period represented since it is contradicted by Alestra's testimony, the David Chamberlain interview, the A & A 104(e) response and the Kell ledger. Consistent with the principles previously applied by the Committee with regard to other parties, when an amount is unknown and there is a low-end basis and a high-end basis for calculating an estimate, the average of the two is used.

CONFIDENTIAL INFORMATION
PRIV18-03192

4

cc:  Settlement Process Committee Members
     Francis B. Stella, Esq.

CONFIDENTIAL INFORMATION
**PRIV18-03193**