# Exhibit I.

*Dave/Kim
cut your own criteria
Carl
1/3*

ENVIRONMENTAL DEPARTMENT
December 8, 1994

ENVIRONMENTAL DEPARTMENT
Carl Brigada

RE:   USEPA (BROS) - BLACK & DECKER MANUFACTURING CO.
      FILE NUMBER:   P033-162135-01

PURPOSE:

At your earliest convenience I wish to discuss with you our position
concerning defense and indemnity for the above referenced claim.   This
memo outlines the salient issues in terms of the fact pattern and legal
review of applicable policies.

BACKGROUND:

Please refer to Kim Olson's attached memo, dated October 12, 1994, for
greater detail.   In essence, Black & Decker's claim for coverage arises from
its voluntary payment and assumption of obligation by joining the Bros
Settlement Process Committee ("SPC").   The policyholder joined this group
following an invitation, dated December 17, 1992, by private party
litigants in the now consolidated actions: Rollins Environmental Services,
Inc. vs. United States, et al and United States vs. Allied Signal, Inc., et al.
Please note that Black & Decker is not a named party in either action.
Invitations were extended to potential third party defendants, such as
Black and Decker, to join in a settlement process through allocation of
liability in order to avoid third party litigation.

Through informal discovery, the SPC has assembled documents that
purportedly allocates 136,000 gallons of waste to Black & Decker.   Despite
our policyholder's objections, the committee stated, after their third
appeal, that for purposes of the settlement process this figure is final.   The
SPC estimates that policyholder's exposure is in the range of $700,000 to
$1,000,000.   Black & Decker has evidently not decided yet whether it will
participate at these levels.

XXX-160

PRIVILEGED AND CONFIDENTIAL B&D MA LM          0035454

Page 2

Black & Decker's efforts to locate records concerning their relationship with the transporter, A&A Waste Oil Company ("A&A"), has been unfruitful. However, during interviews with former employees at policyholder's Hampstead, Maryland facility, the insured learned that they had indeed used A&A during the 1970s and early 1980s to haul away waste oil (cutting oils, lubricants, and crankcase oil). Policyholder's relationship with A&A is further evidenced by A&A log entries indicating pickups at Black & Decker from March 5, 1973 through September 29, 1973. Black & Decker has vehemently denied that its waste oil ended up at the Bros site, referring to documents stating that A&A's waste shipment were directed to either Oil Recovery, Inc. in Clayton, New Jersey or the Berks site in Pennsylvania. However, based on deposition testimony and ledger card entries, it would appear that, at least in 1979, A&A did haul waste to the Bros site.

## COVERAGE:

Please refer to Kim's memo dated October 12, 1994 indicating confirmed CGL policies issued July 1, 1970 through July 1, 1979. The policies in effect 1976 forward have a deductible of $500,000 for both loss and expense. As stated above, evidence so far available to us indicates the policyholder's involvement with this site began in March, 1973. Contamination was discovered at this site February, 1979. All policies issued by Liberty Mutual during this period contain the standard ISO policy jacket provisions and exclusions including the pollution exclusion for sudden and accidental discharges.

## LEGAL REVIEW:

## DAMAGES:

The New Jersey Supreme Court ruled, in Morton International, that the undefined term "damages" should be interpreted to encompass response costs imposed to remediate environmental damage.

## CHOICE OF LAW:

Also in Morton, the court determined that a site approach is applicable in deciding choice of law issues. (This site approach was further exercised in AT&T v. Aenta Casualty & Surety Company, et al where this trial court ruled that for important public policy issues, no matter where this site, the pollution exclusion clause must be interpreted in line with Morton.)

XXX-161

PRIVILEGED AND CONFIDENTIAL B&D MA LM          0035455

**Page 3**

## POLLUTION EXCLUSION:

The Morton court ruled that the pollution exclusion will not apply unless the policyholder intentionally discharges a known pollutant. A pollution exclusion does not apply to "passive polluters". Intentional discharge refers to the actual act of discharging, not the act of intentionally disposing of waste which is later released by a third party. The terms discharge, dispersal, release or escape are distinguishable from, disposal or deposit. The former terms denote a transition from a state of confinement to movement. They do not, as a matter of law, encompass the transfer of waste to an independent hauler which, in turn, disposes of the waste at a landfill.

## OCCURRENCE/"EXPECTED AND INTENDED":

The Morton court determined that, in environmental coverage litigation, a case by case analysis is required in order to determine whether, in the context of all the available evidence, "exceptional circumstances exist that objectively establish the insured's intent to injure". Intent to injure can be presumed from an act in cases involving particularly reprehensible conduct by the insured.

## RECOMMENDATIONS:

At your earliest convenience, I wish to discuss this case with you and Kim Olson. Until we can schedule such a meeting, Kim will request an aggregate run for the appropriate policy year.

Thanks.

DAVID W. HUDSON, CPCU
Unit Director-
Environmental Department

cc. Kim Olson

DWH/kd

xxx-162

PRIVILEGED AND CONFIDENTIAL  B&D MA LM          0035456

# Exhibit J.



**LIBERTY MUTUAL**

Liberty Mutual Group

100 Main Street
P.O. Box 1525
Dover, New Hampshire 03820-1525
Telephone: (603) 749-2600

August 15, 1995

Certified Mail - Return Receipt Requested

Alexander & Alexander
111 Market Place
Baltimore, MD 21202

ATTN: Michael D. Margiotta, Asst. Vice President

RE: USEPA(BROS) - Black & Decker P033-162135-01

Dear Mr. Margiotta:

Liberty Mutual has conducted an investigation into this claim. This letter is further to our letter of April 12, 1994 and will outline Liberty's coverage denial.

## SITE HISTORY:

The BROS. Facility is an inactive waste oil reprocessing plant located in Logan Township, Gloucester County, New Jersey. The total area of the site is approximately twenty four (24) acres containing an unlined 12.7 acre waste oil and waste water lagoon, and a tank farm with approximately ninety (90) process and storage tanks. The site is named for its current owner, Bridgeport Rental and Oil Services, Inc. (BROS.). which operated the site from April 1969 to October 1981. Prior to that time it was owned by SCS Corporation from 1966 to 1969 and by Regal Petroleum Products Company from 1959 to 1966.

Construction of the BROS. lagoon reportedly began in the 1940's as a result of sand and gravel dredging operations. Various liquids and oils were discarded in the lagoon into the late 1970's. Storage tanks were constructed on the site in the late 1950's and 1960's. The facility was used for waste oil storage and recovery, storage tank leasing operations, and illegal dumping operations. In addition, an unidentified number of barrels which contained waste chemicals had been disposed at the site.

The previous owners were responsible for periodic opening of the lagoon dike wall and discharging excess waste oil to Cedar Swamp resulting in large quantities of oil leaching into Little Timber Creek. When BROS., Inc. took over operation of the site, no intentional discharges were made, however, they increased the volume of the oil in the lagoon and allowed the condition of the property to deteriorate. It also became apparent that BROS. was accepting solid and sludge wastes for on-site disposal, compounding the organic pollution problems. The New Jersey Department of Environmental Protection ordered this practice to stop on October 2, 1974.

**Facing the Issues That Face Our Customers**



PRIVILEGED AND CONFIDENTIAL B&D MA LM          0035448

Page 2
August 15, 1995

From 1967 to 1981 the Site was periodically inspected by local, state and Federal governmental authorities. On October 31, 1975, BROS. and NJDEP entered into formal negotiations concerning the removal and treatment of the lagoon liquid. BROS., Inc. signed a Consent Agreement on April 26, 1976 requiring them to sample lagoon liquid, perform samplings and hydrology studies and to design and implement a pilot plant to remove the lagoon liquid. They failed to comply with the consent order. In February, 1979 four groundwater monitoring wells were installed near the lagoon. Oil contamination was found at 28 feet below the surface. Samples taken again on November, 1979 revealed eighteen volatile organic priority pollutants were identified in a liquid sample from the lagoon and soils near storage tanks show evidence of past spillage and contamination.

On September 8, 1983, the BROS. Site was added to the National Priorities List.

## POLICYHOLDER INVOLVEMENT:

Black & Decker's Hampstead, MD plant contracted A & A Waste Oil Company to haul their waste oil away in tank trucks. Records held by the United State Environmental Protection Agency (USEPA) from A & A reveal that pick-ups were made at Black & Decker's Hampstead, MD plant between March 5, 1973 and September 29, 1973. A & A allegedly transported waste to the BROS site. There are currently no documents that reveal if A & A deposited Black & Decker's waste at this site in 1973. Deposition testimony and ledger card entries reveal that A & A did haul waste to the BROS site in 1979. Black & Decker further produced records showing A & A deposited the waste oil from their Hampstead, MD plant at the Berks Landfill site in Reading, PA in the 1970's and the Oil Recovery, Inc. site in Clayton, NJ in 1982.

The potentially responsible party (PRP) group at the BROS site has assessed Black & Decker 136,012 gallons of waste.

## LITIGATION:

Two actions have been filed in connection with this site. Rollins Environmental et al vs. the United States of America, case #92-1253, was filed in the U.S. District Court for the District of New Jersey on March 20, 1992. The United States of America vs. Allied Signal et al, case #92-2726, was also filed in the U.S. District Court for the District of New Jersey on November 30, 1992. Both are cost recovery actions under the Comprehensive Environmental Recovery, Compensation and Liability Act (CERCLA) for clean up costs in connection with the BROS site. The two cases have been consolidated for purposes of trial. Black & Decker has not been named as a defendant in this litigation, however, has voluntarily joined the Settlement Process Committee (SPC) in February, 1993.

Page 3
August 15, 1995

## COVERAGE:

Liberty Mutual issued comprehensive general liability (CGL) and umbrella excess liability (UEL) policies to Black & Decker Corporation. We have located CGL policies from July 1, 1970 to July 1, 1979 and UEL policies from July 1, 1970 to July 1, 1974 and July 1, 1976 to July 1, 1978.

## COMPREHENSIVE GENERAL LIABILITY (CGL) POLICIES:

We have examined the policies effective July 1, 1972 to July 1, 1979, based on the dates that Black & Decker allegedly sent waste to this site in 1973 up to the date the policies expired.

### The CGL policies effective July 1, 1972 to July 1, 1979 contain the following language.

Part I        COVERAGE A - BODILY INJURY LIABILITY

          COVERAGE B - PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as **damages** because of

        Coverage A.  **bodily injury** or

        Coverage B.  **property damage**

to which this insurance applies, caused by an **occurrence**,...

Part VI - DEFINITIONS

   "**occurrence**" means an accident, including injurious exposure to conditions, which results during the policy period, in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the insured;

   "**property damage**" means injury to or destruction of tangible property.

Part VII, CONDITIONS

4.    Insured's Duties in the Event of Occurrence, Claim or Suit

     (a)     In the event of an occurrence, written notice...shall be given by or for the insured to the company...as soon as practicable....

PRIVILEGED AND CONFIDENTIAL B&D MA LM          0035450

Page 4
August 15, 1995

(b)     If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c)     The insured shall cooperate with the company,... The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**The CGL policy effective July 1, 1972 to July 1, 1973 contains the following exclusion endorsement.**

Endorsement #20 - EXCLUSION  (Contamination or Pollution)

It is agreed that the insurance does not apply to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

This endorsement does not apply to operations or occurrences in the following states:

Maryland
New Hampshire
North Carolina
Vermont

**The CGL policies effective July 1, 1973 to July 1, 1979 contain the following additional exclusion.**

Part I - Exclusions

This policy does not apply:

(f)     to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this

PRIVILEGED AND CONFIDENTIAL  B&D MA LM          0035451

Page 5
August 15, 1995

exclusion does not apply if such discharge, dispersal, release or escape, is sudden and accidental;

## UMBRELLA EXCESS LIABILITY (UEL) POLICIES:

The UEL policies, with minor variations, contain substantially the same language as the CGL policies.

## APPLICATION OF THE POLICIES:

It is our position that the pollution exclusion contained in the policies issued to Black & Decker precludes coverage for all damages alleged in the above-referenced actions, since the damage complained of is alleged to have been caused by the discharge, dispersal, release, or escape of pollutants which occurred gradually, and as a routine part of the operations at the BROS site. Such discharges were not "sudden and accidental."

In addition to the foregoing basis for denial, we also take this opportunity to alert you to additional policy terms, conditions and exclusion which would operate to limit and/or bar coverage, for losses incurred in connection with the above-referenced claim.

We do not believe there has been an occurrence or property damage as defined by the policies. It is our position that expenses incurred for preventative measures, in compliance with environmental regulations or governmental direction, do not qualify as legal damages because of property damage whether incurred directly by you or claimed by others as response costs under statutory authority.

To the extent that Black & Decker failed to timely notify Liberty Mutual of an occurrence likely to involve its policies, and/or any suit or claim against Black & Decker, or otherwise failed to comply with all terms, conditions, and other prerequisites to coverage under the Liberty Mutual policies, coverage under the policies is thereby precluded. In this regard, we note that your letter of March 3, 1994, represents Liberty Mutual's first notice of the claim in this matter, yet Black & Decker had knowledge of this claim as early as December 1992, when the PRP group put Black & Decker on notice. It is Liberty Mutual's position that such delay constitutes a breach of the notice provisions of the policies.

PRIVILEGED AND CONFIDENTIAL B&D MA LM          0035452

Page 6
August 15, 1995

There is no coverage under the Liberty Mutual policies for costs and expenses or other obligations voluntarily assumed by Black & Decker without notice to or the consent of Liberty Mutual.

While we have tried to identify and address above, all of the coverage considerations that we feel are related to this claim, the foregoing specificity is not intended, nor should it be construed as a waiver of any right or basis which Liberty Mutual may have to further disclaim coverage, and Liberty Mutual expressly reserves all rights in this regard under applicable law and all policies of insurance issued to Black & Decker by Liberty Mutual

Very truly yours,
LIBERTY MUTUAL INSURANCE COMPANY

Kim A. Olson
Sr. Environmental Claims Specialist

PRIVILEGED AND CONFIDENTIAL  B&D MA LM          0035453

# Exhibit K.



**BLACK&DECKER®**

December 18, 1995

Ms. Kim A. Olson
Environmental Claims Specialist
Liberty Mutual Insurance Group
100 Main Street
Dover, NH 03820-1525

    Re:  USEPA (BROS) - Black & Decker - P033-162135-01

Dear Ms. Olson:

    This letter responds to your letter to Michael Margiotta dated August 15, 1995 regarding the Bridgeport Rental and Oil Services, Inc. ("BROS") Superfund matter.  By acknowledging receipt of your letter, I am in no way suggesting that The Black & Decker Corporation ("Black & Decker") accepts the factual or legal representations, or any coverage positions, stated in your letter.  Black & Decker expressly reserves all of its rights under all applicable policies of insurance issued by Liberty Mutual Insurance Company ("Liberty").

    You have denied Black & Decker's claim for coverage for defense and indemnity with respect to the BROS environmental matter, principally in reliance on the so-called "pollution exclusion" which you state is contained in the primary and umbrella excess liability insurance policies issued to Black & Decker by Liberty.  In fact, the "pollution exclusions" in those policies do not apply to this claim.

    You recite incorrectly in the section of your letter entitled "Policyholder Involvement" that: "Records held by the United States Environmental Protection Agency (USEPA) from A&A reveal that pick-ups were made at Black & Decker's Hampstead, MD plant between March 5, 1973 and September 29, 1973."  In fact, the few records that suggest a potential connection between Black & Decker and the BROS site are in the hands of parties to the two pending lawsuits relating to the BROS site (to which Black & Decker is not a party).  Further, the other potentially responsible parties in the BROS matter continue to allege that Black & Decker is responsible for shipments during the period March 1973 through July 1979.

    Further, in the section entitled "Coverage," you fail to note that the Liberty umbrella excess liability policy in effect for most of 1973 does not contain any form of the pollution exclusion.  You acknowledge that the general liability policy for the period July 1 1972-July 1, 1973 contains the following language modifying the "pollution exclusion":

           This endorsement does not apply to operations or occurrences in the following states:

               Maryland
               New Hampshire
               North Carolina
               Vermont



Page 2
To: Kim A. Olson
December 18, 1995

You fail to acknowledge, however, that a similar endorsement deleting the "pollution exclusion" with respect to "operations or occurrences" in Maryland (among other states) is found in <u>every primary and umbrella</u> excess liability policy issued by Liberty to Black & Decker form July 1, 1972 through July 1, 1979.

Let me remind you that the "operations" that gave rise to the allegations of liability on Black & Decker's part for environmental contamination at the BROS site are the operations of Black & Decker's Hampstead plant, located in the State of Maryland. Thus, the pollution exclusion does not apply to bar coverage for the underlying BROS claims. Even if you contend that the endorsement does not apply to remove the "pollution exclusion" in this particular instance, the substantive law that would likely determine whether there is coverage with respect to the BROS site would be that of New Jersey. As I am sure you know, New Jersey law is particularly favorable to policyholders regarding the application of the "pollution exclusion." It would be difficult to imagine how Liberty could prove that Black & Decker knowingly and intentionally caused damage to the environment at a site to which Black & Decker had no knowledge that any of its material was sent.

Black & Decker requests that you reconsider your denial of coverage, particularly as to providing a defense to Black & Decker. The potential for ultimate coverage for indemnity clearly exists in this instance. Under the circumstances, to deny a defense at this time may well amount to bad faith on Liberty's part. I urge you to reexamine this claim and to communicate with me as soon as possible regarding your conclusion.

Sincerely,

Linda H. Biagioni
Vice President, Environmental Affairs

LHB:hr

cc:  Elaine Caprio Brady, Esq.
     Peri N. Mahaley, Esq.
     Barry L. Malter, Esq.
     Michael D. Margiotta

CONFIDENTIAL SETTLEMENT DOCUMENT
PROTECTED BY FEDERAL RULE OF EVIDENCE 408

P633-162135-01

| Site or Matter Name | BROS - Bridgeport Rental and Oil Services |
|---|---|
| Location | Bridgeport, NJ |
| Waste Generator | Black & Decker, Hampstead, MD facility |
| Dates of Operation, Shipment, and/or Disposal | The BROS site may have received shipments of waste oil from B&D from March 1973 to July 1979. |
| Nature of Contamination | Primarily waste oils (sometimes mixed with solvents). |
| Nature of Action or Claim | B&D received a letter on 12/17/92 inviting it to participate in court-sponsored mediation and settlement proceedings, in lieu of being joined in two pending lawsuits. |
| Status of Action or Claim | B&D elected to participate in settlement/mediation. Government and private parties have agreed in principle to settlement in which private parties will pay $46.76M in response costs. In August 1994, the PRP committee assigned B&D a volumetric share (136,012 gallons) that would translate to a $700,000 - $1 million settlement payment. B&D has internally decided not to accept its allocated share, but to vigorously contest its liability if it is brought into the litigation either by EPA or a PRP. As of 06/94, the total cost of remediation was estimated at $300 million. |
| Past Costs | $276,283. |
| Projected Costs | Up to $1 million in defense costs; $0 in damages, assuming B&D is successful in defending any litigation. Government/ private parties will be seeking joint and several liability for $30-100 million. |
| TOTAL COSTS | $1,276,283 (assuming success in the litigation). If B&D is unsuccessful, damages could exceed $5 million. |



# Exhibit L.

# In The Matter Of:

*Liberty Mutual Insurance Co.  v.*
*The Black and Decker Corp., et al.*

---

*Harold A. Hartung*
*October 17, 1997*

---

*Vincent Varallo Associates, Inc.*
*Registered Professional Reporters*
*Eleven Penn Center*
*1835 Market Street, Suite 600*
*Philadelphia, PA  19103*
*(215) 561-2220    FAX: (215) 561-2221*

Original File bb101797.v1, 67 Pages
Min-U-Script® File ID: 2416967321

**Word Index included with this Min-U-Script®**

2.33

Case 1:04-cv-10659-DPW     Document 5-20     Filed 05/17/2004     Page 18 of 25

Liberty Mutual Insurance Co. v.
The Black and Decker Corp., et al.

Harold A. Hartung
October 17, 1997

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
LIBERTY MUTUAL INSURANCE COMPANY: CIVIL
ACTION

vs.

THE BLACK & DECKER CORPORATION, :
BLACK & DECKER, INC., :
BLACK & DECKER (U.S.) INC., :
EMHART CORPORATION, and :
EMHART INDUSTRIES, INC.,: NO. 96-10804-DPW

Philadelphia, Pennsylvania
Friday, October 17, 1997
Pretrial Examination of HAROLD A.
HARTUNG, taken pursuant to notice at the law
offices of Dechert, Price & Rhoads, 4000 Bell
Atlantic Tower, 1717 Arch Street, on the above
date, beginning at approximately 3:25 p.m. before
Pamela Harrison, a Registered Professional
Reporter, an Approved Reporter of the United
States District Court, and Notary Public.
VINCENT VARALLO ASSOCIATES, INC.
Registered Professional Reporters
Suite 600, Eleven Penn Center Plaza
1835 Market Street
Philadelphia, PA 19103
(215) 561-2220

Page 2

APPEARANCES:
KENNETH R. BROWN, ESQUIRE
Warner & Stackpole, LLP
75 State Street
Boston, MA 02109
Counsel for Plaintiff
JACK R. PIROZZOLO, ESQUIRE
Willcox, Pirozzolo & McCarthy, P.C.
50 Federal Street
Boston, MA 02110
Counsel for Defendant
(INDEX at end of transcript.)

Page 3

[1] HAROLD A. HARTUNG, having been
duly [2] sworn, was examined and tes-
tified as follows:

[3] **BY MR. PIROZZOLO:**

[4] **Q:** Please give your full name and
address.

[5] **A:** Harold A. Hartung, 902 Collings
Avenue, [6] Collingswood, New Jersey,
08017.

[7] **Q:** And I believe you are a chemical
engineer?

[8] **A:** I am.

[9] **Q:** Would you briefly give your educa-
tion and [10] degrees that you hold.

[11] **A:** I have a Bachelor of Science in
chemical [12] engineering from Drexel,
which is now Drexel [13] University, and I
have a Master of Science in [14] chemical
engineering from the University of [15]
Pennsylvania.

[16] **Q:** And when did you earn those
degrees?

[17] **A:** The B.S. from Drexel in 1942, and
the M.S. [18] from Penn in 1947.

[19] **Q:** And did you go to Drexel im-
mediately after [20] high school –

[21] **A:** Well –

[22] **Q:** – or did you have work experi-
ence?

[23] **A:** I had some work experience in
between high [24] school and Drexel.

Page 4

[1] **Q:** Would you please describe your

work [2] experience briefly.

[3] **A:** My work experience at that time
consisted of [4] correcting mathematics
papers in the International [5] Corres-
pondence School, ICS, in Scranton,
which I [6] did for a year, and then for a
year after that I [7] went to sea as a
merchant seaman to try to collect [8]
enough money to go to school.

[9] **Q:** After you graduated from Drexel
did you go [10] into military service?

[11] **A:** Directly.

[12] **Q:** Did you serve in the military in [13]
World War II?

[14] **A:** I did.

[15] **Q:** And you were discharged in what
year?

[16] **A:** January of 1946.

[17] **Q:** And following that time, did you
pursue a [18] business career?

[19] **A:** No, I went to Penn graduate
school after that [20] primarily to refresh
myself, it had been about [21] four years
without practicing my profession and I
[22] had a good opportunity to get a good
refresher [23] course in. During the pro-
cess I got a master's [24] degree.

Page 5

[1] **Q:** And what did you do after that?

[2] **A:** Then I went to work for the
Atlantic Refining [3] Company which is
now Atlantic Richfield, and in in [4] the
research and development department
in South [5] Philadelphia.

[6] **Q:** And for how long did you work for
that [7] company?

[8] **A:** I worked for Atlantic 13, 14 years. I
left [9] them at the end of 1960.

[10] **Q:** Generally what type of work did
you do for [11] Atlantic?

[12] **A:** My work at Atlantic was in re-
search and [13] development and it cov-
ered virtually all aspects [14] of petroleum
refining and product manufacture, the
[15] testing of lubricants and the deve-
lopment of [16] lubricant formulations,
work with industrial [17] lubricants and
work with automotive crankcase [18]
lubricants.

[19] **Q:** Did you actually work in a re-
finery?

[20] **A:** Well, adjacent to the refinery. We
worked [21] with refinery people dire-
ctly.

[22] **Q:** Did you become knowledgeable
in petroleum and [23] petroleum pro-
ducts and the like?

[24] **A:** I did.

Page 6

[1] **Q:** Go ahead.

[2] **A:** I had experience with virtually
every [3] petroleum product manuf-
actured by the company.

[4] **Q:** And did you during the course of
that [5] employment learn the char-
acteristics of petroleum [6] products?

[7] **A:** I certainly did, yes.

[8] **Q:** Now, in 1960, what employment
did you then [9] take?

[10] **A:** In 1960 I left the company to go
into [11] business for myself as a con-
sultant, a private [12] consultant.

[13] **Q:** In what field or fields did you
consult?

[14] **A:** In the general fields of chemical
engineering [15] and physical chemistry
which are both related to [16] lubrication,
primarily, which is my greatest [17] in-
terest.

[18] **Q:** For how long did you work as a
consultant?

[19] **A:** From that time on. I am still a
consultant.

[20] **Q:** Would you give us by way of
sampling the type [21] of consulting work
you've done during that time?

[22] **A:** Yes, I've –

[23] **Q:** And I should say particularly in the
1960s.

[24] **A:** Particularly in the 1960s, all right.

Page 7

[1] I worked with lubricating oils a [2]
great deal, process lubricants, and both
from the [3] point of view of application
of these materials in [4] nonlubricating
uses, let's say, such as dust [5] control
formulations which would be used to
treat [6] roads and mats to take the dirt off
your feet as [7] you walk over them. In
these applications the [8] properties of
the lubricant are extremely [9] import-
ant. I did some work for people with – in
[10] which I was required to run some
small engine [11] tests to evaluate lub-
ricant additives, and I also [12] did some
work for people in the generation of [13]
electrostatic charges in the transfer of
[14] lubricating materials and fuels.

[15] **Q:** In the course of that work, again,
did you [16] become more familiar with
characteristics of [17] petroleum pro-
ducts and particularly oils?

[18] **A:** Yes, I was able during that time to
keep [19] track of the changes that were
occurring in the [20] industry which are
related primarily to automotive [21] en-
gine changes coming out of Detroit.

[22] **Q:** Now, at some time in the mid-'60s
did you [23] receive an assignment with
respect to Regal [24] Petroleum?

Page 8

[1] **A:** Yes, I did.

[2] **Q:** About when did you receive that
assignment?

[3] **A:** I believe that was in 1966 or
thereabouts.

Case 1:04-cv-30022-DEW v. Document 5-20 Filed 05/17/2004 Page 19 of 25
Libbey-Owens-Ford Co.
The Black and Decker Corp., et al.

Harold A. Hartung
October 17, 1997

there were also [11] pieces of equipment erected which were used in the [12] re-refining process, and in addition to that there [13] was a gate house and an office building, and [14] that's about what I remember of the site.

[15] **Q:** Can you describe the approximate size of the [16] site in acreage or dimensions?

[17] **A:** Let's see. The pond as I remember was 10 or [18] 12 acres and there must have been at least that [19] much more. I don't really know how far it [20] extended on what I think would have been the east [21] side, which was away from where the tanks were [22] erected; but on the side where the tanks were, it [23] was at least another 10 or 12 acres, so I'm going [24] to say 25 or 30 acres probably.

Page 15

[1] **Q:** Speaking of the lagoon or focusing your [2] attention on the lagoon –

[3] **A:** Yes.

[4] **MR. BROWN:** Objection. I don't [5] think he testified it was a lagoon, but...

[6] **BY MR. PIROZZOLO:**

[7] **Q:** Did you say a lake or a lagoon?

[8] **A:** I might have used the word. Actually –

[9] **Q:** Did you use the word lake or lagoon?

[10] **A:** I probably used both right now.

[11] **MR. BROWN:** The record will speak [12] for itself, but go ahead.

[13] **BY MR. PIROZZOLO:**

[14] **Q:** I just want to focus your attention on what I [15] understood you to say a lake or a lagoon.

[16] **A:** I'm not sure that I understand the [17] difference.

[18] **MR. BROWN:** My objection stands.

[19] **BY MR. PIROZZOLO:**

[20] **Q:** You have in mind that feature of the site –

[21] **A:** That's it.

[22] **Q:** – by whatever name that you choose to call [23] it.

[24] **A:** Yes.

Page 16

[1] **Q:** Would you describe what that lake or lagoon [2] was made of?

[3] **A:** It was simply a depression in the ground [4] which was full of water and on top of the water [5] the waste oil was floated. What happened to it [6] was that any heavy materials would settle out of [7] it, rainfall would come and wash through it and [8] perhaps wash more material out of it, and as the [9] sun shone on it, chemical reactions would take [10] place in the floating mass there, and more [11] insoluble materials would form

so that if an oil [12] was suitable for that type of processing it would [13] be reasonably well-refined just by floating on the [14] surface for some time, a few months, maybe, [15] whatever.

[16] **Q:** Let me ask – I'm sorry, I didn't want to cut [17] you off.

[18] **A:** The bottom is a feature of great interest, or [19] it was to me. It seemed to me at the time that [20] when all of these asphaltic and resinous type [21] materials settled out of oil, the bottom would be [22] like a parking lot, it would have an impermeable [23] layer on it, and that was my assumption, I never [24] was able to actually test it, but I have been told

Page 17

[1] subsequently that that was indeed the case, and [2] that the bottom was rendered impermeable to water [3] by this settling action of the asphaltic [4] materials.

[5] **Q:** Other than the material at the bottom that [6] was formed by the settling action, did the lagoon [7] have dirt sides and a bottom? Dirt or soil?

[8] **A:** I think the lagoon started off as a [9] dirt-lined hole. There was – I don't think there [10] was any concrete, certainly no membrane liner. [11] Those things were unknown at the time that was [12] placed in operation.

[13] **Q:** And I guess that is – you anticipated my [14] question. Was there any liner to the lagoon?

[15] **A:** No; no.

[16] **Q:** Neither a membrane nor concrete or anything [17] like that?

[18] **A:** No.

[19] **Q:** Is it your testimony that the lagoon was [20] actually used as part of a processing of the [21] material in order to get a product for sale?

[22] **A:** Absolutely.

[23] **Q:** And did it process the material in the way [24] you described?

Page 18

[1] **A:** It did, and successfully prior to, say, 1950, [2] but not successfully subsequently.

[3] **Q:** You said 1950?

[4] **A:** Thereabouts. Thereabouts.

[5] **Q:** Well, during the time you were there?

[6] **A:** The 1950s, let me put it that way.

[7] **Q:** During the time you were there in the 1960s, [8] was the lagoon being used as part of the [9] processing –

[10] **A:** It was indeed.

[11] **Q:** And you say by that time it was not [12] successful?

[13] **A:** The whole processing was becoming more and [14] more difficult. As

oils became more and more [15] highly compounded – I described earlier the kind [16] of settling out that was occurring as the oils [17] laid on top of the water in this lagoon or pond or [18] lake, but after about, oh, I'm going to say the [19] late '50s, engines from Detroit became more [20] powerful and they needed – they required oils [21] that were more highly compounded and would [22] actually prevent the kind of settling that the [23] lagoon provided, that was essential to the [24] re-refining process, so that kind of defeated the

Page 19

[1] action that used to take place in the lagoon.

[2] **Q:** During the time you were on the site was oil [3] put into the lagoon?

[4] **A:** Yes.

[5] **Q:** Could you describe how oil was introduced [6] into the lagoon during that time?

[7] **A:** Well, prior to my introduction of the – of [8] the pit for collecting each load before it went [9] in, drivers would just back their trucks down to [10] the edge of the lagoon, open the rear valve and [11] let them drain in.

[12] The measure of quantity was taken [13] by sticking the truck, before it emptied out, and [14] there was of course no way to measure the quality [15] by that method.

[16] After we put the pit in service, [17] then what would happen is that as the pit filled [18] up it would be pumped into the lagoon out of the [19] pit.

[20] **Q:** And when you say it was pumped, would that [21] have been the entire contents of each load that [22] was dumped into the pit?

[23] **A:** Yes.

[24] **Q:** About how much of that type of material was

Page 20

[1] pumped into the lagoon during the time you [2] observed it?

[3] **MR. BROWN:** Objection.

[4] **THE WITNESS:** I'm not sure that I [5] can give a meaningful answer to that.

[6] **BY MR. PIROZZOLO:**

[7] **Q:** Could you say about how much a week or how [8] much a month?

[9] **MR. BROWN:** Objection. Objection.

[10] **BY MR. PIROZZOLO:**

[11] **Q:** Some other estimate?

[12] **A:** I would like to beg leave on that because it [13] was not my function to monitor each load coming [14] in. I looked at records and I honestly cannot [15] remember how much was on each invoice, let's say, [16] but that would have been part of the record that [17] went

# Exhibit M.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



LIBERTY MUTUAL INSURANCE COMPANY,)
                                 )
                Plaintiff,       )
                                 )   CIVIL ACTION
        vs.                      )   CASE NO. 96-10804
                                 )
THE BLACK & DECKER CORPORATION,  )
BLACK & DECKER INC.,             )
BLACK & DECKER (U.S.) INC.,      )
EMHART CORPORATION, and          )
EMHART INDUSTRIES, INC.,         )
                                 )
                Defendants.      )
_____ )


DEPOSITION OF:          Robert Gregory

DATE:                   January 23, 1998

TIME:                   9:30 a.m. to 11:45 a.m.

LOCATION:               Donovan Court Reporting
                        2668 Airport Road South
                        Naples, FL  34112


TAKEN BY:               Defendants

REPORTER:               Barbara A. Donovan, RMR, CRR


Donovan Court Reporting   (941) 793-0021
2668 Airport Road South, Naples, FL  34112

23

35:34    1    -- I -- that's as refined an answer as I can give you.

35:39    2        Q.    Okay.  Now, Exhibit 1 refers to an individual

35:43    3    named A. Dicola who it says is the supervisor at the

35:47    4    Bridgeport tank firm.  Do you remember Mr. Dicola?

35:53    5        A.    No, I don't.

35:57    6        Q.    Would it refresh your recollection if I were to

36:00    7    suggest that Mr. Dicola's first name was Armen?

36:13    8        A.    No.

36:14    9        Q.    Okay.  Do you recall the incident about the

36:17    10   Tank 2 springing a leak that is referred to in Exhibit 1?

36:22    11       A.    No, I don't.

36:30    12       Q.    Okay.  Now, the fifth paragraph of Exhibit 1

36:32    13   states the tank had contained 59,000 gallons of a mixture

36:37    14   of ammonium methacrylate and Minerec caustic sulfide.  Did

37:08    15   you see that section of the memorandum, Mr. Gregory?

37:10    16       A.    Yes.

37:11    17       Q.    Do you know what ammonium methacrylate was?

37:15    18       A.    Do I know --

37:16    19       Q.    Yes.

37:17    20       A.    -- what it is?

37:19    21       Q.    Yes.

37:19    22       A.    It's a -- an organic chemical.

37:27    23       Q.    And do you recall whether it was a hazardous

37:30    24   substance?

37:31    25            MR. LEPORE:  Objection.

51

25:25    1        Q.    My information is that it was approximately 12.7

3:28    2    acre lagoon.  Does that make sense to you?

25:33    3        A.    I wouldn't be surprised.

25:35    4        Q.    12.7 acres is large.

25:39    5        A.    Yes.

25:40    6        Q.    And 59,000 gallons in a 12.7-acre lagoon is an

25:48    7    infinitesimal small amount of gallonage, isn't it

25:53    8            MR. BINDER:  Objection.

25:54    9        A.    Well, those are two widely different numbers.

25:58    10       Q.    Right.  In fact, it would probably be -- if you

26:00    11   had to say, 12.7 acres of lagoon is millions and millions

26:06    12   of gallons of water and liquid, wouldn't you say?

26:11    13           MR. BINDER:  Objection.

26:12    14       A.    Well, that's -- that's a reasonable statement.

26:14    15       Q.    And, again, 59,000 gallons is -- is very small in

26:18    16   a relative basis, wouldn't you agree?

26:22    17           MR. BINDER:  Objection.

26:25    18       A.    I -- I'd have to agree with that, yes.

26:28    19       Q.    And would you agree that if we were talking

26:31    20   about, perhaps, an olympic-size swimming pool being

26:37    21   analogous in size to the lagoon, would you agree that the

26:40    22   59,000 gallons would probably approximate about one drop

26:46    23   of water in an olympic-size pool?

26:50    24           MR. BINDER:  Objection.

26:51    25       A.    Well, I don't know about that calculation, but it

52

26:53  1    would be a small amount.

.6:54  2         Q.   Well, it certainly wouldn't be on the nature of a

26:57  3    gallon of water.

26:58  4         A.   No.

26:59  5         Q.   It would be much, much smaller than a gallon?

27:03  6         A.   Right.

27:11  7         Q.   Now, the other thing that, if you could take a

27:15  8    look at it, it says, Thus, not creating problems in the

27:20  9    separation of the upper oil layer.  Do you see that?

27:26  10        A.   Yes.

27:26  11        Q.   Do you have an understanding today as to the

27:27  12   purpose of the lagoon at the BROS site?

27:33  13        A.   I -- I can't recall the operation of that

27:42  14   particular site in any kind of specific terms.  So, you

27:49  15   know, I just have to speculate from the memorandum as to

28:02  16   the upper oil layer and how it fit into the scheme of

28:02  17   things at that site.

28:12  18        Q.   Let me give you a -- some background, and you

28:16  19   tell me if you understand if this is true or not true or

28:20  20   if you have no recollection.  Okay?  My understanding is

28:25  21   that the lagoon, again, was approximately 12.7 acres --

28:30  22        A.   Uh-huh.

28:30  23        Q.   -- in size, that it contained approximately 70

28:38  24   million gallons of contaminated wastewater in the lagoon

28:42  25   --

53

28:43  1      A.    Uh-huh.

.8:43  2      Q.    -- and another 2 1/2 million gal -- gallons of

28:47  3   oil, which generally was on the top level of the lagoon.

28:52  4      A.    Uh-huh.

28:53  5      Q.    My understanding is that the waste oil was

28:59  6   trucked to the site and deposited in the lagoon for

29:06  7   purposes of re-refining the waste oil.  And in the normal

29:11  8   course, the waste oil would -- through chemical changes,

29:21  9   the oil that -- the good oil would rise to the top, and

29:24  10  the bad oil and all of the waste would fall to the bottom

29:29  11  of the lagoon.

29:30  12     A.    Uh-huh.

29:30  13     Q.    Now, having given you that explanation, does that

29:34  14  refresh any recollection of your understanding of the

29:37  15  operation of the lagoon?

29:42  16     A.    I can't remember the operation of the -- of that

29:44  17  site.  However, what you have described is -- is a very

29:51  18  commonplace circumstance within oil refineries.  In fact,

29:57  19  long before any of this -- this year, the oil industry did

30:07  20  this routinely as a method of -- of dealing with waste

30:12  21  oils.  I can remember driving up New York -- the

30:16  22  New Jersey Turnpike past the oil refineries around

30:23  23  Carteret when they did it out in the open there in

30:27  24  lagoons, and it wasn't until the institution of the EPA

30:32  25  when all of that started to change.